# EXHIBIT 1

 CT Corporation

**Service of Process Transmittal**
04/23/2020
CT Log Number 537573162

**TO:** Carol Purcell
Endo Pharmaceuticals Inc.
1400 Atwater Dr
Malvern, PA 19355-8701

**RE:** **Process Served in Delaware**

**FOR:** Endo Health Solutions Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | POARCH BAND OF CREEK INDIANS, PLTF. vs. AMNEAL PHARMACEUTICALS, LLC, ETC., ET AL., DFTS. // TO: Endo Health Solutions Inc. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # 02CV202090075500 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 04/23/2020 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/23/2020, Expected Purge Date: 04/28/2020 |
| | Image SOP |
| | Email Notification, Jobina Jones-McDonnell  jones.jobina@endo.com |
| | Email Notification, Helen Howlett  howlett.helen@endo.com |
| | Email Notification, Gary Cennerazzo  gary.cennerazzo@parpharm.com |
| | Email Notification, Carolyn Hazard  hazard.carrie@endo.com |
| | Email Notification, Par Notice Dept  Par.noticeDept@parpharm.com |
| | Email Notification, Carol Purcell  Purcell.Carol@endo.com |
| | Email Notification, Sandra DiIorio  DiIorio.Sandra@endo.com |
| | Email Notification, JULIANNE DECKER  julianne.decker@parpharm.com |
| | Email Notification, BETHANN MILES  miles.bethann@endo.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
04/23/2020
CT Log Number 537573162

**TO:**   Carol Purcell
Endo Pharmaceuticals Inc.
1400 Atwater Dr
Malvern, PA 19355-8701

**RE:**   **Process Served in Delaware**

**FOR:**   Endo Health Solutions Inc.  (Domestic State: DE)

**SIGNED:**   The Corporation Trust Company
**ADDRESS:**   1209 N Orange St
Wilmington, DE 19801-1120

**For Questions:**   866-401-8252
EastTeam2@wolterskluwer.com

Page 2 of  2 / AS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



CERTIFIED MAIL

LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
(Ana M. Rodriguez/Archie Lamb)

7019 2280 0001 1109 6546



US.POST.
ZIP 32502
02 4M
00003393

## First Class Mail

ENDO HEALTH SOLUTIONS, INC.
1209 Orange Street
Wilmington, DE 19801

# 160840








AlaFile E-Notice

02-CV-2020-900755.00

To: ENDO HEALTH SOLUTIONS, INC.
1209 ORANGE STREET
WILMINGTON, DE, 19801

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following complaint was FILED on 4/3/2020 4:01:44 PM

Notice Date:      4/3/2020 4:01:44 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>02-CV-2020-900755.00 |
|---|---|---|

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA
### POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL

**NOTICE TO:** ENDO HEALTH SOLUTIONS, INC., 1209 ORANGE STREET, WILMINGTON, DE 19801

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), THOMAS ROE FRAZER II

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: 30 BURTON HILLS BLVD., SUITE 450, NASHVILLE, TN 37215

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of **POARCH BAND OF CREEK INDIANS** pursuant to the Alabama Rules of the Civil Procedure.

*[Name(s)]*

| 04/03/2020 | /s/ JOJO SCHWARZAUER | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.   **/s/ THOMAS ROE FRAZER II**

*(Plaintiff's/Attorney's Signature)*

### RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____ in _____ County,

*(Name of Person Served)*      *(Name of County)*

Alabama on _____

*(Date)*

_____
*(Type of Process Server)*

_____
*(Server's Signature)*

_____
*(Address of Server)*

_____
*(Server's Printed Name)*

_____
*(Phone Number of Server)*

ELECTRONICALLY FILED
4/3/2020 4:01 PM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev. 9/18 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Ca<br>02<br><br>Date of Filing:<br>04/03/2020 | Judge Code: |
|---|---|---|---|

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA
### POARCH BAND OF CREEK INDIANS v. AMNEAL PHARMACEUTICALS, INC. ET AL

**First Plaintiff:** ☐ Business  ☐ Individual  **First Defendant:** ☑ Business  ☐ Individual
☐ Government  ☑ Other                              ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
☐ WDEA - Wrongful Death
☑ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
☐ TOPE - Personal Property
☐ TORE - Real Properly

**OTHER CIVIL FILINGS**
☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**
☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/ Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ EPFA - Elder Protection From Abuse
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**   F ☑ **INITIAL FILING**     A ☐ **APPEAL FROM**        O ☐ **OTHER**
                                          **DISTRICT COURT**

              R ☐ **REMANDED**          T ☐ **TRANSFERRED FROM**
                                          **OTHER CIRCUIT COURT**

**HAS JURY TRIAL BEEN DEMANDED?**   ☑ YES  ☐ NO    Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
FRA031                    4/3/2020 4:01:44 PM              /s/ THOMAS ROE FRAZER II
_____            _____        _____
                         Date                            Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**         ☐ YES ☑ NO ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:**      ☐ YES ☐ NO

DOCUMENT 2

ELECTRONICALLY FILED
4/3/2020 4:01 PM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF
## MOBILE COUNTY, ALABAMA

| | | |
|---|---|---|
| **POARCH BAND OF CREEK INDIANS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| **AMNEAL PHARMACEUTICALS, LLC;** | § | **CIVIL ACTION NO. _____** |
| **AMNEAL PHARMACEUTICALS, INC.;** | | |
| **TEVA PHARMACEUTICALS USA, INC.;** | § | |
| **CEPHALON, INC.; JOHNSON & JOHNSON;** | | |
| **JANSSEN PHARMACEUTICALS, INC.;** | § | |
| **NORAMCO, INC.; ABBOTT** | | |
| **LABORATORIES; ABBOTT** | § | **JURY DEMAND** |
| **LABORATORIES, INC.; ASSERTIO** | | **REQUESTED** |
| **THERAPEUTICS, INC.;** | § | |
| **ENDO HEALTH SOLUTIONS, INC.;** | | |
| **ENDO PHARMACEUTICALS. INC.;** | § | |
| **PAR PHARMACEUTICAL, INC.; PAR** | | |
| **PHARMACEUTICALS COMPANIES,** | § | |
| **INC.; ALLERGAN PLC; ALLERGAN** | | |
| **FINANCE, LLC; ALLERGAN SALES,** | § | |
| **LLC; ALLERGAN USA, INC.; WATSON** | | |
| **PHARMACEUTICALS, INC.; ACTAVIS LLC;** | § | |
| **ACTAVIS PHARMA, INC.;** | | |
| **RITE AID OF ALABAMA, INC.; RITE AID** | § | |
| **OF MARYLAND, INC.; THE KROGER CO.;** | | |
| **KROGER LIMITED PARTNERSHIP II;** | § | |
| **CVS HEALTH CORPORATION; CVS** | | |
| **PHARMACY, INC.; CVS INDIANA,** | § | |
| **L.L.C.; WAL-MART INC.; WAL-MART** | | |
| **STORES EAST, LP; WALGREEN** | § | |
| **EASTERN CO., INC.; WALGREEN CO.,** | | |
| **INC.; JOHN PATRICK COUCH;** | § | |
| **XIULU RUAN; PHYSICIANS PAIN** | | |
| **SPECIALISTS OF ALABAMA, P.C.;** | § | |
| **THOMAS JUSTIN PALMER; BRIDGETTE** | | |
| **PARKER; EASTERN SHORE NEUROLOGY** | § | |
| **CLINIC, INC.; RASSAN M. TARABEIN;** | | |
| **And DOE 1-100, being those persons,** | § | |
| **firms, corporations, agents, servants and/or** | | |
| **employees who authorized, ordered and/or** | § | |

DOCUMENT 2

committed the acts described in this Complaint
and whose names when ascertained will be                §
substituted by amendment by Plaintiff;

                                                         §

          **Defendants.**

                                                         §

"The opioid epidemic is the deadliest drug crisis in American history. . . ." Attorney General
William P. Barr announced in a press release on April 17, 2019.[1]

The decade of the 1990s was the era of the blockbuster drug, the billion-dollar pill, and a
pharmaceutical sales force arms race was part of the excess of the time . . . . A pharmaceutical
Wild West emerged. Salespeople stampeded into offices. They made claims that helped sell
the drugs to besieged doctors. Those claims also lead years later to blockbuster lawsuits and
criminal cases against their companies.[2]

## COMPLAINT

Plaintiff Poarch Band of Creek Indians (the "Tribe") brings this Complaint against

Defendants under Alabama law for negligence, nuisance, fraud and deceit, unjust enrichment,

wantonness, civil conspiracy, and violation of the Alabama Deceptive Trade Practices Act, seeking

judgment against Defendants and in favor of Plaintiff for compensatory damages; punitive

damages; prejudgment and post-judgment interest; costs of suit; and equitable relief, including

injunctive relief, and alleges as follows:

## I.      INTRODUCTION

### A. The Opioid Crisis in Alabama

1.     The opioid epidemic is an ongoing crisis in Alabama, including within the

Tribe's land. The Tribe is a federally recognized tribe in Southern Alabama. These Native

people currently face a crisis that threatens to destroy their lives, land, and history. An

---

[1] Press Release, U.S. Dep't of Justice, Appalachian Regional Prescription Opioid (ARPO) Strike Force Takedown
Results in Charges Against 60 Individuals, Including 53 Medical Professionals (Apr. 17, 2019),
https://www.justice.gov/opa/pdappalachian-regional-prescription-opioid-arpo-strike-force-takedown-results-charges-
against.

[2] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* at 133 (Bloomsbury Press 2015)
(hereinafter referred to as "Dreamland").

DOCUMENT 2

epidemic of prescription opioid abuse is devastating the people, babies, institutions, and resources of Indian Country, and causing the Tribe to suffer substantial loss of resources, economic damages, addiction, disability, and harm to the health and welfare of the Tribe, Tribe Members, and wholly-owned enterprises of the Tribe.

2.    Opioid use has had tragic consequences for communities across Alabama, including the Tribe's community. Thousands of people have died from opioid overdoses, and many thousands more suffer from opioid use disorders and related health conditions in Alabama. The misrepresentations by Defendants described herein regarding the risks and benefits of opioids enabled, and are continuing to enable, the widespread prescribing of opioids for common chronic pain conditions like lower back pain, arthritis, and headaches.[3]

3.    Overdose mortalities in Alabama have increased sharply in recent years. From 2013 to 2014 alone, Alabama saw a twenty percent (20%) increase in overdose fatalities.[4] In 2014, there were 723 Alabama overdose deaths, up from 598 Alabama overdose deaths in 2013.[5] These deaths are overwhelmingly caused by opioids.[6] No fewer than 282 deaths were attributable to opioid overdose in 2015 alone in Alabama.[7] In 2017, there were 422 overdose deaths involving opioids in Alabama – a rate of 9.0 deaths per 100,000 persons and over half the national rate of 14.6 deaths per 100,000 persons.

---

[3] Consistent with the commonly accepted medical usage, the term "chronic pain" as used herein refers to non-cancer pain lasting three months or longer.
[4] Centers for Disease Control and Prevention, Drug Overdose Death Data, https://www.cdc.gov/drugoverdose /data/statedeaths.html.
[5] *Id.*
[6] X.J. Shen, Ph.D., Director, Division of Statistical Analysis, Alabama Department of Public Health, Center for Health Statistics, Data-Driven Prevention Initiative (DDPI) for Heroin and Opioid Abuse/Overdose (April 28, 2017), *available at* http://www.alabamapublichealth.gov/pharmacy/assets/ddpi opioidoverdose.pdf.
[7] The Henry J. Kaiser Family Foundation, Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths (2015), www.kff.org.

DOCUMENT 2

4.      The greatest increase in opioid deaths occurred among cases involving synthetic opioids (mainly fentanyl), with a rise from 16 deaths in 2012 to 198 in 2017. Heroin involved deaths also increased dramatically from 40 deaths in 2013 to 122 in 2014 but have remained unchanged through 2017.

5.      Since 2005, Alabama has participated in the Prescription Drug Monitoring Program, which collects prescription records. On August 8, 2017, Alabama Governor Kay Ivey established the Alabama Opioid Overdose and Addiction Council to study the state's opioid crisis and identify a strategy to counteract its adverse consequences.

6.      Alabama has the second-highest rate of nonmedical use of prescription pain relievers in the nation, covering one out of every nineteen Alabamians aged twelve or older.[8] Drug poisoning deaths are significantly impacting Plaintiff's communities.[9] Significant numbers of the residents of Alabama report drug dependence and nonmedical use of pain relievers.[10] Many residents of Alabama who need addiction treatment don't receive it.[11]

7.      American Indians are at least two times more susceptible to opioid addiction than the rest of the U.S. population at large. American Indian high school students are two to three times more prone to try opioid pills than U.S. teenagers in general. American Indians are three (3) times more likely to die from a drug overdose than the rest of the U.S. population. American Indian Country is usually located in more rural parts of the U.S., where medically assisted addiction treatment is unavailable, underfunded, or overwhelmed by demand. Often, American Indians cannot even find opioid addiction treatment within a reasonable proximity.

---

[8] Rachel N. Lipari, Ph.D., et al., State and Substate Estimates of Nonmedical Use of Prescription Pain Relievers, National Survey on Drug Use and Health, Substance Abuse and Mental Health Services Administration (Jul. 13, 2017), https://www.samhsa.gov/data/sites/default/files/report 3187/ShortReport-3187.html.

[9] U.S. Centers for Disease Control and Prevention, National Center for Health Statistics' Drug Poisoning Mortality dataset, https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/.

[10] See, e.g., Alabama Opioid Epidemic, amfAR, http://opioid.amfar.org/AL, at View Counties: Opioid Use.

[11] Id. at View Counties: Healthcare.

4

DOCUMENT 2

8.      Prescription opioids killed over 40,000 Americans in 2017. Prescription opioids kill twice as many people in the U.S. as heroin. Prescription opioids and related drug overdose deaths exceed the number of car accident deaths in the United States. Nearly 150 Americans die every day from opioids overdoses. Almost 91% of persons who have a non-fatal overdose of opioids are prescribed opioids again within one year. One third (1/3) of all children who go into foster parent care do so because of the opioids addiction of their parent(s). Seven (7) in ten (10) opioid overdoses are treated in an emergency room due to the abuse of prescription opioids. An opioid-addicted baby is born every thirty (30) minutes in America.

9.      American Indians have been left out of major initiatives by state governments, municipal governments, and county governments and the federal government in attempts to remedy the opioid crisis.

10.     Excessive numbers of opioids have been dispensed in and around Plaintiff's tribal community. From 2006 to 2012, there were 1,703,752,769 prescription pain pills supplied to Alabama.12 From 2006 to 2012, there were 22,035,540 prescription pain pills, enough for 64 pills per person per year, supplied to Escambia County, Alabama - 6,615,990 of the pills were manufactured by Actavis Pharma, Inc. Brewton Medical Center Pharmacy in Brewton received the highest number (2,374,180) of pills during that period.[13]

11.     In 2017, 107.2 opioid prescriptions were written in Alabama for every 100 persons. This was the highest prescribing rate in the country and was almost twofold greater than the average U.S. rate of 58.7 prescriptions. [14] Alabama is second in the nation for benzodiazepine prescriptions,

---

[12] THE WASHINGTON POST, The Opioid Files: Drilling into the DEA's pain pill database, Jul. 21, 2019, https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/ (hereinafter "Drilling into the DEA's pain pill database").
[13] *Id.*
[14] *Id.*

DOCUMENT 2

at a rate of 61.9 per 100 persons (U.S. median rate: 37.6). [15] Over 6.5 million opioid prescriptions were filled in Alabama in 2015, supplying over 437 million pills, which equates to a total days' supply of 127,159,152 – or 348,381 years' worth. [16] There were 167 deaths involving prescription opioids in 2017, an increase from 124 in 2016. [17]

12.     Children have been especially vulnerable to the opioid epidemic. Alabama, including the Tribe, and neighboring states have now become ground zero for an explosion of cases in newborns with Neonatal Abstinence Syndrome ("NAS"), a collection of symptoms babies experience in withdrawing from opioid medications taken by the mother. The region that includes Alabama, Mississippi, Tennessee, and Kentucky has the highest rate in the country, with NAS occurring in 16.2 out of every 1,000 hospital births in 2012. [18] NAS is closely associated with opioid use. [19] Infants born with NAS usually spend weeks in neonatal intensive care units while they painfully withdraw from the drugs – a process so painful that it traps many adults on opioids.

13.     Children are also injured by the removal from their homes due to opioid abuse and addiction. The percentage of Alabama children in foster care because of parental drug abuse has

[15] *See* Leonard J. Paulozzi, M.D., et al., Centers for Disease Control and Prevention, *Vital Signs: Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines – United States, 2012,* Morbidity and Mortality Wkly.   Rep.   July   4,   2014;   63(26);   563-568,   *available   at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6326a2.htm. The combination of hydrocodone, oxycodone and benzodiazepines is referred to as the "holy trinity" and significantly increases the risk of harm to those that abuse prescription pills.
[16] George C. Smith, Jr., M.D., ALBME Efforts to Combat Opioid Overuse, Alabama Board of Medical Examiners (March 10, 217), http://alabamapublichealth.gov/pharmacy/assets/presentation_smith_2017.pdf.
[17] National Institute on Drug Abuse, *Alabama Opioid Summary,*
https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/alabaina-opioid-summary.
[18] Amy Yurkanin, A grim and growing trend: Alabama sees increased cases of drug-dependent newborns (Sep. 29, 2015), *available at*
http://www.al.com/news/index.ssf/2015/09/a grim and growing_trend alaba.html.
[19] Casey Wylie, Quality Analytics, ALABAMA MEDICAID AGENCY, *Neonatal Abstinence Syndrome (NAS) Adverse Fetal Outcomes in Mothers with Prescribed Opioid Medications Compared to Mothers With No Prescribed Opioid Medications* (December 10, 2014),
http://www.alabamapublichealth.gov/perinatal/assets/NASPresentationforSCPH.pdf.

risen from 11.5% in 2006 to 37% in 2016.[20] Children with parents addicted to drugs tend to stay in foster care longer and often enter the system having experienced significant trauma, which makes their care more expensive.[21]

14.     Across the state, Alabama families and communities, including the Plaintiff's Tribe, face heartbreaking tragedies that cannot be adequately conveyed by statistics, and they have faced them all too often. Many grieving families have been financially tapped out by the costs of repeated cycles of addiction treatment programs; others have lost hope and given up. The increasing number of cases takes both a physical and mental toll on investigators, first-responders, and the Tribe and its citizens.

15.     Defendants have foreseeably caused damages to the Tribe, including the costs of providing: (a) medical care, additional therapeutic and prescription drug purchases, and other treatments for individuals suffering from opioid-related addiction or disease, including overdoses and deaths; (b) counseling and rehabilitation services; (c) treatment of infants born with opioid-related medical conditions; (d) welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation; and (e) law enforcement and public safety relating to the opioid epidemic within the Tribe. The Tribe has also suffered substantial damages relating to the lost productivity of the Tribe, as well as increased administrative costs.

## B. The Opioid Crisis Nationally

---

[20] Mary Sell, *Parental drug use putting more children in foster care,* DECATUR DAILY (Jan. 29, 2017), http://www.decaturdaily.cominews/local/parental-drug-use-putting-more-children-in-fostercare/article  957642a9-e3d5-52a3-b8d9-d881be352aab.html, citing Alabama Department of Human Resources.
[21] Trista Thurston, *Drug addiction drives spike in Ohio foster care,* NEWARK ADVOCATE (Mar. 23, 2017), *available at*  http://www.newarkadvocate.comistoryinews/crime/high-in-ohio/2017/03/23/drug-addiction-drives-spike-ohiofoster-care/99545804/.

16.     The United States is in the midst of an opioid epidemic caused by the Defendants' unlawful marketing, sale, and distribution of prescription opioids that have resulted in addiction, criminal activity, serious health issues, and the loss of life.[22]

17.     The United States constitutes 4.6% of the world's population but consumed 80% of the world's opioid supply in 2011.[23] According to the Centers for Disease Control and Prevention ("CDC"), from 1999 to 2014, the sales of prescription opioids in the U.S. nearly quadrupled, but there was no overall change in the amount of pain that Americans reported.[24]

18.     Between the start of the century and the year 2014, opioid-related death rates have increased by 200%. Fourteen percent of that increase occurred between 2013 and 2014.[25]

19.     It is undisputed that opioids are both addictive and deadly. Between 1999 and 2014, more than 165,000 Americans died from an opioid overdose.[26] Deaths related to opioids are accelerating. In 2011, the CDC declared that prescription opioid deaths had reached "epidemic levels."[27] That year, 11,693 people died of prescription opioid overdoses.[28] Since then, prescription

---

[22] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic, and semi-synthetic opiates.

[23] Donald Teater, Nat'l Safety Council, *The Psychological and Physical Side Effects of Pain Medications*, https://www.colorado.gov/pacificisites/default/files/Psycholigical%20and%20Physical%20Side%20Effects%20Teater%2ONSC.pdf (citing Daneshvari R. Solanki et *al.*, *Monitoring Opioid Adherence in Chronic Pain Patients: Assessment of Risk of Substance Abuse*, PAIN PHYSICIAN JOURNAL, 14:E119-E131, (2011), *available at* https://www.painphysicianjournal.com/current/pdf?article=MTQ0NQ%3D%3D&journal=60.

[24] Centers for Disease Control and Prevention, *Prescribing Data, available at* https://www.cdc.gov/drugoverdose/data/prescribing.html.

[25] *Id.*

[26] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65(1) Morbidity and Mortality Weekly Report (Mar. 2016), at 2, *available at* https://www.cdc.gov/mmwrivolumes/65/a/pdfs/rr6501el.pdf (hereinafter "CDC Guideline").

[27] Press Release, Centers for Disease Control and Prevention: Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www. cdc.gov/media/releases/201 1/p1101 flu pain killer overdose.html (hereinafter "Prescription Painkiller Overdoses at Epidemic Levels").

[28] Li Hui Chen et al., *Drug-poisoning Deaths Involving Opioid Analgesics: United States, 19992011*, 166 NCHS Data Brief (Sept. 2014), https://www.cdc.gov/nchs/data/databriefs/db166.pdf.

opioid deaths have *more than quadrupled,* reaching 47,600 Americans in 2017 – more than ten times the number of Americans who died in the entire Iraq War.[29]

20.   According to the CDC, opioid overdoses killed more than 45,000 people, nationally, over a 12-month timeframe that ended in September 2017. It is already the deadliest drug epidemic in American history.[30] If current trends continue, lost lives from opioid overdoses will soon represent the vast majority of all drug overdose deaths in the United States.



Note: Drug overdose data available since 1999. Source: Centers for Disease Control and Prevention | By THE NEW YORK TIMES. [31]

---

[29] U.S. Dep't of Health and Human Services, *What is the U.S. Opioid Epidemic?* (Jan. 2019), https://www.hhs.gov/opioids/about-the-epidemic/index.html; German Lopez, *2017 was the worst year ever for drug overdose deaths in America,* Vox (Aug. 16, 2018), https://www.vox.com/science-and-health/2018/8/8/16/17698204/opioid-epidemicoverdose-deaths-2017.

[30] The Editorial Board, *An Opioid Crisis Foretold,* THE NEW YORK TIMES (April 21, 2018), https://www.nytimes.corn/2018/04/21/opinion/an-opioid-crisis- foretold. html

[31] *Id.*

DOCUMENT 2

21.     The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid medications.[32] In many cases, heroin abuse starts with prescription opioid abuse addiction. An inflated volume of opioids invariably leads to increased diversion and abuse. Indeed, there is a 'parallel relationship' between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated outcomes."[33] For most people who misuse opioids, the source of their drugs can typically be found in the excess supply of drugs in the community, beyond what is needed for legitimate medical purposes. Filling an opioid prescription is a significant risk factor for overdose.[34]

22.     According to the CDC, the United States is currently seeing the highest overdose death rate ever recorded.[35]   Aside from overdose, long-term opioid use is associated with a significant increase in mortality from other causes.[36] As opioid-related deaths increase, life expectancy in the United States decreases.[37]

23.     On October 28, 2017, the President of the United States declared the opioid crisis a public health emergency.[38]

---

[32] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (Apr. 14, 2016), doi: 10.1056/NEJMsr1601307,
https://www.nejm.org/doi/full/10.1056/NEJMsr1601307 (hereinafter "Califf et al.").
[33] Dart, Richard C. et *al.*, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015), DOI: 10.1056/NEJMsa1406143, *available at* https://www.nej m. orWdoi/full/10.1056/nejmsa1406143.
[34] CDC Guideline, *supra* n. 26, at 22-24.
[35] Jessica Glenza, *Opioid crisis: overdoses increased by a third across US in 14 months, says CDC,* THE GUARDIAN (March 6, 2018), https://www.theguardian.com/us-news/2018/mar/06/opioid-crisis-overdoses-increased-by-a-third-across-us-in-14-months-says-cdc.
[36] Wayne A. Ray et al., *Prescription of Long-Acting Opioids and Mortality in Patients With Chronic Noncancer Pain,* 315(22):2415-2423, JAMA (Jun. 2016), doi:10.1001/jama.2016.7789, *available at* https://jamanetwork.com/journa ls/j ama/fullarticle/2528212.
[37] National Center for Health Statistics, Life Expectancy, *available at*
https://www.cdc.gov/nchs/fastats/life-expectancy.htm; Centers for Disease Control and Prevention, U.S. drug overdose deaths continue to rise; increase fueled by synthetic opioids, (March 18, 2018), https://www.cdc.gov/media/releases.2018/p0329-drug-overdose-deaths.html.
[38] Julie Hirschfeld Davis, *Trump Declares Opioid Crisis a 'Health Emergency' but Requests No Funds,* THE NEW YORK TIMES(Oct. 26, 2017), https://www.nytimes.com/2017/10/26/us/poli tics/trump-opioid-crisis.html.

24.     This suit takes aim at the primary cause of the opioid crisis: A false narrative marketing scheme, in which Defendants joined and conspired, involving the false and deceptive marketing of prescription opioids, which was designed to dramatically increase demand for and sale of opioids and opioid prescriptions.

25.     On the demand side, the Defendants who manufacture, sell and market prescription opioid painkillers (the "Marketing Defendants") precipitated the crisis. These opioids have various brand names and generic names, and include OxyContin, Kadian, Duragesic, Opana, Nucynta, fentanyl, hydrocodone, oxycodone, and others mentioned in this Complaint. Through a massive marketing campaign premised on false and incomplete information, the Marketing Defendants engineered a dramatic shift in how and when opioids are prescribed by the medical community and used by patients.

26.     The Marketing Defendants relentlessly and methodically – but untruthfully – asserted that the risk of addiction was low when opioids were used to treat chronic pain and overstated the benefits and trivialized the risk of the long-term use of opioids. However, opioids are extremely addictive. Studies have found diagnosed opioid dependence rates in primary care settings as high as 26%.[39] Among opioid users who received four prescriptions in a year, 41.3% meet diagnostic criteria for a lifetime opioid-use disorder.[40] Because opioids cause tolerance and dependence, patients who take the drugs for even a short time become a physiologically captured market. According to the U.S. Department of Health and Human Services, more than two million Americans are opioid-

---

[39] CDC Guideline, *supra* n. 26.
[40] Joseph A. Boscarino et al., *Opioid-Use Disorder Among Patients on Long-Term Opioid Therapy: Impact of Final DSM-5 Diagnostic Criteria on Prevalence and Correlates, available at*
https://www.nthi.nlrn.nih.gov/pme/articles/PMC4548725/; *see also* Joseph A. Boscarino et al., *Prevalence of Prescription Opioid-Use Disorder Among Chronic Pain Patients: Comparison of the DSM-5 vs. DSM-4 Diagnostic Criteria,* 30(3):185-94, Journal of Addictive Diseases (Sept. 2011), *available at*
https://www.nebi.nlm.nih.gov/pubmed/21745041 (showing a 34.9% lifetime opioid use disorder).

dependent.[41] The difficulty in stopping use is particularly true for patients first prescribed an extended-release opioid. Patients who initiated treatment on an extended-release opioid – such as OxyContin – have a 27.3% likelihood to be using opioids one year later, and a 20.5% likelihood of using opioids three years later.[42] Whether in the end, a patient meets the clinical definition of addiction or is simply dependent and unable to stop using opioids, once opioids are prescribed for even a short period of time, patients are hooked.

27.     Opioids pose high risks for children and adolescents. Most of the use in this population is off-label as opioids are not approved for children. The use of prescription opioid pain medication before high school graduation is associated with a 33% increase in the risk of later opioid misuse. The misuse of opioids in adolescence strongly predicts the later onset of heroin use.[43] Nonetheless, the 2016 CDC guidelines found that there have been significant increases in opioid prescribing for children and adolescents, for conditions such as headaches and sports injuries.

28.     The Marketing Defendants' goal was simple: dramatically increase sales by convincing doctors to prescribe opioids not only for the kind of severe pain associated with cancer or short-term post-operative pain, but also for common chronic pain, such as back pain and arthritis. They did this even though they knew that opioids were addictive and subject to abuse, and that their claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded.

---

[41] U.S. Dept. of Health and Human Services, *What is the U.S. Opioid Epidemic?* (Jan. 2019), *available at* https://www.hhs.gov/opioids/about-the-epidemic/index.html.
[42] Anuj Shah et al., *Characteristics of Initial Prescription Episodes and Likelihood of Long-Term Opioid Use – United States, 2006-2015*, 66(10):265-269, Morbidity and Mortality Weekly Report (Mar. 2017), *available at* https://www.cdc.gov/mmwr/volumes/66/wr/mm6610a1.htm.
[43] CDC Guideline, *supra* n. 26.

DOCUMENT 2

29.     The National Retail Pharmacies Defendants saw the profit potential in opioid sales, participated in the conspiracy by ignoring their legal responsibilities, and flooded affected areas with opioids while knowing they were contributing to, but profiting from, widespread addiction and human misery. Through their willingness to uncritically fill prescriptions without scrutiny or hesitation, the National Retail Pharmacies Defendants normalized overprescribing and caused widespread proliferation and availability of these dangerous drugs throughout communities in Alabama, including the Tribe's communities.

30.     Defendants succeeded. Opioid abuse has quickly become one of the nation's most pressing health management issues, not only because of its toll on opioid users, but increasingly because of the financial and cultural impact on the Tribe.

31.     The Marketing Defendants and the National Retail Pharmacies Defendants extract billions of dollars of revenue from the addicted American public, including tribal members, while the Tribe sustains losses caused as a result of the reasonably foreseeable consequences of the prescription opioid addiction epidemic. Defendants knew that, but for the Tribe providing at least some aspect of a safety net, the number of overdose deaths and other related health consequences arising from opioid addictions would have even been far greater than actually occurred, and the public outcry and political backlash threatening their profitmaking activities would have been swifter and far more certain.

32.     The deceptive marketing campaign of the Marketing Defendants substantially contributed to an explosion in the use of opioids across the country, including the Tribe and its citizens. Approximately 20% of the population between the ages of 30 and 44 and nearly 30% of the population over 45 have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office visits now include a prescription of an opioid.

13

33.     The sharp increase in opioid use resulting from Defendants' conduct has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death throughout the United States, including within the Tribe's community. Representing the NIH's National Institute of Drug Abuse in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."[44]

34.     In August 2016, then U.S. Surgeon General Vivek Murthy published an open letter to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[45]

35.     In a 2016 report, the CDC explained that "[o]pioid prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[46] Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[47]

---

[44] *America's Addiction to Opioids: Heroin and Prescription Drug Abuse, U.S.* Senate, Caucus on International Narcotics Control, 113th Cong., at 3 (May 14, 2014) (statement). Testimony of Dr. Nora D. Volkow, Director, National Institute on Drug Abuse, *available at* https://www.hdsl.ord/?abstract&did=754557.
[45] Letter from Vivek H. Murthy, M.D., U.S. Surgeon General, *available at* http://www.tumtheridem.org.
[46] Rose A. Rudd et al., Centers for Disease Control and Prevention, Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014 (Jan. 1, 2016), Morbidity and Mortality Weekly Report, 64(50);1378-82, *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (hereinafter "2000-2014 Increases in Drug and Opioid Overdose Deaths").
[47] *Id.*

14

36.     Defendants' practice of continually filling opioid prescriptions, including from suspicious prescribers, and failing to report suspicious orders of opioids has enabled an oversupply of opioids to communities, including communities in the regions that the Tribe resides.

37.     The widespread use of opioids and corresponding increases in addiction and abuse have led to increased primary care clinic visits, those clinics' responses to overdoses, and clinical administration of naloxone – the antidote to opioid overdose.

38.     As the Tribe works to restore the lives of its citizens, the opioid epidemic continues to outpace their efforts.

## C. Financial Impact of Defendants' Activities on Plaintiff

39.     Plaintiff brings this civil action to recover monetary losses that the Tribe has incurred as a direct and proximate result of Defendants' false, deceptive, and unfair marketing of prescription opioids. Such economic damages were foreseeable to Defendants and were sustained because of Defendants' unlawful actions and omissions.

40.     Plaintiff brings this suit against the manufacturers of prescription opioids. The manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. These pharmaceutical companies aggressively advertised to and persuaded healthcare providers to purchase and prescribe highly addictive, dangerous, opioids, and turned patients into drug addicts for their own corporate profit. Such actions were unlawful.

41.     Plaintiff also brings this suit against the National Retail Pharmacies Defendants of these highly addictive drugs. In addition to participating in the false narrative campaign described below, the National Retail Pharmacies Defendants unlawfully breached their legal duties under Alabama law to monitor, detect, investigate, report, and refuse to fill suspicious orders of

prescription opiates, which enabled the manufacturers' deceptive advertising to increase sales, profits and distribution of their products to communities, including Plaintiff's tribal community.

**D.  The Roles of Defendants in Causing and Perpetuating the Opioid Crisis**

42.     The Marketing Defendants' push to increase opioid sales worked. Through publications and websites, endless streams of sales representatives, "education" programs, and other means, Marketing Defendants dramatically increased their sales of prescription opioids and reaped billions of dollars of profit as a result. Since 1999, the amount of prescription opioids sold in the U.S. has nearly quadrupled. In 2016, 289 million prescriptions for opioids were filled in the U.S. – enough to medicate every adult in America around the clock for a month.

43.     On the supply side, the crisis was fueled and sustained by those involved in the supply chain of opioids, including manufacturers, distributors and retail suppliers, who failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls. Defendants have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know should be necessary for legitimate medical uses, while failing to report, and take steps to halt, suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

44.     From the day they made the pills to the day those pills were consumed in each community, the Marketing Defendants had control over the information regarding addiction they chose to spread and emphasize as part of their massive marketing campaign. By providing misleading information to doctors about addiction being rare and opioids being safe even in high doses, then pressuring those doctors into prescribing their products by arguing, among other things, that no one should be in pain, especially chronic pain, the

16

DOCUMENT 2

Marketing Defendants created a population of addicted patients who sought opioids at never-before-seen rates. The scheme worked, although perversely, and through it, the Marketing Defendants caused their profits to soar as more and more people became dependent on opioids.

45.     Defendants systematically and repeatedly disregarded the health and safety of the public. Charged by law to monitor and report dangerous behavior, they failed to do so in favor of maximizing corporate profits and increasing their market share.

46.     Corporate greed and callous indifference to the known, serious potential for human suffering have caused this public health crisis. Defendants unleashed a public crisis that has had far-reaching financial and social consequences in this country, including opioid addiction and death.

47.     The Marketing Defendants falsely and misleadingly, and contrary to the language of their drugs' labels: (1) downplayed the serious risk of addiction; (2) promoted the concept of "pseudo addiction" and thus advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; (6) promoted the falsehood that long-term opioid use improves functioning; and (7) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse, addiction and death.

48.     The Marketing Defendants disseminated these common messages to reverse the popular and medical understanding of opioids. They disseminated these messages directly, through their sales representatives, and in speaker groups led by physicians who were recruited by and paid by the Marketing Defendants for their support of the Marketing Defendants' marketing messages.

49.     The Marketing Defendants also worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors, known as "key opinion leaders" ("KOLs") and (b) creating, funding, assisting, directing, and/or encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups"). The Marketing Defendants then worked together with those KOLs and Front Groups to profoundly influence, and at times control, the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, continuing medical education ("CME") programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, the Marketing Defendants persuaded doctors and patients that what they had long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids.

50.     Each Marketing Defendant knew that its misrepresentations of the risks and benefits of opioids were not supported by or were directly contrary to the scientific evidence.

51.     The Tribe brings this civil action for injunctive relief, abatement of the opioids nuisance, compensatory damages, statutory damages, punitive damages, and any other relief allowed by law against the Defendant opioid drug manufacturers and retailers that, by their actions, knowingly or negligently have manufactured and dispensed prescription opioid drugs to and within the economic proximity of the Tribe in a manner that foreseeably injured, and continues to injure, the Tribe and its Citizens.

## II.     JURISDICTION AND VENUE

52.     This Court has subject matter jurisdiction over the claims made by Plaintiff herein pursuant to Section 12-11-30 of the Code of Alabama (1975).

53.     This Court has personal jurisdiction over Defendants in that they conducted business in Alabama at all times material herein, committed acts and/or omissions in or outside Alabama which caused tortious injury to Plaintiff, and/or engaged in substantial business activities in proximity to the Tribe and purposefully directed their actions towards the Tribe and its Citizens, voluntarily submitted to the jurisdiction of Alabama when obtaining a manufacturer, and/or pharmacy license, and have the requisite minimum contacts with Alabama necessary to constitutionally permit this Court to exercise jurisdiction.

54.     Venue is proper in this Court pursuant to Sections 6-3-2 and Section 6-3-7 of the Code of Alabama (1975) and Rule 82 of the Alabama Rules of Civil Procedure as many of the acts on which the action is founded occurred in  County, as the Defendants did business by agent in Mobile County at the time of the accrual of each cause of action.

55.     This action is not removable because there is incomplete diversity of residents and no substantial federal question is presented.

### III.     PARTIES

#### A. Plaintiff

56.     Poarch Band of Creek Indian (the "Tribe") is a federally sovereign Indian tribe located within Alabama, governed by the Poarch Band of Creek Indian Constitution and the laws of the Poarch Band of Creek Indian tribe, and exercises inherent governmental authority within the Tribe's community.

57.     A substantial number of the Tribe's Citizens have fallen victim to the opioid epidemic, becoming addicted to prescription opioids or coping with family members who are addicted. The Plaintiff has incurred significant costs in an attempt to abate the opioid epidemic that continues to plague its Citizens and Indian Lands by providing medical

services and opioid-related treatments to those in need. The Plaintiff brings this suit, in part, to recover these costs and procure the additional financial resources required to adequately combat and abate opioid addiction, opioid-related injuries, and other problems caused by the opioid crisis.

58.     This action is brought by the Plaintiff in the exercise of its authority as sovereign governments and on behalf of the Tribe in its proprietary capacity and under its parens patriae authority in the public interest to protect the health, safety, and welfare of all of their Tribe Citizens as well as the non-tribal Member inhabitants of their Indian Lands and to stop the growing prescription opioid epidemic within the Tribe. The Plaintiff also brings this action to recover damages and seek other redresses for harm caused by Defendants' improper, wrongful, fraudulent, and tortious conduct with respect to the manufacturing and sale of prescription opioids. Defendants' actions have caused, and continue to cause, a crisis that threatens the health, safety, and welfare of the Tribe.

59.     Plaintiff brings this action to recover opioid-related expenses, as well as to halt the reprehensible and tortious conduct of Defendants and the results of that conduct, and to cause Defendants to disgorge their profits earned improperly from their unlawful conduct, and to permit a Mobile County jury to determine whether Defendants should be punished for their unlawful conduct.

## B. Defendants

### 1.     Marketing Defendants and Related Entities

#### a.     Teva and Associated Companies

60.     Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. Teva Ltd. is traded on the New

20

York Stock Exchange (NYSE: TEVA). In its most recent Form 10-K filed with the Securities and Exchange Commission, Teva Ltd. stated that it is the leading generic drug company in the United States. Teva Ltd. operates globally, with significant business transactions in the United States. In 2018, its gross profit from North American operations was $4.979 million.

61. Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Teva Ltd. acquired Cephalon in October 2011, and Cephalon Inc. became a wholly-owned subsidiary of Defendant Teva Ltd.

62. Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania, and is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd.

63. Teva USA and Cephalon work together closely to market and sell Cephalon products in the United States. Since its acquisition of Cephalon in October 2011, Teva USA has conducted all sales and marketing activities for Cephalon in the United States, through its "specialty medicines" division. Teva USA and Cephalon, Inc. worked together to manufacture, promote, sell, and distribute opioids such as Actiq and Fentora in the United States. Teva USA holds out Actiq and Fentora as Teva products to the public. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo. [48] Teva USA's parent company, Teva Pharmaceuticals Industries, Ltd. lists Cephalon and Teva USA's sales as its own on its financial reports, and its year-end report for 2012 – in the year immediately following the Cephalon acquisition

---

[48] E.g., ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left).

DOCUMENT 2

– attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including inter alia sales of Fentora.[49] Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain.[50] Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[51] In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay a $425 million fine.[52]

64.    Teva USA also sells generic opioids in the United States, including generic opioids previously sold by Allergan plc, whose generics business Teva Ltd., Teva USA's parent company based in Israel, acquired in August 2016.

65.    Teva Ltd., Teva USA, and Cephalon are referred to herein as "Teva."

66.    Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Nevada corporation with its principal place of business in Corona, California. In 2013, it changed its name to Actavis, Inc.

67.    Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma Inc.) ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey.

---

[49] Teva Ltd., Annual Report (Form 20-F), at 62 (Feb. 12, 2013), http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ TEVA 2012.pdf.
[50] Highlights of Prescribing information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII (2009), ACTIQ PI/Med Guide, https://www.accessdata.fda.gov/drugsatfda docs/label/2009/020747s0301b1.pdf.
[51] Highlights of Prescribing Information, FENTORA® (fentanyl citrate) buccal tablet, CII (2011), https://www.accessdata.fda.gov/drugsatfda docs/label/2012/021947s015 lbl.pdf.
[52] Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve    Allegations    of    Off-Label    Marketing    (Sept.    29,    2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

68.     Defendant Actavis LLC (f/k/a Actavis Inc.) ("Actavis LLC") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Watson, Actavis Pharma and Actavis LLC are collectively referred to as "Actavis."

69.     Defendant Teva Ltd. acquired ownership of Actavis in 2016. Prior to that transaction, Actavis was owned by Defendant Allergan PLC.

70.     Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana in the United States. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

71.     Actavis made thousands of payments to physicians nationwide, including in Alabama, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

### b.     Janssen and Associated Companies

72.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

73.     Defendant Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly-owned subsidiary of J&J.

74.     Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which was formerly known as Janssen Pharmaceutica, Inc.

75.     Defendant Noramco, Inc. is a Delaware company headquartered in Wilmington, Delaware and was a wholly-owned subsidiary of J&J until July 2016. Noramco, Inc. is or had been

23

DOCUMENT 2

part of J&J's opium processing. It makes active pharmaceutical ingredients ("APIs") for opioid painkillers.

76.   J&J is the only company that owns over 10% of Janssen Pharmaceuticals stock. J&J controls the sale and development of Janssen Pharmaceuticals drugs and Janssen Pharmaceuticals profits inure to J&J's benefit.

77.   J&J, Janssen Pharmaceuticals, Inc., Noramco, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen") are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States.

78.   Janssen manufactures, promotes, sells, and distributes drugs in the United States, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

79.   Janssen made thousands of payments to physicians nationwide, including in Alabama, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

80.   Janssen, like many other companies, has a corporate code of conduct, which sets forth the organization's mission, values and principles. Janssen's employees are required to read, understand and follow its Code of Conduct for Health Care Compliance. Johnson & Johnson imposes this code of conduct on Janssen as a pharmaceutical subsidiary of J&J.[53] Documents

---

[53] Depomed, Inc. acquired the rights to Nucynta and Nucynta ER from Janssen in 2015.

DOCUMENT 2

posted on J&J's and Janssen's websites confirm J&J's control of the development and marketing of opioids by Janssen. Janssen's website *"Ethical Code for the Conduct of Research and Development,"* names only J&J and does not mention Janssen anywhere within the document. The *"Ethical Code for the Conduct of Research and Development"* posted on the Janssen website is J&J's company-wide Ethical Code, which requires all of its subsidiaries to follow.

81.     The "Every Day Health Care Compliance Code of Conduct" posted on Janssen's website is a J&J company-wide document that describes Janssen as one of the "Pharmaceutical Companies of Johnson & Johnson" and as one of the "Johnson & Johnson Pharmaceutical Affiliates." It governs how lain employees of Johnson & Johnson Pharmaceutical Affiliates," including those of Janssen, "market, sell, promote, research, develop, inform and advertise Johnson & Johnson Pharmaceutical Affiliates' products." All Janssen officers, directors, employees, sales associates must certify that they have "read, understood and will abide by" the code. The code governs all of the forms of marketing at issue in this case. J&J made payments to thousands of physicians nationwide, including in Alabama, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

82.     On August 26, 2019, an Oklahoma judge ruled that Johnson & Johnson had intentionally played down the dangers and oversold the benefits of opioids and ordered it to pay the state $572 million in the first trial of a drug manufacturer for the destruction wrought by prescription painkillers.[54] The judge found that Oklahoma proved that Johnson & Johnson had

---

[54] an Hoffman, *Johnson & Johnson Ordered to Pay $572 Million in Landmark Opioid Trial,* THE NEW YORK TIMES (Aug 26, 2019), *available at* https://www.nytimes.com/2019/08/26/health/oklahoma-opioids-johnson-and-johnson.html.

created a public nuisance by exaggerating the benefits of narcotic painkillers and minimizing their addiction risks.

### c.  Endo and Associated Companies

83.     Defendant Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

84.     Defendant Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

85.     Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.

86.     Defendant Par Pharmaceuticals Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. collectively, "Par Pharmaceutical"). Par Pharmaceutical was acquired by Endo International plc in September 2015 and is an operating company of Endo International plc.

87.     Endo Health Solutions Inc., Endo Pharmaceuticals Inc. and Par Pharmaceutical (collectively, "Endo") are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States.

88.     Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, general versions of oxycodone, oxymorphone, hydromorphone, and hydrocodone in the United States. Opioids made up roughly $403 million of

DOCUMENT 2

Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for 10% of Endo's total revenue in 2012.

89.     On June 8, 2017, the FDA requested that Endo remove Opana ER from the market because of a "serious outbreak" of HIV and hepatitis C due to abuse of the drug after the reformulation of Opana from a nasal spray to an injectable.[55] In response to the FDA's request, Endo removed Opana ER from the market in July 2017, the first time the agency had ever moved to pull an opioid medication from sale.[56] Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

90.     Endo made thousands of payments to physicians nationwide, including in Alabama, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of wields.

**d.     Abbott Laboratories**

91.     Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois. Defendant Abbott Laboratories, Inc. is a subsidiary of Abbott Laboratories, whose principal place of business is also in Abbott Park, Illinois. Defendants Abbott Laboratories and Abbott Laboratories, Inc. are referred to collectively as "Abbott."

92.     Abbott was primarily engaged in the promotion and distribution of opioids nationally due to a co-promotional agreement with Purdue. Pursuant to that agreement,

---

[55] Press Release, U.S. Food & Drug Administration, FDA Requests Removal of Opana ER for Risks Related to Abuse (June 8, 2017), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/uern562401.htm (hereinafter "FDA Requests Removal of Opana ER").

[56] Press Release, Endo International PLC, Endo Provides update on Opana ER (July 6, 2017), http://investor.endo.com/news-releases/news-release-details/endo-provides-update-opanar-er. (hereinafter "Endo Provides Update on Opana ER").

between 1996 and 2006, Abbott actively promoted, marketed, and distributed Purdue's opioid products as set forth above.

93.    Abbott, as part of the co-promotional agreement, helped turn OxyContin into the largest selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the higher the reward. Specifically, Abbott received twenty-five to thirty percent (25-30%) of all net sales for prescriptions written by doctors its sales force called on. This agreement was in operation from 1996-2002, following which Abbott continued to receive a residual payment of six percent (6%) of net sales up through at least 2006.

94.    With Abbott's help, sales of OxyContin went from a mere $49 million in its first full year on the market to $1.2 billion in 2002. Over the life of the co-promotional agreement, Purdue paid Abbott nearly half a billion dollars.

95.    Abbott and Purdue's conspiracy with Pharmacy Benefit Managers (PBMs) to drive opioid use is well established. As described in an October 28, 2016, article from Psychology Today entitled *America's Opioid Epidemic:*

> Abbott and Purdue actively misled prescribers about the strength and safety of the painkiller [OxyContin]. To undermine the policy of requiring prior authorization, they offered lucrative rebates to middlemen such as Merck Medco [now Express Scripts] and other pharmacy benefits managers on condition that they eased availability of the drug and lowered co-pays. The records were part of a case brought by the state of West Virginia against both drug makers alleging inappropriate and illegal marketing of the drug as a cause of widespread addiction.... One reason the documents are so troubling is that, in public at least, the drug maker was carefully assuring authorities that it was working with state authorities to curb abuse of OxyContin. Behind the scene, however, as one Purdue official openly acknowledged, the drug maker was "working with Medco (PBM) [now Express Scripts] to try and make parameters [for prescribing] less stringent.[57]

---

[57] American Society of Addiction Medicine, *America's Opioid Epidemic – Court released documents show drug makers blocked efforts to curb prescribing,* PSYCHOLOGY TODAY (Oct. 28, 2016),

### e.    Amneal Pharmaceuticals, LLC

96.    Defendant Amneal Pharmaceuticals, LLC ("Amneal LLC") is a Delaware limited liability company with its principal place of in New Jersey.

97.    Defendant Amneal Pharmaceuticals, Inc. ("API") is a Delaware corporation with its principal place of business in New Jersey. API is the managing member of Amneal LLC and conducts and exercises full control over all activities of Amneal LLC.[58]

98.    API and Amneal LLC are referred to herein as "Amneal."

99.    At all relevant times, Amneal has sold prescription drugs, including opioids in Alabama, including to the Tribe, and across the United States.

### f.    Assertio Therapeutics, Inc.

100.    Defendant Assertio Therapeutics, Inc. f/k/a Depomed, Inc. ("Assertio" or "Depomed") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Assertio describes itself as a specialty pharmaceutical company focused on pain and other central nervous system conditions. Assertio develops, markets, and sells prescription drugs in Alabama and across the United States. Assertio acquired the rights to Nucynta and Nucynta ER for $1.05 billion from Janssen pursuant to January 15, 2015, Asset Purchase Agreement. This agreement closed on April 2, 2015. Assertio has since that date, if not before, sold opioids in Alabama and across the United States.

### g.    Allergan and Associated Companies

101.    Defendant Allergan plc is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland and its administrative headquarters and all executive officers located in Madison, New Jersey. Shares of Allergan are traded on

https://www.psychologytoday.com/blog/side-effects/201610/america-s-opioid-epidemic.
[58] Id.

29

DOCUMENT 2

the New York Stock Exchange (NYSE: AGN). In its most recent Form 10-K filed with the SEC, Allergan plc stated that it does business in the United States through its U.S. Specialized Therapeutics and U.S. General Medicine segments, which generated nearly 80% of the company's $15.8 billion in net revenue during the year ended December 31, 2018.

102.    Before (the entities defined above as) Actavis was sold to Teva Ltd. in August 2016, Actavis was part of the same corporate family as Allergan and sold and marketed opioids as part of a coordinated strategy to sell and market the branded and generic opioids of Allergan and Actavis. In October 2012, the Actavis Group was acquired by Watson Pharmaceuticals, Inc., and the combined company changed its name to Actavis, Inc. as of January 2013, and then to Actavis plc in October 2013. In October 2013, Actavis plc (n/k/a Allergan plc) acquired Warner Chilcott plc pursuant to a transaction agreement dated May 19, 2013. Actavis plc (n/k/a Allergan plc) was established to facilitate the business combination between Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc. Following the consummation of the October 1, 2013 acquisition, Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc became wholly-owned subsidiaries of Actavis plc (n/k/a Allergan plc). Pursuant to the transaction, each of Actavis, Inc.'s common shares were converted into one Actavis plc share. Further, Actavis plc (n/k/a Allergan plc) was the "successor issuer" to Actavis, Inc. and Warner Chilcott. Actavis plc acquired Allergan, Inc. in March 2015, and the combined company thereafter changed its name to Allergan plc.

103.    Defendant Allergan Finance, LLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.) is a limited liability company incorporated in Nevada and headquartered in Madison, New Jersey. Allergan Finance, LLC is a wholly-owned subsidiary of defendant Allergan plc. In 2008, Actavis, Inc. (n/k/a Allergan Finance, LLC),

acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Pharma, Inc., and Allergan USA, Inc. Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its behalf.

104. Defendant Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California. Allergan Sales, LLC is the current New Drug Application ("NDA") holder for Kadian, and in 2016, Allergan Sales, LLC held the Abbreviated New Drug Applications ("ANDAs") for Norco. Allergan Sales, LLC is the wholly-owned subsidiary of Allergan plc. The Norco ANDAs are currently held by Allergan Pharmaceuticals International Limited, which is incorporated in Ireland.

105. Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in Madison, New Jersey. Allergan USA, Inc. is currently responsible for Norco and Kadian sales. Allergan USA, Inc. is a wholly-owned subsidiary of Allergan plc.

106. Defendant Allergan plc has, at all times, exercised control over these marketing and sales efforts and profits from the sale of its subsidiaries' products, ultimately inure to its benefit, including those sales by Actavis during the period of its ownership and control by Allergan. Allergan and its associated entities are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States, including to Plaintiff.

107. Collectively Actavis, Amneal, Teva, Janssen, Assertio, Endo, Abbott, and Allergan are referred to as "Marketing Defendants."

2. **National Retail Pharmacies**

DOCUMENT 2

### a.   CVS

108.   Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its principal place of business in Rhode Island. At all times relevant to this Complaint.

109.   Defendant CVS Pharmacy, Inc. ("CVS Pharmacy") is a Rhode Island corporation with its principal place of business in Rhode Island.

110.   Defendant, CVS Indiana, L.L.C. ("CVS Indiana") is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

111.   CVS Health Corporation, CVS Pharmacy, Inc. and CVS Indiana are collectively referred to as "CVS." CVS distributed prescription opioids throughout the United States, including in Alabama.

### b.   The Kroger Co.

112.   Defendant, The Kroger Co., is an Ohio corporation with its headquarters in Cincinnati, Ohio.

113.   Defendant, Kroger Limited Partnership II is an Ohio limited partnership with its principal office located in Columbus, Ohio.

114.   The Kroger Co. and Kroger Limited Partnership II are collectively referred to as "Kroger." Kroger operates 2,268 pharmacies in the United States, including in Alabama. At all times relevant to this Complaint, Kroger distributed prescription opioids throughout the United States, including in Alabama.

### c.   Rite-Aid Entities

115.   Defendant Rite Aid of Alabama, Inc. is an Alabama corporation with its principal office located in Montgomery, Alabama. Defendant Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc., is a Maryland corporation with

DOCUMENT 2

its principal office located in Camp Hill, Pennsylvania. Rite Aid of Alabama and Rite Aid of Maryland are collectively referred to as "Rite Aid." At most times relevant to this Complaint, and at least until 2018, Rite Aid operated pharmacies and distributed prescription opioids throughout the State of Alabama. Rite Aid has since sold or closed most of its Alabama stores.

116.    Rite Aid continues to distribute prescription opioids in other regions throughout the United States.

### d.    Walgreens

117.    Defendant Walgreen Co. ("Walgreen Co.") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Defendant Walgreen Eastern Co., Inc. ("WEC") is a New York corporation with its principal place of business in Deerfield, Illinois.

118.    Walgreen Co. and WEC are collectively referred to herein as "Walgreens." At all times relevant to this Complaint, Walgreens distributed prescription opioids throughout the United States, including in Alabama.

### e.    Wal-Mart

119.    Defendant Wal-Mart Inc., formerly known as Wal-Mart Stores, Inc. ("Wal-Mart"), is a Delaware corporation with its principal place of business in Arkansas.

120.    Defendant, Wal-Mart Stores East, LP, is a Delaware limited partnership with its principal place of business in Arkansas.

121.    Wal-Mart, Inc. and Wal-Mart Stores East, LP are collectively referred to as "Wal-Mart." At all times relevant to this Complaint, Wal-Mart distributed prescription opioids throughout the United States, including in Alabama.

122. Collectively, Defendants CVS, Kroger, Rite Aid, Walgreens, and Wal-Mart are referred to as "National Retail Pharmacies."

### 3. Pill Mill Defendants

123. Like many other localities in the United States, Mobile County and Baldwin County were the homes of several "pill mills." A "pill mill" is a doctor's office, clinic, or healthcare facility that routinely conspires in or participates in the prescribing or dispensing of controlled substances outside the scope of the prevailing standards of medical practice and in violation of state law regarding the prescribing of controlled substances.

124. The Defendants identified in the following paragraphs are doctors, nurses, and medical professionals who illegally wrote prescriptions for controlled substances absent medical necessity or other legitimate basis located at the currently known regional pill mills: Physician Pain Specialists of Alabama, P.C.; and Eastern Shore Neurology Clinic, Inc.

### I. Physician Pain Specialists of Alabama, P.C.

125. Physician Pain Specialists of Alabama, P.C. ("PPSA") is a corporation organized and existing under Alabama law. PPSA was operated as a pill mill in Mobile, Alabama, run by Defendants John Patrick Couch and Xiulu Ruan. C&R Pharmacy Pharmacy, LLC, an Alabama limited liability company whose members are Couch and Ruan, was an affiliated pharmacy.

126. In a 2017 trial in the United States District Court for the Southern District of Alabama, Defendants Ruan and Couch were charged with and convicted of utilizing both the clinic and the pharmacy to violate the Controlled Substances Act and to commit mail and wire fraud. Additional charges included unjust enrichment and illegal distribution of Schedule II and Schedule III drugs, including Fentanyl.

127.     Defendants Thomas Justin Palmer and Bridgette Palmer were nurse practitioners for Defendant Couch, and they ultimately pled guilty to prescribing controlled substances outside the normal course of professional practice. Upon information and belief, some of those controlled substances were opioids.

128.     In the course of their work, not only did these Defendants defraud multiple insurance and healthcare entities, they illegally prescribed high numbers of opioids in and around Mobile County thus leading many to addiction and opioid disorder. These illegal prescriptions were part and parcel of the misconduct of the other Defendants named herein in the manufacturing, marketing, and distribution of opioids.

## II.     Eastern Shore Neurology Clinic, Inc.

129.     Eastern Shore Neurology Clinic, Inc. ("ESNC") is a corporation organized and existing under Alabama law. ESNC was operated as a pill mill in Foley, Alabama, run by Defendant Rassan M. Tarabein.

130.     In 2017, Defendant Tarabein pleaded guilty in the United States District Court for the Southern District of Alabama to one count of health care fraud and one count of unlawful distribution of Schedule II and Schedule III drugs.

131.     In the course of his work, not only did Defendant defraud multiple insurance and healthcare entities, he illegally prescribed high numbers of opioids to the citizens around Mobile County, thus leading many to addiction and opioid disorder. These illegal prescriptions were part and parcel of the misconduct of the other Defendants named herein in the manufacturing, marketing, and distribution of opioids.

### 4.     Defendants' Agents and Affiliated Persons

DOCUMENT 2

132.    All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

133.    The true names and capacities, whether individual, corporate, associate, or otherwise of certain vendors, distributors and/or their alter egos, sued herein as DOES 1 through 100 inclusive, are presently unknown to Plaintiff, who therefore sue these Defendants by fictitious names. Plaintiff will seek leave of this Court to amend this Complaint to show their true names and capacities when they become ascertained. Each of the Doe Defendants has taken part in and participated with, and/or aided and abetted, some or all of the other Defendants in some or all of the matters referred to herein, and therefore are liable for the same.

## IV.    FACTUAL BACKGROUND

### A.    The History of Opioids

134.    The synthetic opioids manufactured and filled by Defendants are related to the opium poppy, which has been used to relieve pain for centuries.

135.    The opium poppy was a well-known symbol of the Roman Civilization, which signified both sleep and death. The Romans used opium not only as a medicine but also as a poison.[59]

136.    During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve

---

[59] Martin Booth, *Opioids: A History,* at 20 (Simon & Schuster Ltd. 1996).

pain on the battlefield. They were also used in a wide variety of commercial products ranging from pain elixirs to cough suppressants to beverages.

137.   Alabama law imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, the likelihood of addiction or abuse, and safety. Opioids generally have been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence; Schedule III drugs are deemed to have a lower potential for abuse, but their abuse may lead to moderate or low physical dependence or high psychological dependence.[60]

138.   The effects of opioids vary by duration. Long-acting opioids, such as Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours. The Marketing Defendants promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

139.   Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids – the "high." However, opioids depress respiration, and at very high doses, can and often do

---

[60] *See* Ala. Code 975 § 20-2-24; Ala. Code 1975 § 20-2-25.

arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

140.    Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after the complete withdrawal from opioids, depending on how long the opioids were used.

141.    Opioids provide effective treatment for short-term, post-surgical and trauma-related pain, and for palliative end-of-life care. They are approved by the FDA for use in the management of moderate to severe pain where the use of an opioid analgesic is appropriate for more than a few days. Defendants, however, have manufactured, promoted, marketed, and distributed opioids for the management of chronic pain by misleading consumers and medical providers through misrepresentations or omissions regarding the appropriate uses, risks, and safety of opioids.

142.    As one doctor put it, the widespread, long-term use of opioids "was an experiment on the population of the United States. It wasn't randomized, it wasn't controlled, and no data was collected until they started gathering death statistics."

## B. The Opioid Epidemic

143.    Prescription opioids have become widely prescribed. In 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for one month.[61]

---

[61] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States,* 104 Am. J. Pub. Health e52-e59 (2014), https://www.nebi.nlm.nih.gov/pme/articles/PMC3935688/.

144.    Despite the enormous number of prescriptions, recent studies have concluded that treatment with opioids is not superior to treatment with non-opioid medications for improving pain-related function.[62] Even for patients presenting to the emergency room with acute extremity pain, there is no significant or clinically important difference in pain reduction at 2 hours among single-dose treatment with ibuprofen and acetaminophen, or with three different opioid and acetaminophen combination analgesics.[63]

145.    In 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

    a.    The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

    b.    More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

    c.    Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

    d.    The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older – a total of 12 million people – reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

    e.    Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

---

[62] Erin E. Krebs, M.D., et al., *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain*, 319 JAMA 872-882 (2018), doi: 10.1001/jama.2018.0899, https://jamanetwork.com/journals/jama/article-abstract/2673971?redirect=true.
[63] Andrew K. Chang, M.D., et al., *Effect of a Single Dose of Oral Opioid and Nonopioid Analgesics on Acute Extremity Pain in the Emergency Department*, 318 JAMA 1661-1667 (2017), DOI: 10.1001/jama.2017.16190, https://jamanetwork.com/journals/jama/article-abstract/2661581?widget=personalizedcontent& previousarticle=2673971&redirect=true.

DOCUMENT 2

    f.    Almost 5,500 people start to misuse prescription painkillers every day.[64]

146.    The CDC has also identified an addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers – which, at the molecular level and in their effect, closely resemble heroin – are forty times more likely to be addicted to heroin.[65] According to a recent study, among young urban heroin users, 86% used opioid pain relievers prior to using heroin.[66]

147.    The synthetic opioid fentanyl has been a driving force behind the nation's opioid epidemic, killing tens of thousands of Americans in overdoses. The drug is so powerful that it is now being used to execute prisoners on death row.[67]

148.    In a November 2016 report, the DEA declared opioid prescription drugs, heroin, and fentanyl as the most significant drug-related threats to the United States.[68]

149.    The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999-2014. Among the 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[69]

---

[64] *See* Press Release, Centers for Disease Control and Prevention, Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1,2011), https://www.cdc.gov/mediaireleases/2011/p1101_flu_pain_killer_overdose.html.
[65] *See* Centers for Disease Control and Prevention, *Today's Heroin Epidemic,* https://www.cdc.gov/vitalsigns/heroin/index.html.
[66] Nat'l Inst. on Drug Abuse, *Prescription Opioids and Heroin* (Jan. 2018), https://d14rmgtrwzf5a.cloudfront.net/sites/default/files/19774-prescription-opioids-and-heroin.pdf.
[67] Mitch Smith, *Fentanyl Used to Execute Nebraska Inmate, in First for U.S.,* (Aug. 14, 2018), https://www.nytimes.com/2018/08/14/us/carey-dean-moore-nebraska-execution-fentanyl.html.
[68] Rudd et al., Centers for Disease Control and Prevention, *Increases in Drug and Opioid-Involved Overdose Deaths-United States, 2010-2015* (Dec. 30, 2016), Morbidity & Mortality Wkly. Rep. 2016; 65; 1445-1452, doi: http://dx.doi.org/10.15585/mmwr.mm655051e1, *available at* https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm.
[69] *Id.*

DOCUMENT 2

150.   The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[70]

151.   The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[71] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[72]

152.   In 2016, the President of the United States officially declared an opioid and heroin epidemic.[73]

## V.    THE MARKETING DEFENDANTS' FALSE, DECEPTIVE, AND UNFAIR MARKETING OF OPIOIDS

153.   The opioid epidemic did not happen by accident.

154.   Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

---

[70] *See* Nora D. Volkow, M.D. & A. Thomas McLellan, M.D., *Opioid Abuse in Chronic Pain –Misconceptions and Mitigation Strategies,* 374 N Eng. J. Med. 1253-1263 (2016), DOI: 10.1056/NEJMra1507771, http://www.nejm.org/doi/full/10.1056/NEJMra1507771, (hereinafter "Volkow & McLellan").
[71] *Id.*
[72] *Id.* (citing at note 2, Florence CS, et al., *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013* (Oct. 2016), 54 Med. Care 901-906 (2016),
DOI: 10.1097/ML R.0000000000000625, *available at* https://www.ncbi.nlm.nih.gov/pubmed/27623005.
[73] *See* Proclamation No. 9499, 81 Fed. Reg. 65173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week"), *available at* https://www.gpo.gov/fdsys/pkg/FR-2016-09-22/pdf/2016-22960.pdf

155. Each Marketing Defendant has conducted, and continues to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Marketing Defendant spent, and continues to spend millions of dollars on promotional activities and materials that falsely deny, trivialize, or materially understate the risks of opioids while overstating the benefits of using them for chronic pain.

156. The Marketing Defendants have disseminated these common messages to reverse the generally accepted medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians that the Marketing Defendants recruited for their support of their marketing messages, and through unbranded marketing and industry-funded Front Groups.

157. The Marketing Defendants' efforts have been wildly successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.[74] In an open letter to the nation's physicians in August 2016, the then U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[75] This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand). And when those patients can no longer afford or obtain opioids

---

[74] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine,* Fortune (Nov. 9, 2011), http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/; David Crow, *Drugmakers Hooked on $10bn Opioid Habit,* FINANCIAL TIMES (Aug. 10, 2016).

[75] Letter from Vivek H. Murthy, M.D., U.S. Surgeon General, *supra* n. 45.

42

DOCUMENT 2

from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

158.    The Marketing Defendants intentionally continued their conduct, as alleged herein, with the knowledge that such conduct was creating the opioid epidemic and causing the harms and damages alleged herein.

159.    As alleged throughout this Complaint, Defendants' conduct created a public health crisis and a public nuisance. The harm and endangerment to the public health, safety, and the environment created by this public nuisance is ongoing and has not been abated.

160.    The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm can be abated by, *inter alia,* (a) educating prescribers and patients regarding the true risks and benefits of opioids, including the risk of addiction, in order to prevent the next cycle of addiction; (b) providing addiction treatment to patients who are already addicted to opioids; and (c) making naloxone widely available so that overdoses are less frequently fatal.

161.    Defendants have the ability to act to abate the public nuisance, and the law recognizes that they must do so. It is the manufacturer of a drug that has the primary responsibility to ensure the safety, efficacy, and appropriateness of a drug's labeling, marketing, and promotion. All Defendants in the supply chain of a controlled substance are primarily responsible for ensuring that the drug is only distributed and dispensed to appropriate patients and not diverted. These responsibilities, to ensure that their products and practices meet both state-controlled substance and consumer protection laws and regulations, exist independently of any FDA or DEA regulation. As registered manufacturers and distributors of controlled substances, Defendants are placed in a position of special trust and responsibility, and are

43

DOCUMENT 2

uniquely positioned, based on their knowledge of prescribers and orders, to act as the first line of defense.

### A. The Marketing Defendants' False and Deceptive Statements About Opioids

162.    The Marketing Defendants' misrepresentations fall into the following eight categories:

> a.    The risk of addiction from chronic opioid therapy is low;
>
> b.    To the extent there is a risk of addiction, it can be easily identified and managed;
>
> c.    Signs of addictive behavior are "pseudoaddiction " requiring more opioids;
>
> d.    Opioid withdrawal can be avoided by tapering;
>
> e.    Opioid doses can be increased without limit or greater risks;
>
> f.    Long-term opioid use improves functioning;
>
> g.    Alternative forms of pain relief pose greater risks than opioids; and
>
> h.    New formulations of certain opioids successfully deter abuse.

163.    Each of these propositions is false. The Marketing Defendants knew this, but they nonetheless set out to convince physicians, patients, and the public at large of the truth of each of these propositions in order to expand the market for their opioids.

164.    The categories of misrepresentations are offered to organize the numerous statements the Marketing Defendants made and to explain their role in the overall marketing effort, not as a checklist for assessing each Marketing Defendant's liability. While each Marketing Defendant deceptively promoted their opioids specifically, and, together with other Marketing Defendants, opioids generally, not every Marketing Defendant propagated (or needed to propagate) each misrepresentation. Each Marketing Defendant's conduct, and each misrepresentation, contributed to an overall narrative that aimed

44

DOCUMENT 2

to – and did – mislead doctors, patients, and payors about the risks and benefits of opioids. While this Complaint endeavors to document examples of each Marketing Defendant's misrepresentations and the manner in which they were disseminated, they are just that – examples. The Complaint is not, especially prior to discovery, an exhaustive catalog of the nature and manner of each deceptive statement by each Marketing Defendant.

      **1.**       **Falsehood #1: The Risk of Addiction from Chronic Opioid Therapy is Low**

165.    Central to the Marketing Defendants' promotional scheme was the misrepresentation that opioids are rarely addictive when taken for chronic pain. Through their marketing efforts, the Marketing Defendants advanced the idea that the risk of addiction is low when opioids are taken as prescribed by "legitimate" pain patients. That, in turn, directly led to the expected and intended result that doctors prescribed more opioids to more patients – thereby enriching the Marketing Defendants and substantially contributing to the opioid epidemic.

166.    Each of the Marketing Defendants claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support those claims. None of them have acknowledged, retracted, or corrected their false statements.

167.    In fact, studies have shown that a substantial percentage of long-term users of opioids experience addiction. Addiction can result from the use of any opioid, "even at the recommended dose,"[76] and the risk substantially increases with more than three months of

---

[76] FDA announces safety labeling changes and post market study requirements for extended-release and long-acting opioid analgesics, FDA (Sept. 10, 2013); *see also* FDA announces enhanced warnings for immediate-release opioid pain medications related to risks of misuse, abuse, addiction, overdose and death, FDA (Mar. 22, 2016).

DOCUMENT 2

use. [77] As the CDC Guideline states, "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" (a diagnostic term for addiction).[78]

### a.  Marketing Defendants' Misrepresentations Regarding Addiction Risk

168.    The Marketing Defendants knew they would need data to overcome decades of wariness regarding opioid use. They needed some sort of research to back up their messaging. But these Marketing Defendants had not conducted any studies about abuse potential or addiction risk as part of their application for FDA approval for any of their drugs. The Marketing Defendants found this "research" in the form of a one-paragraph letter to the editor published in the New England Journal of Medicine ("NEJM") in 1980.

169.    This letter, by Dr. Hershel Jick and Jane Porter, declared the incidence of addiction "rare" for patients treated with opioids.[79] They had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.

---

[77] CDC Guideline, *supra* n. 26 at 21.
[78] *Id.* at 2.
[79] Jane Porter and Herschel Jick, MD, *Addiction Rare in Patients Treated with Narcotics,* 302(2) N Engl J Med. 123 (Jan. 10, 1980), http://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221 (hereinafter "Porter and Jick Letter").

## ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients' who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,² Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154     Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

170. As Dr. Jick explained to a journalist years later, he submitted the statistics to NEJM as a letter because the data were not robust enough to be published as a study.[80]

171. Citation of the letter, which was largely ignored for more than a decade, significantly increased after the introduction of opioids. While Marketing Defendants used it to assert that their opioids were not addictive, "that's not in any shape or form what we suggested in our letter," according to Dr. Jick.

172. Marketing Defendants relied on and disseminated the same false and deceptive messaging. The enormous impact of Defendants' misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and, in some cases, "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed

---

[80] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death,* 47 (Rodale 2003) (hereinafter "Pain Killer").

DOCUMENT 2

to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy.[81]

173.    "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."[82]

b.    **Endo's Misrepresentations Regarding Addiction Risk**

174.    Endo also falsely represented that addiction is rare in patients who are prescribed opioids.

175.    Until April 2012, Endo's website for Opana, *www.opana.com,* stated that [m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

176.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that Endo improperly instructed its sales representatives to diminish and distort the risk of addiction associated with Opana ER.

177.    One of the Front Groups with which Endo worked most closely was the American Pain Foundation ("APF"), described more fully below.

178.    APF conveyed misinformation through its National Initiative on Pain Control ("NIPC") and its website *www.Painknowledge.com,* which claimed that "[p]eople who take opioids as prescribed usually do not become addicted."

---

[81] Pamela T.M. Leung, B.Sc. Pharm., Erin M. Macdonald, M.Sc., Matthew B. Stanbrook, M.D., Ph.D., Irfan Al Dhalla, M.D., David N. Juurlink, M.D., Ph.D., *A 1980 Letter on the Risk of Opioid Addiction,* 376 N Engl. J Med 2194-95 (June 1, 2017), http://www.nejm.org/doi/full/10.1056/NEJMc1700150#t=article.
[82] *Painful words: How a 1980 letter fueled the opioid epidemic,* STAT (May 31, 2017), https://www.statnews.com/2017/05/31/opioid-epidemic-nejm- letter/.

DOCUMENT 2

179.    Another Endo website, *www.PainAction.corn,* stated: "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

180.    A brochure available on *www.Painknowledge.com* titled *"Pain: Opioid Facts,"* an Endo-sponsored NIPC publication, stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted." In numerous patient education pamphlets, Endo repeated this deceptive message.

181.    In a patient education pamphlet titled *"Understanding Your Pain: Taking Oral Opioid Analgesics,"* Endo answers the hypothetical patient question – "What should I know about opioids and addiction?" – by focusing on explaining what addiction is ("a chronic brain disease") and is not ("Taking opioids for pain relief"). It goes on to explain that "[a]ddicts take opioids for other reasons, such as unbearable emotional problems. Taking opioids as prescribed for pain relief is not addiction." This publication is still available online and was edited by KOL Dr. Russell Portenoy.[83]

182.    In addition, a 2009 patient education publication, *Pain: Opioid Therapy,* funded by Endo and posted on *www.Painknowledge.com,* omitted addiction from the "common risks" of opioids, as shown below:

---

[83] Margo McCaffery, RN MS, FAAN and Chris Pasero, RN, MS FAAN, *Understanding Your Pain, Taking Oral Opioid Analgesics,* available at http://www.thblack.com/links/rsd/understand_pain_opioid_analgesics.pdf.

> As with any medication, there are some side effects that are associated with opioid therapy. The most common side effects that occur with opioid use include the following:
> - Constipation
> - Drowsiness
> - Confusion
> - Nausea
> - Itching
> - Dizziness
> - Shortness of breath
>
> Your healthcare provider can help to address and, in some cases, prevent side effects that may occur as a result of opioid treatment. Less severe side effects, including nausea, itching, or drowsiness, typically go away within a few days without the need for further treatment. If you experience any side effects, you should let your healthcare provider know immediately.

### c.   Janssen's Misrepresentations Regarding Addiction Risk

183.   Janssen likewise misrepresented the addiction risk of opioids on its websites and print materials. One website, *Let's Talk Pain,* states, among other things, that "the stigma of drug addiction and abuse" associated with the use of opioids stemmed from a "lack of understanding addiction."

184.   The *Let's Talk Pain* website also perpetuated the concept of pseudoaddiction, associating patient behaviors such as "drug seeking," "clock watching," and "even illicit drug use or deception" with undertreated pain, which can be resolved with "effective pain management."

185.   A Janssen unbranded website, *www.PrescribeResponsibly.com,* states that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."[84]

186.   Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief Pain Management for Older Adults,* which, as seen below, described as "myth" that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain" (emphasis in original). Until recently, this guide was still available online.

---

[84]   Keith Candiotti, M.D., *Use of Opioid Analgesics in Pain Management,* Prescribe Responsibly, http://www.prescriberesponsibly.com/articles/opioid-pain-managementu.

> **Opioid myths**
>
> **Myth:** Opioid medications are always addictive.
>
> **Fact: Many studies show that opioids are *rarely* addictive when used properly for the management of chronic pain.**

187.    Janssen's website for Duragesic included a section addressing "Your Right to Pain Relief" and a hypothetical patient's fear that "I'm afraid I'll become a drug addict." The website's response: "Addiction is relatively rare when patients take opioids appropriately."

####        d.    Cephalon's Misrepresentations Regarding Addiction Risk

188.    Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide,* which included claims that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.

189.    For example, a 2003 Cephalon-sponsored CME presentation titled *Pharmacologic Management of Breakthrough or Incident Pain,* posted on Medscape in February 2003, teaches:

> [C]hronic pain is often undertreated, particularly in the non-cancer patient population. . . . The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to under treatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between

physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.[85]

190.    Marketing Defendants' suggestions that the opioid epidemic is the result of bad patients who manipulate doctors to obtain opioids illicitly helped further their marketing scheme is at odds with the facts. While there are certainly patients who unlawfully obtain opioids, they are a small minority. For example, patients who "doctor-shop" – i.e., visit multiple prescribers to obtain opioid prescriptions – are responsible for roughly 2% of opioid prescriptions. The epidemic of opioid addiction and abuse is overwhelmingly a problem of false marketing (and unconstrained distribution) of the drugs, not problem patients.

### 2.    Falsehood #2: To the Extent There is a Risk of Addiction, It Can Be Easily Identified and Managed

191.    While continuing to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted, the Marketing Defendants assert that to the extent that *some* patients are at risk of opioid addiction, doctors can effectively identify and manage that risk by using screening tools or questionnaires. In materials they produced, sponsored, or controlled, Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting opioid therapy for chronic pain. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance use, mental illness, trauma, or abuse) so that doctors can then more closely monitor those patients.

192.    Janssen, on its website *www.PrescribeResponsibly.con* states that the risk of opioid addiction "can usually be managed" through tools such as opioid agreements between

---

[85] Michael J. Brennan et al., Pharmacologic Management of Breakthrough or Incident Pain, Medscape, http://www.medscape.org/iviewarticle/449803.

patients and doctors.[86] The website, which directly provides screening tools to prescribers for risk assessments,[87] includes a "four question screener" to purportedly help physicians identify and address possible opioid misuse.[88]

193.    Cephalon sponsored the APF's *Treatment Options: A Guide for People Living with Pain* (2007), which also falsely reassured patients that opioid agreements between doctors and patients can "ensure that you take the opioid as prescribed" and counseled patients that opioids "give [pain patients] a quality of life we deserve."

194.    Endo paid for a 2007 supplement available for continuing education credit in the *Journal of Family Practice,* written by a doctor who became a member of Endo's speaker's bureau in 2010. This publication, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids,* (i) recommended screening patients using tools like (a) the *Opioid Risk Tool (*"ORT") created by Dr. Webster and linked to Janssen or (b) the *Screener and Opioid Assessment for Patients with Pain,* and (ii) taught that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts. The ORT was linked to Endo-supported websites, as well.

195.    There are three fundamental flaws in the Marketing Defendants' representations that doctors can consistently identify and manage the risk of addiction. First, there is no reliable scientific evidence that doctors can depend on the screening tools

---

[86] Howard A. Heit, MD, FACP, FASAM and Douglas L. Gourlay, MD, MSc, FRCPC, FASAM, *What a Prescriber Should Know Before Writing the First Prescription,* Prescribe Responsibly. As of the date of this filing, the "Prescribe Responsibly" website is unavailable, but an archived version of this article may be accessed here: https://web.archive.org/web/20171003105720/http://www.prescriberesponsibly.com/articles/before-prescribing-opioids (hereinafter *"What a Prescriber Should Know Before Writing the First Prescription Prescribing Opioids."*).
[87] Risk Assessment Resources *at PrescribeResponsibly.com* is unavailable, but an archived version is available at https://web.archive.org/web/20190129201700/http://www.prescriberesponsibly .com/risk-assessment-resources.
[88] *Id.*

DOCUMENT 2

currently available to materially limit the risk of addiction. Second, there is no reliable scientific evidence that high-risk patients identified through screening can take opioids long-term without triggering addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients who are not identified through such screening can take opioids long-term without significant danger of addiction.

**3.    Falsehood #3: Signs of Addictive Behavior are "Pseudoaddiction" Requiring More Opioids**

196.    The Marketing Defendants instructed patients and prescribers that signs of addiction are actually indications of untreated pain, such that the appropriate response is to prescribe even more opioids. Dr. David Haddox, who later became a Senior Medical Director for Purdue, published a study in 1989 coining the term "pseudoaddiction," which he characterized as "the iatrogenic syndrome of abnormal behavior developing as a direct consequence of inadequate pain management.[89] In other words, people on prescription opioids who exhibited classic signs of addiction – for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids – were not addicted, but rather simply suffering from under-treatment of their pain.

197.    In the materials and outreach they produced, sponsored, or controlled, the Marketing Defendants made each of these misrepresentations and omissions, and have never acknowledged, retracted, or corrected them.

198.    Cephalon and Endo sponsored the Federation of State Medical Boards' *("FSMB") Responsible Opioid Prescribing* (2007) written by Dr. Scott Fishman and

---

[89] David E. Weissman and 4. David Haddox, *Opioid pseudoaddiction – an iatrogenic syndrome*, 36(3) Pain 363-66 (Mar. 1989), https://www.ncbi.nlm.nih.gov/pubmed/2710565. ("Iatrogenic" describes a condition induced by medical treatment.)

discussed in more detail below, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, which are signs of genuine addiction, are all really signs of "pseudoaddiction."

199.     Endo also sponsored a NIPC CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia,* which promoted pseudoaddiction and listed "[d]ifferentiation among states of physical dependence, tolerance, pseudoaddiction, and addiction" as an element to be considered in awarding grants to CME providers.

200.     Endo itself has repudiated the concept of pseudoaddiction. In finding that "[t]he pseudoaddiction concept has never been empirically validated and, in fact, has been abandoned by some of its proponents," the New York Attorney General, in a 2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'"[90] Endo, thereafter, agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.

201.     Janssen sponsored, funded, and edited a website called *Let's Talk Pain,* which in 2009 stated "pseudoaddiction refers to patient behaviors that may occur when pain is undertreated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management." This website was accessible online until at least May 2012. Janssen also currently runs a website, *www.Prescriberesponsibly.com,* which claims that concerns about opioid addiction are "overestimated," and describes pseudoaddiction as "a

---

[90] Attorney General of the State of New York, In the Matter of Endo Health Solutions Inc. & Endo Pharmaceuticals Inc., Assurance No.:15-228, Assurance of Discontinuance Under Executive Law Section 63. Subdivision 15 at 7.

syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically, when the pain is treated appropriately the inappropriate behavior ceases."[91]

202.    The CDC Guidelines nowhere recommended attempting to provide more opioids to patients exhibiting symptoms of addiction. Dr. Lynn Webster, a KOL discussed below, admitted that pseudoaddiction "is already something we are debunking as a concept" and became "too much of an excuse to give patients more medication. It led us down a path that caused harm."

**4.    Falsehood #4: Opioid Withdrawal Can Be Avoided by Tapering**

203.    In an effort to underplay the risk and impact of addiction, the Marketing Defendants falsely claimed that, while patients become physically dependent on opioids, physical dependence is not the same as addiction and can be easily addressed, if and when pain relief is no longer desired, by gradually tapering a patient's dose to avoid the adverse effects of withdrawal. Defendants failed to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—adverse effects that also make it less likely that patients will be able to stop using the drugs. Defendants also failed to disclose how difficult it is for patients to stop using opioids after they have used them for a prolonged period.

204.    A non-credit educational program sponsored by Endo, *Persistent Pain in the Older Adult,* claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days.

205.    However, this claim is at odds with the experience of patients addicted to opioids. Most patients who have been taking opioids regularly will, upon stopping treatment, experience withdrawal, characterized by intense physical and psychological effects, including anxiety, nausea,

---

[91] *What a Prescriber Should Know Before Writing the First Prescription Prescribing Opioids, supra* n. 86.

headaches, and delirium, among others. This painful and arduous struggle to terminate use can leave many patients unwilling or unable to give up opioids and heightens the risk of addiction.

206.    To this day, the Marketing Defendants have not corrected or retracted their misrepresentations regarding tapering as a solution to opioid withdrawal.

### 5.    Falsehood #5: Opioid Doses Can Be Increased Without Limit or Greater Risk

207.    In materials they produced, sponsored, or controlled, Marketing Defendants instructed prescribers that they could safely increase a patient's dose to achieve pain relief. Each of the Marketing Defendants' claims was deceptive in that they omitted warnings of increased adverse effects that occur at higher doses that were confirmed by scientific evidence.

208.    These misrepresentations were integral to the Marketing Defendants' promotion of prescription opioids. As discussed above, patients develop a tolerance to opioids' analgesic effects, so that achieving long-term pain relief requires constantly increasing the dose. Patients who take larger doses, and who escalate to larger doses faster, are much more likely to remain on opioids for a longer period of time, resulting in increased revenue.

209.    In addition, sales representatives aggressively pushed doctors to prescribe stronger doses of opioids. For example, one sales representative wrote about how his regional manager would drill the sales team on their upsetting tactics:

> It went something like this. "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Ql2h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Ql2h, will you do that?" "Okay." "Doctor, what if that patient then came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q l2h, would you do that?" "I don't know, maybe." "Doctor, but you do agree that you would at least Rx the 40mg dose, right?" "Yes."

The next week the representative would see that same doctor and go through the same discussion with the goal of selling higher and higher doses. Stronger doses were more expensive and increased the likelihood of addiction.

210.    These misrepresentations were particularly dangerous. Opioid doses at or above 50 MME (morphine milligram equivalents)/day double the risk of overdose compared to 20 MME/day, and 50 MME is equal to just 33 mg of oxycodone. The recommendation of 320 mg every twelve hours is ten times that.

211.    Endo sponsored a website, *www.Painknowledge.com,* which claimed that opioids may be increased until "you are on the right dose of medication for your pain," at which point further dose increases would not be required.

212.    Endo also published on its website a patient education pamphlet entitled *Understanding Your Pain: Taking Oral Opioid Analgesics.* In Q&A format, it asked, "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased . . . You won't 'run out' of pain relief."

213.    Marketing Defendants were aware of the greater dangers high dose opioids posed. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality." A study of the Veterans Health Administration from 2004 to 2008 found the rate of overdose deaths is directly related to the maximum daily dose.

### 6.    Falsehood #6: Long-term Opioid Use Improves Functioning

214.    Despite the lack of evidence of improved function and the existence of evidence to the contrary, the Marketing Defendants consistently promoted opioids for patients' function and

quality of life because they viewed these claims as a critical part of their marketing strategies. In recalibrating the risk-benefit analysis for opioids, increasing the perceived benefits of treatment was necessary to overcome its risks.

215.   Janssen, for example, promoted Duragesic as improving patients' functioning and work productivity through an ad campaign that included the following statements: "[w]ork, uninterrupted," "[l]ife, uninterrupted," "[g]ame, uninterrupted," "[c]hronic pain relief that supports functionality," and [i]mprove[s] . . . physical and social functioning."

216.   Similarly, since at least May of 2011, Endo has distributed and made available on its website, *www.opana.com,* a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like those of a construction worker or chef, misleadingly implying that the drug would provide long-term pain relief and functional improvement.

217.   As noted above, Janssen sponsored and edited a patient education guide entitled *Finding Relief Pain Management for Older Adults* (2009), which states as "a fact" that "opioids may make it easier for people to live normally." This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. It assures patients that, "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'" Similarly, *Responsible Opioid Prescribing* (2007), sponsored and distributed by Teva and Endo taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

218.     In addition, Janssen's *Let's Talk Pain* website featured a video interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative.

219.     Endo's NIPC website, *www.Painknowledge.com,* claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." In addition to "improved function," the website touted the improved quality of life as a benefit of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.

220.     Endo was the sole sponsor, through NIPC, of a series of CMEs titled *Persistent Pain in the Older Patient,* which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

221.     The Marketing Defendants' claims that long-term use of opioids improves patient function and quality of life are unsupported by clinical evidence. There are no controlled studies of the use of opioids beyond 16 weeks, and there is no evidence that opioids improve patients' pain and function long term. The FDA, for years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[92] Based upon a review of the existing scientific evidence, the

---

[92] The FDA has warned other drug makers that claims of improved function and quality of life were misleading. *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008), (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.

DOCUMENT 2

CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use."[93]

222.    Consistent with the CDC's findings, substantial evidence exists, demonstrating that opioid drugs are ineffective for the treatment of chronic pain and worsen patients' health. For example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. The few longer-term studies of opioid use had "consistently poor results," and "several studies have shown that Opioids for chronic pain may actually worsen pain and functioning . . ,"[94] along with general health, mental health, and social function. Over time, even high doses of potent opioids often fail to control pain, and patients exposed to such doses are unable to function normally.

223.    On the contrary, the available evidence indicates opioids may worsen patients' health and pain. Increased duration of opioid use is strongly associated with increased prevalence of mental health disorders (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization. The CDC Guideline concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[95] According to the CDC, "for the vast majority of patients, the known, serious, and too-often fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain.]"[96]

224.    As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social

---

[93] CDC Guideline, *supra* n. 26 at 20.
[94] Thomas Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline,* at 1503, 374   New   Eng.   J.   Med.   1501-1504   (Apr.   21,   2016),   doi:   10.1056/NEJMp1515917, http://www.nej.org/doi/full/10.1056/NEJMp1515917.
[95] CDC Guideline, *supra* n. 26 at 2, 18.
[96] *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline, supra n.* 94.

DOCUMENT 2

functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[97] In fact, research such as a 2008 study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[98] Another study demonstrated that injured workers who received a prescription opioid for more than seven days during the first six weeks after the injury were 2.2 times more likely to remain on work disability a year later than workers with similar injuries who received no opioids at all.[99] Yet, Marketing Defendants have not acknowledged, retracted, or corrected their false statements.

### 7.   Falsehood #7: Alternative Forms of Pain Relief Pose Greater Risks Than Opioids

225.   In materials they produced, sponsored, or controlled, the Marketing Defendants omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would favor opioids over other therapies such as over-the-counter acetaminophen or over-the-counter or prescription non-steroidal anti-inflammatory drugs ("NSAIDs").

226.   For example, in addition to failing to disclose the risks of addiction, overdose, and death in promotional materials, the Marketing Defendants routinely ignored the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the

---

[97] Andrea Rubinstein, *Are We Making Pain Patients Worse?*, Sonoma Med. (Fall 2009), available at http://www.nbcms.org/en-us/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144ctabid=747.

[98] Jeffrey Dersh et al., *Prescription opioid dependence is associated with poorer outcomes in disabling spinal disorders,* 33(20) Spine 2219-27 (Sept. 15, 2008).

[99] Franklin, GM, et al., *Early opioid prescription and subsequent disability among workers with back injuries: the Disability Risk Identification Study Cohort,* 33 SPINE 199, 201-202 (Jan. 15, 2008) doi: 10.1097/BRS.0b013e318160455c, https://www.ncbi.nlm.nih.gov/pubmed/18197107.

patient becomes more sensitive to certain painful stimuli over time,"[100] hormonal dysfunction,[101] decline in immune function; mental clouding, confusion, and dizziness, increased falls and fractures in the elderly,[102] NAS (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or with benzodiazepines, which are used to treat anxiety and may be co-prescribed with opioids, particularly to veterans suffering from pain.[103]

227.    Janssen sponsored *Finding Relief Pain Management for Older Adults* (2009) that listed dose limitations as "disadvantages" of other pain medicines but omitted any discussion of risks from increased doses of opioids. *Finding Relief* described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "can increase the risk of heart attack and stroke." The only adverse effects of opioids listed are "upset stomach or sleepiness," which the brochure claims will go away, and constipation.

228.    Endo's NIPC website, *www.Painknowledge.org,* contained a flyer called "Pain: Opioid Therapy." This publication listed opioids' adverse effects but with significant omissions, including hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death.

---

[100] Letter from Janet Woodcock, Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[101] H.W. Daniell, Hypogonadism in men consuming sustained-action oral opioids, 3(5) J. Pain 377-84 (2001), https://www.ncbi.nlm.nih.gov/pubmed/14622741.

[102] *See* Bernhard M. Kuschel et al., *The risk of fall injury in relation to commonly prescribed medications among older people – a Swedish case-control study,* 25 Eur. J. Pub. H. 527-32 (July 31, 2014), doi: 10.1093/eurpub/cku120, https://www.ncbi.nlm.nih.gov/pubmed/25085470.

[103] Karen H. Seal et *al., Association of Mental Health Disorders With Prescription Opioids and High- Risk Opioids in US Veterans of Iraq and Afghanistan,* 307(9) J. Am. Med. Ass'n 940-47, (March 7, 2012) doi:10.1001/jama.2012.234, https://jamanetwork.com/journals/jama/fullarticle/1105046.

229.    In April 2007, Endo sponsored an article aimed at prescribers, published in *Pain Medicine News,* titled "Case Challenges in Pain Management: Opioid Therapy for Chronic Pain.[104] The article asserted:

> Opioids represent a highly effective but controversial and often misunderstood class of analgesic medications for controlling both chronic and acute pain. The phenomenon of tolerance to opioids – the gradual waning of relief at a given dose – and fears of abuse, diversion, and misuse of these medications by patients have led many clinicians to be wary of prescribing these drugs, and/or to restrict dosages to levels that may be insufficient to provide meaningful relief.[105]

230.    To help allay these concerns, Endo emphasized the risks of NSAIDs as an alternative to opioids. The article included a case study that focused on the danger of extended use of NSAIDs, including that the subject was hospitalized with a massive upper gastrointestinal bleed believed to have resulted from his protracted NSAID use. In contrast, the article did not provide the same detail concerning the serious side effects associated with opioids.

231.    Additionally, Endo sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

232.    As a result of the Marketing Defendants' deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and

---

[104] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain,* Pain Med. News, http://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf (link no longer available).
[105] *Id.*

acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.[106]

### 8. Falsehood #8: New Formulations of Certain Opioids Successfully Deter Abuse

233.    Rather than take the widespread abuse of and addiction to opioids as reason to cease their untruthful marketing efforts, Endo seized them as an opportunity to compete. This company developed and oversold "abuse-deterrent formulations" ("ADF") opioids as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids, as well as an advantage of these expensive branded drugs over other opioids. This Defendant's false and misleading marketing of the benefits of their ADF opioids preserved and expanded their sales and falsely reassured prescribers, thereby prolonging the opioid epidemic. Other Marketing Defendants, including Actavis, also promoted their branded opioids as formulated to be less addictive or less subject to abuse than other opioids.

234.    The CDC Guideline confirms that "[n]o studies" support the notion that "abuse-deterrentt technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes." Tom Frieden, the former Director of the CDC, reported that his staff could not find "any evidence showing the updated opioids [ADF opioids] actually reduce rates of addiction, overdoses, or death."

### a.    Endo's Deceptive Marketing and Reformulated ER

---

[106] M. Daubresse et al., *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, 51(10) Med. Care, 870-878 (2013). "For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady." *See also*, J. Mafi et al., *Worsening Trends in the Management and Treatment of Back Pain*, 173(17) J. of the Am Med. Ass'n Internal Med. 1573, 1573 (2013).

235.    Opana ER was particularly likely to be tampered with and abused. That is because Opana ER has lower "bioavailability" than other opioids, meaning that the active pharmaceutical ingredient (the "API" or opioid) does not absorb into the bloodstream as rapidly as other opioids when taken orally. Additionally, when swallowed whole, the extended-release mechanism remains intact, so that only 10% of Opana ER's API is released into the patient's bloodstream relative to injection; when it is taken intranasally, that rate increases to 43%. The larger the gap between bioavailability when consumed orally versus snorting or injection, the greater the incentive for users to manipulate the drug's means of administration.

236.    In December 2011, Endo obtained approval for a new formulation of Opana ER that added a hard coating that the company claimed made it crush-resistant.

237.    Even prior to its approval, the FDA advised Endo that it could not market the new Opana ER as abuse-deterrent.

238.    Nonetheless, in August of 2012, Endo submitted a citizen petition asking the FDA for permission to change its label to indicate that Opana ER was abuse-resistant, both in that it was less able to be crushed and snorted and that it was resistant to injection by syringe. Borrowing a page from Purdue's playbook, Endo announced it would withdraw original Opana ER from the market and sought a determination that its decision was made for safety reasons (its lack of abuse-deterrence), which would prevent generic copies of original Opana ER.

239.    Endo then sued the FDA, seeking to force expedited consideration of its citizen petition. The court filings confirmed Endo's true motives: in a declaration submitted with its lawsuit, Endo's chief operating officer indicated that a generic version of Opana ER would decrease the company's revenue by up to $135 million per year. Endo also claimed that if the FDA did not block generic competition, $125 million, the amount Endo spent on developing the

reformulated drug to "promote the public welfare," would be lost.[107] The FDA responded that: "Endo's true interest in expedited FDA consideration stems from business concerns rather than protection of the public health."[108]

240.    Despite Endo's purported concern with public safety, not only did Endo continue to distribute original, admittedly unsafe Opana ER for nine months after the reformulated version became available, it declined to recall original Opana ER despite its dangers. In fact, Endo claimed in September 2012 to be "proud" that "almost all remaining inventory" of the original Opana ER had "been utilized."[109]

241.    In its citizen petition, Endo asserted that redesigned Opana ER had "safety advantages." Endo even relied on its rejected assertion that Opana was less crushable to argue that it developed Opana ER for patient safety reasons and that the new formulation would help, for example, "where children unintentionally chew the tablets prior to an accidental ingestion."[110]

242.    However, in a 2013 decision rejecting the petition, the FDA found that "study data show that the reformulated version's extended-release features can be compromised when subjected to ... cutting, grinding, or chewing." The FDA also determined that "reformulated Opana ER" could also be "readily prepared for injections and more easily injected[.]" In fact, the FDA warned that preliminary data—including in Endo's own studies – suggested that a higher percentage of reformulated Opana ER abuse is via injection than was the case with the original formulation.

---

[107] Plaintiff's Opposition to Defendants' and Intervenor's Motions to Dismiss and Plaintiff's Reply in Support of Motion for Preliminary Injunction ("Endo Br."), *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 23 at 20 (D.D.C. Dec.14, 2012).

[108] Defendants' Response to the Court's November 30, 2012 Order, *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 9 at 6 (D.D.C. Dec. 3, 2012).

[109] *Id.*; Endo News Release, Sept. 6, 2012 (Ex. L to Rurka Decl.) *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 18-4 (D.D.C. Dec. 9, 2012).

[110] CP, FDA Docket 2012-8-0895, at 2.

243.    In 2009, only 3% of Opana ER abuse was by intravenous means. Since the reformulation, the injection of Opana ER has increased by more than 500%. Endo's own data, presented in 2014, found that between October 2012 and March 2014, 64% of abusers of Opana ER did so by injection, compared with 36% for the old formulation.[111] The transition into the injection of Opana ER made the drug even less safe than the original formulation. Injection carries risks of HIV, hepatitis C, and, in reformulated Opana ER's specific case, the blood-clotting disorder thrombotic thrombocytopenic purpura (TTP), which can cause kidney failure.

244.    Publicly, Endo sought to minimize the problem. On a 2013 call with investors, when asked about an outbreak of TTP in Ohio from injecting Opana ER, Endo sought to limit its import by assigning it to "a very, very distinct area of the country."

245.    Despite its knowledge that Opana ER was widely abused and injected, Endo marketed the drug as tamper-resistant and abuse-deterrent. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that based on the company's detailing elsewhere, Endo sales representatives informed doctors that Opana ER was abuse-deterrent, could not be tampered with, and was safe. In addition, sales representatives did not disclose evidence that Opana was easier to abuse intravenously and, if pressed by prescribers, claimed that while outlier patients might find a way to abuse the drug, most would be protected.

246.    A review of national surveys of prescribers regarding their "take-aways" from pharmaceutical detailing confirms that prescribers remember being told Opana ER was tamper-resistant. Endo also tracked messages that doctors took from its in-person marketing. Among the advantages of Opana ER, according to participating doctors, was its "low abuse potential." For

---

[111] Theresa Cassidy et al., *The Changing Abuse Ecology: Implications for Evaluating the Abuse Pattern of Extended-Release Oxymorphone and Abuse-Deterrent Opioid Formulations*, Inflexxion (Sept. 7, 2014), https://www.inflexxion.com/changing-abuse-ecology-extended-release-oxymorphone/.

example, a June 14, 2012, Endo press release announced, "the completion of the company's transition of its Opana ER franchise to the new formulation designed to be crush resistant."

247.    The press release further stated that: "We firmly believe that the new formulation of Opana ER, coupled with our long-term commitment to awareness and education around appropriate use of opioids will benefit patients, physicians and payers." The press release described the old formulation of Opana as subject to abuse and misuse but failed to disclose the absence of evidence that reformulated Opana was any better. In September 2012, another Endo press release stressed that reformulated Opana ER employed "INTAC Technology" and continued to describe the drug as "designed to be crush-resistant."

248.    Similarly, journal advertisements that appeared in April 2013 stated Opana ER was "designed to be crush resistant." A January 2013 article in Pain Medicine News, based in part on an Endo press release, described Opana ER as "crush-resistant." This article was posted on the *Pain Medicine News* website, which was accessible to patients and prescribers.

249.    In 2015, the Indiana Department of Public Health determined that an HIV outbreak in Southeastern Indiana was linked to injection of Opana,[112] the first documented HIV outbreak in the United States associated with injection of a prescription painkiller. After the outbreak, the FDA required "that Endo Pharmaceuticals remove [Opana ER] from the market." The agency sought removal "based on its concern that the benefits of the drug may no longer outweigh its risks."[113]

250.    In March 2017, because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and TTP, an FDA advisory committee recommended that Opana

---

[112] Press Release, State of Ind. Health Dep't, HIV Outbreak in Southeastern Alabama, (Feb. 25, 2015), http://www.in.gov/activecalendar/EventList.aspx?fromdate=1/1/2015&todate=12/31/2015&display=Month&type=public&eventidn=210259&view=EventDetails&information_id=211489.
[113] Jen Christensen, *FDA wants Opioid Painkiller Pulled off Market*, CNN (June 8, 2017), https://www.cnn.com/2017/06/08/health/fda-opioid-opana-er-bn/index.html; FDA Requests Removal of Opana ER.

be withdrawn from the market. The FDA adopted this recommendation on June 8, 2017.[114] Endo announced on July 6, 2017, that it would agree to stop marketing and selling Opana ER.[115] However, by this point, the damage had been done. Even then, Endo continued to insist, falsely, that it "has taken significant steps over the years to combat misuse and abuse."

> **b.   Other Marketing Defendants' Misrepresentations Regarding Abuse Deterrence**

251.   While Marketing Defendants promote patented technology as the solution to opioid abuse and addiction, none of their "technology" addresses the most common form of abuse – oral ingestion – and their statements regarding abuse-deterrent formulations give the misleading impression that these reformulated opioids can be prescribed safely.

252.   In sum, each of the nine categories of misrepresentations discussed above regarding the use of opioids to treat chronic pain was either not supported by or was contrary to the scientific evidence. In addition, the Defendants' misrepresentations and omissions, as set forth in this Complaint, are misleading and contrary to the Marketing Defendants' products' labels.

> **B.   The Marketing Defendants Disseminated Their Misleading Messages About Opioids Through Multiple Direct and Indirect Channels**

253.   The Marketing Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients throughout the United States. The Marketing Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the country, including the Tribe's communities.

254.   Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by the drug manufacturers' corporate headquarters. This

---

[114] *Id.*
[115] Endo Provides Update on Opana ER, *supra* n. 56.

comprehensive approach ensures that the Marketing Defendants' messages are accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising – and in each sales territory. The Marketing Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

255.    The Marketing Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons (the company employees who respond to physician inquiries); centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. The Marketing Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

256.    The Marketing Defendants utilized various channels to carry out their marketing scheme of targeting the medical community and patients with deceptive information about opioids: (1) direct, targeted communications with prescribers by sales representatives or "detailers;" (2) "Front Groups" with the appearance of independence from the Marketing Defendants; (3) so-called "KOLs," that is, doctors who were paid by the Marketing Defendants to promote their pro-opioid message; (4) disseminating their misleading messages through reputable organizations; (5) CME programs controlled and/or funded by the Marketing Defendants; (6) branded advertising; (7) unbranded advertising; (8) publications; and (9) speakers bureaus and programs.

### 1.    The Marketing Defendants Used "Detailers" To Directly Disseminate Their Misrepresentations to Prescribers

257.    The Marketing Defendants' sales representatives executed carefully crafted marketing tactics, developed at the highest rungs of their corporate ladders, to reach targeted doctors and hospitals with centrally orchestrated messages. The Marketing Defendants' sales

representatives also distributed third-party marketing material to their target audience that was deceptive. The Marketing Defendants' direct contact with prescribers was, by far, their most important means of disseminating the false narrative and increasing opioid prescriptions, and, accordingly, their sales.

258.   Each Marketing Defendant promoted opioids through sales representatives (also called "detailers") and, in consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that small group speaker programs were designed to reach out to individual prescribers. By establishing close relationships with doctors, the Marketing Defendants were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to promote their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

259.   In accordance with common industry practice, the Marketing Defendants purchased and closely analyzed prescription sales data from IMS Health (now IQVIA), a healthcare data collection, management, and analytics corporation. This data allowed them to precisely track the rates of initial and renewal prescribing by individual doctors, which allowed them to target and tailor their appeals. Sales representatives visited hundreds of thousands of doctors and disseminated the misinformation and materials described above.

260.   Marketing Defendants devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, Marketing Defendants spent $166 million on detailing branded opioids to doctors. This amount is twice as much as Marketing Defendants spent on detailing in 2000. The amount includes $34 million by Janssen, $13 million by Teva, and $10 million by Endo.

261.    Cephalon's quarterly spending steadily climbed from below $1 million in 2000 to more than $3 million in 2014 (and more than $13 million for the year), with a peak, coinciding with the launch of Fentora, of more than $27 million in 2007, as shown below:



262.    For its opioid, Actiq, Cephalon also engaged in direct marketing in direct contravention of the FDA's strict instructions that Actiq be prescribed only to terminal cancer patients and by oncologists and pain management doctors experienced in treating cancer pain.

263.    Endo's quarterly spending went from the $2 million to $4 million range in 2000-2004 to more than $10 million following the launch of Opana ER in mid-2006 (and more than $38 million for the year in 2007) and more than $8 million coinciding with the launch of a reformulated version in 2012 (and nearly $34 million for the year), as shown below:



264.     Janssen's quarterly spending dramatically rose from less than $5 million in 2000 to more than $30 million in 2011, coinciding with the launch of Nucynta ER (with yearly spending at $142 million for 2011), as shown below:



265.     Abbott, which was tasked with marketing Purdue's products to hospitals, heavily incentivized its staff to push OxyContin, offering $20,000 cash prizes and luxury vacations to top performers. Abbott's almost religious zeal to sell the drug is evident in the wide use of terminology from the Middle Ages Crusades: Sales reps were called "royal crusaders" and "knights" in internal documents, and they were supervised by the "Royal Court of OxyContin" – executives referred to in memos as the "Wizard of OxyContin," "Supreme Sovereign of Pain Management," and the "Empress of Analgesia." The head of pain care sales, Jerry Eichhorn, was the "King of Pain," and signed memos simply as "King."



## 2. The Marketing Defendants Deceptively Directed Front Groups to Promote Opioid Use

266.    Patient advocacy groups and professional associations also became vehicles to reach prescribers, patients, and policymakers. Marketing Defendants exerted influence and effective control over the messaging by these groups by providing major funding directly to them, as well as through KOLs who served on their boards. These "Front Groups" put out patient education materials, treatment guidelines and CMEs that supported the use of opioids for chronic pain, overstated the benefits of opioids, and understated their risks.[116] Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages – often at the expense of the Front Groups' own constituencies.

---

[116] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Members' Office, *Fueling an Epidemic, Report Two: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Feb. 12, 2018), https://www.hsdl.org/?abstract&did=808171 ("*Fueling an Epidemic, Part Two*"), at p. 3.

267.    "Patient advocacy organizations and professional societies like the Front Groups 'play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public.'"[117] "Even small organizations – with 'their large numbers and credibility with policymakers and the public' – have 'extensive influence in specific disease areas.' Larger organizations with extensive funding and outreach capabilities 'likely have a substantial effect on policies relevant to their industry sponsors.'"[118] Indeed, the U.S. Senate's report, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*,[119] which arose out of a 2017 Senate investigation and, drawing on disclosures from Janssen and other opioid manufacturers, "provides the first comprehensive snapshot of the financial connections between opioid manufacturers and advocacy groups and professional societies operating in the area of Office opioids policy,"[120] found that the Marketing Defendants made millions of dollars' worth of contributions to various Front Groups.[121]

268.    The Marketing Defendants also "made substantial payments to individual group executives, staff members, board members, and advisory board members" affiliated with the Front Groups subject to the Senate Committee's study.[122]

269.    As the Senate's *Fueling an Epidemic* Report found, the Front Groups "amplified or issued messages that reinforce industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic

---

[117] *Id.* at p. 2.
[118] *Id.*
[119] *Id.* at p. 1.
[120] Meeting Notice, Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee; Notice of Meeting, May 25, 2015, 80 FR 30686.
[121] *Id.*
[122] *Id.* at p. 10.

pain."[123] They also "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for over prescription and misbranding."[124]

270.    The Marketing Defendants took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that Defendants were consistently in control of their content. By funding, directing, editing, approving, and distributing these materials, Defendants exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and through the Front groups, with each working with the other to deceptively promote the use of opioids for the treatment of chronic pain.

    a.        **American Pain Foundation**

271.    The most prominent of the Front Groups was the APF. While APF held itself out as an independent patient advocacy organization, in reality, it received 90% of its funding in 2010 from the drug and medical-device industry, including from Defendants Endo, Janssen, and Cephalon. APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo was APF's largest donor and provided more than half of its $10 million in funding from 2007 to 2012.

272.    For example, APF published a guide sponsored by Cephalon titled *Treatment Options: A Guide for People Living with Pain* and distributed 17,200 copies of this guide in one year alone, according to its 2007 annual report. This guide contains multiple misrepresentations regarding opioid use, which are discussed *supra*.

---

[123] *Id.* at 12-15.
[124] *Id.* at 12.

273.    APF also developed the NIPC, which ran a facially unaffiliated website, *www.painknowledge.org*. NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field. NIPC published unaccredited prescriber education programs (accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies), including a series of "dinner dialogues." But it was Endo that substantially controlled NIPC, by funding NIPC projects, developing, specifying, and reviewing its content, and distributing NIPC materials. Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan Endo submitted to the FDA. Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or on *www.painknowledge.org*. Endo estimated it would reach 60,000 prescribers through NIPC.

274.    APF was often called upon to provide "patient representatives" for the Marketing Defendants' promotional activities including Janssen's "*Let's Talk Pain*." Although APF presented itself as a patient advocacy organization, it functioned largely as an advocate for the interests of the Marketing Defendants, not patients.

275.    In practice, APF operated in close collaboration with Defendants, submitting grant proposals seeking to fund activities and publications suggested by Defendants and assisting in marketing projects for Defendants.

276.    APF's Board of Directors was largely comprised of doctors who were on the Marketing Defendants' payrolls, either as consultants or as speakers for medical events. The close relationship between APF and the Marketing Defendants demonstrates APF's lack of independence in its finances, management, and mission, and APF's willingness to allow Marketing Defendants to control its activities and messages supports an inference that each Defendant that

worked with it was able to exercise editorial control over its publications – even when Defendants' messages contradicted APF's internal conclusions.

277.    In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to exist, effective immediately." Without support from Marketing Defendants, to whom APF could no longer be helpful, APF was no longer financially viable.

**b.    American Academy of Pain Medicine and the American Pain Society**

278.    The American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.[125] The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website.

279.    AAPM's corporate council includes Assertio, Teva, and other pharmaceutical companies. AAPM's past presidents include Haddox (1998), Dr. Scott Fishman ("Fishman") (2005), Dr. Perry G. Fine ("Fine") (2011) and Dr. Lynn R. Webster ("Webster") (2013), all of whose connections to the opioid manufacturers are well-documented as set forth below.

---

[125] *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997), *available at* http://www.stgeorgeutah.com/wp-content/uploads/2016/05/OPIOIDES.DOLORCRONICO.pdfhttp://www.stgeorgeutah.com/wp-content/uploads/2016/05/OPIOIDES.DOLORCRONICO.pdf.

280.    Fishman, who also served as a KOL for Marketing Defendants, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[126]

281.    AAPM has received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations.

282.    More specifically, Janssen paid $83,975 from 2012-2017 to AAPM.[127] Endo funded AAPM CMEs. Teva is on AAPM's corporate relations council.

283.    As to APS, Janssen paid $88,500 from 2012-2017.[128]

284.    AAPM describes its annual meeting as an "exclusive venue" for offering CME programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event. The conferences sponsored by AAPM heavily emphasized CME sessions on opioids – 37 out of roughly 40 at one conference alone.

285.    AAPM's staff understood that they and their industry funders were engaged in a common task. Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

---

[126] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), *available at* http://www.medscape.org/viewarticle/500829http://www.medscape.org/viewarticle/500829.
[127] *Fueling an Epidemic Part Two, supra* n. 116.
[128] *Id.*

286.    In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patients' addiction to opioids was low. Dr. David Haddox co-authored the AAPM/APS statement. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011.

287.    AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines"). AAPM, with the assistance, prompting, involvement, and funding of Defendants, issued the treatment guidelines discussed herein, and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21-panel members who drafted the 2009 Guidelines, including KOL Dr. Fine, received support from Defendants Janssen, Cephalon and Endo. Of these individuals, eight received support from Teva, nine from Janssen, and nine from Endo.

288.    Dr. Gilbert Fanciullo, now retired as a professor at Dartmouth College's Geisel School of Medicine, who served on the AAPM/APS Guidelines panel, has since described them as "skewed" by drug companies and "biased in many important respects," including the high presumptive maximum dose, lack of suggested mandatory urine toxicology testing, and claims of a low risk of addiction.

289.    The 2009 Guidelines have been a particularly effective channel of deception. They have influenced not only treating physicians, but also the scientific literature on opioids; they were reprinted in the Journal of Pain, have been cited hundreds of times in academic literature, were disseminated during the relevant time period, and were and are available online. Treatment guidelines are especially influential with primary care physicians and family doctors to whom Marketing Defendants promoted opioids and whose lack of specialized training in pain management and opioids makes them more reliant on, and less able to evaluate, these guidelines.

290.   For that reason, the CDC has recognized that treatment guidelines can "change prescribing practices."[129]

291.   The 2009 Guidelines are relied upon by doctors, especially general practitioners and family doctors who have no specific training in treating chronic pain.

292.   The Marketing Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions, their involvement in the development of the Guidelines, or their financial backing of the authors of these Guidelines. For example, a speaker presentation prepared by Endo in 2009 titled *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain* relies on the AAPM/APS 2009 Guidelines while omitting their disclaimer regarding the lack of evidence for recommending the use of opioids for chronic pain.

c.       **The Federation of State Medical Boards**

293.   The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.

294.   The FSMB finances opioid- and pain-specific programs through grants from Defendants.

295.   Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies." The 1998 Guidelines – that the pharmaceutical companies helped

---

[129] CDC Guideline, *supra* n. 26.

author – taught not that opioids could be appropriate in only limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

296.    A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including physicians who served the Tribe and its citizens.

297.    FSMB's 2007 publication *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including Endo and Cephalon.

298.    The publication also received support from the American Pain Foundation (APF) and the American Academy of Pain Medicine (AAPM). The publication was written by Dr. Fishman, and Dr. Fine served on the Board of Advisors. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards.[130] The FSMB website describes the book as "the leading continuing medical education (CME) activity for prescribers of opioid medications." This publication asserted that opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins; that pain is under-treated, and that patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient.[131]

299.    The Marketing Defendants relied on the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription

---

[130] Email from Dr. Scott Fishman to Charles Ornstein, ProPublica (Dec. 15, 2011), https://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdfhttps://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdf.
[131] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* 8-9 (Waterford Life Sciences 2007).

decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

300.    Dr. Fishman said that he did not receive any payments from FSMB or any royalties from the publisher because he wanted to avoid the perception of a potential conflict of interest in his authorship of the book or for the ongoing efforts of FSMB. This is because prior to 2011, he had been scrutinized for his involvement with the front groups/manufacturers and accepting payments.[132]

301.    The Manufacturing Defendants made additional contributions to the FSMB to further their misleading advertising. For example, Cephalon paid FSMB $180,000 over a 3-year period, 2007-2008 and 2011.[133] Endo paid FSMB $371,620 over a 5-year period.[134]

### d.    The Alliance for Patient Access

302.    Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[135] It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006.[136] As of July 2019, the APA listed 34 "Associate Members and Financial Supporters." The list includes J&J, Allergan, and Teva.

---

[132] Email from Dr. Scott Fishman to Charles Ornstein, ProPublica (Dec. 15, 2011), https://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdf.
[133] *Id.*
[134] *Id.*
[135] The Alliance for Patient Access, *About AFPA*, http://allianceforpatientaccess.org/about-afpa/#membershiphttp://allianceforpatientaccess.org/about-afpa/#membership. References herein to APA include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.
[136] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access uses journalists and politicians to push Big Pharma's agenda*, Health News Review (Oct. 2, 2017), https://www.healthnewsreview.org/2017/10/non-profit-alliance-

303.   APA's board members have also directly received substantial funding from pharmaceutical companies.[137] For instance, board vice president Dr. Srinivas Nalamachu ("Nalamachu"), who practices in Kansas, received more than $800,000 from 2013 through 2015 from pharmaceutical companies – nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from Defendants Endo and Cephalon. Other board members include Dr. Robert A. Yapundich from North Carolina, who received $215,000 from 2013 through 2015 from pharmaceutical companies, including payments by defendant Cephalon; Dr. Jack D. Schim from California, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, and Cephalon; Dr. Howard Hoffberg from Maryland, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, and Cephalon; and Dr. Robin K. Dore from California, who received $700,000 between 2013 and 2015 from pharmaceutical companies.

304.   Among its activities, APA issued a "white paper" titled "*Prescription Pain Medication: Preserving Patient Access While Curbing Abuse.*"[138] Among other things, the white paper criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.
>
> \*\*\*

patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ ("Jaklevic, *Non-profit Alliance for Patient Access*").

[137] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, *available at* https://projects.propublica.org/docdollars/.

[138] Alliance for Patient Access, *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse,* (Oct. 2013), http://1yh21u3cjptv3xjder1dco9mx5s.wpengine.netdna-cdn.com/wp-content/uploads/2013/01/PT_White-Paper_Finala.pdf.

In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face the loss of their professional licensure. Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff. Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives. . .

We cannot merely assume that these programs will reduce prescription pain medication use and abuse.[139]

305.   The white paper also purports to express concern about policies that have

been enacted in response to the prevalence of pill mills:

Although well intentioned, many of the policies designed to address this problem have made it difficult for legitimate pain management centers to operate. For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board-certified medical director, may need to pay for annual inspections, and are subject to increased record keeping and reporting requirements. . .. [I]t is not even certain that the regulations are helping prevent abuses.[140]

In addition, in an echo of earlier industry efforts to push back against what they termed

"opiophobia," the

white paper laments the stigma associated with prescribing and taking pain medication:

Both pain patients and physicians can face negative perceptions and outright stigma. When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong – or even criminal. . .. Physicians can face similar stigma from peers. Physicians in non-pain specialty areas often look down on those who specialize in pain management – a situation fueled by the numerous regulations and fines that surround prescription pain medications.[141]

---

[139] *Id.* at 4-5 (footnote omitted).

[140] *Id.* at 5-6.

[141] *Id.* at 6.

In conclusion, the white paper states that "[p]rescription pain medications, and specifically opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that do not adequately respond to over-the-counter drugs."[142]

306.    The APA also issues "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015. The awards were funded by a $7.8 million donation from unnamed donors. While the awards are ostensibly given for protecting patients' access to Medicare and are thus touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they were generally given to members of Congress who supported the APA's agenda.[143]

307.    The APA also lobbies Congress directly. In 2015, the APA signed onto a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the CSA.[144] The AAPM is also a signatory to this letter. An internal DOJ memo stated that the proposed bill "'could actually result in increased diversion, abuse, and public health and safety consequences'"[145] and, according to DEA chief administrative law judge John J. Mulrooney, the law would make it "all but logically impossible" to prosecute manufacturers and distributors, like Defendants here, in the courts.[146] The law passed both Houses of Congress and was signed into law in 2016.

e.    The U.S. Pain Foundation

---

[142] *Id.* at 7.
[143] Jaklevic, *Non-profit Alliance for Patient Access, supra* n. 136.
[144] Letter from Alliance for Patient Access, et al., to Congressmen Tom Marino, Marsha Blackburn, Peter Welch, and Judy Chu (Jan. 26, 2015).
[145] Bill Whitaker, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress,* CBS NEWS (last updated Oct. 17, 2017) https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-congress/.
[146] John J. Mulrooney, II & Katherine E. Legel, *Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters,* 101 Marquette L. Rev. (forthcoming Feb. 2018), https://www.documentcloud.org/documents/4108121-Marquette-Law-Review-Mulrooney-Legel.html.

308.    The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections and interpersonal relationships with the Marketing Defendants. The USPF was one of the largest recipients of contributions from the Marketing Defendants, collecting nearly $3 million in payments between 2012 and 2015 alone.[147] The USPF was also a critical component of the Marketing Defendants' lobbying efforts to reduce the limits on over-prescription. The U.S. Pain Foundation advertised its ties to the Marketing Defendants, listing opioid manufacturers like Pfizer, Teva, Assertio, Endo, and McNeil (i.e. Janssen) as "Platinum," "Gold," and "Basic" corporate members.[148] Industry Front Groups like the American Academy of Pain Management, the American Academy of Pain Medicine, the American Pain Society, and PhRMA are also members of varying levels in the USPF. More specifically, Janssen paid $41,500 from 2012-2017[149].

###     f.    American Geriatrics Society

309.    The AGS was another Front Group with systematic connections and interpersonal relationships with the Marketing Defendants. The AGS was a large recipient of contributions from the Marketing Defendants, including Endo and Janssen. AGS contracted with Endo and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (*The Management of Persistent Pain in Older Persons*, hereinafter "2002 AGS Guidelines") and 2009 (*Pharmacological Management of Persistent Pain in Older Persons*,[150] hereinafter "2009 AGS Guidelines"). According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009.[151] AGS's complicity in the common purpose with the Marketing

---

[147] *Fueling an Epidemic Part Two, supra* n. 116 at p. 4.
[148] *Id.* at 12; U.S. Pain Foundation, *Transparency*, https://uspainfoundation.org/transparency/.
[149] *Id.*
[150] Ferrell B et al., *Pharmacological Management of Persistent Pain in Older Persons*, 57 J. Am. Geriatrics Soc'y 1331 (2009), https://www.ncbi.nlm.nih.gov/pubmed/19573219 ("2009 AGS Guidelines").
[151] John Fauber & Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly*, MILWAUKEE J. SENTINEL (May 30, 2012), https://www.medpagetoday.com/geriatrics/painmanagement/32967.

Defendants is evidenced by the fact that AGS internal discussions in August 2009 reveal that it did not want to receive upfront funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate pro-opioid publications.

310.   The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy." The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable for patients, even with a prior history of drug abuse.[152] These Guidelines further recommended that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." These recommendations are not supported by any study or other reliable scientific evidence. Nevertheless, they have been cited over 500 times in Google Scholar (which allows users to search scholarly publications that would have been relied on by researchers and prescribers) since their 2009 publication and as recently as this year.

311.   One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the Guidelines were influenced by contributions that drug companies, including Endo, Janssen, and Teva, made to the sponsoring organizations and committee members.

312.   Dr. Bruce Farrell was an AGS task force chairman for the 2009 Guidelines, but was also a paid speaker for Endo, and he helped conduct a CME for treating osteoarthritis pain.[153]

313.   Representatives of the Marketing Defendants, often at informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue. AGS then

---

[152] 2009 AGS Guidelines, *supra* n. 150 at 1342.
[153] John Fauber & Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly*, MILWAUKEE J. SENTINEL (May 30, 2012), https://www.medpagetoday.com/geriatrics/painmanagement/32967.

submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

314.    Members of AGS Board of Directors were doctors who were on the Marketing Defendants' payrolls, either as consultants or as speakers for medical events. As described below, many of the KOLs also served in leadership positions within the AGS.

> **g.    American Chronic Pain Association**

315.    The Marketing Defendants also made substantial payments to the American Chronic Pain Association ("ACPA"). Founded in 1980, the ACPA offers support and education for people suffering from chronic pain. Contributions to the ACPA from the Manufacturing Defendants include $50,000 from Janssen from 2012-2017.[154] Between 2013 and 2016, 10 members of ACPA's Advisory Board received more than $140,000 from opioid manufacturers, including Endo.

> **3.    The Marketing Defendants Deceptively Paid KOLs to Promote Opioid Use**

316.    To falsely promote their opioids, the Marketing Defendants paid and cultivated a select circle of doctors who were chosen and sponsored by the Marketing Defendants for their supportive messages. As set forth below, pro-opioid doctors have been at the hub of the Marketing Defendants' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that science and legitimate medical professionals favored the wider and broader use of opioids. These doctors include Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman.

317.    Although these KOLs were funded by the Marketing Defendants, the KOLs were used extensively to present the appearance that unbiased and reliable medical research supporting

---

[154] *Fueling an Epidemic, Part Two, supra* n. 116.

the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals.

318.     As the Marketing Defendants' false marketing scheme picked up steam, these pro-opioid KOLs wrote, consulted on, edited, and lent their names to books and articles, and gave speeches and CMEs supportive of opioid therapy for chronic pain. They served on committees that developed treatment guidelines that strongly encouraged the use of opioids to treat chronic pain, and they were placed on boards of pro-opioid advocacy groups and professional societies that developed, selected, and presented CMEs.

319.     Through use of their KOLs and strategic placement of these KOLs throughout every critical distribution channel of information within the medical community, the Marketing Defendants were able to exert control of each of these modalities through which doctors receive their information.

320.     In return for their pro-opioid advocacy, the Marketing Defendants' KOLs received money, prestige, recognition, research funding, and avenues to publish. For example, Dr. Webster has received funding from Endo and Cephalon. Dr. Fine has received funding from Janssen, Cephalon, and Endo.

321.     The Marketing Defendants carefully vetted their KOLs to ensure that they were likely to remain on-message and supportive of the Marketing Defendants' agenda. The Marketing Defendants also kept close tabs on the content of the materials published by these KOLs. Of course, the Marketing Defendants also kept these KOLs well-funded, enabling them to push the Marketing Defendants' deceptive message out to the medical community.

322.     Once the Marketing Defendants identified and funded KOLs and those KOLs began to publish "scientific" papers supporting the Marketing Defendants' false position that opioids

were safe and effective for the treatment of chronic pain, the Marketing Defendants poured significant funds and resources into a marketing machine that widely cited and promoted their KOLs and studies or articles by their KOLs to drive prescriptions of opioids for chronic pain. The Marketing Defendants cited to, distributed, and marketed these studies and articles by their KOLs as if they were independent medical literature so that it would be well-received by the medical community. By contrast, the Marketing Defendants did not support, acknowledge, or disseminate the truly independent publications of doctors critical of the use of chronic opioid therapy.

323.   In their promotion of the use of opioids to treat chronic pain, the Marketing Defendants' KOLs knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves and the Marketing Defendants.

### a.   Dr. Russell Portenoy

324.   In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[155]

325.   Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> *The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs.* This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial

---

[155] Russell Portenoy & Kathy Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases*, 25(2) Pain 171 (1986), https://www.ncbi.nlm.nih.gov/pubmed/2873550.

analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*[156] (emphasis added).

According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[157]

326.   Despite having taken this position on long-term opioid treatment, Dr. Portenoy ended up becoming a spokesperson for Marketing Defendants, promoting the use of prescription opioids, and minimizing their risks. A respected leader in the field of pain treatment, Dr. Portenoy was highly influential. Dr. Andrew Kolodny, co-founder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure."

327.   Dr. Portenoy was also a critical component of the Marketing Defendants' control over their Front Groups. Specifically, Dr. Portenoy sat as a Director on the board of the APF. He was also the President of the APS.

328.   In recent years, some of the Marketing Defendants' KOLs have conceded that many of their past claims in support of opioid use lacked evidence or support in the scientific literature.[158] Dr. Portenoy has now admitted that he minimized the risks of opioids,[159] and that he "gave

---

[156] Russell Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields and J.C. Liebeskind eds., 1994) (emphasis added).
[157] *Id.*
[158] *See, e.g.*, John Fauber, *Painkiller boom fueled by networking*, Journal Sentinel (Feb. 18, 2012), http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html/ (reporting that a key Endo KOL acknowledged that opioid marketing went too far).
[159] Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, THE NEW YORKER (Nov. 8, 2013), https://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic.

innumerable lectures in the late 1980s and '90s about addiction that weren't true."[160] He mused, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, against the standards of 2012, I guess I did . . ."[161]

329.    In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, *none of which represented real evidence*, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they hadn't before. *In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.*[162]

330.    Several years earlier, when interviewed by journalist Barry Meier for his 2003 book, *Pain Killer*, Dr. Portenoy was more direct: "It was pseudoscience. I guess I'm going to have always to live with that one."[163]

**b.    Dr. Lynn Webster**

331.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a Front Group that ardently supports chronic opioid therapy. He is a Senior Editor of Pain Medicine, the same journal that published Endo's

---

[160] Thomas Catan and Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, THE WALL STREET JOURNAL (Dec. 17, 2012), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[161] *Id.*

[162] Harrison Jacobs, *This one-paragraph letter may have launched the opioid epidemic*, BUSINESS INSIDER (May 26, 2016), http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5; Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011), https://www.youtube.com/watch?v=DgyuBWN9D4w&feature=youtu.be.

[163] *Pain Killer, supra* n. 80, at 277.

special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon and Endo. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

332.    Dr. Webster created and promoted the Opioid Risk Tool, a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors the confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool ("ORT") appear on, or are linked to, websites run by Endo and Janssen. In 2011, Dr. Webster presented, via webinar, a program titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk*. Dr. Webster recommended the use of risk screening tools, urine testing, and patient agreements to prevent "overuse of prescriptions" and "overdose deaths."

333.    Dr. Webster was himself tied to numerous overdose deaths. The DEA investigated him and the Lifetree Clinic for overprescribing opioids after twenty patients died from overdoses. In keeping with the Marketing Defendants' promotional messages, Dr. Webster apparently believed the solution to patients' tolerance or addictive behaviors was more opioids: he prescribed staggering quantities of pills.

334.    At an AAPM annual meeting held February 22 through 25, 2006, Cephalon sponsored a presentation by Webster and others titled, "Open-label study of fentanyl effervescent buccal tablets in patients with chronic pain and breakthrough pain: Interim safety results." The presentation's agenda description states: "Most patients with chronic pain experience episodes of breakthrough pain, yet no currently available pharmacologic agent is ideal for its treatment." The

DOCUMENT 2

presentation purports to cover a study analyzing the safety of a new form of fentanyl buccal tablets in the chronic pain setting and promises to show the "[i]nterim results of this study suggest that [fentanyl buccal] is safe and well-tolerated in patients with chronic pain and [breakthrough pain]." This CME effectively amounted to off-label promotion of Cephalon's opioids, even though they were approved only for cancer pain.

335.    Cephalon sponsored a CME written by Dr. Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating breakthrough pain because of dose limitations on the non-opioid component.

### c.    Dr. Perry Fine

336.    Dr. Perry Fine's ties to the Marketing Defendants have been well documented. He has authored articles and testified in court cases and before state and federal committees, and he, too, has argued against legislation restricting high-dose opioid prescriptions for non-cancer patients. He has provided medical legal consulting for Janssen and participated in CME activities for Endo, along with serving in these capacities for several other drug companies. He co-chaired the APS-AAPM Opioid Guideline Panel, served as treasurer of the AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and was also on the board of directors of APF.[164]

337.    Multiple videos feature Dr. Fine delivering educational talks about prescription opioids. He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith before her death for pain did not make her an addict.

---

[164] Scott M. Fishman, MD, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306    (13)    JAMA    1445    (Sept.    20,    2011),    https://jamanetwork.com/journals/jama/article-abstract/1104464?redirect=true.

338.    Dr. Fine has also acknowledged having failed to disclose numerous conflicts of interest. For example, Dr. Fine failed to fully disclose payments received as required by his employer, the University of Utah – telling the university that he had received under $5,000 in 2010 from Johnson & Johnson for providing "educational" services, but Johnson & Johnson's website states that the company paid him $32,017 that year for consulting, promotional talks, meals, and travel.[165]

339.    Dr. Fine and Dr. Portenoy co-wrote *A Clinical Guide to Opioid Analgesia* in which they downplayed the risks of opioid treatment such as respiratory depression and addiction:

> At clinically appropriate doses . . . respiratory rate typically does not decline. Tolerance to the respiratory effects usually develops quickly, and doses can be steadily increased without risk.

> Overall, the literature provides evidence that the outcomes of drug abuse and addiction are rare among patients who receive opioids for a short period (i.e., for acute pain) and among those with no history of abuse who receive long-term therapy for medical indications.[166]

340.    In November 2010, Dr. Fine and others published an article presenting the results of another Cephalon-sponsored study titled "Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study."[167] In that article, Dr. Fine explained that the 18-month "open-label" study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for non-

---

[165] Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry.

[166] Perry G. Fine, MD and Russell K. Portenoy, MD, *A Clinical Guide to Opioid Analgesia* 20 and 34, McGraw-Hill Companies (2004), http://www.tnblack.com/links/RSD/OpioidHandbook.pdf.

[167] Perry G. Fine et al., *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).

cancer pain."[168] The article acknowledged that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic non-cancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[169]

341.    The article concluded: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in most cases, predictable, manageable, and tolerable." They also conclude that the number of abuse-related events was "small."[170]

342.    Multiple videos feature Dr. Fine delivering educational talks about the drugs. In one video from 2011 titled "Optimizing Opioid Therapy," he sets forth a "Guideline for Chronic Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) not only for cancer patients, but also for non-cancer patients, and suggests it may take four or five switches over a person's "lifetime" to manage pain.[171] He states the "goal is to improve effectiveness which is different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events *over the course of years*."[172] The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids can be used to treat *sleep apnea*. He further states

---

[168] *Id.*
[169] *Id.*
[170] *Id.*
[171] Perry A. Fine, M.D., *Safe and Effective Opioid Rotation*, YouTube.com (Nov. 8, 2012), https://www.youtube.com/watch?v=_G3II9yqgXI.
[172] *Id.*

that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture."[173]

### d.   Dr. Scott Fishman

343.   Dr. Scott Fishman is a physician whose ties to the opioid drug industry are multitudinous. He has served as an APF board member and as president of the AAPM and has participated yearly in numerous CME activities for which he received "market rate honoraria." As discussed below, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Marketing Defendants. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. He has acknowledged his failure to disclose all potential conflicts of interest in a letter in the *Journal of the American Medical Association* titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."[174]

344.   Dr. Fishman authored a physician's guide on the use of opioids to treat chronic pain titled "Responsible Opioid Prescribing" in 2007, which promoted the notion that long-term opioid treatment was a viable and safe option for treating chronic pain.

345.   In 2012, Dr. Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, it's critical to remember that the problem of unrelieved pain remains as urgent as ever.[175]

---

[173] *Id.*
[174] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13) JAMA 1445 (2011); Weber, *Two Leaders in Pain*, *supra* n. 165.
[175] Scott M. Fishman, *Responsible Opioid Prescribing: A Guide for Michigan Clinicians*, 10-11 (Waterford Life Sciences 2012).

The updated guide still assures that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins."[176]

346.    In another guide by Dr. Fishman, he continues to downplay the risk of addiction: "I believe clinicians must be cautious with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict."[177] The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."

### 4.    The Marketing Defendants Disseminated Their Misrepresentations Through CME Programs

347.    Now that the Marketing Defendants had both a group of physician promoters and had built a false body of "literature," Defendants needed to make sure their false marketing message was widely distributed.

348.    One way the Marketing Defendants aggressively distributed their false message was through countless continuing medical education programs ("CME").

349.    Doctors are required to attend a certain number and, often, the type of CME programs each year as a condition of their licensure. These programs are generally delivered in person, often in connection with professional organizations' conferences, online, or through written publications. Doctors rely on CMEs not only to satisfy licensing requirements but also to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because CMEs typically are taught by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

---

[176] *Id.*
[177] Scott M. Fishman, *Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication* 45 (Oxford University Press 2012).

350.    The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation. As one target, Defendants aimed to reach general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to the Marketing Defendants' deceptions.

351.    The Marketing Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain, focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids, and frequently omitted or downplayed their risks and adverse effects.

352.    Cephalon sponsored numerous CME programs, which were made widely available through organizations like Medscape, LLC ("Medscape") and which disseminated false and misleading information to physicians across the country.

353.    Another Cephalon-sponsored CME presentation titled *Breakthrough Pain: Treatment Rationale with Opioids* was available on Medscape starting September 16, 2003 and was given by a self-professed pain management doctor who "previously operated back, complex pain syndromes, the neuropathies, and interstitial cystitis." He describes the pain process as a non-time-dependent continuum that requires a balanced analgesia approach using "targeted pharmaco therapeutics to affect multiple points in the pain-signaling pathway."[178] The doctor lists fentanyl as one of the most effective opioids available for treating breakthrough pain, describing its use as

---

[178]    Daniel   S.   Bennett,   *Breakthrough   Pain:   Treatment   Rationale   With   Opioids*,   Medscape, http://www.medscape.org/viewarticle/461612.

an expected and normal part of the pain management process.[179] Nowhere in the CME is cancer or cancer-related pain even mentioned, despite FDA restrictions that fentanyl use be limited to cancer-related pain.

354.    Teva paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain. The CME is still available online.

355.    *Responsible Opioid Prescribing* was sponsored by Endo and Teva. The FSMB website described it as the "leading continuing medical education (CME) activity for prescribers of opioid medications." Endo sales representatives distributed copies of *Responsible Opioid Prescribing* with a special introductory letter from Dr. Fishman.

356.    In all, more than 163,000 copies of *Responsible Opioid Prescribing* were distributed nationally.

357.    The American Medical Association ("AMA") recognized the impropriety that pharmaceutical company-funded CMEs create, stating that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urged that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."[180]

358.    Physicians attended or reviewed CMEs sponsored by the Marketing Defendants during the relevant time period and were misled by them.

---

[179] *Id.*
[180] Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011).

359.    By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, the Marketing Defendants expected and understood that instructors would deliver messages favorable to them, as these organizations were dependent on the Marketing Defendants for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Marketing Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids. Producers of CMEs and the Marketing Defendants both measure the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

### 5. The Marketing Defendants Used "Branded" Advertising to Promote Their Products to Doctors and Consumers

360.    The Marketing Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Marketing Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the Journal of Pain and Clinical Journal of Pain, to journals with wider medical audiences, such as the Journal of the American Medical Association. The Marketing Defendants collectively spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001. The 2011 total includes $4.9 million by Janssen and $1.1 million by Endo.

361.    The Marketing Defendants also targeted consumers in their advertising. They knew that physicians are more likely to prescribe a drug if a patient specifically requests it.[181] They also knew that this willingness to acquiesce to such patient requests holds true even for opioids and for

---

[181] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it, compared with 1% of those making no specific request. J.B. McKinlay et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52(2) Med. Care 294 (2014).

conditions for which they are not approved.[182] Endo's research, for example, found that such communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. The Marketing Defendants thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physician's office.

### 6.     The Marketing Defendants Used "Unbranded" Advertising to Promote Opioid Use for Chronic Pain Without FDA Review

362.    The Marketing Defendants also aggressively promoted opioids through "unbranded advertising" to generally tout the benefits of opioids without specifically naming a particular brand-name opioid drug. Instead, unbranded advertising is usually framed as "disease awareness" – encouraging consumers to "talk to your doctor" about a certain health condition without promoting a specific product and, therefore, without providing balanced disclosures about the product's limits and risks. In contrast, a pharmaceutical company's "branded" advertisement that identifies a specific medication and its indication (i.e., the condition which the drug is approved to treat) must also include possible side effects and contraindications – what the FDA Guidance on pharmaceutical advertising refers to as "fair balance." Branded advertising is also subject to FDA review for consistency with the drug's FDA-approved label. Through unbranded materials, the Marketing Defendants expanded the overall acceptance of and demand for chronic opioid therapy without the restrictions imposed by regulations on branded advertising.

### 7.     The Marketing Defendants Funded, Edited and Distributed Publications That Supported Their Misrepresentations

---

[182] *Id.*

104

363.    The Marketing Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was calculated to shape the perceptions of prescribers, patients, and payors. This literature served marketing goals, rather than scientific standards, and was intended to persuade doctors and consumers that the benefits of long-term opioid use outweighed the risks.

364.    To accomplish their goal, the Marketing Defendants – sometimes through third-party consultants and/or Front Groups – commissioned, edited, and arranged for the placement of favorable articles in academic journals.

365.    The Marketing Defendants' plans for these materials did not originate in the departments with the organizations that were responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients; rather, they originated in the Marketing Defendants' marketing departments.

366.    The Marketing Defendants made sure that favorable articles were disseminated and cited widely in the medical literature, even when the Marketing Defendants knew that the articles distorted the significance or meaning of the underlying study, as with the Porter & Jick letter. The Marketing Defendants also frequently relied on unpublished data or posters, neither of which are subject to peer review, but were presented as valid scientific evidence.

367.    The Marketing Defendants published or commissioned deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy.

368.    For example, in 2007 Cephalon sponsored the publication of an article titled "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Non-cancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate,"[183] published in the nationally circulated Journal of Pain Medicine, to support its effort to expand the use of its branded fentanyl products. The article's authors (including Dr. Webster, discussed above) stated that the "OTFC [fentanyl] has been shown to relieve BTP [breakthrough pain] more rapidly than conventional oral, normal-release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of non-cancer pain patients." The number-one-diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cites Portenoy and recommends fentanyl for non-cancer BTP patients:

369.    In summary, BTP appears to be a clinically important condition in patients with chronic non-cancer pain and is associated with an adverse impact on QoL. This qualitative study on the negative impact of BTP and the potential benefits of BTP-specific therapy suggests several domains that may be helpful in developing BTP-specific, QoL assessment tools.[184]

### 8.    The Marketing Defendants Used Speakers' Bureaus and Programs to Spread Their Deceptive Messages

370.    In addition to making sales calls, the Marketing Defendants' detailers also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers with meals paid for by the Marketing Defendants. These speaker programs and associated speaker training served three purposes: they provided 1) an incentive to doctors to prescribe, or

---

[183] Donald R. Taylor et al., *Impact of Breakthrough Pain on Quality of Life in Patients With Chronic, Non-cancer Pain: Patient Perceptions and Effect of Treatment With Oral Transmucosal Fentanyl Citrate (OTFC, ACTIQ)*, 8(3) Pain Med. 281-88 (Mar. 2007), *available at* https://academic.ouop.com/painmedicine/article/8/3/281/1829094.
[184] *Id.*

increase their prescriptions of, a particular drug; 2) an opportunity for doctors to be selected to attend forum at which the drug companies could further market to the speaker himself or herself; and 3) an opportunity for the doctors to market to their peers. The Marketing Defendants graded their speakers, and future opportunities were based on speaking performance, post-program sales, and product usage. Janssen, Endo, and Cephalon each made thousands of payments to physicians nationwide, for activities including participating on speakers' bureaus, providing consulting services, and other services.

### C. The Marketing Defendants' Goal Was for More Patients to Take More Opioids at Higher Doses for Longer Periods of Time

#### 1. The Marketing Defendants Focused on Vulnerable Populations In Order to Increase the Patient Population

371.    The Marketing Defendants specifically targeted their marketing at two particularly vulnerable populations – the elderly and veterans – who tend to suffer from chronic pain.

372.    The Marketing Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, a 2016 CDC Guideline observes that existing evidence confirms that elderly patients taking opioids suffer from elevated fall and fracture risks, reduced renal function and medication clearance, and a smaller window between safe and unsafe dosages.[185] Elderly patients taking opioids have also been found to have a greater risk for hospitalizations and increased vulnerability to adverse drug effects and interactions, such as respiratory depression. The 2016 CDC Guideline concludes that there must be "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients.[186]

#### 2. Increasing Dosages and Increasing Them Quickly to Keep Patients on Longer

---

[185] CDC Guideline, *supra* n. 26.
[186] *Id.* at 27.

373.    In order to promote long-term sales, the Marketing Defendants promoted the prescription of higher dosages of opioids. There were several dimensions to this. First, the Marketing Defendants charged more for the higher dosages. More importantly, patients who took higher dosages would stay on opioids longer.

374.    The Marketing Defendants' focus on increasing dosages, and increasing the duration of opioid usage, had devastating consequences for patients. Patients exposed to higher dosages, and for longer periods of time, are many times more likely to become addicted, and to overdose.

### D. The Marketing Defendants' Scheme Succeeded, Creating a Public Health Epidemic

#### 1.    The Marketing Defendants Dramatically Expanded Opioid Prescribing and Use

375.    The Marketing Defendants necessarily expected a return on the enormous investment they made in their deceptive marketing scheme, and they worked to measure and expand their success. Their own documents show that they knew they were influencing prescribers and increasing prescriptions. Studies also show that in doing so, they fueled an epidemic of addiction and abuse.

376.    Cephalon also recognized the return of its efforts to market Actiq and Fentora off-label for chronic pain. In 2000, Actiq generated $15 million in sales. By 2002, Actiq sales had increased by 92%, which Cephalon attributed to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[187] Actiq became Cephalon's second best-selling drug.

---

[187]    Cephalon, Inc. Annual Report (Form 10-K) at 28 (Mar. 31, 2003), https://www.sec.gov/Archives/edgar/data/873364/000104746903011137/a2105971z10-k.htm.

DOCUMENT 2

By the end of 2006, Actiq's sales had exceeded $500 million.[188] Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. One measure suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[189]

377.    Each of the Marketing Defendants tracked the impact of their marketing efforts to measure their impact in changing doctors' perceptions and prescribing of their drugs. They purchased prescribing and survey data that allowed them to closely monitor these trends, and they did actively monitor them. For instance, they monitored doctors' prescribing before and after detailing visits and before and after speaker programs. Defendants continued and, in many cases, expanded and refined their aggressive and deceptive marketing for one reason: it worked. As described in this Complaint, both in specific instances (e.g., the low abuse potential of various Defendants' opioids), and more generally, Defendants' marketing changed prescribers' willingness to prescribe opioids, led them to prescribe more of their opioids, and persuaded them not to stop prescribing opioids or to switch to "safer" opioids, such as ADF.

378.    This success would have come as no surprise. Drug company marketing materially impacts doctors' prescribing behavior.[190] The effects of sale calls on prescribers' behavior are well

---

[188] John Carreyrou, *Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs*, THE WALL STREET JOURNAL (Nov. 3, 2006), https://www.wsj.com/articles/SB116252463810112292.

[189] *Id.*

[190] *See, e.g.*, P. Manchanda & P. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis*, 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); Ian Larkin et al., *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children*, 33(6) Health Affairs 1014 (2014), *available at* https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2013.0939?url_ver=Z39.88-2003&rfr_id=ori%3Arid%3Acrossref.org&rfr_dat=cr_pub%3Dpubmed& (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* A. Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am J. Pub. Health 221 (2009) *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/ (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997 to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls) (hereinafter "*Commercial Triumph*").

documented in the literature. One study examined four practices, including visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on drug utilization. An additional study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

379.    Marketing Defendants spent millions of dollars to market their drugs to prescribers and patients, and meticulously tracked their return on that investment. In one recent survey published by the AMA, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic non-cancer pain.[191] These results are directly due to the Marketing Defendants' fraudulent marketing campaign focused on several misrepresentations.

380.    Thus, both independent studies and Defendants' own tracking confirm that Defendants' marketing scheme dramatically increased their sales.

## 2.    The Marketing Defendants' Deception in Expanding Their Market Created and Fueled the Opioid Epidemic

381.    Independent research demonstrates a close link between opioid prescriptions and opioid abuse. For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[192] It has been

---

[191] CS Hwang et al., *Prescription Drug Abuse: A National Survey of Primary Care Physicians*, 175 JAMA Intern. Med. 302 (2014), doi: 10.1001/jamainternmed.2014.6520, https://www.ncbi.nlm.nih.gov/pubmed/25485657.

[192] Theodore J. Cicero et al., *Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States*, 16 Pharmacoepidemiology and Drug Safety, 827-40 (2007), doi: 10.1002/pds.1452, https://www.cdhs.udel.edu/content-sub-site/Documents/Publications/Relationship%20Between%20Therapeutic%20Use%20and%20Abuse%20of%20Opioid%20Analgesics.pdf.

estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

382.    There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes." The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[193]

383.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

**E.    Each of the Marketing Defendants Made Materially Deceptive Statements and Concealed Material Facts**

384.    As alleged herein, the Marketing Defendants made and/or disseminated deceptive statements regarding material facts and further concealed material facts in the course of manufacturing, marketing, and selling prescription opioids. The Marketing Defendants' actions were intentional and/or unlawful. Such statements include, but are not limited to, those set out below and alleged throughout this Complaint.

385.    As a part of their deceptive marketing scheme, the Marketing Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the United States. For example, the Marketing Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs but were less likely

---

[193] *See* Califf et al., *supra* n. 32.

to be educated about treating pain and the risks and benefits of opioids and therefore more likely

to accept the Marketing Defendants' misrepresentations.

## 1. **Endo**

386.   Defendant Endo made and/or disseminated deceptive statements, and concealed

material facts in such a way to make their statements deceptive, including, but not limited to, the

following:

     a.   Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

     b.   Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

     c.   Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high-risk patients;

     d.   Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

     e.   Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

     f.   Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

     g.   Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

     h.   Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.    Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.    Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.    Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.    Directly distributing and assisting in the dissemination of literature written by pro- opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.    Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.    Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

## 2. **Janssen**

387.    Defendant Janssen made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.    Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.    Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c.    Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

DOCUMENT 2

d.   Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e.   Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

f.   Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g.   Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including inpatient education materials, concerning the use of opioids to treat chronic non-cancer pain;

h.   Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

i.   Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

j.   Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.   Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

l.   Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

m.   Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

114

     n.    Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

**3.**    **Assertio**

388.    Defendant Assertio has, since at least October 2011, made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive with respect to Lazanda and (with the acquisition from Janssen in January 2015) of Nucynta and Nucynta ER, including, but not limited to:

    a.    Promoting the usage of Lazanda with patients not suffering from cancer;

    b.    Endorsing, supporting, and pressuring its sales representative to target pain management physicians, particularly those who historically wrote large numbers of Lazanda-like drugs;

    c.    Discouragement of sales representatives from targeting physicians treating cancer patients in contradiction to the FDA approved warning indicating that Lazanda is only indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain;"

    d.    Training of sales representatives on how to deal with pushback from physicians;

    e.    Promotion of Nucynta and Nucynta ER for all manner of pain management while downplaying the drug's addictive nature;

    f.    Promoting its drugs as a safer alternative than other opioids;

    g.    Telling investors that Lazanda is safe. August Moretti, Assertio's Senior Vice President and Chief Financial Officer, stated that "[a]lthough not in the label, there's a very low abuse profile and side effect rate."

**4.**    **Cephalon**

389.    Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

    a.    Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.    Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

c.    Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

d.    Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

e.    Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

f.    Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g.    Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

h.    Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

i.    Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

j,    Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

### 5. Actavis

390.    Defendant Actavis made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.    Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

b.    Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

c.   Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

d.   Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

391.   A Kadian prescriber guide deceptively represents that Kadian is more difficult to abuse and less addictive than other opioids. Kadian's prescriber guide is full of disclaimers that Actavis has not done any studies on the topic and that the guide is "only intended to assist you in forming your own conclusion." However, the guide includes the following statements: 1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and 2) "KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action," "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine," "Long duration of action," and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state." The guide is copyrighted by Actavis in 2007 before Actavis officially purchased Kadian from Alpharma.

## VI.   DEFENDANTS THROUGHOUT THE SUPPLY PROCESS DELIBERATELY DISREGARDED THEIR DUTIES TO MAINTAIN EFFECTIVE CONTROLS AND TO IDENTIFY, REPORT, AND TAKE STEPS TO HALT SUSPICIOUS ORDERS

392.   The Marketing Defendants created a vastly and dangerously larger market for opioids. All of the Defendants compounded this harm by facilitating the supply of far more opioids than could have been justified to serve that market. The failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to not fill prescriptions that they knew or should have known were suspicious breached both their statutory and common law duties.

117

393.    Marketing Defendants' scheme was resoundingly successful. Chronic opioid therapy – the prescribing of opioids long-term to treat chronic pain – has become commonplace and often first-line treatment. Marketing Defendants' deceptive marketing caused prescribing not only of their opioids but also of opioids as a class, to skyrocket. According to the CDC, opioid prescriptions, as measured by the number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. While previously a small minority of opioid sales, today between 80% and 90% of opioids (measured by weight) used are for chronic pain. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids.

394.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[194] Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[195]

**A.   All Defendants Have, and Breached Duties to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders**

395.    Multiple sources impose duties on Defendants with respect to the supply of opioids, including the common law duty to exercise reasonable care.

396.    Each Defendant was also required to register with the Alabama Board of Pharmacy and certify compliance with Alabama law. The "Alabama Uniform Controlled Substances Act," Ala. Code 1975 §§ 20-2-1 *et seq.* provides, *inter alia*, that anyone who "manufactures, distributes,

---

[194] 2000-2014 Increases in Drug and Opioid Overdose Deaths, *supra* n. 46.
[195] *Id.*

or dispenses" any controlled substance in Alabama must obtain a registration annually. issued by the certifying boards. § 20-2-51(a). Such registrants must abide by the terms of their issued registration and act "in conformity with the other provisions of this article." § 20-2-51(b). Ala. Code 1975 §§ 20-2-56 requires registrants to maintain records in conformity "with any additional rules issued by the State Board of Medical Examiners, the State Board of Health, or the State Board of Pharmacy." Ala. Code 1975 §§ 20-2-210 through 220 created the "Controlled Substances Prescription Database" and imposes mandatory reporting requirements on registrants.

397.    The Defendants also had legal duties under Alabama common law, statutes and regulations to maintain adequate records, prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids. This includes the common law of fraud, statutes designed to generally prohibit unfair and deceptive acts in commerce, as well as statutes specifically prohibiting deceptive practice relating to drugs. Ala. Admin. Code r.680-X-2-.23 requires distributors (a term defined quite broadly) "to establish and maintain inventories and records of all transactions regarding the receipt and distribution or other disposition of drugs," § 2(e), to forward to the Board of Pharmacy "[c]opies of records and reports required by the [DEA] concerning increases in purchases or high or unusual volumes purchased by pharmacies," § 2(e)5, and to comply with "applicable federal, state and municipal laws and regulations." § 2(k)3. Ala. Admin. Code r. 680-X-3-.05 requires "[a]ny manufacturer, wholesaler or distributor of controlled substances doing business in the State of Alabama" to "submit to the Alabama State Board of Pharmacy legible copies of records and reports required by the Drug Enforcement Administration concerning increases in purchases or high or unusual volumes purchased by pharmacies within 30 days."

398.    These prescription drugs are regulated for the purpose of providing a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[196]

399.    "Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities."[197]

400.    The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and the subsequent plague of opioid addiction, with costs and damages necessarily inflicted on and incurred by Plaintiff and others.

401.    The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality, along with the costs imposed upon Plaintiff and others associated with the treatment of these conditions and related health consequences caused by opioid abuse.

402.    Finding it impossible to legally achieve their ever-increasing sales ambitions, Defendants engaged in the common purpose of increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and distribution of their prescription opioids.

---

[196] See 1970 U.S.C.C.A.N. 4566, 4571-72.

[197] Brief for Healthcare Distribution Mgmt. Association and National Ass'n of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 (hereinafter "Brief for HDMA and NACDS"). The Healthcare Distribution Mgmt. Ass'n (HDMA or HMA) – now known as the Healthcare Distribution Alliance (HDA) – is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others: AmerisourceBergen Drug Corporation and Cardinal Health, Inc. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about. The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others: Walgreen Company, CVS Health, Rite Aid Corporation and Walmart. *See generally* NACDS, *Mission*, https://www.nacds.org/%20about/mission/.

403. The Marketing Defendants engaged in the practice of paying rebates and/or chargebacks to entities for sales of prescription opioids as a way to help them boost sales and better target their marketing efforts. The Washington Post has described the practice as industry-wide, and the Healthcare Distribution Alliance ("HDA") includes a "Contracts and Chargebacks Working Group," suggesting a standard practice. The transaction information contains data relating to the direct customer sales of controlled substances to "downstream registrants", meaning pharmacies or other dispensaries, such as hospitals. Marketing Defendants buy data from pharmacies as well. This exchange of information, upon information and belief, would have opened channels providing for the exchange of information revealing suspicious orders as well.

404. A dramatic example of the use of prescription information provided by IMS Health was described in Congressional testimony:

> Mr. Greenwood: Well, why do you want that [IMS Health] information then?
>
> Mr. Friedman: Well, we use that information to understand what is happening in terms of the development of use of our product in any area.
>
> Mr. Greenwood: And so the use of it–and I assume that part of it–a large part of it you want is to see how successful your marketing techniques are so that you can expend money in a particular region or among a particular group of physicians– you look to see if your marketing practices are increased in sales. And, if not, you go back to the drawing board with your marketers and say, how come we spent "X" number of dollars, according to these physicians, and sales haven't responded. You do that kind of thing. Right?
>
> Mr. Friedman: Sure.[198]

405. The contractual relationships among the Defendants also include vault security programs. Defendants are required to maintain certain security protocols and storage facilities for

---

[198] *Oxycontin: Its Use and Abuse: Hearing Before the H. Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce*, 107th Cong. 1 (Aug. 28, 2001) (statement of Michael Friedman, Executive Vice President, Chief Operating Officer, Purdue Pharma, L.P.), https://www.gpo.gov/fdsys/pkg/CHRG-I07hhrg75754/html/CHRG-107hh.rg75754.htm.

the manufacture and distribution of their opiates. The Defendants negotiated agreements whereby the Marketing Defendants installed security vaults for distributors of their product in exchange for agreements to maintain minimum sales performance thresholds. These agreements were used by the Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

### 1.    Defendants' Use of Trade and Other Organizations

406.    In addition, Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and the Healthcare Distribution Alliance ("HDA").

#### a.    Pain Care Forum

407.    PCF has been described as a coalition of drugmakers, trade groups, and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

408.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drugmakers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[199] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[200]

---

[199] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (Sept. 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic. (emphasis added).
[200] *Id.*

409.   The Defendants who stood to profit from expanded prescription opioid use are members of and/or participants in the PCF.[201] In 2012, membership and participating organizations included Endo, Actavis, and Cephalon. Each of the Marketing Defendants worked together through the PCF.

### b.   Healthcare Distribution Alliance

410.   Additionally, the HDA led to the formation of interpersonal relationships and an organization among the Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Marketing Defendants, including Actavis, Endo, and Cephalon, were members of the HDA.[202] Additionally, the HDA eagerly sought the active membership and participation of the Marketing Defendants by advocating for the many benefits of members, including "strengthening . . . alliances."[203]

411.   Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[204] The HDA used membership in the HDA as an opportunity to create interpersonal and ongoing organizational relationships and "alliances."

412.   The application for manufacturer membership in the HDA further indicates the level of connection among the Defendants and the level of insight that they had into each other's

---

[201]   *PAIN   CARE   FORUM   2012   Meetings   Schedule*,   (last   updated   Dec.   2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf.
[202] *Manufacturer Membership*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/about/membership/manufacturer.
[203] *Id.*
[204] *Id.*

businesses.[205] For example, the manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company.

413.    The HDA application also requests that the manufacturer identify its current distribution information, including the facility name and contact information. Manufacturer members were also asked to identify their "most recent year-end net sales" through wholesale distributors.

414.    The closed meetings of the HDA's councils, committees, task forces and working groups provided the Marketing Defendants and distributors of their products with the opportunity to work closely together, confidentially, to develop and further the common purpose and interests of the enterprise.

415.    The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA advertises these conferences to the Marketing Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[206] The conferences also gave the Marketing Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[207] The HDA and its conferences were significant opportunities for the Marketing Defendants to interact at a high-level of leadership. The Marketing Defendants embraced this opportunity by attending and sponsoring these events.[208]

---

[205] *Id.*

[206] *Business and Leadership Conference – Information for Manufacturers*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-business-and- leadership-conference/blc-for-manufacturers (last visited Aug. 1, 2018, and no longer available).

[207] *Id.*

[208] *2015 Distribution Management Conference and Expo*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

416.    After becoming members of the HDA, Defendants were eligible to participate on councils, committees, task forces and working groups, including:

    a.    Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

    b.    Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes marketing members.

    c.    Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes marketing members.

    d.    Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.

    e.    Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation in this group includes marketing members.

417.    The Marketing Defendants also participated, through the HDA, in Webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including purchase orders, acknowledgments, ship notices, and invoices.[209] For example, on April 27, 2011, the HDA offered a Webinar to "accurately and effectively exchange business transactions

---

[209] *Webinars*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

between distributors and manufacturers…" The Marketing Defendants used this information to gather high-level data regarding overall distribution and to direct distributors on how to most effectively sell prescription opioids.

418.    The HDA and the Pain Care Forum are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of the Defendants were in communication and cooperation.

419.    Publications and guidelines issued by the HDA confirm that the Defendants utilized their membership in the HDA to form agreements. Specifically, in the fall of 2008, the HDA published the *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (the "Industry Compliance Guidelines") regarding diversion. As the HDA explained in an amicus brief, the Industry Compliance Guidelines were the result of "[a] committee of HDMA members contribut[ing] to the development of this publication" beginning in late 2007.

420.    This statement by the HDA and the Industry Compliance Guidelines support the allegation that Defendants utilized the HDA to form agreements about their approach to their duties under the law. As John M. Gray, President/CEO of the HDA stated to the Energy and Commerce Subcommittee on Health in April 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications." Here, it is apparent that all of the Defendants found the same balance – an overwhelming pattern and practice of failing to identify, report or halt suspicious orders, and failure to prevent diversion.

421.    The Defendants' scheme had a decision-making structure driven by the Marketing Defendants. The Marketing Defendants worked together to control the government's responses to

126

the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

422.    The Defendants worked together to control the flow of information and to influence governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution. The Marketing Defendants did this through their participation in the PCF and HDA.

423.    The Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas, and Procurement Quotas allowed by the DEA remained artificially high. In so doing, they ensured that suspicious orders were not reported to the DEA, and, further, in so doing, they ensured that the DEA had no basis for either refusing to increase production quotas or decreasing production quotas due to diversion.

424.    The Defendants also had reciprocal obligations to report suspicious orders of other parties if they became aware of them. Defendants were thus collectively responsible for each other's compliance with reporting obligations.

425.    Defendants thus knew that their own conduct could be reported by other distributors or manufacturers and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting of suspicious orders to ensure consistency in their dealings with DEA.

426.    The desired consistency was achieved. As described below, none of the Defendants reported suspicious orders and the flow of opioids continued unimpeded.

**2.      Defendants Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers**

427.   The data that reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's Confidential Automation of Reports and Consolidated Orders System (ARCOS) database. The data necessary to identify with specificity the transactions that were suspicious is in possession of the Defendants but has not been disclosed to the public.

428.   Publicly available information confirms that the Marketing Defendants and National Retail Pharmacies Defendants funneled far more opioids into the Tribe and its communities than could have been expected to serve legitimate medical use and ignored other red flags of suspicious orders. This information, along with the information known only to Marketing Defendants, would have alerted them to potentially suspicious orders of opioids.

429.   This information includes the following facts:

    a.   manufacturers have access to detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

    b.   manufacturers make use of that data to target their marketing and, for that purpose, regularly monitor the activity of doctors and pharmacies;

    c.   manufacturers regularly visit pharmacies and doctors to promote and provide their products and services, which allows them to observe red flags of diversion; and

    d.   Marketing Defendants purchased chargeback data (in return for discounts to distributors) that allowed them to monitor the combined flow of opioids into a pharmacy or geographic area.

430.   The conclusion that Defendants were on notice of the problems of abuse and diversion follows inescapably from the fact that they flooded communities with opioids in quantities that they knew or should have known exceeded any legitimate market for opioids-even the wider market for chronic pain.

431.   At all relevant times, the Defendants were in possession of national, regional, state, and local prescriber-and patient-level data that allowed them to track prescribing patterns over time. They obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

432.   Defendants purchased nationwide, regional, state, and local prescriber- and patient-level data from the Data Vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc. The Data Vendors' information purchased by the Defendants allowed them to view, analyze, compute, and track their competitors' sales, and to compare and analyze market share information.[210]

433.   IMS Health, for example, provided Defendants with reports detailing prescriber behavior and the number of prescriptions written between competing products.[211]

434.   Similarly, Wolters Kluwer, an entity that eventually owned data mining companies that were created by Cardinal (ArcLight), provided the Defendants with charts analyzing the weekly prescribing patterns of multiple physicians, organized by territory, regarding competing drugs and analyzed the market share of those drugs.[212]

435.   This information allowed the Defendants to track and identify instances of overprescribing. In fact, one of the Data Vendors' experts testified that the Data Vendors'

---

[210] A Verispan representative testified that the National Retail Pharmacies Defendants use the prescribing information to "drive market share." *Sorrell v. IMS Health Inc.*, 2011 WL 661712, *9-10 (Feb. 22, 2011).

[211] Paul Kallukaran & Jerry Kagan, *Data Mining at IMS HEALTH: How we Turned a Mountain of Data into a Few Information-rich Molehills,*
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.198.349&rep=rep1&type=pdf, Figure 2 at p. 3.

[212] *Sorrell v. IMS Health Inc.*, 2011 WL 705207, at *467-471 (Feb. 22, 2011).

information could be used to track, identify, report and halt suspicious orders of controlled substances.[213] Defendants were, therefore, collectively aware of the suspicious orders that flowed from their facilities.

436.    Sales representatives were also aware that the prescription opioids they were promoting were being diverted, often with lethal consequences. As a sales representative wrote on a public forum:

> Actions have consequences - so some patient gets Rx'd the 80mg OxyContin when they probably could have done okay on the 20mg (but their doctor got "sold" on the 80mg) and their teen son/daughter/child's teen friend finds the pill bottle and takes out a few 80's . . . next they're at a pill party with other teens and some kid picks out a green pill from the bowl . . . they go to sleep and don't wake up (because they don't understand respiratory depression). Stupid decision for a teen to make . . . yes . . . but do they really deserve to die?

437.    Defendants' obligation to report suspicious prescribing ran head-on into their marketing strategy. Defendants did identify doctors who were their most prolific prescribers. However, this was done not to report them, but to market to them. It would make little sense to focus on marketing to doctors who may be engaged in improper prescribing only to report them to law enforcement.

438.    Defendants purchased data from IMS Health (now IQVIA) or other proprietary sources to identify doctors to target for marketing and to monitor their own and competitors' sales. Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high frequency detailing visits. This focus on marketing to the highest prescribers demonstrates that manufacturers were keenly aware of the

---

[213] In *Sorrell*, expert Eugene "Mick" Kolassa testified, on behalf of the Data Vender, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." *Id*; *see also* Joint Appendix in *Sorrell v. IMS Health*, 2011 WL 687134, at *204 (Feb. 22, 2011).

doctors who were writing large quantities of opioids. But instead of investigating or reporting those doctors, Defendants were singularly focused on maintaining, capturing, or increasing their sales.

439.    Whenever examples of opioid diversion and abuse have drawn media attention, Marketing Defendants have consistently blamed "bad actors." But given the closeness with which they monitored prescribing patterns through IMS Health data, the Defendants either knew or chose not to know of the obvious drug diversions.

440.    As discussed below, Endo knew that Opana ER was widely abused. Yet, the New York Attorney General revealed, based on information obtained in an investigation into Endo, that Endo sales representatives were not aware that they had a duty to report suspicious activity and were not trained on the company's policies or duties to report suspicious activity, and Endo paid bonuses to sales representatives for detailing prescribers who were subsequently arrested for illegal prescribing.

441.    Sales representatives making in-person visits to such clinics were likewise not fooled. But as pill mills were lucrative for the manufacturers and individual sales representatives alike, Marketing Defendants and their employees turned a collective blind eye, allowing certain clinics to dispense staggering quantities of potent opioids and feigning surprise when the most egregious examples eventually made the nightly news.

**3.    Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement**

442.    When a manufacturer does not report or stop suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse. This, in turn, fuels and expands the illegal market and results in opioid-related overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action – or may not know to take action at all.

443.     After being caught failing to comply with particular obligations at particular facilities, Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens.

444.     Other Marketing Defendants also misrepresented their compliance with their legal duties and their cooperation with law enforcement.

445.     Public statements by the Defendants and their associates created the false and misleading impression to regulators, prescribers, and the public that the Defendants rigorously carried out their legal duties, including their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

### B. The Marketing Defendants' Unlawful Failure to Prevent Diversion and Monitor, Report, and Prevent Suspicious Orders

446.     The legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids are legally required of the Marketing Defendants under Alabama law. The Marketing Defendants were required to register with the Alabama Board of Pharmacy and the DEA to manufacture and distribute Schedule II controlled substances, like prescription opioids. A requirement of such registration is to comply with laws requiring them to maintain effective controls against the diversion of controlled substances or precursor chemicals to unauthorized persons or entities. Defendants failed to maintain effective controls as required, and to comply with the other requirements imposed by Alabama law.

447.     The Marketing Defendants breached these duties.

448.     The Marketing Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The

Marketing Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Marketing Defendants knew – just as the Distributors knew – the volume, frequency, and pattern of opioid orders being placed and filled. The Marketing Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

449.    The Marketing Defendants utilized industry-wide "charge backs" and receipt and review of data from opioid distributors regarding orders of opioids.

450.    Through, *inter alia*, the charge back data, the Marketing Defendants could monitor suspicious orders of opioids.

451.    The Marketing Defendants failed to monitor, report, and halt suspicious orders of opioids as required by law.

452.    The Marketing Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

453.    The Marketing Defendants have misrepresented their compliance with the laws regulating controlled substances.

454.    The wrongful actions and omissions of the Marketing Defendants that caused the diversion of opioids and which were a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's allegations of Defendants' unlawful acts below.

133

455.    The Marketing Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids throughout the United States.

## C.   The National Retail Pharmacies Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids

456.    National retail pharmacy chains earned enormous profits by flooding the country with prescription opioids.[214] They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Yet, instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it.

457.    Each of the National Retail Pharmacies does substantial business throughout the United States, including areas surrounding the Tribe. This business includes the distribution and dispensing of prescription opioids.

458.    Data shows that the National Retail Pharmacies distributed and dispensed substantial quantities of prescription opioids, including fentanyl, hydrocodone, and oxycodone in Alabama, including areas surrounding the Tribe. In addition, they distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Alabama. The National Retail Pharmacies failed to take meaningful action to stop this diversion despite their knowledge of it and contributed substantially to the diversion problem.

459.    The National Retail Pharmacies developed and maintained extensive data on opioids they distributed and dispensed. Through this data, National Retail Pharmacies had direct

---

[214] Plaintiff's allegations of wrongdoing are pointing to the National Retail Pharmacies, not the pharmacy industry who in general serve a vital healthcare function in the U.S.

knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country, and in Alabama in particular. They used the data to evaluate their own sales activities and workforce. On information and belief, the National Retail Pharmacies also provided Defendants with data regarding, inter alia, individual doctors in exchange for rebates or other forms of consideration. The National Retail Pharmacies' data is a valuable resource that they could have used to help stop diversion but failed to do so.

      **1.**    **The National Retail Pharmacies Have a Duty to Prevent Diversion**

      460.    Each participant in the supply chain of opioid distribution, including the National Retail Pharmacies, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

      461.    The National Retail Pharmacies, like manufacturers, are registrants under the Alabama Uniform Controlled Substances Act ("AUCSA"). AL. Code §20-2-1 *et seq.* (1975). Because pharmacies themselves are registrants under the AUCSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

      462.    The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies on how to identify suspicious orders and other evidence of diversion.

      463.    Suspicious pharmacy orders include orders unusually large in size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others.

      464.    Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled

substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwriting. Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies.

465. Suspicious pharmacy orders are red flags for, if not direct, evidence of diversion.

466. Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the National Retail Pharmacies themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

467. According to industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

468. Despite their legal obligations as registrants under state law, the National Retail Pharmacies allowed widespread diversion to occur – and they did so knowingly. They knew they made money by filling prescriptions, not by not filling descriptions. They knew they made money by making it easy for doctors to refer patients with drug prescriptions to them to fill, not by making it difficult for doctors to refer patients to them to fill prescriptions.

469. Performance metrics and prescription quotas adopted by the National Retail Pharmacies for their retail stores contributed to their failure. For instance, under CVS's Metrics System, pharmacists are directed to meet high goals that make it difficult, if not impossible, to

comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. The result is both deeply troubling and entirely predictable: opioids flowed out of National Retail Pharmacies and into communities throughout the country. The policies remained in place even as the epidemic raged.

470.   In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that this problem was compounded by the National Retail Pharmacies' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present, including when prescriptions are procured and pills supplied for the purpose of illegal diversion and drug trafficking.

471.   In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that the National Retail Pharmacies also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

472.   In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that the National Retail Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's

community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

473.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that the National Retail Pharmacies also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

474.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that the National Retail Pharmacies also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

475.    The National Retail Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

## 2.    Multiple Enforcement Actions Against the National Retail Pharmacies Confirm their Compliance Failures

476.    The National Retail Pharmacies have long been on notice of their failure to abide by the law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the National Retail Pharmacies have been repeatedly penalized for their illegal prescription opioid practices. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that based upon the widespread nature of these violations, these

enforcement actions are the product of, and confirm, national policies and practices of the National Retail Pharmacies.

### a.   CVS

477.   CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations. CVS could be a force for good in connection with the opioid crisis, but like other Defendants, CVS sought profits over people.

478.   CVS is a repeat offender; the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the DOJ. It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the law.

479.   In July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.[215]

480.   In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.[216]

---

[215] Press Release, U.S. Attorney's Office E. Dist. of Cal., *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. Dep't of Just. (July 11, 2017), https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violationscontrolled-substance-act.
[216] Press Release, U.S. Attorney's Office Dist. of Md., *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. Dep't of Just. (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-millionsettlement-agreement-cvs-unlawful-distribution-controlled.

481.    In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.[217]

482.    In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.[218]

483.    In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances – mostly addictive painkillers – more than 500 times between 2011 and 2014.[219]

484.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.[220]

---

[217] Press Release, U.S. Attorney's Office Dist. of Conn., *CVS Pharmacy Pays $600,000 to Settle Controlled Substances Act Allegations*, U.S. Dep't of Just. (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-actallegations.

[218] Dialynn Dwyer, *CVS will pay $795,000, strengthen policies around dispensing opioids in agreement with state*, Boston.com (Sept. 1, 2016), https://www.boston.com/news/localnews/2016/09/01/cvs-will-pay-795000-strengthen-policies-around-dispensing-opioids-inagreement-with-state.

[219] Press Release, U.S. Attorney's Office Dist. of Mass., *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacists Filled Fake Prescriptions*, U.S. Dep't of Just. (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filledfake-prescriptions.

[220] Press Release, U.S. Attorney's Office Dist. of R.I., Drug Diversion Claims Against CVS Health Corp. Resolved With $450,000 Civil Settlement, U.S. Dep't of Just. (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved- 450000-civil-settlement.

485.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."[221]

486.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.[222]

487.    In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.[223]

488.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[224]

    b.    Walgreens

489.    Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates

---

[221] Press Release, U.S. Attorney's Office M. Dist. of Fla., United States Reaches $22 Million Settlement Agreement with CVS For Unlawful Distribution of Controlled Substances, U.S. Dep't of Just. (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22- million-settlement-agreement-cvs-unlawful-distribution.
[222] Patrick Danner, H-E-B, CVS Fined Over Prescriptions, San Antonio Express-News (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-BCVSfined-over-prescriptions-5736554.php.
[223] Andrew Knittle, *Oklahoma pharmacy board stays busy, hands out massive fines at times*, NewsOK (May 3, 2015), http://newsok.com/article/5415840.
[224] Press Release, U.S. Attorney's Office W. Dist. of Okla., CVS to Pay $11 Million To Settle Civil Penalty Claims Involving Violations of Controlled Substances Act, U.S. Dep't of Just. (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penaltyclaims-involving-violations-controlled.

more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

490.    Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history – $80 million – to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black-market sales.[225]

491.    As part of the settlement, Walgreens admitted that it failed to uphold its obligations as a DEA registrant regarding the above-described conduct.[226]

492.    The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

493.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011 – more than ten times the average amount.[227]

494.    They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens' corporate officers not only turned a blind eye but provided pharmacists with incentives through a bonus program that compensated them based

---

[225] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees to Pay a Record Settlement pf $80 Million for Civil Penalties Under the Controlled Substances Act*, U.S. Dep't of Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-recordsettlement-80-million-civil-penalties-under-controlled.

[226] *Id.*

[227] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreens Co.* (Drug Enf't Admin. Sept. 13, 2012).

on the number of prescriptions filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the law or the health of communities.[228]

495.   Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on the number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by the number of oxycodone prescriptions dispensed in June of that year and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.[229]

496.   The six retail pharmacies in Florida that received the suspicious drug shipments from the Jupiter Distribution Center, in turn, filled customer prescriptions that they knew or should have known were not for legitimate medical use.[230]

497.   Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).[231]

---

[228] *Id.*
[229] *Id.*
[230] *Id.*
[231] *Walgreens to pay $200,000 settlement for lapses with opioids*, APhA (Jan. 25, 2017), https://www.pharmacist.com/article/walgreens-pay-200000-settlement-lapses-opioids.

498.    The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

499.    In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.[232]

### c.    Rite Aid

500.    With approximately 4,600 stores in 31 states and the District of Columbia, Rite Aid is the largest drugstore chain on the East Coast and the third-largest in the United States, with annual revenue of more than $21 billion.

501.    In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.[233]

502.    Numerous state and federal drug diversion prosecutions have occurred in which prescription opioid pills were procured from National Retail Pharmacies. The allegations in this Complaint do not attempt to identify all these prosecutions, and the information above is merely by way of example.

---

[232] *Id.*

[233] Press Release, Dep't of Just., *Rite Aid Corporation and Subsidiaries Agree to Pay $5 Million in Civil Penalties to Resolve Violations in Eight States of the Controlled Substances Act*, U.S. Dep't of Just. (Jan. 12, 2009), https://www.justice.gov/opa/pr/rite-aid-corporation-andsubsidiaries-agree-pay-5-million-civil-penalties-resolve-violations.

503.    The litany of state and federal actions against the National Retail Pharmacies demonstrate that they routinely, and as a matter of standard operating procedure, violated their legal obligations under the CSA and other laws and regulations that govern the distribution and dispensing of prescription opioids.

504.    Throughout the country and in the Tribe, in particular, the National Retail Pharmacies were or should have been aware of numerous red flags of potentially suspicious activity and diversion.

505.    On information and belief, from the catbird seat of their retail pharmacy operations, the National Retail Pharmacies knew or reasonably should have known about the disproportionate flow of opioids into Alabama, including the Tribe, and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for if not direct evidence of illicit supply and diversion. Additional information was provided by news reports, and state and federal regulatory actions, including prosecutions of pill mills in the area.

506.    On information and belief, the National Retail Pharmacies knew or reasonably should have known about the devastating consequences of the oversupply and diversion of prescription opioids, including spiking opioid overdose rates in the Tribal community.

507.    On information and belief, because of (among others sources of information) regulatory and other actions taken against the National Retail Pharmacies directly, actions taken against others pertaining to prescription opioids obtained from their retail stores, complaints and information from employees and other agents, and the massive volume of opioid prescription drug sale data that they developed and monitored, the National Retail Pharmacies were well aware that their distribution and dispensing activities fell far short of legal requirements.

508.    The National Retail Pharmacies' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids.

## VII.    DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM AND SUBSTANTIAL DAMAGE ALLEGED HEREIN

509.    As the Marketing Defendants' efforts to expand the market for opioids increased, so have the rates of prescription and sale of their products – and the rates of opioid-related substance abuse, hospitalization, and death among the people of the United States, including the Tribe's citizens.

There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[234]

510.    Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[235]

511.    The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[236]

512.    The increased abuse of prescription painkillers, along with growing sales, has contributed to a large number of overdoses and deaths.[237]

513.    For example, one doctor in Ohio was convicted of illegally distributing some 30,000 tablets of oxycodone, OxyContin, and Opana. In connection with sentencing, the U.S.

---

[234] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241-248 (2015), DOI: 10.1056/NEJMsa1406143, http://www.nejm.org/doi/full/10.1056/NEJMsa1406143.
[235] *See* Volkow & McLellan, *supra* n. 70.
[236] *See* Califf et al., *supra* n. 32.
[237] *See* Prescription Painkiller Overdoses at Epidemic Levels, *supra* n. 27.

Attorney explained that its enforcement efforts reflected that "[o]ur region is awash in opioids that have brought heartbreak and suffering to countless families." Henry Schein delivered opioids directly to the office of this doctor, whom the Northern District of Ohio court has described as "selling 30,000 doses of poison into the community."[238] In a separate civil suit, the same prescriber reached a consent judgment alleging that he was purchasing hydrocodone/APAP tablets (hydrocodone and acetaminophen), from Henry Schein on as many as fourteen separate dates within a one-year period, and, subsequently dispensed 11,500 hydrocodone tablets without maintaining purchase and dispensing records as required by the CSA

514.    As shown above, the opioid epidemic has escalated with devastating effects: substantial opiate-related substance abuse, hospitalization, and death that goes hand in hand with Defendants' increased distribution of opioids.

515.    Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, like heroin, the massive distribution of opioids by Defendants has caused the opioid epidemic to include heroin addiction, abuse, and death.

516.    Defendants repeatedly and purposefully breached their duties under Alabama law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes and the foreseeable, inevitable financial burdens imposed on and incurred by hospitals and other health care providers.

## VIII.   CONSPIRACY ALLEGATIONS

517.    The Defendants conspired to engage in the wrongful conduct complained of herein and intended to benefit both independently and jointly from their wrongful conduct.

---

[238] Eric Heisig, *Former Akron-Area Doctor Sentenced to 63 Months in Prison for Doling Out Painkillers*, Cleveland.com (Mar. 16, 2015), https://www.cleveland.com/court-justice/index.ssf/2015/03/former_akron-area_doctor_sente.html.

A. **Conspiracy Among the Marketing Defendants**

518.    The Marketing Defendants agreed among themselves to set up, develop, and fund an unbranded promotion and marketing network to promote the use of opioids for the management of pain in order to mislead the Tribe and its citizens through misrepresentations and omissions regarding the appropriate uses, risks, and safety of opioids in order to increase sales, revenue, and profit from their opioid products.

519.    This interconnected and interrelated network relied on the Marketing Defendants' collective use of unbranded marketing materials, such as KOLs, scientific literature, CMEs, patient education materials, and Front Groups developed and funded collectively by the Marketing Defendants and intended to mislead consumers, such as the Tribe's citizens, of the appropriate uses, risks, and safety of opioids.

520.    The Marketing Defendants' collective marketing scheme to increase opioid prescriptions, sales, revenues and profits centered around the development, dissemination, and reinforcement of nine false propositions: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition dubbed "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

521.    The Marketing Defendants knew that none of these propositions are true.

522.    Each Marketing Defendant worked individually and collectively to develop and actively promulgate these false propositions in order to mislead the Tribe and its citizens regarding the appropriate uses, risks, and safety of opioids.

523.    What is particularly remarkable about the Marketing Defendants' effort is the seamless method in which the Marketing Defendants joined forces to achieve their collective goal: to persuade consumers and medical providers of the safety of opioids, and to hide their actual risks and dangers. In doing so, the Marketing Defendants effectively built a new – and extremely lucrative – opioid marketplace for their select group of industry players.

524.    The Marketing Defendants' unbranded promotion and marketing network was a wildly successful marketing tool that achieved marketing goals that would have been impossible to have been met by a single or even a handful of the network's distinct corporate members.

525.    For example, the network members pooled their vast marketing funds and dedicated them to expansive and normally cost-prohibitive marketing ventures, such as the creation of Front Groups. These collaborative networking tactics allowed each Marketing Defendant to diversify its marketing efforts, all the while sharing any risk and exposure, financial and/or legal, with other Marketing Defendants.

526.    The most unnerving tactic utilized by the Marketing Defendants' network was their unabashed mimicry of the scientific method of citing "references" in their materials. In the scientific community, cited materials and references are rigorously vetted by objective unbiased and disinterested experts in the field, and an unfounded theory or proposition would, or should, never gain traction.

527.    Marketing Defendants put their own twist on the scientific method: they worked together to manufacture wide support for their unfounded theories and propositions involving

opioids. Due to their sheer numbers and resources, the Marketing Defendants were able to create a false consensus through their materials and references.

528.    An illustrative example of the Marketing Defendants' utilization of this tactic is the wide promulgation of the Porter & Jick Letter, which declared the incidence of addiction "rare" for patients treated with opioids. The authors had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. These patients were not given long-term opioid prescriptions or provided opioids to administer to themselves at home, nor was it known how frequently or infrequently and in what doses the patients were given their narcotics. Rather, it appears the patients were treated with opioids for short periods of time under in-hospital doctor supervision.

529.    Nonetheless, Marketing Defendants widely and repeatedly cited this letter as proof of the low addiction risk in connection with taking opioids despite the letter's obvious shortcomings. Marketing Defendants' egregious misrepresentations based on this letter included claims that less than one percent of opioid users became addicted.

530.    Marketing Defendants' collective misuse of the Porter & Jick Letter helped the opioid manufacturers convince patients and healthcare providers that opioids were not a concern. The enormous impact of Marketing Defendants' misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and, in some cases, "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the Journal in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crises by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy . . .

By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, the Marketing Defendants committed overt acts in furtherance of their conspiracy.

**B.    Conspiracy Among the Marketing Defendants and the National Retail Pharmacies Defendants**

531.    In addition, and on an even broader level, all the Marketing Defendants and National Retail Pharmacies Defendants took advantage of the industry structure, including end-running its internal checks and balance, to their collective advantage. The Marketing Defendants and National Retail Pharmacies Defendants agreed among themselves to increase the supply of opioids and fraudulently increase the quotas that governed the manufacture and supply of prescription opioids. The Marketing Defendants and National Retail Pharmacies Defendants did so to increase sales, revenue, and profit from their opioid products.

532.    The interaction and length of the relationships between and among the Marketing Defendants and National Retail Pharmacies Defendants reflect a deep level of interaction and cooperation between the Marketing Defendants and National Retail Pharmacies Defendants in a tightly knit industry. The Marketing and National Retail Pharmacies Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The Marketing Defendants and National Retail Pharmacies Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

533.    The Marketing Defendants and National Retail Pharmacies Defendants collaborated to expand the opioid market in an interconnected and interrelated network in the following ways, as set forth more fully below including, for example, membership in the Healthcare Distribution Alliance.

534.    The Marketing Defendants and National Retail Pharmacies Defendants, in unison with distributors, utilized their membership in the HDA and other forms of collaboration to form agreements about their approach to their duties under AUCSA and other laws to report suspicious orders. The Marketing Defendants and National Retail Pharmacies Defendants, in unison with distributors, overwhelmingly agreed on the same approach – to fail to identify, report, or halt suspicious opioid orders, and fail to prevent diversion. The Marketing Defendants and National Retail Pharmacies Defendants' agreement to restrict reporting provided an added layer of insulation from DEA scrutiny for the entire industry as the Marketing Defendants and National Retail Pharmacies Defendants were thus collectively responsible for each other's compliance with their reporting obligations. The Marketing Defendants and National Retail Pharmacies Defendants were aware, both individually and collectively, of the suspicious orders that flowed directly from the Marketing Defendants and National Retail Pharmacies Defendants' facilities.

535.    The desired consistency and collective end goal was achieved. The Marketing Defendants and National Retail Pharmacies Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

## IX.    ADDITIONAL FACTS PERTAINING TO PUNITIVE DAMAGES

536.    As set forth above, Defendants acted deliberately to increase sales of, and profits from, opioid drugs. The Marketing Defendants knew there was no support for their claims that addiction was rare, that addiction risk could be effectively managed, that signs of addiction were merely "pseudoaddiction," that withdrawal is easily managed, that higher doses pose no significant additional risks, that long-term use of opioids improves function, or that time-release or abuse-deterrent formulations would prevent addiction or abuse. Nonetheless, they knowingly promoted these falsehoods in order to increase the market for their addictive drugs.

537.    All of the Defendants, moreover, knew that large and suspicious quantities of opioids were being poured into communities throughout the United States, including the Tribe's. Despite this knowledge, Defendants took no steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion. Indeed, as described above, Defendants acted in concert together to maintain high levels of quotas for their products and to ensure that suspicious orders would not be reported to regulators.

538.    Defendants' conduct was so willful and deliberate that it continued in the face of numerous enforcement actions, fines, and other warnings from state and local governments and regulatory agencies. Defendants paid their fines, made promises to do better, and continued on with their marketing and supply schemes. This ongoing course of conduct knowingly, deliberately, and repeatedly threatened and accomplished harm and risk of harm to public health and safety, and large-scale economic loss to the Tribal citizens, families, communities, and governments

539.    As all of the governmental actions against the Marketing Defendants and against all the Defendants show, Defendants knew that their actions were unlawful, and yet deliberately refused to change their practices because compliance with their legal obligations would have decreased their sales and their profits.

A.    **The Marketing Defendants Persisted in Their Fraudulent Scheme Despite Repeated Admonitions, Warnings, and Even Prosecutions**

540.    So determined were the Marketing Defendants to sell more opioids that they simply ignored multiple admonitions, warnings, and prosecutions, as described more fully below.

1.    **FDA Warnings to Janssen Failed to Deter Janssen's Misleading Promotion of Duragesic**

541.    February 15, 2000, the FDA sent Janssen a letter concerning the dissemination of "homemade" promotional pieces that promoted the Janssen drug Duragesic in violation of the

Federal Food, Drug, and Cosmetic Act. In a subsequent letter, dated March 30, 2000, the FDA explained that the "homemade" promotional pieces were "false or misleading because they contain misrepresentations of safety information, broaden Duragesic's indication, contain unsubstantiated claims, and lack fair balance." The March 30, 2000 letter detailed numerous ways in which Janssen's marketing was misleading.

542.    The letter did not stop Janssen. On September 2, 2004, the U.S. Department of Health and Human Services ("HHS") sent Janssen a warning letter concerning Duragesic due to "false or misleading claims about the abuse potential and other risks of the drug, and . . . unsubstantiated effectiveness claims for Duragesic," including, specifically, "suggesting that Duragesic has a lower potential for abuse compared to other opioid products." The September 2, 2004 letter detailed a series of unsubstantiated, false or misleading claims.

543.    One year later, Janssen was still at it.  On July 15, 2005, the FDA issued a public health advisory warning to doctors of deaths resulting from the use of Duragesic and its generic competitor, manufactured by Mylan N.V.  The advisory noted that the FDA had been "examining the circumstances of product use to determine if the reported adverse events may be  related to inappropriate use of the patch" and noted the possibility "that patients and physicians might be unaware of the risks" of using the fentanyl transdermal patch, which is a potent opioid analgesic approved only for chronic pain in opioid-tolerant patients that could not be treated by other drugs.

**2.    Governmental Action, Including Large Monetary Fines, Failed to Stop Cephalon From Falsely Marketing Actiq For Off-label Uses**

544.    On September 29, 2008, Cephalon finalized and entered into a corporate integrity agreement with the Office of the Inspector General of HHS and agreed to pay $425 million in civil and criminal penalties for its off-label marketing of Actiq and two other drugs (Gabitril and Provigil).  According to a DOJ press release, Cephalon had trained sales representatives to

disregard restrictions of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of the three drugs and funded CMEs to promote off-label uses.

545.    Notwithstanding letters, an FDA safety alert, DOJ and state investigations, and the massive settlement, Cephalon has continued its deceptive marketing strategy.

### 3. FDA Warnings Did Not Prevent Cephalon from Continuing False and Off-Label Marketing of Fentora

546.    On September 27, 2007, the FDA issued a public health advisory to address numerous reports that patients who did not have cancer or were not opioid-tolerant had been prescribed Fentora, and death or life-threatening side effects had resulted. The FDA warned: "Fentora should not be used to treat any type of short-term pain." Indeed, the FDA specifically denied Cephalon's application in 2008 to broaden the indication of Fentora to include treatment of non-cancer breakthrough pain and use in patients who were not already opioid-tolerant.

547.    Flagrantly disregarding the FDA's refusal to broaden the indication for Fentora, Cephalon nonetheless marketed Fentora beyond its approved indications. On March 26, 2009, the FDA warned Cephalon against its misleading advertising of Fentora ("Warning Letter"). The Warning Letter described a Fentora Internet advertisement as misleading because it purported to broaden "the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora . . . when this is not the case." It further criticized Cephalon's other direct Fentora advertisements because they did not disclose the risks associated with the drug.

548.    Despite this warning, Cephalon continued to use the same sales tactics to push Fentora as it did with Actiq. For example, on January 13, 2012, Cephalon published an insert in Pharmacy Times titled "An Integrated Risk Evaluation and Mitigation Strategy (REMS) for

FENTORA (Fentanyl Buccal Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)." Despite the repeated warnings of the dangers associated with the use of the drugs beyond their limited indication, as detailed above, the first sentence of the insert states: "It is well recognized that the judicious use of opioids can facilitate effective and safe management of chronic pain."

### 4. Endo Continued to Aggressively Promote Opana After Becoming Aware of Its Widespread Abuse

549.    The New York Attorney General found that Endo knew, as early as 2011, that Opana ER was being abused in New York, but certain sales representatives who detailed New York health care providers testified that they did not know about any policy or duty to report problematic conduct. The New York Attorney General further determined that Endo detailed health care providers who were subsequently arrested or convicted for illegal prescribing of opioids a total of 326 times, and these prescribers collectively wrote 1,370 prescriptions for Opana ER (although the subsequent criminal charges at issue did not involve Opana ER).

550.    Even after the Indiana Department of Public Health determined that an HIV outbreak in Southeastern Indiana was linked to injection of the prescription painkiller Opana and requested removal from the market, in 2015, "based on its concern that the benefits of the drug may no longer outweigh its risks," Endo continued to market the drug until 2017.

### X.    JOINT ENTERPRISE ALLEGATIONS

551.    Defendants entered into an agreement with respect to opioids and/or distribution of opioids in Alabama and the Tribe's communities.

552.    The agreement had a common purpose: to promote the sale and distribution of opioids through the marketing of opioids and/or distribution of opioids into Alabama and the Tribe's communities, in violation of the statutory, common law (of fraud and nuisance) and regulations of Alabama.

553.    The Defendants had a community of pecuniary interest in that common purpose, as all of the Defendants profited from sales of opioids in Alabama.

554.    The Defendants had an equal right to a voice in the direction of the enterprise.

## XI.    TOLLING AND FRAUDULENT CONCEALMENT

555.    Defendants, individually and acting through their employees and agents, knowingly and intentionally concealed material facts and knowledge from Plaintiff and others to induce them to purchase and administer opioids as set forth in detail above.

556.    The Defendants invented the term "pseudoaddiction" and promoted it to the medical community, including Plaintiff. Defendants provided the medical community, including Plaintiff, with false and misleading information about ineffectual medical strategies to avoid or control the opioid addiction. Marketing Defendants recommended to the medical community that dosages be increased, without disclosing the risks. Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.

557.    In overstating the benefits of and evidence for the use of opioids for chronic pain and understating their very serious risks, including the risk of addiction and death; in falsely promoting abuse-deterrent formulations as reducing abuse; in falsely portraying their efforts or commitment to rein in the supply and diversion of opioids; and doing all of this while knowing full well that their statements were misrepresentations of material facts, Defendants have engaged in intentional, fraudulent misrepresentations and concealment of the material facts, as detailed herein.

558.    Defendants intended that Plaintiff would rely on their misrepresentations, omissions, and concealment, knew that Plaintiff would rely on their misrepresentations, and that

DOCUMENT 2

such reliance would cause harm to Plaintiff. The general community, including Plaintiff, was duped by the Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing to the Tribe.

559.    Plaintiff reasonably relied on Defendants' misrepresentations and omissions in writing and filling prescriptions for Defendants' opioids. The use of Defendants' opioid medicines became widespread and continuous as a result.

560.    The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed, nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants have not ceased. The nuisance created by Defendants remains unabated.

561.    Plaintiff's claims are equitably tolled because Defendants knowingly and fraudulently concealed the facts and their wrongful acts, and the material information pertinent to their discovery, which Defendants concealed from the Plaintiff. Plaintiff did not know or could not have known through the exercise of reasonable diligence, of their claims, as a result of Defendants' conduct.

562.    Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on their part.

563.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from the negligence of Defendants. They do not seek damages that may have been

suffered by individual citizens for wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by the actions of Defendants.

564.     Plaintiff suffered actual pecuniary damages proximately caused by Defendants concealment of material fact, which include but are not limited to, expending funds on treatment, counseling, additional training, additional security, and other services Plaintiff would not have incurred.

565.     Plaintiff has incurred expenditures for special programs over and above their ordinary services.

566.     Defendants' misconduct alleged, in this case, does not concern a discrete event or discrete emergency of the sort a Tribe would reasonably expect to occur and is not part of the normal and expected costs of a Tribe's existence. Plaintiff alleges wrongful acts which were neither discrete nor of the sort a Tribe can reasonably expect.

## XII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE
### (Against All Defendants)

567.     Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

568.     This claim is brought under the Alabama common law of negligence.

### 1.     Defendants Owed a Duty of Care

569.     Each Defendant had a duty to exercise reasonable care in the manufacturing, marketing, selling, prescribing, and distributing highly dangerous opioid drugs. Defendants knew or should have known that opioids were unreasonably dangerous and were likely to cause

addiction. Each Defendant owed its aforesaid duties to Plaintiff because the injuries alleged herein were foreseeable by the Defendants.

570.    A reasonable person could foresee the probability of occurrence of injury to Plaintiff. Reasonably prudent wholesale drug manufacturers, marketers and distributors of opioids would have anticipated the scourge of opioid addiction, especially when being warned and prosecuted by law enforcement repeatedly. Defendants are required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of highly dangerous opioid drugs during manufacture and distribution.

### 2.    Defendants Breached Their Duty of Care

#### a.    Defendants' Conduct, in Violation of Applicable Statutes, Constitutes Negligence *Per Se*

571.    Defendants violated State law in failing to report suspicious orders of opioid pain medications in Alabama. Defendants violated state law, including Ala. Admin. Code r.680-X-2-.23, in failing to maintain effective controls against the diversion of opioids into other than legitimate medical channels. Defendants also violated state law, including Ala. Code 1975 § 20-2-56, and Ala. Code 1975 § 20-2-213, in failing to operate a system to stop orders which were flagged or should have been flagged as suspicious.

572.    A manufacturer or wholesaler/distributor of prescription drugs must obtain a license from Alabama Board of Pharmacy and must forward "[c]opies of records and reports required by the [DEA] concerning increases in purchases or high or unusual volumes purchased by pharmacies," Ala. Admin. Code r.680-X-2-.23 § 2(e)5, and to comply with "applicable federal, state and municipal laws and regulations," Ala. Admin. Code r.680-X-2-.23 § 2(k)3, among other requirements. A license shall be denied by the Board if "the granting of such a license would not

be in the public interest." Ala. Admin. Code r.680-X-2-.23 § 2(i). Defendants have a duty to comply with the law and regulations.

573.     Each Defendant's actions were in violation of Chapter 2 of the Alabama Uniform Controlled Substances Act ("AUCSA"), as set out above, including but not limited to Ala. Code 1975 § 20-2-54, which forbids excessively dispensed controlled substances, and of Ala. Code 1975 § 20-2-55, which allows suspension of any registration "without an order to show cause" by the certifying board if "there is an imminent danger to the public health or safety which warrants this action."

574.     Defendants' failure to comply with Alabama law constitutes negligence *per se*.

575.     Alabama law and the CSA require that the Defendants know their customers, which includes an awareness of the customer base, knowledge of the average prescriptions filled each day, the percentage of controlled substances compared to overall purchases, a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and identification of physicians and bogus centers for the alleged treatment of pain that are the dispenser's most frequent prescribers.

576.     Defendants have failed to diligently respond to suspicious orders in contravention of Alabama law.

577.     Defendants have failed to provide effective controls and procedures to guard against the diversion of controlled substances in contravention of Alabama law.

578.     Defendants have, by their acts and omissions, proximately caused and substantially contributed to damages to Plaintiff by violating Alabama law, by creating conditions which contribute to violations of Alabama laws by others, and by their negligent and/or reckless disregard of the customs, standards, and practices within their own industry.

579.    Plaintiff has suffered and will continue to suffer enormous damages as the proximate result of the failure by Defendants to comply with Alabama law.

580.    Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties. Plaintiff is within the class of persons the AUCSA and the CSA was intended to protect.

581.    The harm that has occurred is the type of harm that the AUCSA and the CSA were intended to guard against.

Defendants' violations constitute negligence *per se*.

### 3.    Defendants Breached Their Duty of Reasonable Care

582.    Alternatively, to the extent that Defendants' statutory violations do not obviate the need to show breaches of the duty of care, each Defendant breached its aforesaid duties of care.

### a.    Negligent Marketing

583.    Defendants marketed opioids in a negligent and improper manner by:

   a.    Overstating the benefits of chronic opioid therapy, promising improvement in patients' function and quality of life, and failing to disclose the lack of evidence supporting long-term use;

   b.    Trivializing or obscuring opioids' serious risks and adverse outcomes, including the risk of addiction, overdose and death;

   c.    Overstating opioids' superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives;

   d.    Mischaracterizing the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms;

   e.    Marketing opioids for indications and benefits that were outside of the opioids' labels and not supported by substantial evidence.

584.    It was Defendants' marketing – and not any medical breakthrough – that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse. The result has been catastrophic.

585.    Defendants disseminated many of their false, misleading, imbalanced, and unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing materials. These KOLs and Front Groups were important elements of Defendants' marketing plans, which specifically contemplated their use because they seemed independent and, therefore, outside FDA oversight. Through unbranded materials, Defendants, with their own knowledge of the risks, benefits and advantages of opioids, presented information and instructions concerning opioids generally that was contrary to, or at best, inconsistent with information and instructions listed on Defendants' branded marketing materials and drug labels. Defendants did so knowing that unbranded materials typically are not submitted to or reviewed by the FDA.

586.    Defendants also negligently marketed opioids through the following vehicles: (a) KOLs, who could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body of biased and unsupported scientific literature; (c) treatment guidelines; (d) CMEs; (e) unbranded patient education materials; and (f) Front Group patient-advocacy and professional organizations, which exercised their influence both directly and through Defendant-controlled KOLs who served in leadership roles in those organizations.

### b.    Negligent Distribution

587.    The Marketing and National Retail Pharmacies Defendants distributed opioids in an improper manner by:

    a.    Selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

    b.    Selling opioids without maintaining effective controls against diversion;

    c.    Choosing not to or failing to report suspicious orders;

    d.    Choosing not to or failing to stop or suspend shipments of suspicious orders; and

e.  Selling opioids prescribed by "pill mills" when Marketing and National Retail Pharmacies Defendants knew or should have known the opioids were being prescribed by "pill mills."

### 4. The Marketing and National Retail Pharmacies Defendants' Breaches of Care Were Intentional, Willful, Wanton and/or Reckless

588.  Marketing and National Retail Pharmacies Defendants' breaches of care were intentional, willful, wanton and/or reckless. Marketing and National Retail Pharmacies Defendants purposely overstated the benefits of chronic opioid therapy and opioids' superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives; actively and continuously promoted the use of opioids for improvement in patients' function and quality of life but failed to disclose the lack of evidence supporting the long-term use, as well as mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms; intentionally trivialized or obscured opioids' serious risks and adverse outcomes, including the risk of addiction, overdose, and death; continuously marketed opioids for indications and benefits that were outside of the opioids' labels and not supported by substantial evidence.

589.  Marketing and National Retail Pharmacies Defendants have willfully turned a blind eye towards the actual facts by regularly distributing large quantities of controlled substances to retailers and dispensers who are serving a customer base substantially comprised of individuals who are abusing and/or diverting prescription medications, many of whom are addicted and all of whom can reasonably be expected to become addicted. Marketing and National Retail Pharmacies Defendants conducted themselves with reckless indifference to the consequences of their acts and omissions, in that they were conscious of their conduct and were aware, from their knowledge of existing circumstances and conditions, that their conduct would inevitably or probably result in injury to others, specifically tribes such as Plaintiff.

### 5. Causation and Damages

164

590.    As a proximate result of Defendants' conduct, Defendants have caused Plaintiff's injury related to the diagnosis and treatment of opioid-related conditions. Plaintiff has incurred massive costs by providing uncompensated care as a result of opioid-related conditions.

591.    The injuries to Plaintiff would not have happened in the ordinary course of events had Defendants exercised the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business in the manufacture, marketing, sale and distribution of opioids.

592.    Plaintiff is entitled to recover compensatory damages as a result of Marketing and National Retail Pharmacies Defendants' negligence, in an amount to be determined at trial.

593.    As a result of Defendants' intentional, willful, wanton and/or reckless conduct described herein, Plaintiff is entitled to treble, punitive, exemplary and/or otherwise enhanced damages to the full extent available under state law, in an amount to be determined at trial.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**NUISANCE**
**(Against All Defendants)**

</div>

594.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

595.    This claim is brought under the Alabama common law of nuisance.

596.    The nuisance created by Defendants is the over-saturation of opioids in the patient population of the geographic area surrounding the Tribe for illegitimate purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use.

597.    Defendants, individually and acting through their employees and agents, through fraudulent and deceptive marketing and other fraudulent schemes as described herein, created and

<div align="center">165</div>

maintained the opioid epidemic in Plaintiff's communities, which is harmful and disruptive to and substantially and unreasonable annoys, injuriously affects, endangers, and interferes with the safety, health, morals, comfort, and general welfare of the public.

598.    Defendants' nuisance-causing activities include selling or facilitating the sale of prescription opioids to the Tribe's citizens, as well as to unintended users, including children, people at risk of overdose or suicide, and criminals.

599.    Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

600.    Defendants' activities unreasonably interfere with Plaintiff's economic rights and the reasonable use of Plaintiff's property. Plaintiff's resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources that could be used to benefit the community within the geographic area served by Plaintiff.

601.    The Defendants' interference with these rights of Plaintiff is unreasonable because it:

    a.    Has harmed and will continue to harm the public health services of and public peace of Plaintiff;

    b.    Has harmed and will continue to harm the Tribe's communities;

    c.    Is proscribed by statutes and regulation, including the AUCSA;

    d.    Is of a continuing nature and it has produced long-lasting effects;

    e.    Was the result of conduct that the Defendants knew, or had reason to know, would inflict a significant effect upon Plaintiff; and

    f.    Has inflicted substantial costs on Plaintiff.

602.     The nuisance undermines public health, quality of life, and safety. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within families and entire communities. It has created a public health crisis.

603.     Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in facilitating widespread opioid addiction and failing to identify, halt, and report suspicious opioid transactions.

604.     Defendants knew of the public health hazard their conduct would create. It was foreseeable to Defendants that their conduct would unreasonably interfere with the ordinary comfort, use, and enjoyment of the Tribal residents in the Tribe's communities.

605.     Defendants' conduct is unreasonable, intentional, unlawful, reckless, and/or negligent.

606.     At all times, all Defendants possessed the right and ability to control the nuisance causing an outflow of opioids from pharmacy locations or other points of sale. National Retail Pharmacies Defendants had the power to shut off the supply of illicit opioids to Plaintiff and in the geographic areas surrounding the Plaintiff.

607.     As a direct and proximate result of the nuisance, Plaintiff has sustained economic harm by spending a substantial amount of money trying to remedy the harms caused by Defendants' nuisance-causing activity. In short, the Defendants created a mess, leaving the Plaintiff the costs of cleaning it up. This is a classic nuisance.

608.     The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

609.   Defendants should be required to pay the expenses Plaintiff has incurred or will incur in the future to fully abate the nuisance.

610.   The acts forming the basis of the nuisance claim against the Defendants were wanton, malicious and/or attended with circumstances of aggravation.

611.   Therefore, Plaintiff demands judgment in its favor against the Defendants for injunctive relief, abatement of the public nuisance, and for damages in an amount to be determined by a jury, together with all cost of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against All Defendants)

612.   The Tribe re-alleges and incorporates by reference the foregoing paragraphs.

613.   The Tribe has expended substantial amounts of money to fix or mitigate the societal harms caused by Defendants' conduct.

614.   The expenditures by the Tribe in providing healthcare services to people who use opioids have added to Defendants' wealth. The expenditures by the Plaintiff has helped sustain Defendants' businesses.

615.   The Tribe has conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities—the costs of the harm caused by Defendants' negligent distribution and sales practices.

616.   Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

617.    Defendants made substantial profits while fueling the prescription drug epidemic in the Plaintiff's community.

618.    Defendants continue to receive considerable profits from the distribution of controlled substances in the Plaintiff's Indian Lands.

619.    Defendants have been unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

620.    It would be inequitable to allow Defendants to retain benefits or financial advantage.

621.    The Tribe demands judgment against each Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**FRAUD AND DECEIT**
**(Against All Defendants)**

</div>

622.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

623.    This claim is brought under the Alabama common law of fraud and deceit.

624.    As alleged herein, Defendants violated their duty not to actively deceive by intentionally and unlawfully making knowingly false statements, and by intentionally and unlawfully omitting and/or concealing information.

625.    Defendants made misrepresentations and failed to disclose material facts to physicians and consumers throughout Alabama and the United States, including the Tribe, to induce the physicians to prescribe and administer, and consumers to purchase and consume, opioids as set forth herein.

626.    Specifically, the Marketing Defendants' knowing deceptions during the relevant period, which were intended to induce reliance, include but are not limited to:

a.    Marketing Defendants' misrepresentations overstating the benefits of, and evidence for, the use of opioids in chronic pain;

b.    Marketing Defendants' misrepresentations that the risks of long-term opioid use, especially the risk of addiction, were overblown;

c.    Marketing Defendants' misrepresentations that opioid doses can be safely and effectively increased until pain relief is achieved;

d.    Marketing Defendants' misrepresentations that signs of addiction were "pseudoaddiction" and thus reflected undertreated pain, which should be responded to with more opioids;

e.    Marketing Defendants' misrepresentations that screening tools effectively prevent addiction;

f.    Marketing Defendants' misrepresentations concerning the comparative risks of NSAIDs and opioids;

g.    Marketing Defendants' misrepresentations that opioids differ from NSAIDs in that opioids have no ceiling dose;

h.    Marketing Defendants' misrepresentations that evidence supports the long-term use of opioids for chronic pain;

i.    Marketing Defendants' misrepresentations that chronic opioid therapy would improve patients' function and quality of life;

j.    Marketing Defendants' false portrayal of their efforts and/or commitment to rein in the diversion and abuse of opioids;

k.    Marketing Defendants' misrepresentations that withdrawal is easily managed;

l.    Endo's misrepresentations that alleged abuse-deterrent opioids reduce tampering and abuse;

m.    Teva's misrepresentations that Actiq and Fentora were appropriate for treatment of non-cancer pain and its failure to disclose that Actiq and Fentora were not approved for such use;

n.    Cephalon's unsubstantiated claims that Actiq and Fentora were appropriate for treatment of non-cancer pain;

o.  Marketing Defendants' use of front groups to misrepresent that the deceptive statements from the sources described in this Complaint came from objective, independent sources;

p.  Marketing Defendants' creation of a body of deceptive, misleading and unsupported medical and popular literature, advertisements, training materials, and speaker presentations about opioids that (1i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors; and

q.  Such other misrepresentations and deceptions outlined above.

627.  By engaging in the acts and practices alleged herein, Marketing Defendants, in the relevant time period and with the intent that others rely on their omissions or suppression of information, omitted material facts that Marketing Defendants had a duty to disclose by virtue of these Defendants' other representations, including but not limited to:

a.  Opioids are highly addictive and may result in overdose or death;

b.  No credible scientific evidence supports the use of screening tools as a strategy for reducing abuse or diversion;

c.  High dose opioids subject the user to greater risks of addiction, other injury, and/or death;

d.  Opioids present the risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, dizziness, increased falls and fractures in the elderly, NAS, and potentially fatal interactions with alcohol or benzodiazepines; these omissions were made while Defendants exaggerated the risks of competing products such as NSAIDs;

e.  Claims regarding the benefits of chronic opioid therapy lacked scientific support or were contrary to the scientific evidence;

f.  Endo's abuse-deterrent formulations are not designed to address, and have no effect on, the common route of abuse (oral), can be defeated with relative ease, and may increase overall abuse;

g.  Marketing Defendants' failure to report suspicious prescribers and/or orders;

h.  Cephalon's failure to disclose that Actiq and Fentora were not approved for non-cancer pain;

    i.     Marketing Defendants' failure to disclose their financial ties to and role in connection with KOLs, front groups, and deceptive literature and materials, as more fully described above; and

    j.     Such other omissions and concealments as described above in this Complaint.

628.    In each of the circumstances described *inter alia* the foregoing paragraph, Marketing Defendants knew that their failure to disclose rendered their prior representations untrue or misleading.

629.    In addition, and independently, Marketing Defendants had a duty not to deceive Plaintiff because Defendants had in their possession unique material knowledge that was unknown, and not knowable, to the Tribe, its citizens, and its communities.

630.    Marketing Defendants intended and had reason to expect under the operative circumstances that Plaintiff, their agents, their communities, physicians, and persons on whom Plaintiff and their agents relied would be deceived by Defendants' statements, concealments, and conduct as alleged herein and that Plaintiff would act or fail to act in reasonable reliance thereon.

631.    Marketing Defendants intended that Plaintiff, their agents, their communities, physicians, and persons on whom Plaintiff and their agents relied would rely on these Defendants' misrepresentations and omissions; Defendants intended and knew that this reasonable and rightful reliance would be induced by these Defendants' misrepresentations and omissions; and, Defendants intended and knew that such reliance would cause Plaintiff to suffer loss.

632.    By engaging in the acts and practices alleged herein, National Retail Pharmacies Defendants, in the relevant time period and with the intent that others rely on their omissions or suppression of information, omitted material facts that National Retail Pharmacies Defendants had a duty to disclose by virtue of these Defendants' other representations, including but not limited to:

172

a. There is no legitimate medical purpose for the copious amounts of opioids shipped into and around Plaintiff's communities;

b. That they failed to report to the DEA suspicious orders;

c. That they failed to maintain effective controls against diversion of controlled substances into other than legitimate medical scientific and industrial channels by sales to certain customers;

d. That they failed to prevent against diversion from legitimate to non-legitimate channels;

e. That they failed to conduct meaningful due diligence to ensure that controlled substances were not diverted into other than legitimate channels;

f. That they failed to keep and maintain accurate records of Schedule II – V controlled substances; and

g. Such other omissions or concealments as alleged above in this Complaint.

633. National Retail Pharmacies Defendants intended and had reason to expect under the operative circumstances that Plaintiff, their agents, their communities, physicians, and persons on whom Plaintiff relied would be deceived by Defendants' statements, concealments, and conduct as alleged herein and that Plaintiff would act or fail to act in reasonable reliance thereon.

634. National Retail Pharmacies Defendants intended that Plaintiff, their agents, their communities, physicians, and persons on whom Plaintiff and their agents relied would rely on these Defendants' misrepresentations and omissions; Defendants intended and knew that this reasonable and rightful reliance would be induced by these Defendants' misrepresentations and omissions; and, Defendants intended and knew that such reliance would cause Plaintiff to suffer loss.

635. The Tribe and tribal members rightfully, reasonably, and justifiably relied on Marketing Defendants' representations and/or concealments, both directly and indirectly. As the Marketing Defendants knew or should have known Plaintiff were directly and proximately injured as a result of this reliance, Plaintiff's injuries were directly and proximately caused by this reliance.

173

636.    As a result of these representations and/or omissions, Plaintiff proceeded under the misapprehension that the opioid crisis was simply a result of conduct by persons other than Defendants. Consequently, these Defendants prevented Plaintiff from a timelier and more effective response to the opioid epidemic.

637.    Defendants' false representations and omissions were material and were made and omitted intentionally and recklessly.

638.    Defendants' misconduct alleged, in this case, is ongoing and persistent.

639.    Defendants' misconduct alleged, in this case, does not concern a discrete event or discrete emergency of the sort Plaintiff would reasonably expect to occur and is not part of the normal and expected costs of a Tribe. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a Tribe can reasonably expect.

640.    Plaintiff has incurred expenditures related to the opioid epidemic.

641.    These Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

642.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

643.    Plaintiff has suffered monetary damages as aforesaid. As such Plaintiff seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, as well as attorney fees, and costs, and pre- and post-judgment interest.

## FIFTH CLAIM FOR RELIEF
### WANTONNESS
### (Against All Defendants)

644.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

645.    This cause of action is brought under Alabama common law relating to wantonness.

646.    The actions and failure to act of the Defendants enumerated in this complaint were made consciously and with reckless disregard of the rights and safety of others and Defendants were aware that harm would likely or probably result from their actions or failure to act.

647.    As a direct and proximate result of Defendants' wantonness, Plaintiff has suffered and continues to suffer injury-in-fact and actual damages.

648.    As a proximate result of Defendants' wantonness, Defendants have caused Plaintiff's injury related to the diagnosis and treatment of opioid-related conditions. Plaintiff has incurred massive costs by providing uncompensated care as a result of opioid-related conditions.

649.    As a result of the Defendants' wantonness, Plaintiff is entitled to compensatory and punitive damages, in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
#### (Against the Marketing Defendants and National Retail Pharmacy Defendants)

650.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

651.    Plaintiff brings this claim under Alabama common law providing for the civil liability of persons who conspire to commit one or more unlawful acts.

652.    Defendants engaged in a common design between two or more persons to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, an overt act in furtherance of the conspiracy, and resulting injury to Plaintiff.

653.     Defendants engaged in a combination and an agreement to act in concert in their tortious and/or otherwise unlawful marketing of opioids and/or distribution of opioids in Plaintiff's communities.

654.     Defendants engaged in one or more unlawful activities to further the conspiracy. The objects of the conspiracy were nuisance, negligence, fraud, misrepresentation, violation of AUCSA, and other unlawful conduct as described above in this Complaint. Defendants knew that these objects were unlawful and would be accomplished by unlawful means such as fraud, misrepresentations, and omissions.

655.     Defendants each conspired with various KOLs and Front Groups to commit unlawful or lawful acts in an unlawful manner. Defendants and the various KOLs and Front Groups with which each of them were allied, knowingly and voluntarily agreed to engage in unfair and deceptive practices to promote and distribute opioids for the treatment of chronic pain by making and disseminating false, unsubstantiated, and misleading statements and misrepresentations to prescribers and consumers. Defendants enlisted various KOLs and Front Groups to make and disseminate these statements in furtherance of their common strategy to increase the sale and distribution of opioids, and Defendants – along with the KOLs and Front Groups with whom each of them conspired – knew that the statements they made and disseminated served this purpose.

656.     By engaging in the conduct described in this Complaint, Defendant Cephalon agreed with Front Groups FSMB and APF that they would deceptively promote the risks, benefits and superiority of opioid therapy. As part of its agreements with FSMB and APF, Cephalon provided support for FSMB's and APF's deceptive statements promoting opioids and FSMB and APF used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Cephalon's drugs. *Responsible Opioid Prescribing* (Cephalon and FSMB) and

*Treatment Options: A Guide for People Living with Pain* (Cephalon and APF) are publications that contained a number of deceptive statements about opioids as outlined *supra*. They are products of these conspiracies, and the collaboration between Cephalon and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

657.    By engaging in the conduct described in this Complaint, Defendant Endo agreed with Front Groups APF, NICP, AGS and FSMB that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with APF, NIPC, AGS and FSMB, Endo provided support for APF, NICP, AGS and FSMB's deceptive statements promoting opioids and APF, NICP, AGS and FSMB used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Endo's drugs. *Persistent Pain in the Older Adult* (Endo, APF, and NIPC), *Persistent Pain in the Older Patient* (Endo, APF, and NIPC), *Painknowledge.com* (Endo, APF, and NIPC), *Exit Wounds* (Endo and APF), *Pharmacological Management of Persistent Pain in Older Persons* (Endo and AGS), and *Responsible Opioid Prescribing* (Endo and FSMB) are publications, CMEs, and websites that contained a number of deceptive statements about opioids as outlined *supra*. They are products of these conspiracies, and the collaboration between Endo and each of these entities in creating and disseminating these publication, CMEs, and websites is further evidence of each conspiracy's existence.

658.    By engaging in the conduct described in this Complaint, Defendant Janssen agreed with Front Groups AAPM, AGS and APF that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with AAPM, AGS, and APF, Janssen provided support for AAPM, AGS, and APF's deceptive statements promoting opioids and Conrad & Associates LLC, Medical Writer X, AAPM, AGS, and APF used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Janssen's drugs.

*Finding Relief: Pain Management for Older Adults* (Janssen, AAPM, and AGS), a CME promoting the *Pharmacological Management of Persistent Pain in Older Persons* (Janssen and APF), the *Let's Talk Pain* website (Janssen and APF), and *Exit Wounds* (Janssen and APF) are publications, CMEs, and websites that contained a number of deceptive statements about opioids as outlined *supra*. They are products of these conspiracies and the collaboration between Janssen and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

659.    Each of the participants to the conspiracies outlined above was aware of the misleading nature of the statements they planned to issue and of the role they played in each scheme to deceptively promote opioids as appropriate for the treatment of chronic pain. These Defendants and third parties nevertheless agreed to misrepresent the risks, benefits, and superiority of using opioids to Plaintiff in return for increased pharmaceutical sales, financial contributions, reputational enhancements, and other benefits.

660.    Each of the participants to the conspiracies outlined above was aware of the nuisance resulting from their conduct and agreed to continue the practices described above that resulted in the maintenance of that nuisance.

661.    Defendants knew that their own conduct could be reported by other Defendants and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting or suspicious orders to ensure consistency in their dealings with DEA.

662.    The Defendants also worked together to ensure that the opioid quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the

DEA in order to ensure that the DEA had no basis for refusing to increase or decrease production quotas due to diversion.

663. The Defendants further worked together in their unlawful failure to act to prevent diversion and failure to monitor for, report, and prevent suspicious order of opioids.

664. The desired consistency, and collective end goal was achieved. Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

665. By reason of Defendants' unlawful acts, Plaintiff has been damaged and continues to be damaged by paying the costs of Defendants' externalities and has suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain.

666. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

667. Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

668. Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

669. As outlined above, Defendants played an active role in determining the substance of the misleading messages issued by KOLs and Front Groups, including by providing content themselves, editing and approving content developed by their co-conspirators, and providing slide decks for speaking engagements. Defendants further ensured that these misstatements were widely disseminated by both distributing the misstatements themselves and providing their co-

conspirators with funding and other assistance with distribution. The result was an unrelenting stream of misleading information about compliance with state and federal legislation as related to opioid distribution, and the risks, benefits, and superiority of using opioids to treat chronic pain from sources Defendants knew were trusted by prescribers and consumers. Defendants exercised direct editorial control over most of these statements. However, even if Defendants did not directly disseminate or control the content of these misleading statements, they are liable for conspiring with the third parties who did.

670.   Defendants had a meeting of the minds on the object of or course of action for this conspiracy. Defendants knew and agreed upon the unlawful object or course of action for this conspiracy. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiff.

671.   Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

672.   Defendants' misconduct alleged, in this case, is ongoing and persistent.

673.   Defendants' misconduct alleged, in this case, does not concern a discrete event or discrete emergent of the sort the Tribe would reasonably expect to occur and is not part of the normal and expected costs of the Tribe. Plaintiff alleges wrongful acts which are neither discrete nor of the sort the Tribe can reasonably expect.

674.   Plaintiff has incurred expenditures for special programs.

675.   Because of Defendants' dissemination of false information and misleading information of opioid risks, benefits, and sustainability for chronic pain, and false and misleading statements regarding compliance with Alabama law concerning the distribution of opioids, Defendants are responsible for the costs incurred by Plaintiff.

676.    Defendants conspired to create a public nuisance and to commit tortious conduct and are therefore jointly and severally liable for the damages flowing from the conspiracy.

677.    Plaintiff, therefore, request this Court to enter an order awarding judgment in its favor against Defendants, compelling Defendants to pay the direct and consequential damages, and awarding Plaintiff such other, further, and different relief as this Court may deem just and proper.

## SEVENTH CLAIM FOR RELIEF
## ALABAMA DECEPTIVE TRADE PRACTICES ACT

678.    Plaintiff realleges and incorporates by reference all paragraphs above.

679.    Defendants violated the Alabama Deceptive Trade Practices Act, Ala. Code § 18-19-1, et seq. ("ADTPA") by engaging in unfair and deceptive acts or practices and/or unconscionable consumer sales acts and practices in this state.

680.    This Cause of Action is brought in the public interest under the ADTPA and seeks a declaratory judgment that Defendants have violated the ADTPA, an injunction enjoining Defendants' misrepresentations and other misconduct described in this Complaint, restitution to Plaintiff who on behalf of its citizens paid for opioid prescriptions for chronic pain and therefore have been damaged by Defendants' conduct, and civil penalties, and restitution to Plaintiff who suffered financial losses to their annual budgets from increased associated costs in addressing the opioid epidemic caused by the Defendants. The ADTPA prohibits, in connection with consumer transactions, unfair, deceptive or unconscionable consumer sales practices that mislead consumers about the nature of the product they are receiving. The ADTPA prohibits sellers from representing that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have.

681.    The following acts are deemed to be deceptive under Alabama law:

i.    Making any express or implied statement in connection with the marketing or advertisement of any product that is false, or has the capacity, tendency or effect of deceiving or misleading consumers; or omitting any material information such that the express or implied statement deceives or tends to deceive consumers.

ii.    Making any representation, in connection with the marketing or advertising of a product, about research that has been performed, including but not limited to, any representation that a product has been clinically tested unless at the time the claim is made, competent and reliable scientific evidence exists substantiating such claim.

iii.    Making in connection with the marketing or advertising of a product any . . . statements or representations concerning a product that materially contradict or conflict with any other statements or representations the Defendants made about such Product and rend such statements or representations misleading and/or deceptive.

iv.    Making, or causing to be made, any written or oral claim that is false, misleading or deceptive.

v.    Representing that any product has any sponsorship, approval, characteristics, ingredients, uses, benefits, quantities, or qualities that it does not have.

vi.    Representing that any product has any sponsorship, characteristics, ingredients, uses, benefits, quantities, or qualities that it does not have.

vii.    Making in a promotional context an express or implied representation, not approved or permitted for use in the labeling or under the FDCA, that a product is better, more effective, useful in a broader range of conditions or patients, safer, has fewer, or less incidence of, or less serious side effects or contraindications than has been demonstrated by competent and reliable scientific evidence, whether or not such express or implied representation is made by comparison with another drug or treatment, and whether or not such a representation or suggestion is made directly or through use of published or unpublished literature, a quotation, or other references.

682.    As alleged herein, each Defendant, at all times relevant to this Complaint, violated the ADTPA by making deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

683.    Plaintiff has suffered monetary damages as aforesaid. As such, Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, as well as attorneys' fees, costs, and pre-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks that the Court:

A.    Enter judgment against Defendants, jointly and severally, and in favor of Plaintiff;

B.    Award compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages; punitive damages; pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate; and such equitable relief against Defendants as the Court should find appropriate, including disgorgement of illicit proceeds, injunctive relief, abatement and other orders;

C.    Award Plaintiff their costs of suit; including reasonable attorneys' fees as provided by law;

D.    Award such further and additional relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 3, 2020

Respectfully Submitted,

*/s/ T. Roe Frazer II*
T. Roe Frazer II (6624-R42T)
Patrick D. McMurtray (3387-M37P)
FRAZER PLC

30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
roe@frazer.law
patrick@frazer.law

*To be Admitted Pro Hac Vice:*

Thomas Roe Frazer III
W. Matthew Pettit
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
trey@frazer.law
mpettit@frazer.law

Archie Lamb
THE LAW FIRM OF LEVIN PAPANTONIO
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
alamb@levinlaw.com

J. Nixon Daniel, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
jnd@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
2013 1st Avenue North, Ste 450
Birmingham, Alabama  35203
(205) 252-6127
ftk@thekuykendallgroup.com

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>- CIVIL - | **Court Case Number**<br>02-CV-2020-900755.00 |
|---|---|---|

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA
### POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL

**NOTICE TO:** ENDO HEALTH SOLUTIONS, INC., 1209 ORANGE STREET, WILMINGTON, DE 19801

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), THOMAS ROE FRAZER II

*(Name(s) of Attorney(s))*

WHOSE ADDRESS(ES) IS/ARE: 30 BURTON HILLS BLVD., SUITE 450, NASHVILLE, TN 37215

*(Address(es) of Plaintiff(s) or Attorney(s))*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of POARCH BAND OF CREEK INDIANS pursuant to the Alabama Rules of the Civil Procedure.

*(Name(s))*

| 04/03/2020 | /s/ JOJO SCHWARZAUER | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.   /s/ THOMAS ROE FRAZER II

*(Plaintiff's/Attorney's Signature)*

### RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____ in _____ County,

*(Name of Person Served)* _____ *(Name of County)*

Alabama on _____

*(Date)*

_____   _____   _____
*(Type of Process Server)*   *(Server's Signature)*   *(Address of Server)*

_____   _____
*(Server's Printed Name)*   *(Phone Number of Server)*

**02-CV-2020-900755.00**
POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL

| C001 - POARCH BAND OF CREEK INDIANS | v. | D011 - ENDO HEALTH SOLUTIONS, INC. |
|---|---|---|
| *(Plaintiff)* | | *(Defendant)* |

**SERVICE RETURN COPY**



# ALABAMA SJIS CASE DETAIL

**PREPARED FOR: SARA TURNER**


alacourt.com

County: **02**    Case Number: **CV-2020-900755.00**    Court Action:
Style: **POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL**

**Real Time**

## Case

### Case Information

| | | | | | | |
|---|---|---|---|---|---|---|
| County: | **02-MOBILE** | Case Number: | **CV-2020-900755.00** | Judge: | **JAY:JAY A YORK** | |
| Style: | **POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL** | | | | | |
| Filed: | **04/03/2020** | Case Status: | **ACTIVE** | Case Type: | **NEGLIGENCE-GENERAL** | |
| Trial Type: | **JURY** | Track: | **FAST** | Appellate Case: | **0** | |
| No of Plaintiffs: | **1** | No of Defendants: | **38** | | | |

### Damages

| | | | | | |
|---|---|---|---|---|---|
| Damage Amt: | **0.00** | Punitive Damages: | **0.00** | General Damages: | **0.00** |
| No Damages: | | Compensatory Damages: | **0.00** | | |
| Pay To: | | Payment Frequency: | | Cost Paid By: | |

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action Code: | | Court Action Desc: | | Court Action Date: | |
| Num of Trial days: | **0** | Num of Liens: | **0** | Judgment For: | |
| Dispositon Date of Appeal: | | Disposition Judge: | **:** | Disposition Type: | |
| Revised Judgement Date: | | Minstral: | | Appeal Date: | |
| Date Trial Began but No Verdict (TBNV1): | | | | | |
| Date Trial Began but No Verdict (TBNV2): | | | | | |

### Comments

Comment 1:
Comment 2:

### Appeal Information

| | | | | |
|---|---|---|---|---|
| Appeal Date: | | Appeal Case Number: | | Appeal Court: |
| Appeal Status: | | Orgin Of Appeal: | | |
| Appeal To: | | Appeal To Desc: | | LowerCourt Appeal Date: |
| Disposition Date Of Appeal: | | Disposition Type Of Appeal: | | |

### Administrative Information

| | | | | |
|---|---|---|---|---|
| Transfer to Admin Doc Date: | | Transfer Reason: | | Transfer Desc: |
| Number of Subponeas: | | Last Update: | **04/03/2020** | Updated By: **JOD** |

## Settings

### Settings

| | Date: | Que: | Time: | Description: |
|---|---|---|---|---|
| 4 | **12/18/2020** | **001** | **08:30 AM** | **READ - CERT TO BE FILED** |

## Parties

### Party 1 - Plaintiff OTHER - POARCH BAND OF CREEK INDIANS

## Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **C001-Plaintiff** | Name: | **POARCH BAND OF CREEK INDIANS** | Type: | **O-OTHER** |
| Index: | **D AMNEAL PHARM** | Alt Name: | | Hardship: **No** | JID: **JAY** |
| Address 1: | **5811 JACK SPRINGS ROAD** | | | Phone: **(205) 000-0000** | |
| Address 2: | | | | | |
| City: | **ATMORE** | State: | **AL** | Zip: **36502-0000** | Country: **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: |

## Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: | **$0.00** | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

## Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: | Issued Type: | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: | Service Type | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | FRA031 | | FRAZER THOMAS ROE II | ROE@FRAZER.LAW | (615) 647-0990 |

### Party 2 - Defendant BUSINESS - AMNEAL PHARMACEUTICALS, INC.

## Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **D001-Defendant** | Name: | **AMNEAL PHARMACEUTICALS, INC.** | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** | JID: **JAY** |
| Address 1: | **251 LITTLE FALLS DRIVE** | | | Phone: **(205) 000-0000** | |
| Address 2: | | | | | |
| City: | **WILMINGTON** | State: | **DE** | Zip: **19808-0000** | Country: **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: |

## Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: | **$0.00** | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

## Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: | **04/03/2020** | Issued Type: | **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | **05/07/2020** | Service Type | **C-CERTIFIED MAIL** | Service On: | Served By: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 3 - Defendant BUSINESS - AMNEAL PHARMACEUTICALS, LLC

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D002-Defendant | Name: | **AMNEAL PHARMACEUTICALS, LLC** | | | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** |
| Address 1: | **2 NORTH JACKSON ST., STE** | | | Phone: | **(205) 000-0000** | | |
| Address 2: | | | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | Zip: | **36104-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | |

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: | **$0.00** | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Issued: | **04/03/2020** | Issued Type: | **F-CERTIFIED MAIL BY FIL** | Reissue: | | Reissue Type: | |
| Return: | | Return Type: | | Return: | | Return Type: | |
| Served: | **04/20/2020** | Service Type | **C-CERTIFIED MAIL** | Service On: | | Served By: | |
| Answer: | | Answer Type: | | Notice of No Service: | | Notice of No Answer: | |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 4 - Defendant BUSINESS - TEVA PHARMACEUTICALS USA, INC.

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D003-Defendant | Name: | **TEVA PHARMACEUTICALS USA, INC.** | | | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** |
| Address 1: | **6 OFFICE PARK CIRCLE #100** | | | Phone: | **(205) 000-0000** | | |
| Address 2: | | | | | | | |
| City: | **MOUNTAIN BROOK** | State: | **AL** | Zip: | **35223-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | |

## Court Action

| | | | |
|---|---|---|---|
| Court Action: | | Court Action Date: | |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: | |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: | |
| Comment: | | Arrest Date: | |
| Warrant Action Date: | Warrant Action Status: | Status Description: | |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **05/07/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 5 - Defendant BUSINESS - CEPHALON, INC.

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **D004-Defendant** | Name: | **CEPHALON, INC.** | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** | JID: **JAY** |
| Address 1: | **3411 SILVERSIDE ROAD, STE** | | | Phone: **(205) 000-0000** | |
| Address 2: | **TATNALL BUIDLING** | | | | |
| City: | **WILMINGTON** | State: | **DE** | Zip: **19810-0000** | Country: **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: |

### Court Action

| | | | |
|---|---|---|---|
| Court Action: | | Court Action Date: | |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: | |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: | |
| Comment: | | Arrest Date: | |
| Warrant Action Date: | Warrant Action Status: | Status Description: | |

### Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **05/07/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 6 - Defendant BUSINESS - JOHNSON & JOHNSON

### Party Information

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Party: | D005-Defendant | Name: | JOHNSON & JOHNSON | | | Type: | B-BUSINESS | |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: | No | JID: | JAY | |
| Address 1: | ONE JOHNSON & JOHNSON PLA | | | Phone: | (205) 000-0000 | | | |
| Address 2: | | | | | | | | |
| City: | NEW BRUNSWICK | State: | NJ | Zip: | 08933-0000 | Country: | US | |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | | Race: | | |

### Court Action

| | | | |
|---|---|---|---|
| Court Action: | | | Court Action Date: |
| Amount of Judgement: | $0.00 | Court Action For: | Exemptions: |
| Cost Against Party: | $0.00 | Other Cost: $0.00 | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | | Warrant Action Status: | Status Description: |

### Service Information

| | | | |
|---|---|---|---|
| Issued: 04/03/2020 | Issued Type: F-CERTIFIED MAIL BY FIL | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: 04/21/2020 | Service Type C-CERTIFIED MAIL | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 7 - Defendant BUSINESS - JANSSEN PHARMACEUTICALS, INC.

### Party Information

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Party: | D006-Defendant | Name: | JANSSEN PHARMACEUTICALS, INC. | | | Type: | B-BUSINESS | |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: | No | JID: | JAY | |
| Address 1: | 2 NORTH JACKSON STREET, S | | | Phone: | (205) 000-0000 | | | |
| Address 2: | | | | | | | | |
| City: | MONTGOMERY | State: | AL | Zip: | 36104-0000 | Country: | US | |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | | Race: | | |

## Court Action

| | | | |
|---|---|---|---|
| Court Action: | | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 8 - Defendant BUSINESS - NORAMCO, INC.

## Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **D007-Defendant** | Name: | **NORAMCO, INC.** | | Type: **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** | JID: **JAY** |
| Address 1: | **2 NORTH JACKSON STREET, S** | | | Phone: **(205) 000-0000** | |
| Address 2: | | | | | |
| City: | **MONTGOMERY** | State: **AL** | | Zip: **36104-0000** | Country: **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: |

## Court Action

| | | | |
|---|---|---|---|
| Court Action: | | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 9 - Defendant BUSINESS - ABBOTT LABORATORIES

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | D008-Defendant | Name: | **ABBOTT LABORATORIES** | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** JID: | **JAY** |
| Address 1: | **\*\*\* RETURNED ADDRESS \*\*\*** | | | Phone: **(205) 000-0000** | |
| Address 2: | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | Zip: **36103-0000** Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: Race: | |

### Court Action

| | | | |
|---|---|---|---|
| Court Action: | | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | | Status Description: |

### Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: | Service Type | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 10 - Defendant BUSINESS - ABBOTT LABORATORIES, INC.

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | D009-Defendant | Name: | **ABBOTT LABORATORIES, INC.** | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** JID: | **JAY** |
| Address 1: | **2 NORTH JACKSON STREET, S** | | | Phone: **(205) 000-0000** | |
| Address 2: | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | Zip: **36104-0000** Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: Race: | |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 11 - Defendant BUSINESS - ASSERTIO THERAPEUTICS, INC.

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **D010-Defendant** | Name: | **ASSERTIO THERAPEUTICS, INC.** | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** JID: | **JAY** |
| Address 1: | **641 SOUTH LAWRENCE STREET** | | Phone: **(205) 000-0000** | | |
| Address 2: | | | | | |
| City: | **MONTGOMERY** | State: **AL** | Zip: **36104-0000** | Country: **US** | |
| SSN: | **XXX-XX-X999** | DOB: | Sex: | Race: | |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 12 - Defendant BUSINESS - ENDO HEALTH SOLUTIONS, INC.

### Party Information

| | | | | | | | | |
|--|--|--|--|--|--|--|--|--|
| Party: | **D011-Defendant** | Name: | **ENDO HEALTH SOLUTIONS, INC.** | | | Type: | **B-BUSINESS** | |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** | |
| Address 1: | **1209 ORANGE STREET** | | | Phone: | **(205) 000-0000** | | | |
| Address 2: | | | | | | | | |
| City: | **WILMINGTON** | State: | **DE** | Zip: | **19801-0000** | Country: | **US** | |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | | |

### Court Action

| | | | | | |
|--|--|--|--|--|--|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: | **$0.00** | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | |
|--|--|--|--|--|--|
| Issued: | **04/03/2020** | Issued Type: | **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | **05/07/2020** | Service Type: | **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 13 - Defendant BUSINESS - ENDO PHARMACEUTICALS, INC.

### Party Information

| | | | | | | | | |
|--|--|--|--|--|--|--|--|--|
| Party: | **D012-Defendant** | Name: | **ENDO PHARMACEUTICALS, INC.** | | | Type: | **B-BUSINESS** | |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** | |
| Address 1: | **1209 ORANGE STREET** | | | Phone: | **(205) 000-0000** | | | |
| Address 2: | | | | | | | | |
| City: | **WILMINGTON** | State: | **DE** | Zip: | **19801-0000** | Country: | **US** | |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | | |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | |
|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **05/07/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 14 - Defendant BUSINESS - PAR PHARMACEUTICAL, INC.

### Party Information

| | | | |
|---|---|---|---|
| Party: **D013-Defendant** | Name: **PAR PHARMACEUTICAL, INC.** | | Type: **B-BUSINESS** |
| Index: **C OF CREEK IND** | Alt Name: | Hardship: **No** | JID: **JAY** |
| Address 1: **2 NORTH JACKSON STREET, S** | | Phone: **(205) 000-0000** | |
| Address 2: | | | |
| City: **MONTGOMERY** | State: **AL** | Zip: **36104-0000** | Country: **US** |
| SSN: **XXX-XX-X999** | DOB: | Sex: | Race: |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | |
|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 15 - Defendant BUSINESS - PAR PHARMACEUTICALS COMPANIES, INC.

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | D014-Defendant | Name: | PAR PHARMACEUTICALS COMPANIES, INC. | Type: | B-BUSINESS |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: No | JID: JAY |
| Address 1: | 1209 ORANGE STREET | | | Phone: (205) 000-0000 | |
| Address 2: | | | | | |
| City: | WILMINGTON | State: DE | | Zip: 19801-0000 | Country: US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | Race: |

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | $0.00 | Court Action For: | | Exemptions: | |
| Cost Against Party: | $0.00 | Other Cost: | $0.00 | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: | 04/03/2020 | Issued Type: | F-CERTIFIED MAIL BY FIL | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | 05/07/2020 | Service Type | C-CERTIFIED MAIL | Service On: | Served By: |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 16 - Defendant BUSINESS - ALLERGAN FINANCE, LLC

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | D015-Defendant | Name: | ALLERGAN FINANCE, LLC | Type: | B-BUSINESS |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: No | JID: JAY |
| Address 1: | 1209 ORANGE STREET | | | Phone: (205) 000-0000 | |
| Address 2: | | | | | |
| City: | WILMINGTON | State: DE | | Zip: 19801-0000 | Country: US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | Race: |

## Court Action

| | | | |
|---|---|---|---|
| Court Action: | | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/29/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 17 - Defendant BUSINESS - ALLERGAN SALES, LLC

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **D016-Defendant** | Name: | **ALLERGAN SALES, LLC** | | Type: **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** | JID: **JAY** |
| Address 1: | **2 NORTH JACKSON STREET, S** | | | Phone: **(205) 000-0000** | |
| Address 2: | | | | | |
| City: | **MONTGOMERY** | State: **AL** | | Zip: **36104-0000** | Country: **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: |

### Court Action

| | | | |
|---|---|---|---|
| Court Action: | | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | | Status Description: |

### Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|--------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

### Party 18 - Defendant BUSINESS - ALLERGAN USA, INC.

#### Party Information

| | | | | | | |
|--|--|--|--|--|--|--|
| Party: | D017-Defendant | Name: | ALLERGAN USA, INC. | | Type: | B-BUSINESS |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: No | JID: | JAY |
| Address 1: | 2 NORTH JACKSON STREET, S | | | Phone: (205) 000-0000 | | |
| Address 2: | | | | | | |
| City: | MONTGOMERY | State: | AL | Zip: 36104-0000 | Country: | US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | Race: | |

#### Court Action

| | | | | | |
|--|--|--|--|--|--|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | $0.00 | Court Action For: | | Exemptions: | |
| Cost Against Party: | $0.00 | Other Cost: | $0.00 | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

#### Service Information

| | | | | | |
|--|--|--|--|--|--|
| Issued: | 04/03/2020 | Issued Type: | F-CERTIFIED MAIL BY FIL | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | 04/20/2020 | Service Type | C-CERTIFIED MAIL | Service On: | Served By: |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: |

#### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|--------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

### Party 19 - Defendant BUSINESS - WATSON PHARMACEUTICALS, INC.

#### Party Information

| | | | | | | |
|--|--|--|--|--|--|--|
| Party: | D018-Defendant | Name: | WATSON PHARMACEUTICALS, INC. | | Type: | B-BUSINESS |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: No | JID: | JAY |
| Address 1: | 6 OFFICE PARK CIRCLE #100 | | | Phone: (205) 000-0000 | | |
| Address 2: | | | | | | |
| City: | MOUNTAIN BROOK | State: | AL | Zip: 35223-0000 | Country: | US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | Race: | |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **05/08/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 20 - Defendant BUSINESS - ACTAVIS LLC

### Party Information

| | | | | |
|---|---|---|---|---|
| Party: | **D019-Defendant** | Name: **ACTAVIS LLC** | | Type: **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | Hardship: **No** | JID: **JAY** |
| Address 1: | **3411 SILVERSIDE ROAD, STE** | | Phone: **(205) 000-0000** | |
| Address 2: | **TATNALL BUILDING** | | | |
| City: | **WILMINGTON** | State: **DE** | Zip: **19810-0000** | Country: **US** |
| SSN: | **XXX-XX-X999** | DOB: | Sex: | Race: |

### Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

### Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: | Service Type | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 21 - Defendant BUSINESS - ACTAVIS PHARMA, INC.

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D020-Defendant | Name: | ACTAVIS PHARMA, INC. | | | Type: | B-BUSINESS |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: | No | JID: | JAY |
| Address 1: | 6 OFFICE PARK CIRCLE #100 | | | Phone: | (205) 000-0000 | | |
| Address 2: | | | | | | | |
| City: | MOUNTAIN BROOK | State: | AL | Zip: | 35223-0000 | Country: | US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | | Race: | |

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | $0.00 | Court Action For: | | Exemptions: | |
| Cost Against Party: | $0.00 | Other Cost: | $0.00 | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: | 04/03/2020 | Issued Type: | F-CERTIFIED MAIL BY FIL | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | 05/07/2020 | Service Type | C-CERTIFIED MAIL | Service On: | Served By: |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 22 - Defendant BUSINESS - RITE AID OF ALABAMA, INC.

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D021-Defendant | Name: | RITE AID OF ALABAMA, INC. | | | Type: | B-BUSINESS |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: | No | JID: | JAY |
| Address 1: | 2 NORTH JACKSON STREET, S | | | Phone: | (205) 000-0000 | | |
| Address 2: | | | | | | | |
| City: | MONTGOMERY | State: | AL | Zip: | 36104-0000 | Country: | US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | | Race: | |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | IRV001 | | IRVINE GEORGE RICHARDSON | GIRVINE@STONECROSBY.COM | (251) 626-6696 |
| Attorney 2 | REE079 | | REEVES FINLEY B | FREEVES@STONECROSBY.COM | (251) 626-6696 |

## Party 23 - Defendant BUSINESS - RITE AID OF MARYLAND, IND.

### Party Information

| | | | | |
|---|---|---|---|---|
| Party: | **D022-Defendant** | Name: | **RITE AID OF MARYLAND, IND.** | Type: **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | Hardship: **No** | JID: **JAY** |
| Address 1: | **2405 YORK ROAD, STE 201** | | Phone: **(205) 000-0000** | |
| Address 2: | | | | |
| City: | **LUTHERVILLE TI** | State: **MD** | Zip: **21093-0000** | Country: **US** |
| SSN: | **XXX-XX-X999** | DOB: | Sex: | Race: |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/21/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | IRV001 | | IRVINE GEORGE RICHARDSON | GIRVINE@STONECROSBY.COM | (251) 626-6696 |
| Attorney 2 | REE079 | | REEVES FINLEY B | FREEVES@STONECROSBY.COM | (251) 626-6696 |

## Party 24 - Defendant BUSINESS - THE KROGER CO

### Party Information

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Party: | **D023-Defendant** | Name: | **THE KROGER CO** | | | | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | | **JAY** |
| Address 1: | **641 SOUTH LAWRENCE STREET** | | | Phone: | **(205) 000-0000** | | | |
| Address 2: | | | | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | Zip: | **36104-0000** | Country: | **US** | |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | | |

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: | **$0.00** | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: | **04/03/2020** | Issued Type: | **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | **04/20/2020** | Service Type | **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 25 - Defendant BUSINESS - KROGER LIMITED PARTNERSHIP II

### Party Information

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Party: | **D024-Defendant** | Name: | **KROGER LIMITED PARTNERSHIP II** | | | | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | | **JAY** |
| Address 1: | **641 SOUTH LAWRENCE STREET** | | | Phone: | **(205) 000-0000** | | | |
| Address 2: | | | | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | Zip: | **36104-0000** | Country: | **US** | |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | | |

## Court Action

| | | | |
|---|---|---|---|
| Court Action: | | Court Action Date: | |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: | |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: | |
| Comment: | | Arrest Date: | |
| Warrant Action Date: | Warrant Action Status: | Status Description: | |

## Service Information

| | | |
|---|---|---|
| Issued: **04/03/2020** Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: Return Type: | Return: | Return Type: |
| Served: **04/20/2020** Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 26 - Defendant BUSINESS - CVS HEALTH CORPORATION

### Party Information

| | | | | | | |
|---|---|---|---|---|---|---|
| Party: | **D025-Defendant** | Name: | **CVS HEALTH CORPORATION** | | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** | JID: | **JAY** |
| Address 1: | **1209 ORANGE STREET** | | | Phone: **(205) 000-0000** | | |
| Address 2: | | | | | | |
| City: | **WILMINGTON** | State: **DE** | | Zip: **19801-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: | |

## Court Action

| | | | |
|---|---|---|---|
| Court Action: | | Court Action Date: | |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: | |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: | |
| Comment: | | Arrest Date: | |
| Warrant Action Date: | Warrant Action Status: | Status Description: | |

## Service Information

| | | |
|---|---|---|
| Issued: **04/03/2020** Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: Return Type: | Return: | Return Type: |
| Served: Service Type | Service On: | Served By: |
| Answer: Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | KIR044 | | KIRBY CASON MICHAEL | CASON@CAMPBELLPARTNERSLAW.COM | (205) 224-0750 |

## Party 27 - Defendant BUSINESS - CVS PHARMACY, INC.

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D026-Defendant | Name: | CVS PHARMACY, INC. | | | Type: | B-BUSINESS |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: | No | JID: | JAY |
| Address 1: | 2 NORTH JACKSON STREET, S | | | Phone: | (205) 000-0000 | | |
| Address 2: | | | | | | | |
| City: | MONTGOMERY | State: | AL | Zip: | 36104-0000 | Country: | US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | | Race: | |

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | $0.00 | Court Action For: | | Exemptions: | |
| Cost Against Party: | $0.00 | Other Cost: | $0.00 | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: | 04/03/2020 | Issued Type: | F-CERTIFIED MAIL BY FIL | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | 04/20/2020 | Service Type | C-CERTIFIED MAIL | Service On: | Served By: |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | KIR044 | | KIRBY CASON MICHAEL | CASON@CAMPBELLPARTNERSLAW.COM | (205) 224-0750 |

## Party 28 - Defendant BUSINESS - CVS INDIANA, L.L.C.

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D027-Defendant | Name: | CVS INDIANA, L.L.C. | | | Type: | B-BUSINESS |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: | No | JID: | JAY |
| Address 1: | 150 WEST MARKET STREET, S | | | Phone: | (205) 000-0000 | | |
| Address 2: | | | | | | | |
| City: | INDIANAPOLIS | State: | IN | Zip: | 46204-0000 | Country: | US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | | Race: | |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **05/07/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | KIR044 | | KIRBY CASON MICHAEL | CASON@CAMPBELLPARTNERSLAW.COM | (205) 224-0750 |

## Party 29 - Defendant BUSINESS - WAL-MART INC.

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **D028-Defendant** | Name: | **WAL-MART INC.** | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** | JID: **JAY** |
| Address 1: | **2 NORTH JACKSON STREET, S** | | | Phone: **(205) 000-0000** | |
| Address 2: | | | | | |
| City: | **MONTGOMERY** | State: **AL** | | Zip: **36104-0000** | Country: **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 30 - Defendant BUSINESS - WAL-MART STORES EAST, LP

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D029-Defendant | Name: | **WAL-MART STORES EAST, LP** | | | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** |
| Address 1: | **2 NORTH JACKSON STREET, S** | | | Phone: | **(205) 000-0000** | | |
| Address 2: | | | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | Zip: | **36104-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | |

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: | **$0.00** | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: | **04/03/2020** | Issued Type: | **F-CERTIFIED MAIL BY FIL** | Reissue: | |
| Return: | | Return Type: | | Return: | Reissue Type: |
| Served: | **04/20/2020** | Service Type | **C-CERTIFIED MAIL** | Service On: | Return Type: |
| Answer: | | Answer Type: | | Notice of No Service: | Served By: |
| | | | | | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 31 - Defendant BUSINESS - WALGREEN EASTERN CO., INC.

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D030-Defendant | Name: | **WALGREEN EASTERN CO., INC.** | | | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** |
| Address 1: | **641 SOUTH LAWRENCE STREET** | | | Phone: | **(205) 000-0000** | | |
| Address 2: | | | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | Zip: | **36104-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | |

## Court Action

| | | | |
|---|---|---|---|
| Court Action: | | Court Action Date: | |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: | |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: | |
| Comment: | | Arrest Date: | |
| Warrant Action Date: | Warrant Action Status: | Status Description: | |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 32 - Defendant BUSINESS - WALGREEN CO., INC.

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **D031-Defendant** | Name: | **WALGREEN CO., INC.** | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | Hardship: **No** | JID: | **JAY** |
| Address 1: | **641 SOUTH LAWRENCE STREET** | | Phone: **(205) 000-0000** | | |
| Address 2: | | | | | |
| City: | **MONTGOMERY** | State: **AL** | Zip: **36104-0000** | Country: **US** | |
| SSN: | **XXX-XX-X999** | DOB: | Sex: | Race: | |

## Court Action

| | | | |
|---|---|---|---|
| Court Action: | | Court Action Date: | |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: | |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: | |
| Comment: | | Arrest Date: | |
| Warrant Action Date: | Warrant Action Status: | Status Description: | |

## Service Information

| | | | |
|---|---|---|---|
| Issued: **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: **04/20/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 33 - Defendant INDIVIDUAL - COUCH JOHN PATRICK

### Party Information

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| Party: | **D032-Defendant** | Name: | **COUCH JOHN PATRICK** | | | Type: | **I-INDIVIDUAL** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** |
| Address 1: | **1400 DALE BUMPERS ROAD** | | | Phone: | **(205) 000-0000** | | |
| Address 2: | | | | | | | |
| City: | **FORREST CITY** | State: | **AZ** | Zip: | **72335-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | |

### Court Action

| | | | | | |
|--|--|--|--|--|--|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: | **$0.00** | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | |
|--|--|--|--|--|--|
| Issued: | **04/03/2020** | Issued Type: | **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | **04/20/2020** | Service Type | **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 34 - Defendant INDIVIDUAL - RUAN XIULU

### Party Information

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| Party: | **D033-Defendant** | Name: | **RUAN XIULU** | | | Type: | **I-INDIVIDUAL** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** |
| Address 1: | **1507 EAST WHATLEY ROAD** | | | Phone: | **(205) 000-0000** | | |
| Address 2: | | | | | | | |
| City: | **OAKDALE** | State: | **LA** | Zip: | **71463-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | |

## Court Action

| | | | | |
|---|---|---|---|---|
| Court Action: | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: **$0.00** | Date Satisfied: | |
| Comment: | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | Status Description: | |

## Service Information

| | | | | |
|---|---|---|---|---|
| Issued: | **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** Reissue: | Reissue Type: | |
| Return: | | Return Type: | Return: | Return Type: |
| Served: | **05/07/2020** | Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 35 - Defendant BUSINESS - PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C.

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | **D034-Defendant** | Name: | **PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C.** | | Type: | **B-BUSINESS** | |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: **No** | JID: | **JAY** | |
| Address 1: | **2001 SPRING HILL AVE** | | | Phone: **(205) 000-0000** | | | |
| Address 2: | | | | | | | |
| City: | **MOBILE** | State: **AL** | | Zip: **36607-0000** | Country: **US** | | |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: | | |

## Court Action

| | | | | |
|---|---|---|---|---|
| Court Action: | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: **$0.00** | Date Satisfied: | |
| Comment: | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | Status Description: | |

## Service Information

| | | | | |
|---|---|---|---|---|
| Issued: | **04/03/2020** | Issued Type: **F-CERTIFIED MAIL BY FIL** Reissue: | Reissue Type: | |
| Return: | | Return Type: | Return: | Return Type: |
| Served: | | Service Type | Service On: | Served By: |
| Answer: | | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 36 - Defendant INDIVIDUAL - PALMER THOMAS JUSTIN

### Party Information

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| Party: | **D035-Defendant** | Name: | **PALMER THOMAS JUSTIN** | | | Type: | **I-INDIVIDUAL** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** |
| Address 1: | **305 NORTH JACKSON STREET** | | | Phone: | **(205) 000-0000** | | |
| Address 2: | | | | | | | |
| City: | **MOBILE** | State: | **AL** | Zip: | **36603-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | |

### Court Action

| | | | | | |
|--|--|--|--|--|--|
| Court Action: | | | | Court Action Date: | |
| Amount of Judgement: | **$0.00** | Court Action For: | | Exemptions: | |
| Cost Against Party: | **$0.00** | Other Cost: | **$0.00** | Date Satisfied: | |
| Comment: | | | | Arrest Date: | |
| Warrant Action Date: | | Warrant Action Status: | | Status Description: | |

### Service Information

| | | | | | |
|--|--|--|--|--|--|
| Issued: | **04/03/2020** | Issued Type: | **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: | | Return Type: | | Return: | Return Type: |
| Served: | **04/21/2020** | Service Type | **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 37 - Defendant INDIVIDUAL - PARKER BRIDGETTE

### Party Information

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| Party: | **D036-Defendant** | Name: | **PARKER BRIDGETTE** | | | Type: | **I-INDIVIDUAL** |
| Index: | **C OF CREEK IND** | Alt Name: | | Hardship: | **No** | JID: | **JAY** |
| Address 1: | **3461 DEER TRACK DRIVE** | | | Phone: | **(205) 000-0000** | | |
| Address 2: | | | | | | | |
| City: | **SEMMES** | State: | **AL** | Zip: | **36575-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | | Race: | |

## Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

## Service Information

| | | |
|---|---|---|
| Issued: **04/03/2020** Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: Return Type: | Return: | Return Type: |
| Served: **05/07/2020** Service Type **C-CERTIFIED MAIL** | Service On: | Served By: |
| Answer: Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 38 - Defendant BUSINESS - EASTERN SHORE NEUROLOGY CLINIC, INC.

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | **D037-Defendant** | Name: | **EASTERN SHORE NEUROLOGY CLINIC, INC.** | Type: | **B-BUSINESS** |
| Index: | **C OF CREEK IND** | Alt Name: | | JID: | **JAY** |
| Address 1: | **28080 US HWY 98** | | Hardship: **No** | | |
| Address 2: | **STE D** | | Phone: **(205) 000-0000** | | |
| City: | **DAPHNE** | State: **AL** | Zip: **36526-0000** | Country: **US** | |
| SSN: | **XXX-XX-X999** | DOB: | Sex: | Race: | |

### Court Action

| | | |
|---|---|---|
| Court Action: | | Court Action Date: |
| Amount of Judgement: **$0.00** | Court Action For: | Exemptions: |
| Cost Against Party: **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | Arrest Date: |
| Warrant Action Date: | Warrant Action Status: | Status Description: |

### Service Information

| | | |
|---|---|---|
| Issued: **04/03/2020** Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
| Return: Return Type: | Return: | Return Type: |
| Served: Service Type | Service On: | Served By: |
| Answer: Answer Type: | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Party 39 - Defendant INDIVIDUAL - TARABEIN RASSAN M

### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | D038-Defendant | Name: | TARABEIN RASSAN M | | | Type: | I-INDIVIDUAL |
| Index: | C OF CREEK IND | Alt Name: | | Hardship: | No | JID: | JAY |
| Address 1: | 27535 US-98 | | | Phone: | (205) 000-0000 | | |
| Address 2: | | | | | | | |
| City: | DALPHNE | State: | AL | Zip: | 36526-0000 | Country: | US |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | | Race: | |

### Court Action

| | | | |
|---|---|---|---|
| Court Action: | | | Court Action Date: |
| Amount of Judgement: | $0.00 | Court Action For: | Exemptions: |
| Cost Against Party: | $0.00 | Other Cost: $0.00 | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | | Warrant Action Status: | Status Description: |

### Service Information

| | | | |
|---|---|---|---|
| Issued: | 04/03/2020 | Issued Type: F-CERTIFIED MAIL BY FIL | Reissue: | Reissue Type: |
| Return: | Return Type: | Return: | Return Type: |
| Served: | Service Type | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | 000000 | | PRO SE | | |

## Financial

### Fee Sheet

| Fee Status | Admin Fee | Fee Code | Payor | Payee | Amount Due | Amount Paid | Balance | Amount Hold | Garnish Party |
|------------|-----------|----------|-------|-------|-----------|-------------|---------|-------------|---------------|
| ACTIVE | N | CONV | C001 | 000 | $18.40 | $18.40 | $0.00 | $0.00 | 0 |
| ACTIVE | N | CV05 | C001 | 000 | $315.00 | $315.00 | $0.00 | $0.00 | 0 |
| ACTIVE | N | JDMD | C001 | 000 | $100.00 | $100.00 | $0.00 | $0.00 | 0 |
| ACTIVE | N | VADM | C001 | 000 | $45.00 | $45.00 | $0.00 | $0.00 | 0 |
| | | | | Total: | $478.40 | $478.40 | $0.00 | $0.00 | |

### Financial History

| Transaction Date | Description | Disbursement | Transaction | Receipt Number | Amount | From Party | To Party | Money Type | Admin | Reason | Attorney | Operator |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/03/2020 | CHGD DUE | CONV | 2020148 | 00 | $18.40 | C001 | 000 | | N | | | CHL |
| 04/03/2020 | CREDIT | CONV | 2020148 | 5316390 | $18.40 | C001 | 000 | | N | | | CHL |
| 04/03/2020 | RECEIPT | CV05 | 2020148 | 5316400 | $315.00 | C001 | 000 | | N | | | CHL |
| 04/03/2020 | RECEIPT | JDMD | 2020148 | 5316410 | $100.00 | C001 | 000 | | N | | | CHL |
| 04/03/2020 | RECEIPT | VADM | 2020148 | 5316420 | $45.00 | C001 | 000 | | N | | | CHL |

## Case Action Summary

| Date: | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 4/3/2020 | 4:01 PM | ASSJ | ASSIGNED TO JUDGE: JAY YORK     (AV01) | AJA |
| 4/3/2020 | 4:01 PM | SCAN | CASE SCANNED STATUS SET TO: N     (AV01) | AJA |
| 4/3/2020 | 4:01 PM | ORIG | ORIGIN: INITIAL FILING     (AV01) | AJA |
| 4/3/2020 | 4:01 PM | TDMJ | JURY TRIAL REQUESTED     (AV01) | AJA |
| 4/3/2020 | 4:01 PM | EORD | E-ORDER FLAG SET TO "Y"     (AV01) | AJA |
| 4/3/2020 | 4:01 PM | FILE | FILED THIS DATE: 04/03/2020     (AV01) | AJA |
| 4/3/2020 | 4:01 PM | STAT | CASE ASSIGNED STATUS OF: ACTIVE     (AV01) | AJA |
| 4/3/2020 | 4:01 PM | C001 | INDIGENT FLAG SET TO: N     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | C001 | LISTED AS ATTORNEY FOR C001: FRAZER THOMAS ROE II | AJA |
| 4/3/2020 | 4:01 PM | C001 | C001 PARTY ADDED: OF CREEK INDIANS POARCH BAND | AJA |
| 4/3/2020 | 4:01 PM | C001 | C001 E-ORDER FLAG SET TO "Y"     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D001 | D001 PARTY ADDED: AMNEAL PHARMACEUTICALS, INC. | AJA |
| 4/3/2020 | 4:01 PM | D001 | INDIGENT FLAG SET TO: N     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D001 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D001   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D001 | D001 E-ORDER FLAG SET TO "Y"     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D001 | LISTED AS ATTORNEY FOR D001: PRO SE     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D002 | D002 E-ORDER FLAG SET TO "Y"     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D002 | D002 PARTY ADDED: AMNEAL PHARMACEUTICALS, LLC | AJA |
| 4/3/2020 | 4:01 PM | D002 | INDIGENT FLAG SET TO: N     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D002 | LISTED AS ATTORNEY FOR D002: PRO SE     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D002 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D002   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D003 | D003 PARTY ADDED: TEVA PHARMACEUTICALS USA, INC. | AJA |
| 4/3/2020 | 4:01 PM | D003 | LISTED AS ATTORNEY FOR D003: PRO SE     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D003 | INDIGENT FLAG SET TO: N     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D003 | D003 E-ORDER FLAG SET TO "Y"     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D003 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D003   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D004 | D004 PARTY ADDED: CEPHALON, INC.     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D004 | INDIGENT FLAG SET TO: N     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D004 | LISTED AS ATTORNEY FOR D004: PRO SE     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D004 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D004   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D004 | D004 E-ORDER FLAG SET TO "Y"     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D005 | D005 PARTY ADDED: JOHNSON & JOHNSON     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D005 | INDIGENT FLAG SET TO: N     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D005 | LISTED AS ATTORNEY FOR D005: PRO SE     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D005 | D005 E-ORDER FLAG SET TO "Y"     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D005 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D005   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D006 | D006 PARTY ADDED: JANSSEN PHARMACEUTICALS, INC. | AJA |
| 4/3/2020 | 4:01 PM | D006 | INDIGENT FLAG SET TO: N     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D006 | LISTED AS ATTORNEY FOR D006: PRO SE     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D006 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D006   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D006 | D006 E-ORDER FLAG SET TO "Y"     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D007 | D007 PARTY ADDED: NORAMCO, INC.     (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D007 | INDIGENT FLAG SET TO: N     (AV02) | AJA |

| 4/3/2020 | 4:01 PM | D007 | LISTED AS ATTORNEY FOR D007: PRO SE          (AV02) | AJA |
|----------|---------|------|-----------------------------------------------------|-----|
| 4/3/2020 | 4:01 PM | D007 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D007   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D007 | D007 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D008 | D008 PARTY ADDED: ABBOTT LABORATORIES      (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D008 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D008 | LISTED AS ATTORNEY FOR D008: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D008 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D008   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D008 | D008 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D009 | D009 PARTY ADDED: ABBOTT LABORATORIES, INC. (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D009 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D009 | LISTED AS ATTORNEY FOR D009: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D009 | D009 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D009 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D009   (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D010 | D010 PARTY ADDED: ASSERTIO THERAPEUTICS, INC. | AJA |
| 4/3/2020 | 4:01 PM | D010 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:01 PM | D010 | LISTED AS ATTORNEY FOR D010: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D010 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D010   (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D010 | D010 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D011 | D011 PARTY ADDED: ENDO HEALTH SOLUTIONS, INC. | AJA |
| 4/3/2020 | 4:02 PM | D011 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D011 | LISTED AS ATTORNEY FOR D011: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D011 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D011   (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D011 | D011 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D012 | D012 PARTY ADDED: ENDO PHARMACEUTICALS, INC.(AV02) | AJA |
| 4/3/2020 | 4:02 PM | D012 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D012 | LISTED AS ATTORNEY FOR D012: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D012 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D012   (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D012 | D012 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D013 | D013 PARTY ADDED: PAR PHARMACEUTICAL, INC.  (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D013 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D013 | LISTED AS ATTORNEY FOR D013: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D013 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D013   (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D013 | D013 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D021 | D021 PARTY ADDED: RITE AID OF ALABAMA, INC. (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D021 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D021 | LISTED AS ATTORNEY FOR D021: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D021 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D021   (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D021 | D021 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D022 | D022 PARTY ADDED: RITE AID OF MARYLAND, IND.(AV02) | AJA |
| 4/3/2020 | 4:02 PM | D022 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D022 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D022   (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D022 | LISTED AS ATTORNEY FOR D022: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D022 | D022 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D023 | D023 PARTY ADDED: THE KROGER CO          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D023 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D023 | LISTED AS ATTORNEY FOR D023: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D023 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D023   (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D023 | D023 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D024 | D024 PARTY ADDED: KROGER LIMITED PARTNERSHIP II | AJA |
| 4/3/2020 | 4:02 PM | D024 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D024 | LISTED AS ATTORNEY FOR D024: PRO SE      (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D024 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D024   (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D024 | D024 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |

| 4/3/2020 | 4:02 PM | D025 | D025 PARTY ADDED: CVS HEALTH CORPORATION (AV02) | AJA |
|---|---|---|---|---|
| 4/3/2020 | 4:02 PM | D025 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D025 | LISTED AS ATTORNEY FOR D025: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D025 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D025 (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D025 | D025 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D026 | D026 PARTY ADDED: CVS PHARMACY, INC. (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D026 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D026 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D026 (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D026 | LISTED AS ATTORNEY FOR D026: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D026 | D026 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D027 | D027 PARTY ADDED: CVS INDIANA, L.L.C. (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D027 | D027 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D027 | LISTED AS ATTORNEY FOR D027: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D027 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D027 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D027 (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D028 | D028 PARTY ADDED: WAL-MART INC. (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D028 | LISTED AS ATTORNEY FOR D028: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D028 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D028 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D028 (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D028 | D028 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D029 | D029 PARTY ADDED: WAL-MART STORES EAST, LP (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D029 | LISTED AS ATTORNEY FOR D029: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:02 PM | D029 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D029 | D029 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D029 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D029 (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D014 | D014 PARTY ADDED: PAR PHARMACEUTICALS COMPANIES, I | AJA |
| 4/3/2020 | 4:03 PM | D014 | D014 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D014 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D014 | LISTED AS ATTORNEY FOR D014: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D014 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D014 (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D015 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D015 | D015 PARTY ADDED: ALLERGAN FINANCE, LLC (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D015 | LISTED AS ATTORNEY FOR D015: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D015 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D015 (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D015 | D015 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D016 | D016 PARTY ADDED: ALLERGAN SALES, LLC (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D016 | D016 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D016 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D016 (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D016 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D016 | LISTED AS ATTORNEY FOR D016: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D017 | LISTED AS ATTORNEY FOR D017: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D017 | D017 PARTY ADDED: ALLERGAN USA, INC. (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D017 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D017 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D017 (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D017 | D017 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D018 | LISTED AS ATTORNEY FOR D018: PRO SE (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D018 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D018 | D018 PARTY ADDED: WATSON PHARMACEUTICALS, INC. | AJA |
| 4/3/2020 | 4:03 PM | D018 | D018 E-ORDER FLAG SET TO "Y" (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D018 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D018 (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D019 | D019 PARTY ADDED: ACTAVIS LLC (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D019 | INDIGENT FLAG SET TO: N (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D019 | LISTED AS ATTORNEY FOR D019: PRO SE (AV02) | AJA |

| 4/3/2020 | 4:03 PM | D019 | D019 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
|---|---|---|---|---|
| 4/3/2020 | 4:03 PM | D019 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D019   (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D020 | D020 PARTY ADDED: ACTAVIS PHARMA, INC.    (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D020 | LISTED AS ATTORNEY FOR D020: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D020 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D020 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D020   (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D020 | D020 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D030 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D030 | LISTED AS ATTORNEY FOR D030: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D030 | D030 PARTY ADDED: WALGREEN EASTERN CO., INC.(AV02) | AJA |
| 4/3/2020 | 4:03 PM | D030 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D030   (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D030 | D030 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D031 | D031 PARTY ADDED: WALGREEN CO., INC.     (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D031 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D031 | LISTED AS ATTORNEY FOR D031: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D031 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D031   (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D031 | D031 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D032 | D032 PARTY ADDED: COUCH JOHN PATRICK      (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D032 | LISTED AS ATTORNEY FOR D032: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D032 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D032 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D032   (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D032 | D032 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D033 | LISTED AS ATTORNEY FOR D033: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D033 | D033 PARTY ADDED: RUAN XIULU          (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D033 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D033 | D033 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D033 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D033   (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D034 | D034 PARTY ADDED: PHYSICIANS PAIN SPECIALISTS OF A | AJA |
| 4/3/2020 | 4:03 PM | D034 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:03 PM | D034 | LISTED AS ATTORNEY FOR D034: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D034 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D034   (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D034 | D034 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D035 | D035 PARTY ADDED: PALMER THOMAS JUSTIN    (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D035 | D035 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D035 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D035 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D035   (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D035 | LISTED AS ATTORNEY FOR D035: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D036 | D036 PARTY ADDED: PARKER BRIDGETTE       (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D036 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D036   (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D036 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D036 | LISTED AS ATTORNEY FOR D036: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D036 | D036 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D037 | D037 PARTY ADDED: EASTERN SHORE NEUROLOGY CLINIC, | AJA |
| 4/3/2020 | 4:04 PM | D037 | LISTED AS ATTORNEY FOR D037: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D037 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D037 | D037 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D037 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D037   (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D038 | D038 PARTY ADDED: TARABEIN RASSAN M       (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D038 | INDIGENT FLAG SET TO: N            (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D038 | CERT MAIL-FIL ISSUED: 04/03/2020 TO D038   (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D038 | LISTED AS ATTORNEY FOR D038: PRO SE       (AV02) | AJA |
| 4/3/2020 | 4:04 PM | D038 | D038 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 4/3/2020 | 4:04 PM | ECOMP | COMPLAINT E-FILED. | FRA031 |

| | | | | |
|---|---|---|---|---|
| 4/3/2020 | 4:27 PM | C001 | C001 NAME CHANGED FROM: OF CREEK INDIANS POARCH BA | CHL |
| 4/3/2020 | 4:32 PM | TRAC | CASE ASSIGNED TO: FAST TRACK (AV01) | JOD |
| 4/3/2020 | 4:32 PM | DAT4 | FOR: CERT TO BE FILED ON 12/18/2020 @ 0830A (AV01) | JOD |
| 4/9/2020 | 6:55 AM | ESCAN | SCAN - FILED 4/9/2020 - PRE TRIAL ORDER | JOD |
| 4/29/2020 | 11:34 AM | EMOT | D025-D026-D027-EXTENSION OF TIME FILED. | KIR044 |
| 4/29/2020 | 11:37 AM | EPORD | PROPOSED ORDER SUBMITTED | KIR044 |
| 4/29/2020 | 4:51 PM | D025 | LISTED AS ATTORNEY FOR D025: KIRBY CASON MICHAEL | AJA |
| 4/29/2020 | 4:51 PM | D026 | LISTED AS ATTORNEY FOR D026: KIRBY CASON MICHAEL | AJA |
| 4/29/2020 | 4:51 PM | D027 | LISTED AS ATTORNEY FOR D027: KIRBY CASON MICHAEL | AJA |
| 4/29/2020 | 4:53 PM | EMOT | D025-D026-D027-EXTENSION OF TIME /DOCKETED | ANM |
| 4/30/2020 | 8:28 AM | JEORDE | ORDER E-FILED - ORDER - MOTION GRANTED- EXTENSIOM OF TIME TO RESPOND TO COMPLAINT - RENDERED & ENTERED: 4/30/2020 8:28:00 AM | |
| 4/30/2020 | 8:28 AM | JEMOT | D025-D026-D027-EXTENSION OF TIME /DISPOSED BY SEPARATE ORDER | |
| 5/8/2020 | 1:45 PM | D026 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D026 | CHL |
| 5/8/2020 | 1:47 PM | D013 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D013 | CHL |
| 5/8/2020 | 1:47 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:48 PM | D010 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D010 | CHL |
| 5/8/2020 | 1:49 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:49 PM | D030 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D030 | CHL |
| 5/8/2020 | 1:50 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:50 PM | D017 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D017 | CHL |
| 5/8/2020 | 1:51 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:52 PM | D031 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D031 | CHL |
| 5/8/2020 | 1:52 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:53 PM | D014 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D014 | CHL |
| 5/8/2020 | 1:54 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:54 PM | D029 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D029 | CHL |
| 5/8/2020 | 1:55 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:55 PM | D023 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D023 | CHL |
| 5/8/2020 | 1:56 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:56 PM | D024 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D024 | CHL |
| 5/8/2020 | 1:57 PM | D009 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D009 | CHL |
| 5/8/2020 | 1:57 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:58 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:59 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 1:59 PM | D027 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D027 | CHL |
| 5/8/2020 | 2:00 PM | D021 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D021 | CHL |
| 5/8/2020 | 2:01 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:02 PM | D001 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D001 | CHL |
| 5/8/2020 | 2:02 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:03 PM | D007 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D007 | CHL |
| 5/8/2020 | 2:04 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:04 PM | D033 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D033 | CHL |
| 5/8/2020 | 2:05 PM | D035 | SERVICE OF CERTIFIED MAI ON 04/21/2020 FOR D035 | CHL |
| 5/8/2020 | 2:05 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:06 PM | D002 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D002 | CHL |
| 5/8/2020 | 2:06 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:07 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:07 PM | D022 | SERVICE OF CERTIFIED MAI ON 04/21/2020 FOR D022 | CHL |
| 5/8/2020 | 2:08 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:08 PM | D028 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D028 | CHL |
| 5/8/2020 | 2:08 PM | D016 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D016 | CHL |
| 5/8/2020 | 2:09 PM | ESERC | SERVICE RETURN | CHL |

| 5/8/2020 | 2:10 PM | ESERC | SERVICE RETURN | CHL |
|---|---|---|---|---|
| 5/8/2020 | 2:10 PM | D004 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D004 | CHL |
| 5/8/2020 | 2:10 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:11 PM | D032 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D032 | CHL |
| 5/8/2020 | 2:11 PM | D018 | SERVICE OF CERTIFIED MAI ON 05/08/2020 FOR D018 | CHL |
| 5/8/2020 | 2:12 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:13 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:13 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:15 PM | D006 | SERVICE OF CERTIFIED MAI ON 04/20/2020 FOR D006 | CHL |
| 5/8/2020 | 2:16 PM | D003 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D003 | CHL |
| 5/8/2020 | 2:17 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:17 PM | D036 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D036 | CHL |
| 5/8/2020 | 2:18 PM | D020 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D020 | CHL |
| 5/8/2020 | 2:18 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:19 PM | D011 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D011 | CHL |
| 5/8/2020 | 2:19 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:20 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:20 PM | D012 | SERVICE OF CERTIFIED MAI ON 05/07/2020 FOR D012 | CHL |
| 5/8/2020 | 2:21 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:22 PM | ESERC | SERVICE RETURN | CHL |
| 5/8/2020 | 2:26 PM | D005 | SERVICE OF CERTIFIED MAI ON 04/21/2020 FOR D005 | CHL |
| 5/8/2020 | 2:28 PM | ESERC | SERVICE RETURN | CHL |
| 5/13/2020 | 1:45 PM | D015 | SERVICE OF CERTIFIED MAI ON 04/29/2020 FOR D015 | CHL |
| 5/13/2020 | 1:46 PM | ESERC | SERVICE RETURN | CHL |
| 5/13/2020 | 3:50 PM | EMISC | CASE STATUS REPORT E-FILED | FRA031 |
| 5/13/2020 | 4:19 PM | EMOT | D021-D022-OTHER - MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM FILED. | IRV001 |
| 5/14/2020 | 8:07 AM | D021 | LISTED AS ATTORNEY FOR D021: IRVINE GEORGE RICHAR | AJA |
| 5/14/2020 | 8:07 AM | D022 | LISTED AS ATTORNEY FOR D022: IRVINE GEORGE RICHAR | AJA |
| 5/14/2020 | 8:09 AM | EMOT | D021-D022-OTHER /DOCKETED | CHL |
| 5/14/2020 | 9:34 AM | D008 | D008 ADDR1 CHANGED FROM: 60 COMMERCE STREET (AV02) | BEL |
| 5/14/2020 | 9:35 AM | ESCAN | SCAN - FILED 5/13/2020 - RETURNED MAIL | BEL |
| 5/14/2020 | 9:43 AM | D021 | LISTED AS ATTORNEY FOR D021: REEVES FINLEY B(AV02) | AJA |
| 5/14/2020 | 9:43 AM | D022 | LISTED AS ATTORNEY FOR D022: REEVES FINLEY B(AV02) | AJA |
| 5/14/2020 | 9:44 AM | ENOTA | NOTICE OF APPEARANCE E-FILED | REE079 |
| 5/14/2020 | 2:52 PM | JEORDE | ORDER GENERATED FOR OTHER - MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM - RENDERED & ENTERED: 5/14/2020 2:52:21 PM - ORDER | |

## Images

| Date: | Doc# | Title | Description | Pages |
|---|---|---|---|---|
| 4/3/2020 4:01:44 PM | 1 | CIVIL_COVER_SHEET | CIRCUIT COURT - CIVIL CASE | 1 |
| 4/3/2020 4:01:44 PM | 2 | COMPLAINT | | 184 |
| 4/9/2020 6:55:48 AM | 5 | PRE TRIAL ORDER | | 4 |
| 4/29/2020 11:34:22 AM | 6 | MOTION_COVER_SHEET | Motion Cover Sheet | 1 |
| 4/29/2020 11:34:22 AM | 7 | MOTION | Joint Stipulation for Extension of Time to Respond to Complaint | 5 |
| 4/29/2020 11:34:22 AM | 8 | EXHIBIT | Exhibit A - Proposed Order | 2 |
| 4/29/2020 11:34:29 AM | 9 | MOTION - TRANSMITTAL | E-NOTICE TRANSMITTALS | 40 |
| 4/29/2020 11:37:10 AM | 10 | PROPOSED ORDER | ORDER GRANTING EXTENSION OF TIME TO RESPOND TO COMPLAINT | 2 |
| 4/29/2020 11:37:15 AM | 11 | PROPOSED ORDER - TRANSMITTAL | E-NOTICE TRANSMITTALS | 40 |
| 4/30/2020 8:27:50 AM | 13 | ORDER - TRANSMITTAL | E-NOTICE TRANSMITTALS | 37 |
| 4/30/2020 8:27:45 AM | 12 | ORDER | MOTION GRANTED- Extensiom of Time to Respond to Complaint | 2 |
| 5/8/2020 1:47:46 PM | 15 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:47:39 PM | 14 | SERVICE RETURN | SERVICE RETURN | 1 |

| 5/8/2020 1:49:03 PM | 17 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 2 |
|---|---|---|---|---|
| 5/8/2020 1:48:58 PM | 16 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:50:16 PM | 19 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:50:10 PM | 18 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:51:32 PM | 21 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:51:24 PM | 20 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:52:26 PM | 23 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:52:18 PM | 22 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:53:49 PM | 25 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:53:47 PM | 24 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:54:56 PM | 27 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:54:50 PM | 26 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:56:19 PM | 29 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:56:14 PM | 28 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:57:24 PM | 31 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:57:22 PM | 30 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:58:29 PM | 33 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:58:21 PM | 32 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 1:59:22 PM | 35 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 1:59:14 PM | 34 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:01:23 PM | 37 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:01:17 PM | 36 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:02:29 PM | 39 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:02:23 PM | 38 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:04:08 PM | 41 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:04:05 PM | 40 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:05:18 PM | 43 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:05:13 PM | 42 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:06:10 PM | 45 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:06:06 PM | 44 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:07:04 PM | 47 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:07:01 PM | 46 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:07:51 PM | 49 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:07:46 PM | 48 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:09:13 PM | 51 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:09:06 PM | 50 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:09:58 PM | 53 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:09:55 PM | 52 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:10:41 PM | 55 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:10:37 PM | 54 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:12:03 PM | 57 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:11:59 PM | 56 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:12:51 PM | 59 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:12:46 PM | 58 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:13:30 PM | 61 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:13:27 PM | 60 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:17:02 PM | 63 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:16:58 PM | 62 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:18:15 PM | 65 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:18:11 PM | 64 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:19:14 PM | 67 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:19:07 PM | 66 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:20:05 PM | 69 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |

| 5/8/2020 2:20:03 PM | 68 | SERVICE RETURN | SERVICE RETURN | 1 |
|---|---|---|---|---|
| 5/8/2020 2:21:08 PM | 71 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:21:00 PM | 70 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:22:26 PM | 73 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:22:17 PM | 72 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/8/2020 2:27:57 PM | 75 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/8/2020 2:27:54 PM | 74 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/13/2020 1:46:55 PM | 77 | SERVICE RETURN - TRANSMITTAL | E-NOTICE TRANSMITTALS | 1 |
| 5/13/2020 1:46:47 PM | 76 | SERVICE RETURN | SERVICE RETURN | 1 |
| 5/13/2020 3:50:53 PM | 78 | CASE STATUS REPORT | Notice of Voluntary Dismissal Without Prejudice as to Certain Defendants | 1 |
| 5/13/2020 3:51:02 PM | 79 | MISCELLANEOUS - TRANSMITTAL | E-NOTICE TRANSMITTALS | 37 |
| 5/13/2020 4:19:28 PM | 80 | MOTION_COVER_SHEET | Motion Cover Sheet | 2 |
| 5/13/2020 4:19:28 PM | 81 | MOTION | Motion for Exclusion from the Expedited Case Management System | 9 |
| 5/13/2020 4:19:36 PM | 82 | MOTION - TRANSMITTAL | E-NOTICE TRANSMITTALS | 38 |
| 5/14/2020 9:35:51 AM | 83 | RETURNED MAIL | PER USPS STAMP:  RETURN TO SENDER/INSUFFICIENT ADDRESS/UNABLE TO FORWARD | 1 |
| 5/14/2020 9:44:32 AM | 84 | NOTICE OF APPEARANCE | Notice of Appearance of Finley B. Reeves for Defendants, Rite Aid of Alabama, Inc. and Rite Aid of Maryland, Inc. | 4 |
| 5/14/2020 9:44:35 AM | 85 | MISCELLANEOUS - TRANSMITTAL | E-NOTICE TRANSMITTALS | 37 |
| 5/14/2020 2:52:05 PM | 86 | ORDER | MOTION GRANTED - Remove from Expedited Case Management System | 1 |
| 5/14/2020 2:54:31 PM | 87 | ORDER - TRANSMITTAL | E-NOTICE TRANSMITTALS | 37 |

 **END OF THE REPORT**

ELECTRONICALLY FILED
4/3/2020 4:01 PM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev. 9/18 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>02<br><br>Date of Filing:<br>04/03/2020 | Judge Code: |

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA
### POARCH BAND OF CREEK INDIANS v. AMNEAL PHARMACEUTICALS, INC. ET AL

**First Plaintiff:** ☐ Business  ☐ Individual  **First Defendant:** ☑ Business  ☐ Individual
☐ Government  ☑ Other  ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

| TORTS: PERSONAL INJURY | OTHER CIVIL FILINGS (cont'd) |
|---|---|
| ☐ WDEA - Wrongful Death | ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve |
| ☑ TONG - Negligence: General | ☐ CVRT - Civil Rights |
| ☐ TOMV - Negligence: Motor Vehicle | ☐ COND - Condemnation/Eminent Domain/Right-of-Way |
| ☐ TOWA - Wantonness | ☐ CTMP - Contempt of Court |
| ☐ TOPL - Product Liability/AEMLD | ☐ CONT - Contract/Ejectment/Writ of Seizure |
| ☐ TOMM - Malpractice-Medical | ☐ TOCN - Conversion |
| ☐ TOLM - Malpractice-Legal | ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/ Injunction Election Contest/Quiet Title/Sale For Division |
| ☐ TOOM - Malpractice-Other | |
| ☐ TBFM - Fraud/Bad Faith/Misrepresentation | ☐ CVUD - Eviction Appeal/Unlawful Detainer |
| ☐ TOXX - Other:_____ | ☐ FORJ - Foreign Judgment |
| | ☐ FORF - Fruits of Crime Forfeiture |
| **TORTS: PERSONAL INJURY** | ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition |
| ☐ TOPE - Personal Property | ☐ PFAB - Protection From Abuse |
| ☐ TORE - Real Properly | ☐ EPFA - Elder Protection From Abuse |
| | ☐ FELA - Railroad/Seaman (FELA) |
| **OTHER CIVIL FILINGS** | ☐ RPRO - Real Property |
| ☐ ABAN - Abandoned Automobile | ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship |
| ☐ ACCT - Account & Nonmortgage | ☐ COMP - Workers' Compensation |
| ☐ APAA - Administrative Agency Appeal | ☐ CVXX - Miscellaneous Circuit Civil Case |
| ☐ ADPA - Administrative Procedure Act | |
| ☐ ANPS - Adults in Need of Protective Services | |

**ORIGIN:**  F ☑ INITIAL FILING  A ☐ APPEAL FROM DISTRICT COURT  O ☐ OTHER

R ☐ REMANDED  T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES  ☐ NO  **Note:** Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**  ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**

| FRA031 | 4/3/2020 4:01:44 PM | /s/ THOMAS ROE FRAZER II |
|---|---|---|
| | Date | Signature of Attorney/Party filing this form |

**MEDIATION REQUESTED:**  ☐ YES ☑ NO  ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:**  ☐ YES ☐ NO



ELECTRONICALLY FILED
4/5/2020 1:40 PM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

# IN THE CIRCUIT COURT OF
# MOBILE COUNTY, ALABAMA

| | | |
|---|---|---|
| **POARCH BAND OF CREEK INDIANS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | | |
| **AMNEAL PHARMACEUTICALS, LLC;** | § | **CIVIL ACTION NO. _____** |
| **AMNEAL PHARMACEUTICALS, INC.;** | | |
| **TEVA PHARMACEUTICALS USA, INC.;** | § | |
| **CEPHALON, INC.; JOHNSON & JOHNSON;** | | |
| **JANSSEN PHARMACEUTICALS, INC.;** | § | |
| **NORAMCO, INC.; ABBOTT** | | |
| **LABORATORIES; ABBOTT** | § | **JURY DEMAND** |
| **LABORATORIES, INC.; ASSERTIO** | | **REQUESTED** |
| **THERAPEUTICS, INC.;** | § | |
| **ENDO HEALTH SOLUTIONS, INC.;** | | |
| **ENDO PHARMACEUTICALS. INC.;** | § | |
| **PAR PHARMACEUTICAL, INC.; PAR** | | |
| **PHARMACEUTICALS COMPANIES,** | § | |
| **INC.; ALLERGAN PLC; ALLERGAN** | | |
| **FINANCE, LLC; ALLERGAN SALES,** | § | |
| **LLC; ALLERGAN USA, INC.; WATSON** | | |
| **PHARMACEUTICALS, INC.; ACTAVIS LLC;** | § | |
| **ACTAVIS PHARMA, INC.;** | | |
| **RITE AID OF ALABAMA, INC.; RITE AID** | § | |
| **OF MARYLAND, INC.; THE KROGER CO.;** | | |
| **KROGER LIMITED PARTNERSHIP II;** | § | |
| **CVS HEALTH CORPORATION; CVS** | | |
| **PHARMACY, INC.; CVS INDIANA,** | § | |
| **L.L.C.; WAL-MART INC.; WAL-MART** | | |
| **STORES EAST, LP; WALGREEN** | § | |
| **EASTERN CO., INC.; WALGREEN CO.,** | | |
| **INC.; JOHN PATRICK COUCH;** | § | |
| **XIULU RUAN; PHYSICIANS PAIN** | | |
| **SPECIALISTS OF ALABAMA, P.C.;** | § | |
| **THOMAS JUSTIN PALMER; BRIDGETTE** | | |
| **PARKER; EASTERN SHORE NEUROLOGY** | § | |
| **CLINIC, INC.; RASSAN M. TARABEIN;** | | |
| **And DOE 1-100, being those persons,** | § | |
| **firms, corporations, agents, servants and/or** | | |
| **employees who authorized, ordered and/or** | § | |

**committed the acts described in this Complaint**
**and whose names when ascertained will be**          §
**substituted by amendment by Plaintiff;**

                                                 §

       **Defendants.**

                                                 §

**"The opioid epidemic is the deadliest drug crisis in American history. . . ."** Attorney General William P. Barr announced in a press release on April 17, 2019.[1]

**The decade of the 1990s was the era of the blockbuster drug, the billion-dollar pill, and a pharmaceutical sales force arms race was part of the excess of the time . . . . A pharmaceutical Wild West emerged. Salespeople stampeded into offices. They made claims that helped sell the drugs to besieged doctors. Those claims also lead years later to blockbuster lawsuits and criminal cases against their companies.[2]**

## COMPLAINT

Plaintiff Poarch Band of Creek Indians (the "Tribe") brings this Complaint against Defendants under Alabama law for negligence, nuisance, fraud and deceit, unjust enrichment, wantonness, civil conspiracy, and violation of the Alabama Deceptive Trade Practices Act, seeking judgment against Defendants and in favor of Plaintiff for compensatory damages; punitive damages; prejudgment and post-judgment interest; costs of suit; and equitable relief, including injunctive relief, and alleges as follows:

## I.   INTRODUCTION

### A. The Opioid Crisis in Alabama

1.      The opioid epidemic is an ongoing crisis in Alabama, including within the Tribe's land. The Tribe is a federally recognized tribe in Southern Alabama. These Native people currently face a crisis that threatens to destroy their lives, land, and history. An

---

[1] Press Release, U.S. Dep't of Justice, Appalachian Regional Prescription Opioid (ARPO) Strike Force Takedown Results in Charges Against 60 Individuals, Including 53 Medical Professionals (Apr. 17, 2019), https://www.justice.gov/opa/pdappalachian-regional-prescription-opioid-arpo-strike-force-takedown-results-charges-against.

[2] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* at 133 (Bloomsbury Press 2015) (hereinafter referred to as "Dreamland").

epidemic of prescription opioid abuse is devastating the people, babies, institutions, and resources of Indian Country, and causing the Tribe to suffer substantial loss of resources, economic damages, addiction, disability, and harm to the health and welfare of the Tribe, Tribe Members, and wholly-owned enterprises of the Tribe.

2.      Opioid use has had tragic consequences for communities across Alabama, including the Tribe's community. Thousands of people have died from opioid overdoses, and many thousands more suffer from opioid use disorders and related health conditions in Alabama. The misrepresentations by Defendants described herein regarding the risks and benefits of opioids enabled, and are continuing to enable, the widespread prescribing of opioids for common chronic pain conditions like lower back pain, arthritis, and headaches.[3]

3.      Overdose mortalities in Alabama have increased sharply in recent years. From 2013 to 2014 alone, Alabama saw a twenty percent (20%) increase in overdose fatalities.[4] In 2014, there were 723 Alabama overdose deaths, up from 598 Alabama overdose deaths in 2013.[5] These deaths are overwhelmingly caused by opioids.[6] No fewer than 282 deaths were attributable to opioid overdose in 2015 alone in Alabama.[7] In 2017, there were 422 overdose deaths involving opioids in Alabama – a rate of 9.0 deaths per 100,000 persons and over half the national rate of 14.6 deaths per 100,000 persons.

---

[3] Consistent with the commonly accepted medical usage, the term "chronic pain" as used herein refers to non-cancer pain lasting three months or longer.
[4] Centers for Disease Control and Prevention, Drug Overdose Death Data, https://www.cdc.gov/drugoverdose /data/statedeaths.html.
[5] Id.
[6] X.J. Shen, Ph.D., Director, Division of Statistical Analysis, Alabama Department of Public Health, Center for Health Statistics, Data-Driven Prevention Initiative (DDPI) for Heroin and Opioid Abuse/Overdose (April 28, 2017), *available at* http://www.alabamapublichealth.gov/pharmacy/assets/ddpi opioidoverdose.pdf.
[7] The Henry J. Kaiser Family Foundation, Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths (2015), www.kff.org.

4.    The greatest increase in opioid deaths occurred among cases involving synthetic opioids (mainly fentanyl), with a rise from 16 deaths in 2012 to 198 in 2017. Heroin involved deaths also increased dramatically from 40 deaths in 2013 to 122 in 2014 but have remained unchanged through 2017.

5.    Since 2005, Alabama has participated in the Prescription Drug Monitoring Program, which collects prescription records. On August 8, 2017, Alabama Governor Kay Ivey established the Alabama Opioid Overdose and Addiction Council to study the state's opioid crisis and identify a strategy to counteract its adverse consequences.

6.    Alabama has the second-highest rate of nonmedical use of prescription pain relievers in the nation, covering one out of every nineteen Alabamians aged twelve or older.[8] Drug poisoning deaths are significantly impacting Plaintiff's communities.[9] Significant numbers of the residents of Alabama report drug dependence and nonmedical use of pain relievers.[10] Many residents of Alabama who need addiction treatment don't receive it.[11]

7.    American Indians are at least two times more susceptible to opioid addiction than the rest of the U.S. population at large. American Indian high school students are two to three times more prone to try opioid pills than U.S. teenagers in general. American Indians are three (3) times more likely to die from a drug overdose than the rest of the U.S. population. American Indian Country is usually located in more rural parts of the U.S., where medically assisted addiction treatment is unavailable, underfunded, or overwhelmed by demand. Often, American Indians cannot even find opioid addiction treatment within a reasonable proximity.

---

[8] Rachel N. Lipari, Ph.D., et al., State and Substate Estimates of Nonmedical Use of Prescription Pain Relievers, National Survey on Drug Use and Health, Substance Abuse and Mental Health Services Administration (Jul. 13, 2017), https://www.samhsa.gov/data/sites/default/files/report 3187/ShortReport-3187.html.
[9] U.S. Centers for Disease Control and Prevention, National Center for Health Statistics' Drug Poisoning Mortality dataset, https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/.
[10] See, e.g., Alabama Opioid Epidemic, amfAR, http://opioid.amfar.org/AL, at View Counties: Opioid Use.
[11] Id. at View Counties: Healthcare.

8.      Prescription opioids killed over 40,000 Americans in 2017. Prescription opioids kill twice as many people in the U.S. as heroin. Prescription opioids and related drug overdose deaths exceed the number of car accident deaths in the United States. Nearly 150 Americans die every day from opioids overdoses. Almost 91% of persons who have a non-fatal overdose of opioids are prescribed opioids again within one year. One third (1/3) of all children who go into foster parent care do so because of the opioids addiction of their parent(s). Seven (7) in ten (10) opioid overdoses are treated in an emergency room due to the abuse of prescription opioids. An opioid-addicted baby is born every thirty (30) minutes in America.

9.      American Indians have been left out of major initiatives by state governments, municipal governments, and county governments and the federal government in attempts to remedy the opioid crisis.

10.     Excessive numbers of opioids have been dispensed in and around Plaintiff's tribal community. From 2006 to 2012, there were 1,703,752,769 prescription pain pills supplied to Alabama.[12] From 2006 to 2012, there were 22,035,540 prescription pain pills, enough for 64 pills per person per year, supplied to Escambia County, Alabama - 6,615,990 of the pills were manufactured by Actavis Pharma, Inc. Brewton Medical Center Pharmacy in Brewton received the highest number (2,374,180) of pills during that period.[13]

11.     In 2017, 107.2 opioid prescriptions were written in Alabama for every 100 persons. This was the highest prescribing rate in the country and was almost twofold greater than the average U.S. rate of 58.7 prescriptions.[14] Alabama is second in the nation for benzodiazepine prescriptions,

---

[12] THE WASHINGTON POST, The Opioid Files: Drilling into the DEA's pain pill database, Jul. 21, 2019, https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/ (hereinafter "Drilling into the DEA's pain pill database").
[13] Id.
[14] Id.

at a rate of 61.9 per 100 persons (U.S. median rate: 37.6). [15] Over 6.5 million opioid prescriptions were filled in Alabama in 2015, supplying over 437 million pills, which equates to a total days' supply of 127,159,152 – or 348,381 years' worth.[16] There were 167 deaths involving prescription opioids in 2017, an increase from 124 in 2016.[17]

12.    Children have been especially vulnerable to the opioid epidemic. Alabama, including the Tribe, and neighboring states have now become ground zero for an explosion of cases in newborns with Neonatal Abstinence Syndrome ("NAS"), a collection of symptoms babies experience in withdrawing from opioid medications taken by the mother. The region that includes Alabama, Mississippi, Tennessee, and Kentucky has the highest rate in the country, with NAS occurring in 16.2 out of every 1,000 hospital births in 2012.[18] NAS is closely associated with opioid use.[19] Infants born with NAS usually spend weeks in neonatal intensive care units while they painfully withdraw from the drugs – a process so painful that it traps many adults on opioids.

13.    Children are also injured by the removal from their homes due to opioid abuse and addiction. The percentage of Alabama children in foster care because of parental drug abuse has

---

[15] *See* Leonard J. Paulozzi, M.D., et al., Centers for Disease Control and Prevention, *Vital Signs: Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines – United States, 2012,* Morbidity and Mortality Wkly.    Rep.    July    4,    2014;    63(26);    563-568,    *available    at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6326a2.htm. The combination of hydrocodone, oxycodone and benzodiazepines is referred to as the "holy trinity" and significantly increases the risk of harm to those that abuse prescription pills.

[16] George C. Smith, Jr., M.D., ALBME Efforts to Combat Opioid Overuse, Alabama Board of Medical Examiners (March 10, 217), http://alabamapublichealth.gov/pharmacy/assets/presentation_smith_2017.pdf.

[17] National Institute on Drug Abuse, *Alabama Opioid Summary,*
https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/alabaina-opioid-summary.

[18] Amy Yurkanin, A grim and growing trend: Alabama sees increased cases of drug-dependent newborns (Sep. 29, 2015), *available at*
http://www.al.com/news/index.ssf/2015/09/a grim and growing_trend alaba.html.

[19] Casey Wylie, Quality Analytics, ALABAMA MEDICAID AGENCY**,** *Neonatal Abstinence Syndrome (NAS) Adverse Fetal Outcomes in Mothers with Prescribed Opioid Medications Compared to Mothers With No Prescribed Opioid Medications* (December 10, 2014),
http://www.alabarnapublichealth.gov/perinatal/assets/NASPresentationforSCPH.pdf.

risen from 11.5% in 2006 to 37% in 2016.[20] Children with parents addicted to drugs tend to stay in foster care longer and often enter the system having experienced significant trauma, which makes their care more expensive.[21]

14.    Across the state, Alabama families and communities, including the Plaintiff's Tribe, face heartbreaking tragedies that cannot be adequately conveyed by statistics, and they have faced them all too often. Many grieving families have been financially tapped out by the costs of repeated cycles of addiction treatment programs; others have lost hope and given up. The increasing number of cases takes both a physical and mental toll on investigators, first-responders, and the Tribe and its citizens.

15.    Defendants have foreseeably caused damages to the Tribe, including the costs of providing: (a) medical care, additional therapeutic and prescription drug purchases, and other treatments for individuals suffering from opioid-related addiction or disease, including overdoses and deaths; (b) counseling and rehabilitation services; (c) treatment of infants born with opioid-related medical conditions; (d) welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation; and (e) law enforcement and public safety relating to the opioid epidemic within the Tribe. The Tribe has also suffered substantial damages relating to the lost productivity of the Tribe, as well as increased administrative costs.

**B.    The Opioid Crisis Nationally**

---

[20] Mary Sell, *Parental drug use putting more children in foster care,* DECATUR DAILY (Jan. 29, 2017), http://www.decaturdaily.cominews/local/parental-drug-use-putting-more-children-in-fostercare/article      957642a9-e3d5-52a3-b8d9-d881be352aab.html, citing Alabama Department of Human Resources.

[21] Trista Thurston, *Drug addiction drives spike in Ohio foster care,* NEWARK ADVOCATE (Mar. 23, 2017), *available at*      http://www.newarkadvocate.comistoryinews/crime/high-in-ohio/2017/03/23/drug-addiction-drives-spike-ohiofoster-care/99545804/.

16.     The United States is in the midst of an opioid epidemic caused by the Defendants' unlawful marketing, sale, and distribution of prescription opioids that have resulted in addiction, criminal activity, serious health issues, and the loss of life.[22]

17.     The United States constitutes 4.6% of the world's population but consumed 80% of the world's opioid supply in 2011.[23] According to the Centers for Disease Control and Prevention ("CDC"), from 1999 to 2014, the sales of prescription opioids in the U.S. nearly quadrupled, but there was no overall change in the amount of pain that Americans reported.[24]

18.     Between the start of the century and the year 2014, opioid-related death rates have increased by 200%. Fourteen percent of that increase occurred between 2013 and 2014.[25]

19.     It is undisputed that opioids are both addictive and deadly. Between 1999 and 2014, more than 165,000 Americans died from an opioid overdose.[26] Deaths related to opioids are accelerating. In 2011, the CDC declared that prescription opioid deaths had reached "epidemic levels."[27] That year, 11,693 people died of prescription opioid overdoses.[28] Since then, prescription

[22] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic, and semi-synthetic opiates.

[23] Donald Teater, Nat'l Safety Council, *The Psychological and Physical Side Effects of Pain Medications*, https://www.colorado.gov/pacificisites/default/files/Psycholigical%20and%20Physical%20Side%20Effects%20Teater%2ONSC.pdf (citing Daneshvari R. Solanki et *al., Monitoring Opioid Adherence in Chronic Pain Patients: Assessment of Risk of Substance Abuse,* PAIN PHYSICIAN JOURNAL, 14:E119-E131, (2011), *available at* https://www.painphysicianjoumal.com/current/pdf?article=MTQ0NQ%3D%3D&joumal=60.

[24] Centers for Disease Control and Prevention, *Prescribing Data, available at* https://www.cdc.gov/drugoverdose/data/prescribing.html.

[25] *Id.*

[26] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016,* 65(1) Morbidity and Mortality Weekly Report (Mar. 2016), at 2, *available at* https://www.cdc.gov/mmwrivolumes/65/a/pdfs/rr6501el.pdf (hereinafter "CDC Guideline").

[27] Press Release, Centers for Disease Control and Prevention: Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www. cdc.media/releases/201 1/p1101 flu pain killer overdose.html (hereinafter "Prescription Painkiller Overdoses at Epidemic Levels").

[28] Li Hui Chen et al., *Drug-poisoning Deaths Involving Opioid Analgesics: United States, 19992011,* 166 NCHS Data Brief (Sept. 2014), https://www.cdc.gov/nchs/data/databriefs/db166.pdf.

opioid deaths have *more than quadrupled,* reaching 47,600 Americans in 2017 – more than ten times the number of Americans who died in the entire Iraq War.[29]

20.     According to the CDC, opioid overdoses killed more than 45,000 people, nationally, over a 12-month timeframe that ended in September 2017. It is already the deadliest drug epidemic in American history.[30] If current trends continue, lost lives from opioid overdoses will soon represent the vast majority of all drug overdose deaths in the United States.



Note: Drug overdose data available since 1999. Source: Centers for Disease Control and Prevention | By THE NEW YORK TIMES. [31]

---

[29] U.S. Dep't of Health and Human Services, *What is the U.S. Opioid Epidemic?* (Jan. 2019), https://www.hhs.gov/opioids/about-the-epidemic/index.html; German Lopez, *2017 was the worst year ever for drug overdose deaths in America,* Vox (Aug. 16, 2018), https://www.vox.com/science-and-health/2018/8/16/17698204/opioid-epidemicoverdose-deaths-2017.
[30] The Editorial Board, *An Opioid Crisis Foretold,* THE NEW YORK TIMES (April 21, 2018), https://www.nytimes.corn/2018/04/21/opinion/an-opioid-crisis- foretold. html
[31] *Id.*

21.    The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid medications.[32] In many cases, heroin abuse starts with prescription opioid abuse addiction. An inflated volume of opioids invariably leads to increased diversion and abuse. Indeed, there is a 'parallel relationship' between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated outcomes."[33] For most people who misuse opioids, the source of their drugs can typically be found in the excess supply of drugs in the community, beyond what is needed for legitimate medical purposes. Filling an opioid prescription is a significant risk factor for overdose.[34]

22.    According to the CDC, the United States is currently seeing the highest overdose death rate ever recorded.[35]   Aside from overdose, long-term opioid use is associated with a significant increase in mortality from other causes.[36] As opioid-related deaths increase, life expectancy in the United States decreases.[37]

23.    On October 28, 2017, the President of the United States declared the opioid crisis a public health emergency.[38]

---

[32] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (Apr. 14, 2016), doi: 10.1056/NEJMsr1601307,

https://www.nejm.org/doi/full/10.1056/NEJMsr1601307 (hereinafter "Califf et al.").

[33] Dart, Richard C. et *al., Trends in Opioid Analgesic Abuse and Mortality in the United States,* 372 N. Eng. J. Med. 241 (2015), DOI: 10.1056/NEJMsa1406143, *available at* https://www.nej m. orWdoi/full/10.1056/nejmsa1406143.

[34] CDC Guideline, *supra* n. 26, at 22-24.

[35] Jessica Glenza, *Opioid crisis: overdoses increased by a third across US in 14 months, says CDC,* THE GUARDIAN (March 6, 2018), https://www.theguardian.com/us-news/2018/mar/06/opioid-crisis-overdoses-increased-by-a-third-across-us-in-14-months-says-cdc.

[36] Wayne A. Ray et al., *Prescription of Long-Acting Opioids and Mortality in Patients With Chronic Noncancer Pain,* 315(22):2415-2423, JAMA (Jun. 2016), doi:10.1001/jama.2016.7789, *available at* https://jamanetwork.com/journa ls/j ama/fullarticIe/2528212.

[37] National Center for Health Statistics, Life Expectancy, *available at* https://www.cdc.gov/nchs/fastats/life-expectancy.htm; Centers for Disease Control and Prevention, U.S. drug overdose deaths continue to rise; increase fueled by synthetic opioids, (March 18, 2018), https://www.cdc.gov/media/releases.2018/p0329-drug-overdose-deaths.html.

[38] Julie Hirschfeld Davis, *Trump Declares Opioid Crisis a 'Health Emergency' but Requests No Funds,* THE NEW YORK TIMES (Oct. 26, 2017), https://www.nytimes.com/2017/10/26/us/poli tics/trump-opioid-crisis.html.

24.     This suit takes aim at the primary cause of the opioid crisis: A false narrative marketing scheme, in which Defendants joined and conspired, involving the false and deceptive marketing of prescription opioids, which was designed to dramatically increase demand for and sale of opioids and opioid prescriptions.

25.     On the demand side, the Defendants who manufacture, sell and market prescription opioid painkillers (the "Marketing Defendants") precipitated the crisis. These opioids have various brand names and generic names, and include OxyContin, Kadian, Duragesic, Opana, Nucynta, fentanyl, hydrocodone, oxycodone, and others mentioned in this Complaint. Through a massive marketing campaign premised on false and incomplete information, the Marketing Defendants engineered a dramatic shift in how and when opioids are prescribed by the medical community and used by patients.

26.     The Marketing Defendants relentlessly and methodically – but untruthfully – asserted that the risk of addiction was low when opioids were used to treat chronic pain and overstated the benefits and trivialized the risk of the long-term use of opioids. However, opioids are extremely addictive. Studies have found diagnosed opioid dependence rates in primary care settings as high as 26%.[39] Among opioid users who received four prescriptions in a year, 41.3% meet diagnostic criteria for a lifetime opioid-use disorder.[40] Because opioids cause tolerance and dependence, patients who take the drugs for even a short time become a physiologically captured market. According to the U.S. Department of Health and Human Services, more than two million Americans are opioid-

---

[39] CDC Guideline, *supra* n. 26.
[40] Joseph A. Boscarino et al., *Opioid-Use Disorder Among Patients on Long-Term Opioid Therapy: Impact of Final DSM-5 Diagnostic Criteria on Prevalence and Correlates, available at* https://www.nthi.nlrn.nih.gov/pme/articles/PMC4548725/; *see also* Joseph A. Boscarino et al., *Prevalence of Prescription Opioid-Use Disorder Among Chronic Pain Patients: Comparison of the DSM-5 vs. DSM-4 Diagnostic Criteria,* 30(3):185-94, Journal of Addictive Diseases (Sept. 2011), *available at* https://www.nebi.nlm.nih.gov/pubmed/21745041 (showing a 34.9% lifetime opioid use disorder).

dependent.[41] The difficulty in stopping use is particularly true for patients first prescribed an extended-release opioid. Patients who initiated treatment on an extended-release opioid – such as OxyContin – have a 27.3% likelihood to be using opioids one year later, and a 20.5% likelihood of using opioids three years later.[42] Whether in the end, a patient meets the clinical definition of addiction or is simply dependent and unable to stop using opioids, once opioids are prescribed for even a short period of time, patients are hooked.

27.    Opioids pose high risks for children and adolescents. Most of the use in this population is off-label as opioids are not approved for children. The use of prescription opioid pain medication before high school graduation is associated with a 33% increase in the risk of later opioid misuse. The misuse of opioids in adolescence strongly predicts the later onset of heroin use.[43] Nonetheless, the 2016 CDC guidelines found that there have been significant increases in opioid prescribing for children and adolescents, for conditions such as headaches and sports injuries.

28.    The Marketing Defendants' goal was simple: dramatically increase sales by convincing doctors to prescribe opioids not only for the kind of severe pain associated with cancer or short-term post-operative pain, but also for common chronic pain, such as back pain and arthritis. They did this even though they knew that opioids were addictive and subject to abuse, and that their claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded.

---

[41] U.S. Dept. of Health and Human Services, *What is the U.S. Opioid Epidemic?* (Jan. 2019), *available at* https://www.hhs.gov/opioids/about-the-epidemic/index.html.
[42] Anuj Shah et al., *Characteristics of Initial Prescription Episodes and Likelihood of Long-Term Opioid Use – United States, 2006-2015,* 66(10):265-269, Morbidity and Mortality Weekly Report (Mar. 2017), *available at* https://www.cdc.gov/mmwr/volumes/66/wr/mm6610a1.htm.
[43] CDC Guideline, *supra* n. 26.

29.     The National Retail Pharmacies Defendants saw the profit potential in opioid sales, participated in the conspiracy by ignoring their legal responsibilities, and flooded affected areas with opioids while knowing they were contributing to, but profiting from, widespread addiction and human misery. Through their willingness to uncritically fill prescriptions without scrutiny or hesitation, the National Retail Pharmacies Defendants normalized overprescribing and caused widespread proliferation and availability of these dangerous drugs throughout communities in Alabama, including the Tribe's communities.

30.     Defendants succeeded. Opioid abuse has quickly become one of the nation's most pressing health management issues, not only because of its toll on opioid users, but increasingly because of the financial and cultural impact on the Tribe.

31.     The Marketing Defendants and the National Retail Pharmacies Defendants extract billions of dollars of revenue from the addicted American public, including tribal members, while the Tribe sustains losses caused as a result of the reasonably foreseeable consequences of the prescription opioid addiction epidemic. Defendants knew that, but for the Tribe providing at least some aspect of a safety net, the number of overdose deaths and other related health consequences arising from opioid addictions would have even been far greater than actually occurred, and the public outcry and political backlash threatening their profitmaking activities would have been swifter and far more certain.

32.     The deceptive marketing campaign of the Marketing Defendants substantially contributed to an explosion in the use of opioids across the country, including the Tribe and its citizens. Approximately 20% of the population between the ages of 30 and 44 and nearly 30% of the population over 45 have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office visits now include a prescription of an opioid.

33.     The sharp increase in opioid use resulting from Defendants' conduct has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death throughout the United States, including within the Tribe's community. Representing the NIH's National Institute of Drug Abuse in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."[44]

34.     In August 2016, then U.S. Surgeon General Vivek Murthy published an open letter to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[45]

35.     In a 2016 report, the CDC explained that "[o]pioid prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[46] Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[47]

---

[44] *America's Addiction to Opioids: Heroin and Prescription Drug Abuse, U.S.* Senate, Caucus on International Narcotics Control, 113th Cong., at 3 (May 14, 2014) (statement). Testimony of Dr. Nora D. Volkow, Director, National Institute on Drug Abuse, *available at* https://www.hdsl.ord/?abstract&did=754557.

[45] Letter from Vivek H. Murthy, M.D., U.S. Surgeon General, *available at* http://www.tumtheridem.org.

[46] Rose A. Rudd et al., Centers for Disease Control and Prevention, Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014 (Jan. 1, 2016), Morbidity and Mortality Weekly Report, 64(50);1378-82, *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (hereinafter "2000-2014 Increases in Drug and Opioid Overdose Deaths").

[47] *Id.*

36.     Defendants' practice of continually filling opioid prescriptions, including from suspicious prescribers, and failing to report suspicious orders of opioids has enabled an oversupply of opioids to communities, including communities in the regions that the Tribe resides.

37.     The widespread use of opioids and corresponding increases in addiction and abuse have led to increased primary care clinic visits, those clinics' responses to overdoses, and clinical administration of naloxone – the antidote to opioid overdose.

38.     As the Tribe works to restore the lives of its citizens, the opioid epidemic continues to outpace their efforts.

**C.  <u>Financial Impact of Defendants' Activities on Plaintiff</u>**

39.     Plaintiff brings this civil action to recover monetary losses that the Tribe has incurred as a direct and proximate result of Defendants' false, deceptive, and unfair marketing of prescription opioids. Such economic damages were foreseeable to Defendants and were sustained because of Defendants' unlawful actions and omissions.

40.     Plaintiff brings this suit against the manufacturers of prescription opioids. The manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. These pharmaceutical companies aggressively advertised to and persuaded healthcare providers to purchase and prescribe highly addictive, dangerous, opioids, and turned patients into drug addicts for their own corporate profit. Such actions were unlawful.

41.     Plaintiff also brings this suit against the National Retail Pharmacies Defendants of these highly addictive drugs. In addition to participating in the false narrative campaign described below, the National Retail Pharmacies Defendants unlawfully breached their legal duties under Alabama law to monitor, detect, investigate, report, and refuse to fill suspicious orders of

prescription opiates, which enabled the manufacturers' deceptive advertising to increase sales, profits and distribution of their products to communities, including Plaintiff's tribal community.

**D.  The Roles of Defendants in Causing and Perpetuating the Opioid Crisis**

42.  The Marketing Defendants' push to increase opioid sales worked. Through publications and websites, endless streams of sales representatives, "education" programs, and other means, Marketing Defendants dramatically increased their sales of prescription opioids and reaped billions of dollars of profit as a result. Since 1999, the amount of prescription opioids sold in the U.S. has nearly quadrupled. In 2016, 289 million prescriptions for opioids were filled in the U.S. – enough to medicate every adult in America around the clock for a month.

43.  On the supply side, the crisis was fueled and sustained by those involved in the supply chain of opioids, including manufacturers, distributors and retail suppliers, who failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls. Defendants have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know should be necessary for legitimate medical uses, while failing to report, and take steps to halt, suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

44.  From the day they made the pills to the day those pills were consumed in each community, the Marketing Defendants had control over the information regarding addiction they chose to spread and emphasize as part of their massive marketing campaign. By providing misleading information to doctors about addiction being rare and opioids being safe even in high doses, then pressuring those doctors into prescribing their products by arguing, among other things, that no one should be in pain, especially chronic pain, the

Marketing Defendants created a population of addicted patients who sought opioids at never-before-seen rates. The scheme worked, although perversely, and through it, the Marketing Defendants caused their profits to soar as more and more people became dependent on opioids.

45.    Defendants systematically and repeatedly disregarded the health and safety of the public. Charged by law to monitor and report dangerous behavior, they failed to do so in favor of maximizing corporate profits and increasing their market share.

46.    Corporate greed and callous indifference to the known, serious potential for human suffering have caused this public health crisis. Defendants unleashed a public crisis that has had far-reaching financial and social consequences in this country, including opioid addiction and death.

47.    The Marketing Defendants falsely and misleadingly, and contrary to the language of their drugs' labels: (1) downplayed the serious risk of addiction; (2) promoted the concept of "pseudo addiction" and thus advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; (6) promoted the falsehood that long-term opioid use improves functioning; and (7) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse, addiction and death.

48.    The Marketing Defendants disseminated these common messages to reverse the popular and medical understanding of opioids. They disseminated these messages directly, through their sales representatives, and in speaker groups led by physicians who were recruited by and paid by the Marketing Defendants for their support of the Marketing Defendants' marketing messages.

49.    The Marketing Defendants also worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors, known as "key opinion leaders" ("KOLs") and (b) creating, funding, assisting, directing, and/or encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups"). The Marketing Defendants then worked together with those KOLs and Front Groups to profoundly influence, and at times control, the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, continuing medical education ("CME") programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, the Marketing Defendants persuaded doctors and patients that what they had long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids.

50.    Each Marketing Defendant knew that its misrepresentations of the risks and benefits of opioids were not supported by or were directly contrary to the scientific evidence.

51.    The Tribe brings this civil action for injunctive relief, abatement of the opioids nuisance, compensatory damages, statutory damages, punitive damages, and any other relief allowed by law against the Defendant opioid drug manufacturers and retailers that, by their actions, knowingly or negligently have manufactured and dispensed prescription opioid drugs to and within the economic proximity of the Tribe in a manner that foreseeably injured, and continues to injure, the Tribe and its Citizens.

## II.    <u>JURISDICTION AND VENUE</u>

52.    This Court has subject matter jurisdiction over the claims made by Plaintiff herein pursuant to Section 12-11-30 of the Code of Alabama (1975).

53.     This Court has personal jurisdiction over Defendants in that they conducted business in Alabama at all times material herein, committed acts and/or omissions in or outside Alabama which caused tortious injury to Plaintiff, and/or engaged in substantial business activities in proximity to the Tribe and purposefully directed their actions towards the Tribe and its Citizens, voluntarily submitted to the jurisdiction of Alabama when obtaining a manufacturer, and/or pharmacy license, and have the requisite minimum contacts with Alabama necessary to constitutionally permit this Court to exercise jurisdiction.

54.     Venue is proper in this Court pursuant to Sections 6-3-2 and Section 6-3-7 of the Code of Alabama (1975) and Rule 82 of the Alabama Rules of Civil Procedure as many of the acts on which the action is founded occurred in  County, as the Defendants did business by agent in Mobile County at the time of the accrual of each cause of action.

55.     This action is not removable because there is incomplete diversity of residents and no substantial federal question is presented.

### III.     PARTIES

#### A. Plaintiff

56.     Poarch Band of Creek Indian (the "Tribe") is a federally sovereign Indian tribe located within Alabama, governed by the Poarch Band of Creek Indian Constitution and the laws of the Poarch Band of Creek Indian tribe, and exercises inherent governmental authority within the Tribe's community.

57.     A substantial number of the Tribe's Citizens have fallen victim to the opioid epidemic, becoming addicted to prescription opioids or coping with family members who are addicted. The Plaintiff has incurred significant costs in an attempt to abate the opioid epidemic that continues to plague its Citizens and Indian Lands by providing medical

services and opioid-related treatments to those in need. The Plaintiff brings this suit, in part, to recover these costs and procure the additional financial resources required to adequately combat and abate opioid addiction, opioid-related injuries, and other problems caused by the opioid crisis.

58.     This action is brought by the Plaintiff in the exercise of its authority as sovereign governments and on behalf of the Tribe in its proprietary capacity and under its parens patriae authority in the public interest to protect the health, safety, and welfare of all of their Tribe Citizens as well as the non-tribal Member inhabitants of their Indian Lands and to stop the growing prescription opioid epidemic within the Tribe. The Plaintiff also brings this action to recover damages and seek other redresses for harm caused by Defendants' improper, wrongful, fraudulent, and tortious conduct with respect to the manufacturing and sale of prescription opioids. Defendants' actions have caused, and continue to cause, a crisis that threatens the health, safety, and welfare of the Tribe.

59.     Plaintiff brings this action to recover opioid-related expenses, as well as to halt the reprehensible and tortious conduct of Defendants and the results of that conduct, and to cause Defendants to disgorge their profits earned improperly from their unlawful conduct, and to permit a Mobile County jury to determine whether Defendants should be punished for their unlawful conduct.

## B. Defendants

### 1.     Marketing Defendants and Related Entities

#### a.     Teva and Associated Companies

60.     Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. Teva Ltd. is traded on the New

York Stock Exchange (NYSE: TEVA). In its most recent Form 10-K filed with the Securities and Exchange Commission, Teva Ltd. stated that it is the leading generic drug company in the United States. Teva Ltd. operates globally, with significant business transactions in the United States. In 2018, its gross profit from North American operations was $4.979 million.

61.     Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Teva Ltd. acquired Cephalon in October 2011, and Cephalon Inc. became a wholly-owned subsidiary of Defendant Teva Ltd.

62.     Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania, and is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd.

63.     Teva USA and Cephalon work together closely to market and sell Cephalon products in the United States. Since its acquisition of Cephalon in October 2011, Teva USA has conducted all sales and marketing activities for Cephalon in the United States, through its "specialty medicines" division. Teva USA and Cephalon, Inc. worked together to manufacture, promote, sell, and distribute opioids such as Actiq and Fentora in the United States. Teva USA holds out Actiq and Fentora as Teva products to the public. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo. [48] Teva USA's parent company, Teva Pharmaceuticals Industries, Ltd. lists Cephalon and Teva USA's sales as its own on its financial reports, and its year-end report for 2012 – in the year immediately following the Cephalon acquisition

---

[48] E.g., ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left).

– attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including inter alia sales of Fentora.[49] Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain.[50] Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[51] In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay a $425 million fine.[52]

64.     Teva USA also sells generic opioids in the United States, including generic opioids previously sold by Allergan plc, whose generics business Teva Ltd., Teva USA's parent company based in Israel, acquired in August 2016.

65.     Teva Ltd., Teva USA, and Cephalon are referred to herein as "Teva."

66.     Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Nevada corporation with its principal place of business in Corona, California. In 2013, it changed its name to Actavis, Inc.

67.     Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma Inc.) ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey.

---

[49] Teva Ltd., Annual Report (Form 20-F), at 62 (Feb. 12, 2013), http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf.
[50] Highlights of Prescribing information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII (2009), ACTIQ PI/Med Guide, https://www.accessdata.fda.gov/drugsatfda docs/label/2009/020747s0301b1.pdf.
[51] Highlights of Prescribing Information, FENTORA® (fentanyl citrate) buccal tablet, CII (2011), https://www.accessdata.fda.gov/drugsatfda docs/label/2012/021947s015 lbl.pdf.
[52] Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

68.     Defendant Actavis LLC (f/k/a Actavis Inc.) ("Actavis LLC") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Watson, Actavis Pharma and Actavis LLC are collectively referred to as "Actavis."

69.     Defendant Teva Ltd. acquired ownership of Actavis in 2016. Prior to that transaction, Actavis was owned by Defendant Allergan PLC.

70.     Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana in the United States. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

71.     Actavis made thousands of payments to physicians nationwide, including in Alabama, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

### b.    Janssen and Associated Companies

72.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

73.     Defendant Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly-owned subsidiary of J&J.

74.     Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which was formerly known as Janssen Pharmaceutica, Inc.

75.     Defendant Noramco, Inc. is a Delaware company headquartered in Wilmington, Delaware and was a wholly-owned subsidiary of J&J until July 2016. Noramco, Inc. is or had been

part of J&J's opium processing. It makes active pharmaceutical ingredients ("APIs") for opioid painkillers.

76.    J&J is the only company that owns over 10% of Janssen Pharmaceuticals stock. J&J controls the sale and development of Janssen Pharmaceuticals drugs and Janssen Pharmaceuticals profits inure to J&J's benefit.

77.    J&J, Janssen Pharmaceuticals, Inc., Noramco, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen") are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States.

78.    Janssen manufactures, promotes, sells, and distributes drugs in the United States, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

79.    Janssen made thousands of payments to physicians nationwide, including in Alabama, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

80.    Janssen, like many other companies, has a corporate code of conduct, which sets forth the organization's mission, values and principles. Janssen's employees are required to read, understand and follow its Code of Conduct for Health Care Compliance. Johnson & Johnson imposes this code of conduct on Janssen as a pharmaceutical subsidiary of J&J.[53] Documents

---

[53] Depomed, Inc. acquired the rights to Nucynta and Nucynta ER from Janssen in 2015.

posted on J&J's and Janssen's websites confirm J&J's control of the development and marketing of opioids by Janssen. Janssen's website *"Ethical Code for the Conduct of Research and Development,"* names only J&J and does not mention Janssen anywhere within the document. The *"Ethical Code for the Conduct of Research and Development"* posted on the Janssen website is J&J's company-wide Ethical Code, which requires all of its subsidiaries to follow.

81.   The "Every Day Health Care Compliance Code of Conduct" posted on Janssen's website is a J&J company-wide document that describes Janssen as one of the "Pharmaceutical Companies of Johnson & Johnson" and as one of the "Johnson & Johnson Pharmaceutical Affiliates." It governs how lain employees of Johnson & Johnson Pharmaceutical Affiliates," including those of Janssen, "market, sell, promote, research, develop, inform and advertise Johnson & Johnson Pharmaceutical Affiliates' products." All Janssen officers, directors, employees, sales associates must certify that they have "read, understood and will abide by" the code. The code governs all of the forms of marketing at issue in this case. J&J made payments to thousands of physicians nationwide, including in Alabama, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

82.   On August 26, 2019, an Oklahoma judge ruled that Johnson & Johnson had intentionally played down the dangers and oversold the benefits of opioids and ordered it to pay the state $572 million in the first trial of a drug manufacturer for the destruction wrought by prescription painkillers.[54] The judge found that Oklahoma proved that Johnson & Johnson had

---

[54] an Hoffman, *Johnson & Johnson Ordered to Pay $572 Million in Landmark Opioid Trial,* THE NEW YORK TIMES (Aug 26, 2019), *available at* https://www.nytimes.com/2019/08/26/health/oklahoma-opioids-johnson-and-johnson.html.

created a public nuisance by exaggerating the benefits of narcotic painkillers and minimizing their addiction risks.

### c.   Endo and Associated Companies

83.    Defendant Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

84.    Defendant Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

85.    Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.

86.    Defendant Par Pharmaceuticals Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. collectively, "Par Pharmaceutical"). Par Pharmaceutical was acquired by Endo International plc in September 2015 and is an operating company of Endo International plc.

87.    Endo Health Solutions Inc., Endo Pharmaceuticals Inc. and Par Pharmaceutical (collectively, "Endo") are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States.

88.    Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, general versions of oxycodone, oxymorphone, hydromorphone, and hydrocodone in the United States. Opioids made up roughly $403 million of

Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for 10% of Endo's total revenue in 2012.

89.     On June 8, 2017, the FDA requested that Endo remove Opana ER from the market because of a "serious outbreak" of HIV and hepatitis C due to abuse of the drug after the reformulation of Opana from a nasal spray to an injectable.[55] In response to the FDA's request, Endo removed Opana ER from the market in July 2017, the first time the agency had ever moved to pull an opioid medication from sale.[56] Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

90.     Endo made thousands of payments to physicians nationwide, including in Alabama, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of wields.

### d.     Abbott Laboratories

91.     Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois. Defendant Abbott Laboratories, Inc. is a subsidiary of Abbott Laboratories, whose principal place of business is also in Abbott Park, Illinois. Defendants Abbott Laboratories and Abbott Laboratories, Inc. are referred to collectively as "Abbott."

92.     Abbott was primarily engaged in the promotion and distribution of opioids nationally due to a co-promotional agreement with Purdue. Pursuant to that agreement,

---

[55] Press Release, U.S. Food & Drug Administration, FDA Requests Removal of Opana ER for Risks Related to Abuse (June 8, 2017), https://www.fda.gov/NewsEvents/Newsroorn/PressAnnouncernents/uern562401.htm (hereinafter "FDA Requests Removal of Opana ER").
[56] Press Release, Endo International PLC, Endo Provides update on Opana ER (July 6, 2017), http://investor.endo.com/news-releases/news-release-details/endo-provides-update-opanar-er. (hereinafter "Endo Provides Update on Opana ER").

between 1996 and 2006, Abbott actively promoted, marketed, and distributed Purdue's opioid products as set forth above.

93.     Abbott, as part of the co-promotional agreement, helped turn OxyContin into the largest selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the higher the reward. Specifically, Abbott received twenty-five to thirty percent (25-30%) of all net sales for prescriptions written by doctors its sales force called on. This agreement was in operation from 1996-2002, following which Abbott continued to receive a residual payment of six percent (6%) of net sales up through at least 2006.

94.     With Abbott's help, sales of OxyContin went from a mere $49 million in its first full year on the market to $1.2 billion in 2002. Over the life of the co-promotional agreement, Purdue paid Abbott nearly half a billion dollars.

95.     Abbott and Purdue's conspiracy with Pharmacy Benefit Managers (PBMs) to drive opioid use is well established. As described in an October 28, 2016, article from Psychology Today entitled *America's Opioid Epidemic:*

> Abbott and Purdue actively misled prescribers about the strength and safety of the painkiller [OxyContin]. To undermine the policy of requiring prior authorization, they offered lucrative rebates to middlemen such as Merck Medco [now Express Scripts] and other pharmacy benefits managers on condition that they eased availability of the drug and lowered co-pays. The records were part of a case brought by the state of West Virginia against both drug makers alleging inappropriate and illegal marketing of the drug as a cause of widespread addiction.... One reason the documents are so troubling is that, in public at least, the drug maker was carefully assuring authorities that it was working with state authorities to curb abuse of OxyContin. Behind the scene, however, as one Purdue official openly acknowledged, the drug maker was "working with Medco (PBM) [now Express Scripts] to try and make parameters [for prescribing] less stringent.[57]

---

[57] American Society of Addiction Medicine, *America's Opioid Epidemic – Court released documents show drug makers blocked efforts to curb prescribing,* PSYCHOLOGY TODAY (Oct. 28, 2016),

### e.      Amneal Pharmaceuticals, LLC

96.     Defendant Amneal Pharmaceuticals, LLC ("Amneal LLC") is a Delaware limited liability company with its principal place of in New Jersey.

97.     Defendant Amneal Pharmaceuticals, Inc. ("API") is a Delaware corporation with its principal place of business in New Jersey. API is the managing member of Amneal LLC and conducts and exercises full control over all activities of Amneal LLC.[58]

98.     API and Amneal LLC are referred to herein as "Amneal."

99.     At all relevant times, Amneal has sold prescription drugs, including opioids in Alabama, including to the Tribe, and across the United States.

### f.      Assertio Therapeutics, Inc.

100.    Defendant Assertio Therapeutics, Inc. f/k/a Depomed, Inc. ("Assertio" or "Depomed") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Assertio describes itself as a specialty pharmaceutical company focused on pain and other central nervous system conditions. Assertio develops, markets, and sells prescription drugs in Alabama and across the United States. Assertio acquired the rights to Nucynta and Nucynta ER for $1.05 billion from Janssen pursuant to January 15, 2015, Asset Purchase Agreement. This agreement closed on April 2, 2015. Assertio has since that date, if not before, sold opioids in Alabama and across the United States.

### g.      Allergan and Associated Companies

101.    Defendant Allergan plc is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland and its administrative headquarters and all executive officers located in Madison, New Jersey. Shares of Allergan are traded on

---

https://www.psychologytoday.com/b1og/side-effects/201610/america-s-opioid-epidemic.
[58] *Id.*

the New York Stock Exchange (NYSE: AGN). In its most recent Form 10-K filed with the SEC, Allergan plc stated that it does business in the United States through its U.S. Specialized Therapeutics and U.S. General Medicine segments, which generated nearly 80% of the company's $15.8 billion in net revenue during the year ended December 31, 2018.

102.    Before (the entities defined above as) Actavis was sold to Teva Ltd. in August 2016, Actavis was part of the same corporate family as Allergan and sold and marketed opioids as part of a coordinated strategy to sell and market the branded and generic opioids of Allergan and Actavis. In October 2012, the Actavis Group was acquired by Watson Pharmaceuticals, Inc., and the combined company changed its name to Actavis, Inc. as of January 2013, and then to Actavis plc in October 2013. In October 2013, Actavis plc (n/k/a Allergan plc) acquired Warner Chilcott plc pursuant to a transaction agreement dated May 19, 2013. Actavis plc (n/k/a Allergan plc) was established to facilitate the business combination between Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc. Following the consummation of the October 1, 2013 acquisition, Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc became wholly-owned subsidiaries of Actavis plc (n/k/a Allergan plc). Pursuant to the transaction, each of Actavis, Inc.'s common shares were converted into one Actavis plc share. Further, Actavis plc (n/k/a Allergan plc) was the "successor issuer" to Actavis, Inc. and Warner Chilcott. Actavis plc acquired Allergan, Inc. in March 2015, and the combined company thereafter changed its name to Allergan plc.

103.    Defendant Allergan Finance, LLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.) is a limited liability company incorporated in Nevada and headquartered in Madison, New Jersey. Allergan Finance, LLC is a wholly-owned subsidiary of defendant Allergan plc. In 2008, Actavis, Inc. (n/k/a Allergan Finance, LLC),

acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Pharma, Inc., and Allergan USA, Inc. Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its behalf.

104.   Defendant Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California. Allergan Sales, LLC is the current New Drug Application ("NDA") holder for Kadian, and in 2016, Allergan Sales, LLC held the Abbreviated New Drug Applications ("ANDAs") for Norco. Allergan Sales, LLC is the wholly-owned subsidiary of Allergan plc. The Norco ANDAs are currently held by Allergan Pharmaceuticals International Limited, which is incorporated in Ireland.

105.   Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in Madison, New Jersey. Allergan USA, Inc. is currently responsible for Norco and Kadian sales. Allergan USA, Inc. is a wholly-owned subsidiary of Allergan plc.

106.   Defendant Allergan plc has, at all times, exercised control over these marketing and sales efforts and profits from the sale of its subsidiaries' products, ultimately inure to its benefit, including those sales by Actavis during the period of its ownership and control by Allergan. Allergan and its associated entities are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States, including to Plaintiff.

107.   Collectively Actavis, Amneal, Teva, Janssen, Assertio, Endo, Abbott, and Allergan are referred to as "Marketing Defendants."

**2.   <u>National Retail Pharmacies</u>**

### a.   CVS

108.   Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its principal place of business in Rhode Island. At all times relevant to this Complaint.

109.   Defendant CVS Pharmacy, Inc. ("CVS Pharmacy") is a Rhode Island corporation with its principal place of business in Rhode Island.

110.   Defendant, CVS Indiana, L.L.C. ("CVS Indiana") is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

111.   CVS Health Corporation, CVS Pharmacy, Inc. and CVS Indiana are collectively referred to as "CVS." CVS distributed prescription opioids throughout the United States, including in Alabama.

### b.   The Kroger Co.

112.   Defendant, The Kroger Co., is an Ohio corporation with its headquarters in Cincinnati, Ohio.

113.   Defendant, Kroger Limited Partnership II is an Ohio limited partnership with its principal office located in Columbus, Ohio.

114.   The Kroger Co. and Kroger Limited Partnership II are collectively referred to as "Kroger." Kroger operates 2,268 pharmacies in the United States, including in Alabama. At all times relevant to this Complaint, Kroger distributed prescription opioids throughout the United States, including in Alabama.

### c.   Rite-Aid Entities

115.   Defendant Rite Aid of Alabama, Inc. is an Alabama corporation with its principal office located in Montgomery, Alabama. Defendant Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc., is a Maryland corporation with

its principal office located in Camp Hill, Pennsylvania. Rite Aid of Alabama and Rite Aid of Maryland are collectively referred to as "Rite Aid." At most times relevant to this Complaint, and at least until 2018, Rite Aid operated pharmacies and distributed prescription opioids throughout the State of Alabama. Rite Aid has since sold or closed most of its Alabama stores.

116.    Rite Aid continues to distribute prescription opioids in other regions throughout the United States.

### d.    Walgreens

117.    Defendant Walgreen Co. ("Walgreen Co.") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Defendant Walgreen Eastern Co., Inc. ("WEC") is a New York corporation with its principal place of business in Deerfield, Illinois.

118.    Walgreen Co. and WEC are collectively referred to herein as "Walgreens." At all times relevant to this Complaint, Walgreens distributed prescription opioids throughout the United States, including in Alabama.

### e.    Wal-Mart

119.    Defendant Wal-Mart Inc., formerly known as Wal-Mart Stores, Inc. ("Wal-Mart"), is a Delaware corporation with its principal place of business in Arkansas.

120.    Defendant, Wal-Mart Stores East, LP, is a Delaware limited partnership with its principal place of business in Arkansas.

121.    Wal-Mart, Inc. and Wal-Mart Stores East, LP are collectively referred to as "Wal-Mart." At all times relevant to this Complaint, Wal-Mart distributed prescription opioids throughout the United States, including in Alabama.

122.    Collectively, Defendants CVS, Kroger, Rite Aid, Walgreens, and Wal-Mart are referred to as "National Retail Pharmacies."

### 3.    Pill Mill Defendants

123.    Like many other localities in the United States, Mobile County and Baldwin County were the homes of several "pill mills." A "pill mill" is a doctor's office, clinic, or healthcare facility that routinely conspires in or participates in the prescribing or dispensing of controlled substances outside the scope of the prevailing standards of medical practice and in violation of state law regarding the prescribing of controlled substances.

124.    The Defendants identified in the following paragraphs are doctors, nurses, and medical professionals who illegally wrote prescriptions for controlled substances absent medical necessity or other legitimate basis located at the currently known regional pill mills: Physician Pain Specialists of Alabama, P.C.; and Eastern Shore Neurology Clinic, Inc.

### I.    Physician Pain Specialists of Alabama, P.C.

125.    Physician Pain Specialists of Alabama, P.C. ("PPSA") is a corporation organized and existing under Alabama law. PPSA was operated as a pill mill in Mobile, Alabama, run by Defendants John Patrick Couch and Xiulu Ruan. C&R Pharmacy Pharmacy, LLC, an Alabama limited liability company whose members are Couch and Ruan, was an affiliated pharmacy.

126.    In a 2017 trial in the United States District Court for the Southern District of Alabama, Defendants Ruan and Couch were charged with and convicted of utilizing both the clinic and the pharmacy to violate the Controlled Substances Act and to commit mail and wire fraud. Additional charges included unjust enrichment and illegal distribution of Schedule II and Schedule III drugs, including Fentanyl.

34

127.     Defendants Thomas Justin Palmer and Bridgette Palmer were nurse practitioners for Defendant Couch, and they ultimately pled guilty to prescribing controlled substances outside the normal course of professional practice. Upon information and belief, some of those controlled substances were opioids.

128.     In the course of their work, not only did these Defendants defraud multiple insurance and healthcare entities, they illegally prescribed high numbers of opioids in and around Mobile County thus leading many to addiction and opioid disorder. These illegal prescriptions were part and parcel of the misconduct of the other Defendants named herein in the manufacturing, marketing, and distribution of opioids.

## II.     Eastern Shore Neurology Clinic, Inc.

129.     Eastern Shore Neurology Clinic, Inc. ("ESNC") is a corporation organized and existing under Alabama law. ESNC was operated as a pill mill in Foley, Alabama, run by Defendant Rassan M. Tarabein.

130.     In 2017, Defendant Tarabein pleaded guilty in the United States District Court for the Southern District of Alabama to one count of health care fraud and one count of unlawful distribution of Schedule II and Schedule III drugs.

131.     In the course of his work, not only did Defendant defraud multiple insurance and healthcare entities, he illegally prescribed high numbers of opioids to the citizens around Mobile County, thus leading many to addiction and opioid disorder. These illegal prescriptions were part and parcel of the misconduct of the other Defendants named herein in the manufacturing, marketing, and distribution of opioids.

## 4.     Defendants' Agents and Affiliated Persons

35

132.    All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

133.    The true names and capacities, whether individual, corporate, associate, or otherwise of certain vendors, distributors and/or their alter egos, sued herein as DOES 1 through 100 inclusive, are presently unknown to Plaintiff, who therefore sue these Defendants by fictitious names. Plaintiff will seek leave of this Court to amend this Complaint to show their true names and capacities when they become ascertained. Each of the Doe Defendants has taken part in and participated with, and/or aided and abetted, some or all of the other Defendants in some or all of the matters referred to herein, and therefore are liable for the same.

## IV.    FACTUAL BACKGROUND

### A.    The History of Opioids

134.    The synthetic opioids manufactured and filled by Defendants are related to the opium poppy, which has been used to relieve pain for centuries.

135.    The opium poppy was a well-known symbol of the Roman Civilization, which signified both sleep and death. The Romans used opium not only as a medicine but also as a poison.[59]

136.    During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve

---

[59] Martin Booth, *Opioids: A History,* at 20 (Simon & Schuster Ltd. 1996).

pain on the battlefield. They were also used in a wide variety of commercial products ranging from pain elixirs to cough suppressants to beverages.

137.    Alabama law imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, the likelihood of addiction or abuse, and safety. Opioids generally have been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence; Schedule III drugs are deemed to have a lower potential for abuse, but their abuse may lead to moderate or low physical dependence or high psychological dependence.[60]

138.    The effects of opioids vary by duration. Long-acting opioids, such as Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours. The Marketing Defendants promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

139.    Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids – the "high." However, opioids depress respiration, and at very high doses, can and often do

---

[60] *See* Ala. Code 975 § 20-2-24; Ala. Code 1975 § 20-2-25.

arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

140.    Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after the complete withdrawal from opioids, depending on how long the opioids were used.

141.    Opioids provide effective treatment for short-term, post-surgical and trauma-related pain, and for palliative end-of-life care. They are approved by the FDA for use in the management of moderate to severe pain where the use of an opioid analgesic is appropriate for more than a few days. Defendants, however, have manufactured, promoted, marketed, and distributed opioids for the management of chronic pain by misleading consumers and medical providers through misrepresentations or omissions regarding the appropriate uses, risks, and safety of opioids.

142.    As one doctor put it, the widespread, long-term use of opioids "was an experiment on the population of the United States. It wasn't randomized, it wasn't controlled, and no data was collected until they started gathering death statistics."

**B.    The Opioid Epidemic**

143.    Prescription opioids have become widely prescribed. In 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for one month.[61]

---

[61] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States,* 104 Am. J. Pub. Health e52-e59 (2014), https://www.nebi.nlm.nih.gov/pme/articles/PMC3935688/.

144.     Despite the enormous number of prescriptions, recent studies have concluded that treatment with opioids is not superior to treatment with non-opioid medications for improving pain-related function.[62] Even for patients presenting to the emergency room with acute extremity pain, there is no significant or clinically important difference in pain reduction at 2 hours among single-dose treatment with ibuprofen and acetaminophen, or with three different opioid and acetaminophen combination analgesics.[63]

145.     In 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

a.     The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

b.     More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

c.     Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

d.     The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older – a total of 12 million people – reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

e.     Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

---

[62] Erin E. Krebs, M.D., et al., *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain,* 319 JAMA 872-882 (2018), doi: 10.1001/jama.2018.0899, https://jamanetwork.com/journals/jama/article-abstract/2673971?redirect=true.

[63] Andrew K. Chang, M.D., et al., *Effect of a Single Dose of Oral Opioid and Nonopioid Analgesics on Acute Extremity Pain in the Emergency Department,* 318 JAMA 1661-1667 (2017), DOI: 10.1001/jama.2017.16190, https://jamanetwork.com/journals/jama/article-abstract/2661581?widget=personalizedcontent& previousarticle=2673971&redirect=true.

      f.     Almost 5,500 people start to misuse prescription painkillers every day.[64]

146.    The CDC has also identified an addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers – which, at the molecular level and in their effect, closely resemble heroin – are forty times more likely to be addicted to heroin.[65] According to a recent study, among young urban heroin users, 86% used opioid pain relievers prior to using heroin.[66]

147.    The synthetic opioid fentanyl has been a driving force behind the nation's opioid epidemic, killing tens of thousands of Americans in overdoses. The drug is so powerful that it is now being used to execute prisoners on death row.[67]

148.    In a November 2016 report, the DEA declared opioid prescription drugs, heroin, and fentanyl as the most significant drug-related threats to the United States.[68]

149.    The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999-2014. Among the 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[69]

---

[64] *See* Press Release, Centers for Disease Control and Prevention, Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1,2011), https://www.cdc.gov/mediairealeases/2011/p1101_flu_pain_killer_overdose.html.

[65] *See* Centers for Disease Control and Prevention, *Today's Heroin Epidemic,* https://www.cdc.gov/vitalsigns/heroin/index.html.

[66] Nat'l Inst. on Drug Abuse, *Prescription Opioids and Heroin* (Jan. 2018), https://d14rmgtrwzf5a.cloudfront.net/sites/default/files/19774-prescription-opioids-and-heroin.pdf.

[67] Mitch Smith, *Fentanyl Used to Execute Nebraska Inmate, in First for U.S.,* (Aug. 14, 2018), https://www.nytimes.com/2018/08/14/us/carey-dean-moore-nebraska-execution-fentanyl.html.

[68] Rudd et al., Centers for Disease Control and Prevention, *Increases in Drug and Opioid-Involved Overdose Deaths-United States, 2010-2015* (Dec. 30, 2016), Morbidity & Mortality Wkly. Rep. 2016; 65; 1445-1452, doi: http://dx.doi.org/10.15585/mmwr.mm655051e1, *available at* https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm.

[69] *Id.*

150.    The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[70]

151.    The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[71] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[72]

152.    In 2016, the President of the United States officially declared an opioid and heroin epidemic.[73]

## V.    THE MARKETING DEFENDANTS' FALSE, DECEPTIVE, AND UNFAIR MARKETING OF OPIOIDS

153.    The opioid epidemic did not happen by accident.

154.    Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

---

[70] *See* Nora D. Volkow, M.D. & A. Thomas McLellan, M.D., *Opioid Abuse in Chronic Pain –Misconceptions and Mitigation Strategies,* 374 N Eng. J. Med. 1253-1263 (2016), DOI: 10.1056/NEJMra1507771, http://www.nejm.org/doi/full/10.1056/NEJMra1507771, (hereinafter "Volkow & McLellan").
[71] *Id.*
[72] *Id.* (citing at note 2, Florence CS, et al., *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013* (Oct. 2016), 54 Med. Care 901-906 (2016),
DOI: 10.1097/ML R.0000000000000625, *available at* https://www.ncbi.nlm.nih.gov/pubmed/27623005.
[73] *See* Proclamation No. 9499, 81 Fed. Reg. 65173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week"), *available at* https://www.gpo.gov/fdsys/pkg/FR-2016-09-22/pdf/2016-22960.pdf

155.    Each Marketing Defendant has conducted, and continues to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Marketing Defendant spent, and continues to spend millions of dollars on promotional activities and materials that falsely deny, trivialize, or materially understate the risks of opioids while overstating the benefits of using them for chronic pain.

156.    The Marketing Defendants have disseminated these common messages to reverse the generally accepted medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians that the Marketing Defendants recruited for their support of their marketing messages, and through unbranded marketing and industry-funded Front Groups.

157.    The Marketing Defendants' efforts have been wildly successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.[74] In an open letter to the nation's physicians in August 2016, the then U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[75] This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand). And when those patients can no longer afford or obtain opioids

---

[74] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine,* Fortune (Nov. 9, 2011), http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/; David Crow, *Drugmakers Hooked on $10bn Opioid Habit,* FINANCIAL TIMES (Aug. 10, 2016).
[75] Letter from Vivek H. Murthy, M.D., U.S. Surgeon General, *supra* n. 45.

from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

158.    The Marketing Defendants intentionally continued their conduct, as alleged herein, with the knowledge that such conduct was creating the opioid epidemic and causing the harms and damages alleged herein.

159.    As alleged throughout this Complaint, Defendants' conduct created a public health crisis and a public nuisance. The harm and endangerment to the public health, safety, and the environment created by this public nuisance is ongoing and has not been abated.

160.    The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm can be abated by, *inter alia,* (a) educating prescribers and patients regarding the true risks and benefits of opioids, including the risk of addiction, in order to prevent the next cycle of addiction; (b) providing addiction treatment to patients who are already addicted to opioids; and (c) making naloxone widely available so that overdoses are less frequently fatal.

161.    Defendants have the ability to act to abate the public nuisance, and the law recognizes that they must do so. It is the manufacturer of a drug that has the primary responsibility to ensure the safety, efficacy, and appropriateness of a drug's labeling, marketing, and promotion. All Defendants in the supply chain of a controlled substance are primarily responsible for ensuring that the drug is only distributed and dispensed to appropriate patients and not diverted. These responsibilities, to ensure that their products and practices meet both state-controlled substance and consumer protection laws and regulations, exist independently of any FDA or DEA regulation. As registered manufacturers and distributors of controlled substances, Defendants are placed in a position of special trust and responsibility, and are

uniquely positioned, based on their knowledge of prescribers and orders, to act as the first line of defense.

### A. **The Marketing Defendants' False and Deceptive Statements About Opioids**

162.    The Marketing Defendants' misrepresentations fall into the following eight categories:

    a.    The risk of addiction from chronic opioid therapy is low;

    b.    To the extent there is a risk of addiction, it can be easily identified and managed;

    c.    Signs of addictive behavior are "pseudoaddiction " requiring more opioids;

    d.    Opioid withdrawal can be avoided by tapering;

    e.    Opioid doses can be increased without limit or greater risks;

    f.    Long-term opioid use improves functioning;

    g.    Alternative forms of pain relief pose greater risks than opioids; and

    h.    New formulations of certain opioids successfully deter abuse.

163.    Each of these propositions is false. The Marketing Defendants knew this, but they nonetheless set out to convince physicians, patients, and the public at large of the truth of each of these propositions in order to expand the market for their opioids.

164.    The categories of misrepresentations are offered to organize the numerous statements the Marketing Defendants made and to explain their role in the overall marketing effort, not as a checklist for assessing each Marketing Defendant's liability. While each Marketing Defendant deceptively promoted their opioids specifically, and, together with other Marketing Defendants, opioids generally, not every Marketing Defendant propagated (or needed to propagate) each misrepresentation. Each Marketing Defendant's conduct, and each misrepresentation, contributed to an overall narrative that aimed

to – and did – mislead doctors, patients, and payors about the risks and benefits of opioids. While this Complaint endeavors to document examples of each Marketing Defendant's misrepresentations and the manner in which they were disseminated, they are just that – examples. The Complaint is not, especially prior to discovery, an exhaustive catalog of the nature and manner of each deceptive statement by each Marketing Defendant.

1.    **Falsehood #1: The Risk of Addiction from Chronic Opioid Therapy is Low**

165.    Central to the Marketing Defendants' promotional scheme was the misrepresentation that opioids are rarely addictive when taken for chronic pain. Through their marketing efforts, the Marketing Defendants advanced the idea that the risk of addiction is low when opioids are taken as prescribed by "legitimate" pain patients. That, in turn, directly led to the expected and intended result that doctors prescribed more opioids to more patients – thereby enriching the Marketing Defendants and substantially contributing to the opioid epidemic.

166.    Each of the Marketing Defendants claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support those claims. None of them have acknowledged, retracted, or corrected their false statements.

167.    In fact, studies have shown that a substantial percentage of long-term users of opioids experience addiction. Addiction can result from the use of any opioid, "even at the recommended dose,"[76] and the risk substantially increases with more than three months of

---

[76] FDA announces safety labeling changes and post market study requirements for extended-release and long-acting opioid analgesics, FDA (Sept. 10, 2013); *see also* FDA announces enhanced warnings for immediate-release opioid pain medications related to risks of misuse, abuse, addiction, overdose and death, FDA (Mar. 22, 2016).

use.[77] As the CDC Guideline states, "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" (a diagnostic term for addiction).[78]

### a.     Marketing Defendants' Misrepresentations Regarding Addiction Risk

168.    The Marketing Defendants knew they would need data to overcome decades of wariness regarding opioid use. They needed some sort of research to back up their messaging. But these Marketing Defendants had not conducted any studies about abuse potential or addiction risk as part of their application for FDA approval for any of their drugs. The Marketing Defendants found this "research" in the form of a one-paragraph letter to the editor published in the New England Journal of Medicine ("NEJM") in 1980.

169.    This letter, by Dr. Hershel Jick and Jane Porter, declared the incidence of addiction "rare" for patients treated with opioids.[79] They had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.

---

[77] CDC Guideline, *supra* n. 26 at 21.
[78] *Id.* at 2.
[79] Jane Porter and Herschel Jick, MD, *Addiction Rare in Patients Treated with Narcotics,* 302(2) N Engl J Med. 123 (Jan. 10, 1980), http://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221 (hereinafter "Porter and Jick Letter").

## ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

<div align="right">

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Boston University Medical Center

</div>

Waltham, MA 02154

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

---

170.    As Dr. Jick explained to a journalist years later, he submitted the statistics to NEJM as a letter because the data were not robust enough to be published as a study.[80]

171.    Citation of the letter, which was largely ignored for more than a decade, significantly increased after the introduction of opioids. While Marketing Defendants used it to assert that their opioids were not addictive, "that's not in any shape or form what we suggested in our letter," according to Dr. Jick.

172.    Marketing Defendants relied on and disseminated the same false and deceptive messaging. The enormous impact of Defendants' misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and, in some cases, "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed

---

[80] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death,* 47 (Rodale 2003) (hereinafter "Pain Killer").

to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy.[81]

173.    "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."[82]

### b.    Endo's Misrepresentations Regarding Addiction Risk

174.    Endo also falsely represented that addiction is rare in patients who are prescribed opioids.

175.    Until April 2012, Endo's website for Opana, *www.opana.com,* stated that [m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

176.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that Endo improperly instructed its sales representatives to diminish and distort the risk of addiction associated with Opana ER.

177.    One of the Front Groups with which Endo worked most closely was the American Pain Foundation ("APF"), described more fully below.

178.    APF conveyed misinformation through its National Initiative on Pain Control ("NIPC") and its website *www.Painknowledge.com,* which claimed that "[p]eople who take opioids as prescribed usually do not become addicted."

---

[81] Pamela T.M. Leung, B.Sc. Pharm., Erin M. Macdonald, M.Sc., Matthew B. Stanbrook, M.D., Ph.D., Irfan Al Dhalla, M.D., David N. Juurlink, M.D., Ph.D., *A 1980 Letter on the Risk of Opioid Addiction,* 376 N Engl. J Med 2194-95 (June 1, 2017), http://www.nejm.org/doi/full/10.1056/NEJMc1700150#t=article.

[82] *Painful words: How a 1980 letter fueled the opioid epidemic,* STAT (May 31, 2017), https://www.statnews.com/2017/05/31/opioid-epidemic-nejm- letter/.

179.    Another Endo website, *www.PainAction.corn,* stated: "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

180.    A brochure available on *www.Painknowledge.com* titled *"Pain: Opioid Facts,"* an Endo-sponsored NIPC publication, stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted." In numerous patient education pamphlets, Endo repeated this deceptive message.

181.    In a patient education pamphlet titled *"Understanding Your Pain: Taking Oral Opioid Analgesics,"* Endo answers the hypothetical patient question – "What should I know about opioids and addiction?" – by focusing on explaining what addiction is ("a chronic brain disease") and is not ("Taking opioids for pain relief"). It goes on to explain that "[a]ddicts take opioids for other reasons, such as unbearable emotional problems. Taking opioids as prescribed for pain relief is not addiction." This publication is still available online and was edited by KOL Dr. Russell Portenoy.[83]

182.    In addition, a 2009 patient education publication, *Pain: Opioid Therapy,* funded by Endo and posted on *www.Painknowledge.com,* omitted addiction from the "common risks" of opioids, as shown below:

---

[83] Margo McCaffery, RN MS, FAAN and Chris Pasero, RN, MS FAAN, *Understanding Your Pain, Taking Oral Opioid Analgesics,* available at http://www.thblack.com/links/rsd/understand_pain_opioid_analgesics.pdf.

> As with any medication, there are some side effects that are associated with opioid therapy. The most common side effects that occur with opioid use include the following:
>
> - Constipation
> - Drowsiness
> - Confusion
> - Nausea
> - Itching
> - Dizziness
> - Shortness of breath
>
> Your healthcare provider can help to address and, in some cases, prevent side effects that may occur as a result of opioid treatment. Less severe side effects, including nausea, itching, or drowsiness, typically go away within a few days without the need for further treatment. If you experience any side effects, you should let your healthcare provider know immediately.

### c.    Janssen's Misrepresentations Regarding Addiction Risk

183.    Janssen likewise misrepresented the addiction risk of opioids on its websites and print materials. One website, *Let's Talk Pain,* states, among other things, that "the stigma of drug addiction and abuse" associated with the use of opioids stemmed from a "lack of understanding addiction."

184.    The *Let's Talk Pain* website also perpetuated the concept of pseudoaddiction, associating patient behaviors such as "drug seeking," "clock watching," and "even illicit drug use or deception" with undertreated pain, which can be resolved with "effective pain management."

185.    A Janssen unbranded website, *www.PrescribeResponsibly.com,* states that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."[84]

186.    Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief Pain Management for Older Adults,* which, as seen below, described as "myth" that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain" (emphasis in original). Until recently, this guide was still available online.

---

[84] Keith Candiotti, M.D., *Use of Opioid Analgesics in Pain Management,* Prescribe Responsibly, http://www.prescriberesponsibly.com/articles/opioid-pain-managementu.

**Opioid myths**

**Myth:** Opioid medications are always addictive.

**Fact:** Many studies show that opioids are *rarely* addictive when used properly for the management of chronic pain.

187.   Janssen's website for Duragesic included a section addressing "Your Right to Pain Relief" and a hypothetical patient's fear that "I'm afraid I'll become a drug addict." The website's response: "Addiction is relatively rare when patients take opioids appropriately."

### d.   Cephalon's Misrepresentations Regarding Addiction Risk

188.   Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide,* which included claims that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.

189.   For example, a 2003 Cephalon-sponsored CME presentation titled *Pharmacologic Management of Breakthrough or Incident Pain,* posted on Medscape in February 2003, teaches:

> [C]hronic pain is often undertreated, particularly in the non-cancer patient population. . . . The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to under treatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between

51

physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.[85]

190.     Marketing Defendants' suggestions that the opioid epidemic is the result of bad patients who manipulate doctors to obtain opioids illicitly helped further their marketing scheme is at odds with the facts. While there are certainly patients who unlawfully obtain opioids, they are a small minority. For example, patients who "doctor-shop" – i.e., visit multiple prescribers to obtain opioid prescriptions – are responsible for roughly 2% of opioid prescriptions. The epidemic of opioid addiction and abuse is overwhelmingly a problem of false marketing (and unconstrained distribution) of the drugs, not problem patients.

2.     **Falsehood #2: To the Extent There is a Risk of Addiction, It Can Be Easily Identified and Managed**

191.     While continuing to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted, the Marketing Defendants assert that to the extent that *some* patients are at risk of opioid addiction, doctors can effectively identify and manage that risk by using screening tools or questionnaires. In materials they produced, sponsored, or controlled, Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting opioid therapy for chronic pain. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance use, mental illness, trauma, or abuse) so that doctors can then more closely monitor those patients.

192.     Janssen, on its website *www.PrescribeResponsibly.con* states that the risk of opioid addiction "can usually be managed" through tools such as opioid agreements between

---

[85]   Michael J. Brennan et al., Pharmacologic Management of Breakthrough or Incident Pain, Medscape, http://www.medscape.org/iviewarticle/449803.

patients and doctors.[86] The website, which directly provides screening tools to prescribers for risk assessments,[87] includes a "four question screener" to purportedly help physicians identify and address possible opioid misuse.[88]

193.    Cephalon sponsored the APF's *Treatment Options: A Guide for People Living with Pain* (2007), which also falsely reassured patients that opioid agreements between doctors and patients can "ensure that you take the opioid as prescribed" and counseled patients that opioids "give [pain patients] a quality of life we deserve."

194.    Endo paid for a 2007 supplement available for continuing education credit in the *Journal of Family Practice,* written by a doctor who became a member of Endo's speaker's bureau in 2010. This publication, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids,* (i) recommended screening patients using tools like (a) the *Opioid Risk Tool (*"ORT") created by Dr. Webster and linked to Janssen or (b) the *Screener and Opioid Assessment for Patients with Pain,* and (ii) taught that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts. The ORT was linked to Endo-supported websites, as well.

195.    There are three fundamental flaws in the Marketing Defendants' representations that doctors can consistently identify and manage the risk of addiction. First, there is no reliable scientific evidence that doctors can depend on the screening tools

---

[86] Howard A. Heit, MD, FACP, FASAM and Douglas L. Gourlay, MD, MSc, FRCPC, FASAM, *What a Prescriber Should Know Before Writing the First Prescription,* Prescribe Responsibly. As of the date of this filing, the "Prescribe Responsibly" website is unavailable, but an archived version of this article may be accessed here: https://web.archive.org/web/20171003105720/http://www.prescriberesponsibly.com/articles/before-prescribing-opioids (hereinafter *"What a Prescriber Should Know Before Writing the First Prescription Prescribing Opioids.").*
[87] Risk Assessment Resources *at PrescribeResponsibly.com* is unavailable, but an archived version is available at https://web.archive.org/web/20190129201700/http://www.prescriberesponsibly .com/risk-assessment-resources.
[88] *Id.*

currently available to materially limit the risk of addiction. Second, there is no reliable scientific evidence that high-risk patients identified through screening can take opioids long-term without triggering addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients who are not identified through such screening can take opioids long-term without significant danger of addiction.

3.     **Falsehood #3: Signs of Addictive Behavior are "Pseudoaddiction" Requiring More Opioids**

196.    The Marketing Defendants instructed patients and prescribers that signs of addiction are actually indications of untreated pain, such that the appropriate response is to prescribe even more opioids. Dr. David Haddox, who later became a Senior Medical Director for Purdue, published a study in 1989 coining the term "pseudoaddiction," which he characterized as "the iatrogenic syndrome of abnormal behavior developing as a direct consequence of inadequate pain management.[89] In other words, people on prescription opioids who exhibited classic signs of addiction – for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids – were not addicted, but rather simply suffering from under-treatment of their pain.

197.    In the materials and outreach they produced, sponsored, or controlled, the Marketing Defendants made each of these misrepresentations and omissions, and have never acknowledged, retracted, or corrected them.

198.    Cephalon and Endo sponsored the Federation of State Medical Boards' *("FSMB") Responsible Opioid Prescribing* (2007) written by Dr. Scott Fishman and

---

[89] David E. Weissman and 4. David Haddox, *Opioid pseudoaddiction – an iatrogenic syndrome,* 36(3) Pain 363-66 (Mar. 1989), https://www.ncbi.nlm.nih.gov/pubmed/2710565. ("Iatrogenic" describes a condition induced by medical treatment.)

discussed in more detail below, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, which are signs of genuine addiction, are all really signs of "pseudoaddiction."

199.    Endo also sponsored a NIPC CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia,* which promoted pseudoaddiction and listed "[d]ifferentiation among states of physical dependence, tolerance, pseudoaddiction, and addiction" as an element to be considered in awarding grants to CME providers.

200.    Endo itself has repudiated the concept of pseudoaddiction. In finding that "[t]he pseudoaddiction concept has never been empirically validated and, in fact, has been abandoned by some of its proponents," the New York Attorney General, in a 2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'"[90] Endo, thereafter, agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.

201.    Janssen sponsored, funded, and edited a website called *Let's Talk Pain,* which in 2009 stated "pseudoaddiction refers to patient behaviors that may occur when pain is undertreated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management." This website was accessible online until at least May 2012. Janssen also currently runs a website, *www.Prescriberesponsibly.com,* which claims that concerns about opioid addiction are "overestimated," and describes pseudoaddiction as "a

---

[90] Attorney General of the State of New York, In the Matter of Endo Health Solutions Inc. & Endo Pharmaceuticals Inc., Assurance No.:15-228, Assurance of Discontinuance Under Executive Law Section 63. Subdivision 15 at 7.

syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically, when the pain is treated appropriately the inappropriate behavior ceases."[91]

202.    The CDC Guidelines nowhere recommended attempting to provide more opioids to patients exhibiting symptoms of addiction. Dr. Lynn Webster, a KOL discussed below, admitted that pseudoaddiction "is already something we are debunking as a concept" and became "too much of an excuse to give patients more medication. It led us down a path that caused harm."

### 4.    Falsehood #4: Opioid Withdrawal Can Be Avoided by Tapering

203.    In an effort to underplay the risk and impact of addiction, the Marketing Defendants falsely claimed that, while patients become physically dependent on opioids, physical dependence is not the same as addiction and can be easily addressed, if and when pain relief is no longer desired, by gradually tapering a patient's dose to avoid the adverse effects of withdrawal. Defendants failed to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—adverse effects that also make it less likely that patients will be able to stop using the drugs. Defendants also failed to disclose how difficult it is for patients to stop using opioids after they have used them for a prolonged period.

204.    A non-credit educational program sponsored by Endo, *Persistent Pain in the Older Adult,* claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days.

205.    However, this claim is at odds with the experience of patients addicted to opioids. Most patients who have been taking opioids regularly will, upon stopping treatment, experience withdrawal, characterized by intense physical and psychological effects, including anxiety, nausea,

---

[91] *What a Prescriber Should Know Before Writing the First Prescription Prescribing Opioids, supra* n. 86.

headaches, and delirium, among others. This painful and arduous struggle to terminate use can leave many patients unwilling or unable to give up opioids and heightens the risk of addiction.

206.   To this day, the Marketing Defendants have not corrected or retracted their misrepresentations regarding tapering as a solution to opioid withdrawal.

### 5.   Falsehood #5: Opioid Doses Can Be Increased Without Limit or Greater Risk

207.   In materials they produced, sponsored, or controlled, Marketing Defendants instructed prescribers that they could safely increase a patient's dose to achieve pain relief. Each of the Marketing Defendants' claims was deceptive in that they omitted warnings of increased adverse effects that occur at higher doses that were confirmed by scientific evidence.

208.   These misrepresentations were integral to the Marketing Defendants' promotion of prescription opioids. As discussed above, patients develop a tolerance to opioids' analgesic effects, so that achieving long-term pain relief requires constantly increasing the dose. Patients who take larger doses, and who escalate to larger doses faster, are much more likely to remain on opioids for a longer period of time, resulting in increased revenue.

209.   In addition, sales representatives aggressively pushed doctors to prescribe stronger doses of opioids. For example, one sales representative wrote about how his regional manager would drill the sales team on their upsetting tactics:

> It went something like this. "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Ql2h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Ql2h, will you do that?" "Okay." "Doctor, what if that patient then came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q I2h, would you do that?" "I don't know, maybe." "Doctor, but you do agree that you would at least Rx the 40mg dose, right?" "Yes."

The next week the representative would see that same doctor and go through the same discussion with the goal of selling higher and higher doses. Stronger doses were more expensive and increased the likelihood of addiction.

210.    These misrepresentations were particularly dangerous. Opioid doses at or above 50 MME (morphine milligram equivalents)/day double the risk of overdose compared to 20 MME/day, and 50 MME is equal to just 33 mg of oxycodone. The recommendation of 320 mg every twelve hours is ten times that.

211.    Endo sponsored a website, *www.Painknowledge.com,* which claimed that opioids may be increased until "you are on the right dose of medication for your pain," at which point further dose increases would not be required.

212.    Endo also published on its website a patient education pamphlet entitled *Understanding Your Pain: Taking Oral Opioid Analgesics.* In Q&A format, it asked, "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased . . . You won't 'run out' of pain relief."

213.    Marketing Defendants were aware of the greater dangers high dose opioids posed. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality." A study of the Veterans Health Administration from 2004 to 2008 found the rate of overdose deaths is directly related to the maximum daily dose.

**6.     Falsehood #6: Long-term Opioid Use Improves Functioning**

214.    Despite the lack of evidence of improved function and the existence of evidence to the contrary, the Marketing Defendants consistently promoted opioids for patients' function and

quality of life because they viewed these claims as a critical part of their marketing strategies. In recalibrating the risk-benefit analysis for opioids, increasing the perceived benefits of treatment was necessary to overcome its risks.

215.    Janssen, for example, promoted Duragesic as improving patients' functioning and work productivity through an ad campaign that included the following statements: "[w]ork, uninterrupted," "[l]ife, uninterrupted," "[g]ame, uninterrupted," "[c]hronic pain relief that supports functionality," and [i]mprove[s] . . . physical and social functioning."

216.    Similarly, since at least May of 2011, Endo has distributed and made available on its website, *www.opana.com,* a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like those of a construction worker or chef, misleadingly implying that the drug would provide long-term pain relief and functional improvement.

217.    As noted above, Janssen sponsored and edited a patient education guide entitled *Finding Relief Pain Management for Older Adults* (2009), which states as "a fact" that "opioids may make it easier for people to live normally." This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. It assures patients that, "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'" Similarly, *Responsible Opioid Prescribing* (2007), sponsored and distributed by Teva and Endo taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

218.   In addition, Janssen's *Let's Talk Pain* website featured a video interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative.

219.   Endo's NIPC website, *www.Painknowledge.com,* claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." In addition to "improved function," the website touted the improved quality of life as a benefit of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.

220.   Endo was the sole sponsor, through NIPC, of a series of CMEs titled *Persistent Pain in the Older Patient,* which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

221.   The Marketing Defendants' claims that long-term use of opioids improves patient function and quality of life are unsupported by clinical evidence. There are no controlled studies of the use of opioids beyond 16 weeks, and there is no evidence that opioids improve patients' pain and function long term. The FDA, for years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[92] Based upon a review of the existing scientific evidence, the

---

[92] The FDA has warned other drug makers that claims of improved function and quality of life were misleading. *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008), (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.

CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use."[93]

222.    Consistent with the CDC's findings, substantial evidence exists, demonstrating that opioid drugs are ineffective for the treatment of chronic pain and worsen patients' health. For example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. The few longer-term studies of opioid use had "consistently poor results," and "several studies have shown that Opioids for chronic pain may actually worsen pain and functioning . . ,"[94] along with general health, mental health, and social function. Over time, even high doses of potent opioids often fail to control pain, and patients exposed to such doses are unable to function normally.

223.    On the contrary, the available evidence indicates opioids may worsen patients' health and pain. Increased duration of opioid use is strongly associated with increased prevalence of mental health disorders (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization. The CDC Guideline concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[95] According to the CDC, "for the vast majority of patients, the known, serious, and too-often fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain.]"[96]

224.    As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social

---

[93] CDC Guideline, *supra* n. 26 at 20.
[94] Thomas Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline,* at 1503, 374 New Eng. J. Med. 1501-1504 (Apr. 21, 2016), doi: 10.1056/NEJMp1515917, http://www.nej.org/doi/full/10.1056/NEJMp1515917.
[95] CDC Guideline, *supra* n. 26 at 2, 18.
[96] *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline, supra n.* 94.

functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[97] In fact, research such as a 2008 study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[98] Another study demonstrated that injured workers who received a prescription opioid for more than seven days during the first six weeks after the injury were 2.2 times more likely to remain on work disability a year later than workers with similar injuries who received no opioids at all.[99] Yet, Marketing Defendants have not acknowledged, retracted, or corrected their false statements.

### 7. Falsehood #7: Alternative Forms of Pain Relief Pose Greater Risks Than Opioids

225.    In materials they produced, sponsored, or controlled, the Marketing Defendants omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would favor opioids over other therapies such as over-the-counter acetaminophen or over-the-counter or prescription non-steroidal anti-inflammatory drugs ("NSAIDs").

226.    For example, in addition to failing to disclose the risks of addiction, overdose, and death in promotional materials, the Marketing Defendants routinely ignored the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the

---

[97] Andrea Rubinstein, *Are We Making Pain Patients Worse?,* Sonoma Med. (Fall 2009), available at http://www.nbcms.org/en-us/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144ctabid=747.

[98] Jeffrey Dersh et al., *Prescription opioid dependence is associated with poorer outcomes in disabling spinal disorders,* 33(20) Spine 2219-27 (Sept. 15, 2008).

[99] Franklin, GM, et al., *Early opioid prescription and subsequent disability among workers with back injuries: the Disability Risk Identification Study Cohort,* 33 Spine 199, 201-202 (Jan. 15, 2008) doi: 10.1097/BRS.0b013e318160455c, https://www.ncbi.nlm.nih.gov/pubmed/18197107.

patient becomes more sensitive to certain painful stimuli over time,"[100] hormonal dysfunction,[101] decline in immune function; mental clouding, confusion, and dizziness, increased falls and fractures in the elderly,[102] NAS (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or with benzodiazepines, which are used to treat anxiety and may be co-prescribed with opioids, particularly to veterans suffering from pain.[103]

227.    Janssen sponsored *Finding Relief Pain Management for Older Adults* (2009) that listed dose limitations as "disadvantages" of other pain medicines but omitted any discussion of risks from increased doses of opioids. *Finding Relief* described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "can increase the risk of heart attack and stroke." The only adverse effects of opioids listed are "upset stomach or sleepiness," which the brochure claims will go away, and constipation.

228.    Endo's NIPC website, *www.Painknowledge.org,* contained a flyer called "Pain: Opioid Therapy." This publication listed opioids' adverse effects but with significant omissions, including hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death.

---

[100] Letter from Janet Woodcock, Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).
[101] H.W. Daniell, Hypogonadism in men consuming sustained-action oral opioids, 3(5) J. Pain 377-84 (2001), https://www.ncbi.nlm.nih.gov/pubmed/14622741.
[102] *See* Bernhard M. Kuschel et al., *The risk of fall injury in relation to commonly prescribed medications among older people – a Swedish case-control study,* 25 Eur. J. Pub. H. 527-32 (July 31, 2014), doi: 10.1093/eurpub/cku120, https://www.ncbi.nlm.nih.gov/pubmed/25085470.
[103] Karen H. Seal et *al., Association of Mental Health Disorders With Prescription Opioids and High- Risk Opioids in US Veterans of Iraq and Afghanistan,* 307(9) J. Am. Med. Ass'n 940-47, (March 7, 2012) doi:10.1001/jama.2012.234, https://jamanetwork.com/journals/jama/fullarticle/1105046.

229.    In April 2007, Endo sponsored an article aimed at prescribers, published in *Pain Medicine News,* titled "Case Challenges in Pain Management: Opioid Therapy for Chronic Pain.[104] The article asserted:

> Opioids represent a highly effective but controversial and often misunderstood class of analgesic medications for controlling both chronic and acute pain. The phenomenon of tolerance to opioids – the gradual waning of relief at a given dose – and fears of abuse, diversion, and misuse of these medications by patients have led many clinicians to be wary of prescribing these drugs, and/or to restrict dosages to levels that may be insufficient to provide meaningful relief.[105]

230.    To help allay these concerns, Endo emphasized the risks of NSAIDs as an alternative to opioids. The article included a case study that focused on the danger of extended use of NSAIDs, including that the subject was hospitalized with a massive upper gastrointestinal bleed believed to have resulted from his protracted NSAID use. In contrast, the article did not provide the same detail concerning the serious side effects associated with opioids.

231.    Additionally, Endo sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

232.    As a result of the Marketing Defendants' deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and

---

[104] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain,* Pain Med. News, http://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf (link no longer available).
[105] *Id.*

acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.[106]

**8.    Falsehood #8:  New Formulations of Certain Opioids Successfully Deter Abuse**

233.    Rather than take the widespread abuse of and addiction to opioids as reason to cease their untruthful marketing efforts, Endo seized them as an opportunity to compete. This company developed and oversold "abuse-deterrent formulations" ("ADF") opioids as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids, as well as an advantage of these expensive branded drugs over other opioids. This Defendant's false and misleading marketing of the benefits of their ADF opioids preserved and expanded their sales and falsely reassured prescribers, thereby prolonging the opioid epidemic. Other Marketing Defendants, including Actavis, also promoted their branded opioids as formulated to be less addictive or less subject to abuse than other opioids.

234.    The CDC Guideline confirms that "[n]o studies" support the notion that "abuse-deterrentt technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes." Tom Frieden, the former Director of the CDC, reported that his staff could not find "any evidence showing the updated opioids [ADF opioids] actually reduce rates of addiction, overdoses, or death."

**a.    Endo's Deceptive Marketing and Reformulated ER**

---

[106] M. Daubresse et al., *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, 51(10) Med. Care, 870-878 (2013). "For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady." *See also*, J. Mafi et al., *Worsening Trends in the Management and Treatment of Back Pain*, 173(17) J. of the Am Med. Ass'n Internal Med. 1573, 1573 (2013).

235.    Opana ER was particularly likely to be tampered with and abused. That is because Opana ER has lower "bioavailability" than other opioids, meaning that the active pharmaceutical ingredient (the "API" or opioid) does not absorb into the bloodstream as rapidly as other opioids when taken orally. Additionally, when swallowed whole, the extended-release mechanism remains intact, so that only 10% of Opana ER's API is released into the patient's bloodstream relative to injection; when it is taken intranasally, that rate increases to 43%. The larger the gap between bioavailability when consumed orally versus snorting or injection, the greater the incentive for users to manipulate the drug's means of administration.

236.    In December 2011, Endo obtained approval for a new formulation of Opana ER that added a hard coating that the company claimed made it crush-resistant.

237.    Even prior to its approval, the FDA advised Endo that it could not market the new Opana ER as abuse-deterrent.

238.    Nonetheless, in August of 2012, Endo submitted a citizen petition asking the FDA for permission to change its label to indicate that Opana ER was abuse-resistant, both in that it was less able to be crushed and snorted and that it was resistant to injection by syringe. Borrowing a page from Purdue's playbook, Endo announced it would withdraw original Opana ER from the market and sought a determination that its decision was made for safety reasons (its lack of abuse-deterrence), which would prevent generic copies of original Opana ER.

239.    Endo then sued the FDA, seeking to force expedited consideration of its citizen petition. The court filings confirmed Endo's true motives: in a declaration submitted with its lawsuit, Endo's chief operating officer indicated that a generic version of Opana ER would decrease the company's revenue by up to $135 million per year. Endo also claimed that if the FDA did not block generic competition, $125 million, the amount Endo spent on developing the

reformulated drug to "promote the public welfare," would be lost.[107] The FDA responded that: "Endo's true interest in expedited FDA consideration stems from business concerns rather than protection of the public health."[108]

240.     Despite Endo's purported concern with public safety, not only did Endo continue to distribute original, admittedly unsafe Opana ER for nine months after the reformulated version became available, it declined to recall original Opana ER despite its dangers. In fact, Endo claimed in September 2012 to be "proud" that "almost all remaining inventory" of the original Opana ER had "been utilized."[109]

241.     In its citizen petition, Endo asserted that redesigned Opana ER had "safety advantages." Endo even relied on its rejected assertion that Opana was less crushable to argue that it developed Opana ER for patient safety reasons and that the new formulation would help, for example, "where children unintentionally chew the tablets prior to an accidental ingestion."[110]

242.     However, in a 2013 decision rejecting the petition, the FDA found that "study data show that the reformulated version's extended-release features can be compromised when subjected to ... cutting, grinding, or chewing." The FDA also determined that "reformulated Opana ER" could also be "readily prepared for injections and more easily injected[.]" In fact, the FDA warned that preliminary data—including in Endo's own studies – suggested that a higher percentage of reformulated Opana ER abuse is via injection than was the case with the original formulation.

---

[107] Plaintiff's Opposition to Defendants' and Intervenor's Motions to Dismiss and Plaintiff's Reply in Support of Motion for Preliminary Injunction ("Endo Br."), *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 23 at 20 (D.D.C. Dec.14, 2012).

[108] Defendants' Response to the Court's November 30, 2012 Order, *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 9 at 6 (D.D.C. Dec. 3, 2012).

[109] *Id.*; Endo News Release, Sept. 6, 2012 (Ex. L to Rurka Decl.) *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 18-4 (D.D.C. Dec. 9, 2012).

[110] CP, FDA Docket 2012-8-0895, at 2.

243.    In 2009, only 3% of Opana ER abuse was by intravenous means. Since the reformulation, the injection of Opana ER has increased by more than 500%. Endo's own data, presented in 2014, found that between October 2012 and March 2014, 64% of abusers of Opana ER did so by injection, compared with 36% for the old formulation.[111] The transition into the injection of Opana ER made the drug even less safe than the original formulation. Injection carries risks of HIV, hepatitis C, and, in reformulated Opana ER's specific case, the blood-clotting disorder thrombotic thrombocytopenic purpura (TTP), which can cause kidney failure.

244.    Publicly, Endo sought to minimize the problem. On a 2013 call with investors, when asked about an outbreak of TTP in Ohio from injecting Opana ER, Endo sought to limit its import by assigning it to "a very, very distinct area of the country."

245.    Despite its knowledge that Opana ER was widely abused and injected, Endo marketed the drug as tamper-resistant and abuse-deterrent. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that based on the company's detailing elsewhere, Endo sales representatives informed doctors that Opana ER was abuse-deterrent, could not be tampered with, and was safe. In addition, sales representatives did not disclose evidence that Opana was easier to abuse intravenously and, if pressed by prescribers, claimed that while outlier patients might find a way to abuse the drug, most would be protected.

246.    A review of national surveys of prescribers regarding their "take-aways" from pharmaceutical detailing confirms that prescribers remember being told Opana ER was tamper-resistant. Endo also tracked messages that doctors took from its in-person marketing. Among the advantages of Opana ER, according to participating doctors, was its "low abuse potential." For

---

[111] Theresa Cassidy et al., *The Changing Abuse Ecology: Implications for Evaluating the Abuse Pattern of Extended-Release Oxymorphone and Abuse-Deterrent Opioid Formulations*, Inflexxion (Sept. 7, 2014), https://www.inflexxion.com/changing-abuse-ecology-extended-release-oxymorphone/.

example, a June 14, 2012, Endo press release announced, "the completion of the company's transition of its Opana ER franchise to the new formulation designed to be crush resistant."

247.    The press release further stated that: "We firmly believe that the new formulation of Opana ER, coupled with our long-term commitment to awareness and education around appropriate use of opioids will benefit patients, physicians and payers." The press release described the old formulation of Opana as subject to abuse and misuse but failed to disclose the absence of evidence that reformulated Opana was any better. In September 2012, another Endo press release stressed that reformulated Opana ER employed "INTAC Technology" and continued to describe the drug as "designed to be crush-resistant."

248.    Similarly, journal advertisements that appeared in April 2013 stated Opana ER was "designed to be crush resistant." A January 2013 article in Pain Medicine News, based in part on an Endo press release, described Opana ER as "crush-resistant." This article was posted on the *Pain Medicine News* website, which was accessible to patients and prescribers.

249.    In 2015, the Indiana Department of Public Health determined that an HIV outbreak in Southeastern Indiana was linked to injection of Opana,[112] the first documented HIV outbreak in the United States associated with injection of a prescription painkiller. After the outbreak, the FDA required "that Endo Pharmaceuticals remove [Opana ER] from the market." The agency sought removal "based on its concern that the benefits of the drug may no longer outweigh its risks."[113]

250.    In March 2017, because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and TTP, an FDA advisory committee recommended that Opana

---

[112]  Press Release, State of Ind. Health Dep't, HIV Outbreak in Southeastern Alabama, (Feb. 25, 2015), http://www.in.gov/activecalendar/EventList.aspx?fromdate=1/1/2015&todate=12/31/2015&display=Month&type=public&eventidn=210259&view=EventDetails&information_id=211489.
[113]  Jen Christensen, *FDA wants Opioid Painkiller Pulled off Market,* CNN (June 8, 2017), https://www.cnn.com/2017/06/08/health/fda-opioid-opana-er-bn/index.html; FDA Requests Removal of Opana ER.

be withdrawn from the market. The FDA adopted this recommendation on June 8, 2017.[114] Endo announced on July 6, 2017, that it would agree to stop marketing and selling Opana ER.[115] However, by this point, the damage had been done. Even then, Endo continued to insist, falsely, that it "has taken significant steps over the years to combat misuse and abuse."

### b. Other Marketing Defendants' Misrepresentations Regarding Abuse Deterrence

251. While Marketing Defendants promote patented technology as the solution to opioid abuse and addiction, none of their "technology" addresses the most common form of abuse – oral ingestion – and their statements regarding abuse-deterrent formulations give the misleading impression that these reformulated opioids can be prescribed safely.

252. In sum, each of the nine categories of misrepresentations discussed above regarding the use of opioids to treat chronic pain was either not supported by or was contrary to the scientific evidence. In addition, the Defendants' misrepresentations and omissions, as set forth in this Complaint, are misleading and contrary to the Marketing Defendants' products' labels.

### B. The Marketing Defendants Disseminated Their Misleading Messages About Opioids Through Multiple Direct and Indirect Channels

253. The Marketing Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients throughout the United States. The Marketing Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the country, including the Tribe's communities.

254. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by the drug manufacturers' corporate headquarters. This

---

[114] *Id.*
[115] Endo Provides Update on Opana ER, *supra* n. 56.

comprehensive approach ensures that the Marketing Defendants' messages are accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising – and in each sales territory. The Marketing Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

255.     The Marketing Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons (the company employees who respond to physician inquiries); centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. The Marketing Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

256.     The Marketing Defendants utilized various channels to carry out their marketing scheme of targeting the medical community and patients with deceptive information about opioids: (1) direct, targeted communications with prescribers by sales representatives or "detailers;" (2) "Front Groups" with the appearance of independence from the Marketing Defendants; (3) so-called "KOLs," that is, doctors who were paid by the Marketing Defendants to promote their pro-opioid message; (4) disseminating their misleading messages through reputable organizations; (5) CME programs controlled and/or funded by the Marketing Defendants; (6) branded advertising; (7) unbranded advertising; (8) publications; and (9) speakers bureaus and programs.

1.       **The Marketing Defendants Used "Detailers" To Directly Disseminate Their Misrepresentations to Prescribers**

257.     The Marketing Defendants' sales representatives executed carefully crafted marketing tactics, developed at the highest rungs of their corporate ladders, to reach targeted doctors and hospitals with centrally orchestrated messages. The Marketing Defendants' sales

representatives also distributed third-party marketing material to their target audience that was deceptive. The Marketing Defendants' direct contact with prescribers was, by far, their most important means of disseminating the false narrative and increasing opioid prescriptions, and, accordingly, their sales.

258.    Each Marketing Defendant promoted opioids through sales representatives (also called "detailers") and, in consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that small group speaker programs were designed to reach out to individual prescribers. By establishing close relationships with doctors, the Marketing Defendants were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to promote their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

259.    In accordance with common industry practice, the Marketing Defendants purchased and closely analyzed prescription sales data from IMS Health (now IQVIA), a healthcare data collection, management, and analytics corporation. This data allowed them to precisely track the rates of initial and renewal prescribing by individual doctors, which allowed them to target and tailor their appeals. Sales representatives visited hundreds of thousands of doctors and disseminated the misinformation and materials described above.

260.    Marketing Defendants devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, Marketing Defendants spent $166 million on detailing branded opioids to doctors. This amount is twice as much as Marketing Defendants spent on detailing in 2000. The amount includes $34 million by Janssen, $13 million by Teva, and $10 million by Endo.

261.    Cephalon's quarterly spending steadily climbed from below $1 million in 2000 to more than $3 million in 2014 (and more than $13 million for the year), with a peak, coinciding with the launch of Fentora, of more than $27 million in 2007, as shown below:



262.    For its opioid, Actiq, Cephalon also engaged in direct marketing in direct contravention of the FDA's strict instructions that Actiq be prescribed only to terminal cancer patients and by oncologists and pain management doctors experienced in treating cancer pain.

263.    Endo's quarterly spending went from the $2 million to $4 million range in 2000-2004 to more than $10 million following the launch of Opana ER in mid-2006 (and more than $38 million for the year in 2007) and more than $8 million coinciding with the launch of a reformulated version in 2012 (and nearly $34 million for the year), as shown below:



264.    Janssen's quarterly spending dramatically rose from less than $5 million in 2000 to more than $30 million in 2011, coinciding with the launch of Nucynta ER (with yearly spending at $142 million for 2011), as shown below:



265.    Abbott, which was tasked with marketing Purdue's products to hospitals, heavily incentivized its staff to push OxyContin, offering $20,000 cash prizes and luxury vacations to top performers. Abbott's almost religious zeal to sell the drug is evident in the wide use of terminology from the Middle Ages Crusades: Sales reps were called "royal crusaders" and "knights" in internal documents, and they were supervised by the "Royal Court of OxyContin" – executives referred to in memos as the "Wizard of OxyContin," "Supreme Sovereign of Pain Management," and the "Empress of Analgesia." The head of pain care sales, Jerry Eichhorn, was the "King of Pain," and signed memos simply as "King."



### 2. The Marketing Defendants Deceptively Directed Front Groups to Promote Opioid Use

266. Patient advocacy groups and professional associations also became vehicles to reach prescribers, patients, and policymakers. Marketing Defendants exerted influence and effective control over the messaging by these groups by providing major funding directly to them, as well as through KOLs who served on their boards. These "Front Groups" put out patient education materials, treatment guidelines and CMEs that supported the use of opioids for chronic pain, overstated the benefits of opioids, and understated their risks.[116] Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages – often at the expense of the Front Groups' own constituencies.

---

[116] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Members' Office, *Fueling an Epidemic, Report Two: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Feb. 12, 2018), https://www.hsdl.org/?abstract&did=808171 ("*Fueling an Epidemic, Part Two*"), at p. 3.

267.    "Patient advocacy organizations and professional societies like the Front Groups 'play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public.'"[117] "Even small organizations – with 'their large numbers and credibility with policymakers and the public' – have 'extensive influence in specific disease areas.' Larger organizations with extensive funding and outreach capabilities 'likely have a substantial effect on policies relevant to their industry sponsors.'"[118] Indeed, the U.S. Senate's report, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*,[119] which arose out of a 2017 Senate investigation and, drawing on disclosures from Janssen and other opioid manufacturers, "provides the first comprehensive snapshot of the financial connections between opioid manufacturers and advocacy groups and professional societies operating in the area of Office opioids policy,"[120] found that the Marketing Defendants made millions of dollars' worth of contributions to various Front Groups.[121]

268.    The Marketing Defendants also "made substantial payments to individual group executives, staff members, board members, and advisory board members" affiliated with the Front Groups subject to the Senate Committee's study.[122]

269.    As the Senate's *Fueling an Epidemic* Report found, the Front Groups "amplified or issued messages that reinforce industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic

---

[117] *Id.* at p. 2.

[118] *Id.*

[119] *Id.* at p. 1.

[120] Meeting Notice, Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee; Notice of Meeting, May 25, 2015, 80 FR 30686.

[121] *Id.*

[122] *Id.* at p. 10.

pain."[123] They also "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for over prescription and misbranding."[124]

270.    The Marketing Defendants took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that Defendants were consistently in control of their content. By funding, directing, editing, approving, and distributing these materials, Defendants exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and through the Front groups, with each working with the other to deceptively promote the use of opioids for the treatment of chronic pain.

### a.    American Pain Foundation

271.    The most prominent of the Front Groups was the APF. While APF held itself out as an independent patient advocacy organization, in reality, it received 90% of its funding in 2010 from the drug and medical-device industry, including from Defendants Endo, Janssen, and Cephalon. APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo was APF's largest donor and provided more than half of its $10 million in funding from 2007 to 2012.

272.    For example, APF published a guide sponsored by Cephalon titled *Treatment Options: A Guide for People Living with Pain* and distributed 17,200 copies of this guide in one year alone, according to its 2007 annual report. This guide contains multiple misrepresentations regarding opioid use, which are discussed *supra*.

---

[123] *Id.* at 12-15.
[124] *Id.* at 12.

273.    APF also developed the NIPC, which ran a facially unaffiliated website, *www.painknowledge.org*. NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field. NIPC published unaccredited prescriber education programs (accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies), including a series of "dinner dialogues." But it was Endo that substantially controlled NIPC, by funding NIPC projects, developing, specifying, and reviewing its content, and distributing NIPC materials. Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan Endo submitted to the FDA. Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or on *www.painknowledge.org*. Endo estimated it would reach 60,000 prescribers through NIPC.

274.    APF was often called upon to provide "patient representatives" for the Marketing Defendants' promotional activities including Janssen's "*Let's Talk Pain*." Although APF presented itself as a patient advocacy organization, it functioned largely as an advocate for the interests of the Marketing Defendants, not patients.

275.    In practice, APF operated in close collaboration with Defendants, submitting grant proposals seeking to fund activities and publications suggested by Defendants and assisting in marketing projects for Defendants.

276.    APF's Board of Directors was largely comprised of doctors who were on the Marketing Defendants' payrolls, either as consultants or as speakers for medical events. The close relationship between APF and the Marketing Defendants demonstrates APF's lack of independence in its finances, management, and mission, and APF's willingness to allow Marketing Defendants to control its activities and messages supports an inference that each Defendant that

worked with it was able to exercise editorial control over its publications – even when Defendants'
messages contradicted APF's internal conclusions.

277.    In May 2012, the U.S. Senate Finance Committee began looking into APF to
determine the links, financial and otherwise, between the organization and the manufacturers of
opioid painkillers. Within days of being targeted by the Senate investigation, APF's board voted
to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to
exist, effective immediately." Without support from Marketing Defendants, to whom APF could
no longer be helpful, APF was no longer financially viable.

### b.    American Academy of Pain Medicine and the American Pain Society

278.    The American Academy of Pain Medicine ("AAPM") and the American Pain
Society ("APS") are professional medical societies, each of which received substantial funding
from Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement that endorsed
opioids to treat chronic pain and claimed that the risk that patients would become addicted to
opioids was low.[125] The consensus statement, which also formed the foundation of the 1998
Guidelines, was published on the AAPM's website.

279.    AAPM's corporate council includes Assertio, Teva, and other pharmaceutical
companies. AAPM's past presidents include Haddox (1998), Dr. Scott Fishman ("Fishman")
(2005), Dr. Perry G. Fine ("Fine") (2011) and Dr. Lynn R. Webster ("Webster") (2013), all of
whose connections to the opioid manufacturers are well-documented as set forth below.

---

[125] *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997), a*vailable at*
http://www.stgeorgeutah.com/wp-
content/uploads/2016/05/OPIOIDES.DOLORCRONICO.pdfhttp://www.stgeorgeutah.com/wp-
content/uploads/2016/05/OPIOIDES.DOLORCRONICO.pdf.

280.    Fishman, who also served as a KOL for Marketing Defendants, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[126]

281.    AAPM has received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations.

282.    More specifically, Janssen paid $83,975 from 2012-2017 to AAPM.[127] Endo funded AAPM CMEs. Teva is on AAPM's corporate relations council.

283.    As to APS, Janssen paid $88,500 from 2012-2017.[128]

284.    AAPM describes its annual meeting as an "exclusive venue" for offering CME programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event. The conferences sponsored by AAPM heavily emphasized CME sessions on opioids – 37 out of roughly 40 at one conference alone.

285.    AAPM's staff understood that they and their industry funders were engaged in a common task. Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

---

[126] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), *available at* http://www.medscape.org/viewarticle/500829http://www.medscape.org/viewarticle/500829.
[127] *Fueling an Epidemic Part Two*, *supra* n. 116.
[128] *Id.*

286.     In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patients' addiction to opioids was low. Dr. David Haddox co-authored the AAPM/APS statement. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011.

287.     AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines"). AAPM, with the assistance, prompting, involvement, and funding of Defendants, issued the treatment guidelines discussed herein, and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21-panel members who drafted the 2009 Guidelines, including KOL Dr. Fine, received support from Defendants Janssen, Cephalon and Endo. Of these individuals, eight received support from Teva, nine from Janssen, and nine from Endo.

288.     Dr. Gilbert Fanciullo, now retired as a professor at Dartmouth College's Geisel School of Medicine, who served on the AAPM/APS Guidelines panel, has since described them as "skewed" by drug companies and "biased in many important respects," including the high presumptive maximum dose, lack of suggested mandatory urine toxicology testing, and claims of a low risk of addiction.

289.     The 2009 Guidelines have been a particularly effective channel of deception. They have influenced not only treating physicians, but also the scientific literature on opioids; they were reprinted in the Journal of Pain, have been cited hundreds of times in academic literature, were disseminated during the relevant time period, and were and are available online. Treatment guidelines are especially influential with primary care physicians and family doctors to whom Marketing Defendants promoted opioids and whose lack of specialized training in pain management and opioids makes them more reliant on, and less able to evaluate, these guidelines.

290.    For that reason, the CDC has recognized that treatment guidelines can "change prescribing practices."[129]

291.    The 2009 Guidelines are relied upon by doctors, especially general practitioners and family doctors who have no specific training in treating chronic pain.

292.    The Marketing Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions, their involvement in the development of the Guidelines, or their financial backing of the authors of these Guidelines. For example, a speaker presentation prepared by Endo in 2009 titled *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain* relies on the AAPM/APS 2009 Guidelines while omitting their disclaimer regarding the lack of evidence for recommending the use of opioids for chronic pain.

### c.    The Federation of State Medical Boards

293.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.

294.    The FSMB finances opioid- and pain-specific programs through grants from Defendants.

295.    Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies." The 1998 Guidelines – that the pharmaceutical companies helped

---

[129] CDC Guideline, *supra* n. 26.

author – taught not that opioids could be appropriate in only limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

296.    A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including physicians who served the Tribe and its citizens.

297.    FSMB's 2007 publication *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including Endo and Cephalon.

298.    The publication also received support from the American Pain Foundation (APF) and the American Academy of Pain Medicine (AAPM). The publication was written by Dr. Fishman, and Dr. Fine served on the Board of Advisors. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards.[130] The FSMB website describes the book as "the leading continuing medical education (CME) activity for prescribers of opioid medications." This publication asserted that opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins; that pain is under-treated, and that patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient.[131]

299.    The Marketing Defendants relied on the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription

---

[130] Email from Dr. Scott Fishman to Charles Ornstein, ProPublica (Dec. 15, 2011), https://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdfhttps://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdf.
[131] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* 8-9 (Waterford Life Sciences 2007).

decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

300.    Dr. Fishman said that he did not receive any payments from FSMB or any royalties from the publisher because he wanted to avoid the perception of a potential conflict of interest in his authorship of the book or for the ongoing efforts of FSMB. This is because prior to 2011, he had been scrutinized for his involvement with the front groups/manufacturers and accepting payments.[132]

301.    The Manufacturing Defendants made additional contributions to the FSMB to further their misleading advertising. For example, Cephalon paid FSMB $180,000 over a 3-year period, 2007-2008 and 2011.[133] Endo paid FSMB $371,620 over a 5-year period.[134]

**d.    The Alliance for Patient Access**

302.    Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[135] It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006.[136] As of July 2019, the APA listed 34 "Associate Members and Financial Supporters." The list includes J&J, Allergan, and Teva.

---

[132]    Email    from    Dr.    Scott    Fishman    to    Charles    Ornstein,    ProPublica    (Dec.    15,    2011), https://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdf.
[133] *Id.*
[134] *Id.*
[135]    The    Alliance    for    Patient    Access,    *About    AFPA*,    http://allianceforpatientaccess.org/about-afpa/#membershiphttp://allianceforpatientaccess.org/about-afpa/#membership.    References    herein    to    APA    include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.
[136] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access uses journalists and politicians to push Big Pharma's agenda*,    Health    News    Review    (Oct.    2,    2017),    https://www.healthnewsreview.org/2017/10/non-profit-alliance-

303.    APA's board members have also directly received substantial funding from pharmaceutical companies.[137] For instance, board vice president Dr. Srinivas Nalamachu ("Nalamachu"), who practices in Kansas, received more than $800,000 from 2013 through 2015 from pharmaceutical companies – nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from Defendants Endo and Cephalon. Other board members include Dr. Robert A. Yapundich from North Carolina, who received $215,000 from 2013 through 2015 from pharmaceutical companies, including payments by defendant Cephalon; Dr. Jack D. Schim from California, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, and Cephalon; Dr. Howard Hoffberg from Maryland, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, and Cephalon; and Dr. Robin K. Dore from California, who received $700,000 between 2013 and 2015 from pharmaceutical companies.

304.    Among its activities, APA issued a "white paper" titled "*Prescription Pain Medication: Preserving Patient Access While Curbing Abuse.*"[138] Among other things, the white paper criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.

                                                    ***

---

patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ ("Jaklevic, *Non-profit Alliance for Patient Access*").

[137] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, *available at* https://projects.propublica.org/docdollars/.

[138] Alliance for Patient Access, *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse*, (Oct. 2013),    http://1yh21u3cjptv3xjder1dco9mx5s.wpengine.netdna-cdn.com/wp-content/uploads/2013/01/PT_White-Paper_Finala.pdf.

In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face the loss of their professional licensure. Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff. Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives. . .

We cannot merely assume that these programs will reduce prescription pain medication use and abuse.[139]

305.    The white paper also purports to express concern about policies that have

been enacted in response to the prevalence of pill mills:

Although well intentioned, many of the policies designed to address this problem have made it difficult for legitimate pain management centers to operate. For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board-certified medical director, may need to pay for annual inspections, and are subject to increased record keeping and reporting requirements. . .. [I]t is not even certain that the regulations are helping prevent abuses.[140]

In addition, in an echo of earlier industry efforts to push back against what they termed

"opiophobia," the

white paper laments the stigma associated with prescribing and taking pain medication:

Both pain patients and physicians can face negative perceptions and outright stigma. When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong – or even criminal. . .. Physicians can face similar stigma from peers. Physicians in non-pain specialty areas often look down on those who specialize in pain management – a situation fueled by the numerous regulations and fines that surround prescription pain medications.[141]

---

[139] *Id*. at 4-5 (footnote omitted).

[140] *Id.* at 5-6.
[141] *Id.* at 6.

In conclusion, the white paper states that "[p]rescription pain medications, and specifically opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that do not adequately respond to over-the-counter drugs."[142]

306.    The APA also issues "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015. The awards were funded by a $7.8 million donation from unnamed donors. While the awards are ostensibly given for protecting patients' access to Medicare and are thus touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they were generally given to members of Congress who supported the APA's agenda.[143]

307.    The APA also lobbies Congress directly. In 2015, the APA signed onto a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the CSA.[144] The AAPM is also a signatory to this letter. An internal DOJ memo stated that the proposed bill "'could actually result in increased diversion, abuse, and public health and safety consequences'"[145] and, according to DEA chief administrative law judge John J. Mulrooney, the law would make it "all but logically impossible" to prosecute manufacturers and distributors, like Defendants here, in the courts.[146] The law passed both Houses of Congress and was signed into law in 2016.

e.    **The U.S. Pain Foundation**

---

[142] *Id.* at 7.

[143] Jaklevic, *Non-profit Alliance for Patient Access*, *supra* n. 136.

[144] Letter from Alliance for Patient Access, et al., to Congressmen Tom Marino, Marsha Blackburn, Peter Welch, and Judy Chu (Jan. 26, 2015).

[145] Bill Whitaker, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress*, CBS NEWS (last updated Oct. 17, 2017) https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-congress/.

[146] John J. Mulrooney, II & Katherine E. Legel, *Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters*, 101 Marquette L. Rev. (forthcoming Feb. 2018), https://www.documentcloud.org/documents/4108121-Marquette-Law-Review-Mulrooney-Legel.html.

308.    The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections and interpersonal relationships with the Marketing Defendants. The USPF was one of the largest recipients of contributions from the Marketing Defendants, collecting nearly $3 million in payments between 2012 and 2015 alone.[147] The USPF was also a critical component of the Marketing Defendants' lobbying efforts to reduce the limits on over-prescription. The U.S. Pain Foundation advertised its ties to the Marketing Defendants, listing opioid manufacturers like Pfizer, Teva, Assertio, Endo, and McNeil (i.e. Janssen) as "Platinum," "Gold," and "Basic" corporate members.[148] Industry Front Groups like the American Academy of Pain Management, the American Academy of Pain Medicine, the American Pain Society, and PhRMA are also members of varying levels in the USPF. More specifically, Janssen paid $41,500 from 2012-2017[149].

### f.    American Geriatrics Society

309.    The AGS was another Front Group with systematic connections and interpersonal relationships with the Marketing Defendants. The AGS was a large recipient of contributions from the Marketing Defendants, including Endo and Janssen. AGS contracted with Endo and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (*The Management of Persistent Pain in Older Persons*, hereinafter "2002 AGS Guidelines") and 2009 (*Pharmacological Management of Persistent Pain in Older Persons*,[150] hereinafter "2009 AGS Guidelines"). According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009.[151] AGS's complicity in the common purpose with the Marketing

---

[147] *Fueling an Epidemic Part Two*, *supra* n. 116 at p. 4.
[148] *Id*. at 12; U.S. Pain Foundation, *Transparency*, https://uspainfoundation.org/transparency/.
[149] *Id.*
[150] Ferrell B et al., *Pharmacological Management of Persistent Pain in Older Persons*, 57 J. Am. Geriatrics Soc'y 1331 (2009), https://www.ncbi.nlm.nih.gov/pubmed/19573219 ("2009 AGS Guidelines").
[151] John Fauber & Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly*, MILWAUKEE J. SENTINEL (May 30, 2012), https://www.medpagetoday.com/geriatrics/painmanagement/32967.

Defendants is evidenced by the fact that AGS internal discussions in August 2009 reveal that it did not want to receive upfront funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate pro-opioid publications.

310.    The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy." The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable for patients, even with a prior history of drug abuse.[152] These Guidelines further recommended that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." These recommendations are not supported by any study or other reliable scientific evidence. Nevertheless, they have been cited over 500 times in Google Scholar (which allows users to search scholarly publications that would have been relied on by researchers and prescribers) since their 2009 publication and as recently as this year.

311.    One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the Guidelines were influenced by contributions that drug companies, including Endo, Janssen, and Teva, made to the sponsoring organizations and committee members.

312.    Dr. Bruce Farrell was an AGS task force chairman for the 2009 Guidelines, but was also a paid speaker for Endo, and he helped conduct a CME for treating osteoarthritis pain.[153]

313.    Representatives of the Marketing Defendants, often at informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue. AGS then

---

[152] 2009 AGS Guidelines, *supra* n. 150 at 1342.

[153] John Fauber & Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly*, MILWAUKEE J. SENTINEL (May 30, 2012), https://www.medpagetoday.com/geriatrics/painmanagement/32967.

submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

314.    Members of AGS Board of Directors were doctors who were on the Marketing Defendants' payrolls, either as consultants or as speakers for medical events. As described below, many of the KOLs also served in leadership positions within the AGS.

### g.    American Chronic Pain Association

315.    The Marketing Defendants also made substantial payments to the American Chronic Pain Association ("ACPA"). Founded in 1980, the ACPA offers support and education for people suffering from chronic pain. Contributions to the ACPA from the Manufacturing Defendants include $50,000 from Janssen from 2012-2017.[154] Between 2013 and 2016, 10 members of ACPA's Advisory Board received more than $140,000 from opioid manufacturers, including Endo.

### 3.    The Marketing Defendants Deceptively Paid KOLs to Promote Opioid Use

316.    To falsely promote their opioids, the Marketing Defendants paid and cultivated a select circle of doctors who were chosen and sponsored by the Marketing Defendants for their supportive messages. As set forth below, pro-opioid doctors have been at the hub of the Marketing Defendants' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that science and legitimate medical professionals favored the wider and broader use of opioids. These doctors include Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman.

317.    Although these KOLs were funded by the Marketing Defendants, the KOLs were used extensively to present the appearance that unbiased and reliable medical research supporting

---

[154] *Fueling an Epidemic, Part Two*, *supra* n. 116.

the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals.

318.    As the Marketing Defendants' false marketing scheme picked up steam, these pro-opioid KOLs wrote, consulted on, edited, and lent their names to books and articles, and gave speeches and CMEs supportive of opioid therapy for chronic pain. They served on committees that developed treatment guidelines that strongly encouraged the use of opioids to treat chronic pain, and they were placed on boards of pro-opioid advocacy groups and professional societies that developed, selected, and presented CMEs.

319.    Through use of their KOLs and strategic placement of these KOLs throughout every critical distribution channel of information within the medical community, the Marketing Defendants were able to exert control of each of these modalities through which doctors receive their information.

320.    In return for their pro-opioid advocacy, the Marketing Defendants' KOLs received money, prestige, recognition, research funding, and avenues to publish. For example, Dr. Webster has received funding from Endo and Cephalon. Dr. Fine has received funding from Janssen, Cephalon, and Endo.

321.    The Marketing Defendants carefully vetted their KOLs to ensure that they were likely to remain on-message and supportive of the Marketing Defendants' agenda. The Marketing Defendants also kept close tabs on the content of the materials published by these KOLs. Of course, the Marketing Defendants also kept these KOLs well-funded, enabling them to push the Marketing Defendants' deceptive message out to the medical community.

322.    Once the Marketing Defendants identified and funded KOLs and those KOLs began to publish "scientific" papers supporting the Marketing Defendants' false position that opioids

were safe and effective for the treatment of chronic pain, the Marketing Defendants poured significant funds and resources into a marketing machine that widely cited and promoted their KOLs and studies or articles by their KOLs to drive prescriptions of opioids for chronic pain. The Marketing Defendants cited to, distributed, and marketed these studies and articles by their KOLs as if they were independent medical literature so that it would be well-received by the medical community. By contrast, the Marketing Defendants did not support, acknowledge, or disseminate the truly independent publications of doctors critical of the use of chronic opioid therapy.

323.    In their promotion of the use of opioids to treat chronic pain, the Marketing Defendants' KOLs knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves and the Marketing Defendants.

### a.      Dr. Russell Portenoy

324.    In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[155]

325.    Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> *The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs.* This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial

---

[155] Russell Portenoy & Kathy Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases*, 25(2) Pain 171 (1986), https://www.ncbi.nlm.nih.gov/pubmed/2873550.

analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*[156] (emphasis added).

According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[157]

326.    Despite having taken this position on long-term opioid treatment, Dr. Portenoy ended up becoming a spokesperson for Marketing Defendants, promoting the use of prescription opioids, and minimizing their risks. A respected leader in the field of pain treatment, Dr. Portenoy was highly influential. Dr. Andrew Kolodny, co-founder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure.

327.    Dr. Portenoy was also a critical component of the Marketing Defendants' control over their Front Groups. Specifically, Dr. Portenoy sat as a Director on the board of the APF. He was also the President of the APS.

328.    In recent years, some of the Marketing Defendants' KOLs have conceded that many of their past claims in support of opioid use lacked evidence or support in the scientific literature.[158] Dr. Portenoy has now admitted that he minimized the risks of opioids,[159] and that he "gave

---

[156] Russell Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields and J.C. Liebeskind eds., 1994) (emphasis added).
[157] *Id.*
[158] *See*, *e.g.*, John Fauber, *Painkiller boom fueled by networking*, Journal Sentinel (Feb. 18, 2012), http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html/ (reporting that a key Endo KOL acknowledged that opioid marketing went too far).
[159] Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, THE NEW YORKER (Nov. 8, 2013), https://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic.

innumerable lectures in the late 1980s and '90s about addiction that weren't true."[160] He mused, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, against the standards of 2012, I guess I did . . ."[161]

329.    In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, *none of which represented real evidence*, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they hadn't before. *In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.*[162]

330.    Several years earlier, when interviewed by journalist Barry Meier for his 2003 book, *Pain Killer*, Dr. Portenoy was more direct: "It was pseudoscience. I guess I'm going to have always to live with that one."[163]

**b.    Dr. Lynn Webster**

331.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a Front Group that ardently supports chronic opioid therapy. He is a Senior Editor of Pain Medicine, the same journal that published Endo's

---

[160] Thomas Catan and Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, THE WALL STREET JOURNAL (Dec. 17, 2012), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.
[161] *Id.*
[162] Harrison Jacobs, *This one-paragraph letter may have launched the opioid epidemic*, BUSINESS INSIDER (May 26, 2016), http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5; Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011), https://www.youtube.com/watch?v=DgyuBWN9D4w&feature=youtu.be.
[163] *Pain Killer, supra* n. 80, at 277.

special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon and Endo. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

332.    Dr. Webster created and promoted the Opioid Risk Tool, a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors the confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool ("ORT") appear on, or are linked to, websites run by Endo and Janssen. In 2011, Dr. Webster presented, via webinar, a program titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk*. Dr. Webster recommended the use of risk screening tools, urine testing, and patient agreements to prevent "overuse of prescriptions" and "overdose deaths."

333.    Dr. Webster was himself tied to numerous overdose deaths. The DEA investigated him and the Lifetree Clinic for overprescribing opioids after twenty patients died from overdoses. In keeping with the Marketing Defendants' promotional messages, Dr. Webster apparently believed the solution to patients' tolerance or addictive behaviors was more opioids: he prescribed staggering quantities of pills.

334.    At an AAPM annual meeting held February 22 through 25, 2006, Cephalon sponsored a presentation by Webster and others titled, "Open-label study of fentanyl effervescent buccal tablets in patients with chronic pain and breakthrough pain: Interim safety results." The presentation's agenda description states: "Most patients with chronic pain experience episodes of breakthrough pain, yet no currently available pharmacologic agent is ideal for its treatment." The

presentation purports to cover a study analyzing the safety of a new form of fentanyl buccal tablets in the chronic pain setting and promises to show the "[i]nterim results of this study suggest that [fentanyl buccal] is safe and well-tolerated in patients with chronic pain and [breakthrough pain]." This CME effectively amounted to off-label promotion of Cephalon's opioids, even though they were approved only for cancer pain.

335.    Cephalon sponsored a CME written by Dr. Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating breakthrough pain because of dose limitations on the non-opioid component.

### c.    Dr. Perry Fine

336.    Dr. Perry Fine's ties to the Marketing Defendants have been well documented. He has authored articles and testified in court cases and before state and federal committees, and he, too, has argued against legislation restricting high-dose opioid prescriptions for non-cancer patients. He has provided medical legal consulting for Janssen and participated in CME activities for Endo, along with serving in these capacities for several other drug companies. He co-chaired the APS-AAPM Opioid Guideline Panel, served as treasurer of the AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and was also on the board of directors of APF.[164]

337.    Multiple videos feature Dr. Fine delivering educational talks about prescription opioids. He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith before her death for pain did not make her an addict.

---

[164] Scott M. Fishman, MD, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306 (13) JAMA 1445 (Sept. 20, 2011), https://jamanetwork.com/journals/jama/article-abstract/1104464?redirect=true.

338.    Dr. Fine has also acknowledged having failed to disclose numerous conflicts of interest. For example, Dr. Fine failed to fully disclose payments received as required by his employer, the University of Utah – telling the university that he had received under $5,000 in 2010 from Johnson & Johnson for providing "educational" services, but Johnson & Johnson's website states that the company paid him $32,017 that year for consulting, promotional talks, meals, and travel.[165]

339.    Dr. Fine and Dr. Portenoy co-wrote *A Clinical Guide to Opioid Analgesia* in which they downplayed the risks of opioid treatment such as respiratory depression and addiction:

> At clinically appropriate doses . . . respiratory rate typically does not decline. Tolerance to the respiratory effects usually develops quickly, and doses can be steadily increased without risk.

> Overall, the literature provides evidence that the outcomes of drug abuse and addiction are rare among patients who receive opioids for a short period (i.e., for acute pain) and among those with no history of abuse who receive long-term therapy for medical indications.[166]

340.    In November 2010, Dr. Fine and others published an article presenting the results of another Cephalon-sponsored study titled "Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study."[167] In that article, Dr. Fine explained that the 18-month "open-label" study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for non-

---

[165] Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry.

[166] Perry G. Fine, MD and Russell K. Portenoy, MD, *A Clinical Guide to Opioid Analgesia* 20 and 34, McGraw-Hill Companies (2004), http://www.thblack.com/links/RSD/OpioidHandbook.pdf.
[167] Perry G. Fine et al., *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).

cancer pain."[168] The article acknowledged that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic non-cancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[169]

341.    The article concluded: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in most cases, predictable, manageable, and tolerable." They also conclude that the number of abuse-related events was "small."[170]

342.    Multiple videos feature Dr. Fine delivering educational talks about the drugs. In one video from 2011 titled "Optimizing Opioid Therapy," he sets forth a "Guideline for Chronic Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) not only for cancer patients, but also for non-cancer patients, and suggests it may take four or five switches over a person's "lifetime" to manage pain.[171] He states the "goal is to improve effectiveness which is different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events *over the course of years*."[172] The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids can be used to treat *sleep apnea*. He further states

---

[168] *Id.*
[169] *Id.*
[170] *Id.*
[171] Perry A. Fine, M.D., *Safe and Effective Opioid Rotation*, YouTube.com (Nov. 8, 2012), https://www.youtube.com/watch?v=_G3II9yqgXI.
[172] *Id.*

that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture."[173]

### d.     Dr. Scott Fishman

343.     Dr. Scott Fishman is a physician whose ties to the opioid drug industry are multitudinous. He has served as an APF board member and as president of the AAPM and has participated yearly in numerous CME activities for which he received "market rate honoraria." As discussed below, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Marketing Defendants. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. He has acknowledged his failure to disclose all potential conflicts of interest in a letter in the *Journal of the American Medical Association* titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."[174]

344.     Dr. Fishman authored a physician's guide on the use of opioids to treat chronic pain titled "Responsible Opioid Prescribing" in 2007, which promoted the notion that long-term opioid treatment was a viable and safe option for treating chronic pain.

345.     In 2012, Dr. Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, it's critical to remember that the problem of unrelieved pain remains as urgent as ever.[175]

---

[173] *Id.*

[174] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13) JAMA 1445 (2011); Weber, *Two Leaders in Pain*, *supra* n. 165.

[175] Scott M. Fishman, *Responsible Opioid Prescribing: A Guide for Michigan Clinicians*, 10-11 (Waterford Life Sciences 2012).

The updated guide still assures that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins."[176]

346.    In another guide by Dr. Fishman, he continues to downplay the risk of addiction: "I believe clinicians must be cautious with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict."[177] The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."

### 4.    The Marketing Defendants Disseminated Their Misrepresentations Through CME Programs

347.    Now that the Marketing Defendants had both a group of physician promoters and had built a false body of "literature," Defendants needed to make sure their false marketing message was widely distributed.

348.    One way the Marketing Defendants aggressively distributed their false message was through countless continuing medical education programs ("CME").

349.    Doctors are required to attend a certain number and, often, the type of CME programs each year as a condition of their licensure. These programs are generally delivered in person, often in connection with professional organizations' conferences, online, or through written publications. Doctors rely on CMEs not only to satisfy licensing requirements but also to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because CMEs typically are taught by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

---

[176] *Id.*
[177] Scott M. Fishman, *Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication* 45 (Oxford University Press 2012).

350. The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation. As one target, Defendants aimed to reach general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to the Marketing Defendants' deceptions.

351. The Marketing Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain, focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids, and frequently omitted or downplayed their risks and adverse effects.

352. Cephalon sponsored numerous CME programs, which were made widely available through organizations like Medscape, LLC ("Medscape") and which disseminated false and misleading information to physicians across the country.

353. Another Cephalon-sponsored CME presentation titled *Breakthrough Pain: Treatment Rationale with Opioids* was available on Medscape starting September 16, 2003 and was given by a self-professed pain management doctor who "previously operated back, complex pain syndromes, the neuropathies, and interstitial cystitis." He describes the pain process as a non-time-dependent continuum that requires a balanced analgesia approach using "targeted pharmaco therapeutics to affect multiple points in the pain-signaling pathway."[178] The doctor lists fentanyl as one of the most effective opioids available for treating breakthrough pain, describing its use as

---

[178] Daniel S. Bennett, *Breakthrough Pain: Treatment Rationale With Opioids*, Medscape, http://www.medscape.org/viewarticle/461612.

an expected and normal part of the pain management process.[179] Nowhere in the CME is cancer or cancer-related pain even mentioned, despite FDA restrictions that fentanyl use be limited to cancer-related pain.

354.    Teva paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain. The CME is still available online.

355.    *Responsible Opioid Prescribing* was sponsored by Endo and Teva. The FSMB website described it as the "leading continuing medical education (CME) activity for prescribers of opioid medications." Endo sales representatives distributed copies of *Responsible Opioid Prescribing* with a special introductory letter from Dr. Fishman.

356.    In all, more than 163,000 copies of *Responsible Opioid Prescribing* were distributed nationally.

357.    The American Medical Association ("AMA") recognized the impropriety that pharmaceutical company-funded CMEs create, stating that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urged that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."[180]

358.    Physicians attended or reviewed CMEs sponsored by the Marketing Defendants during the relevant time period and were misled by them.

---

[179] *Id.*
[180] Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011).

359.    By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, the Marketing Defendants expected and understood that instructors would deliver messages favorable to them, as these organizations were dependent on the Marketing Defendants for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Marketing Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids. Producers of CMEs and the Marketing Defendants both measure the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

## 5.   The Marketing Defendants Used "Branded" Advertising to Promote Their Products to Doctors and Consumers

360.    The Marketing Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Marketing Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the Journal of Pain and Clinical Journal of Pain, to journals with wider medical audiences, such as the Journal of the American Medical Association. The Marketing Defendants collectively spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001. The 2011 total includes $4.9 million by Janssen and $1.1 million by Endo.

361.    The Marketing Defendants also targeted consumers in their advertising. They knew that physicians are more likely to prescribe a drug if a patient specifically requests it.[181] They also knew that this willingness to acquiesce to such patient requests holds true even for opioids and for

---

[181] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it, compared with 1% of those making no specific request. J.B. McKinlay et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52(2) Med. Care 294 (2014).

conditions for which they are not approved.[182] Endo's research, for example, found that such communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. The Marketing Defendants thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physician's office.

### 6.    The Marketing Defendants Used "Unbranded" Advertising to Promote Opioid Use for Chronic Pain Without FDA Review

362.    The Marketing Defendants also aggressively promoted opioids through "unbranded advertising" to generally tout the benefits of opioids without specifically naming a particular brand-name opioid drug. Instead, unbranded advertising is usually framed as "disease awareness" – encouraging consumers to "talk to your doctor" about a certain health condition without promoting a specific product and, therefore, without providing balanced disclosures about the product's limits and risks. In contrast, a pharmaceutical company's "branded" advertisement that identifies a specific medication and its indication (i.e., the condition which the drug is approved to treat) must also include possible side effects and contraindications – what the FDA Guidance on pharmaceutical advertising refers to as "fair balance." Branded advertising is also subject to FDA review for consistency with the drug's FDA-approved label. Through unbranded materials, the Marketing Defendants expanded the overall acceptance of and demand for chronic opioid therapy without the restrictions imposed by regulations on branded advertising.

### 7.    The Marketing Defendants Funded, Edited and Distributed Publications That Supported Their Misrepresentations

---

[182] *Id.*

363.    The Marketing Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was calculated to shape the perceptions of prescribers, patients, and payors. This literature served marketing goals, rather than scientific standards, and was intended to persuade doctors and consumers that the benefits of long-term opioid use outweighed the risks.

364.    To accomplish their goal, the Marketing Defendants – sometimes through third-party consultants and/or Front Groups – commissioned, edited, and arranged for the placement of favorable articles in academic journals.

365.    The Marketing Defendants' plans for these materials did not originate in the departments with the organizations that were responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients; rather, they originated in the Marketing Defendants' marketing departments.

366.    The Marketing Defendants made sure that favorable articles were disseminated and cited widely in the medical literature, even when the Marketing Defendants knew that the articles distorted the significance or meaning of the underlying study, as with the Porter & Jick letter. The Marketing Defendants also frequently relied on unpublished data or posters, neither of which are subject to peer review, but were presented as valid scientific evidence.

367.    The Marketing Defendants published or commissioned deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy.

368.    For example, in 2007 Cephalon sponsored the publication of an article titled "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Non-cancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate,"[183] published in the nationally circulated Journal of Pain Medicine, to support its effort to expand the use of its branded fentanyl products. The article's authors (including Dr. Webster, discussed above) stated that the "OTFC [fentanyl] has been shown to relieve BTP [breakthrough pain] more rapidly than conventional oral, normal-release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of non-cancer pain patients." The number-one-diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cites Portenoy and recommends fentanyl for non-cancer BTP patients:

369.    In summary, BTP appears to be a clinically important condition in patients with chronic non-cancer pain and is associated with an adverse impact on QoL. This qualitative study on the negative impact of BTP and the potential benefits of BTP-specific therapy suggests several domains that may be helpful in developing BTP-specific, QoL assessment tools.[184]

### 8.    The Marketing Defendants Used Speakers' Bureaus and Programs to Spread Their Deceptive Messages

370.    In addition to making sales calls, the Marketing Defendants' detailers also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers with meals paid for by the Marketing Defendants. These speaker programs and associated speaker training served three purposes: they provided 1) an incentive to doctors to prescribe, or

---

[183] Donald R. Taylor et al., *Impact of Breakthrough Pain on Quality of Life in Patients With Chronic, Non-cancer Pain: Patient Perceptions and Effect of Treatment With Oral Transmucosal Fentanyl Citrate (OTFC, ACTIQ)*, 8(3) Pain Med. 281-88 (Mar. 2007), *available at* https://academic.ouop.com/painmedicine/article/8/3/281/1829094.
[184] *Id.*

increase their prescriptions of, a particular drug; 2) an opportunity for doctors to be selected to attend forum at which the drug companies could further market to the speaker himself or herself; and 3) an opportunity for the doctors to market to their peers. The Marketing Defendants graded their speakers, and future opportunities were based on speaking performance, post-program sales, and product usage. Janssen, Endo, and Cephalon each made thousands of payments to physicians nationwide, for activities including participating on speakers' bureaus, providing consulting services, and other services.

## C. The Marketing Defendants' Goal Was for More Patients to Take More Opioids at Higher Doses for Longer Periods of Time

### 1. The Marketing Defendants Focused on Vulnerable Populations In Order to Increase the Patient Population

371. The Marketing Defendants specifically targeted their marketing at two particularly vulnerable populations – the elderly and veterans – who tend to suffer from chronic pain.

372. The Marketing Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, a 2016 CDC Guideline observes that existing evidence confirms that elderly patients taking opioids suffer from elevated fall and fracture risks, reduced renal function and medication clearance, and a smaller window between safe and unsafe dosages.[185] Elderly patients taking opioids have also been found to have a greater risk for hospitalizations and increased vulnerability to adverse drug effects and interactions, such as respiratory depression. The 2016 CDC Guideline concludes that there must be "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients.[186]

### 2. Increasing Dosages and Increasing Them Quickly to Keep Patients on Longer

---

[185] CDC Guideline, *supra* n. 26.
[186] *Id*. at 27.

373.   In order to promote long-term sales, the Marketing Defendants promoted the prescription of higher dosages of opioids. There were several dimensions to this. First, the Marketing Defendants charged more for the higher dosages. More importantly, patients who took higher dosages would stay on opioids longer.

374.   The Marketing Defendants' focus on increasing dosages, and increasing the duration of opioid usage, had devastating consequences for patients. Patients exposed to higher dosages, and for longer periods of time, are many times more likely to become addicted, and to overdose.

**D.   The Marketing Defendants' Scheme Succeeded, Creating a Public Health Epidemic**

**1.   The Marketing Defendants Dramatically Expanded Opioid Prescribing and Use**

375.   The Marketing Defendants necessarily expected a return on the enormous investment they made in their deceptive marketing scheme, and they worked to measure and expand their success. Their own documents show that they knew they were influencing prescribers and increasing prescriptions. Studies also show that in doing so, they fueled an epidemic of addiction and abuse.

376.   Cephalon also recognized the return of its efforts to market Actiq and Fentora off-label for chronic pain. In 2000, Actiq generated $15 million in sales. By 2002, Actiq sales had increased by 92%, which Cephalon attributed to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[187] Actiq became Cephalon's second best-selling drug.

---

[187]   Cephalon, Inc. Annual Report (Form 10-K) at 28 (Mar. 31, 2003), https://www.sec.gov/Archives/edgar/data/873364/000104746903011137/a2105971z10-k.htm.

By the end of 2006, Actiq's sales had exceeded $500 million.[188] Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. One measure suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[189]

377.    Each of the Marketing Defendants tracked the impact of their marketing efforts to measure their impact in changing doctors' perceptions and prescribing of their drugs. They purchased prescribing and survey data that allowed them to closely monitor these trends, and they did actively monitor them. For instance, they monitored doctors' prescribing before and after detailing visits and before and after speaker programs. Defendants continued and, in many cases, expanded and refined their aggressive and deceptive marketing for one reason: it worked. As described in this Complaint, both in specific instances (e.g., the low abuse potential of various Defendants' opioids), and more generally, Defendants' marketing changed prescribers' willingness to prescribe opioids, led them to prescribe more of their opioids, and persuaded them not to stop prescribing opioids or to switch to "safer" opioids, such as ADF.

378.    This success would have come as no surprise. Drug company marketing materially impacts doctors' prescribing behavior.[190] The effects of sale calls on prescribers' behavior are well

---

[188] John Carreyrou, *Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs*, THE WALL STREET JOURNAL (Nov. 3, 2006), https://www.wsj.com/articles/SB116252463810112292.

[189] *Id.*

[190] *See, e.g.*, P. Manchanda & P. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis*, 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); Ian Larkin et al., *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children*, 33(6) Health Affairs 1014 (2014), *available at* https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2013.0939?url_ver=Z39.88-2003&rfr_id=ori%3Arid%3Acrossref.org&rfr_dat=cr_pub%3Dpubmed& (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* A. Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am. J. Pub. Health 221 (2009) *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/ (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997 to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls) (hereinafter "*Commercial Triumph*").

documented in the literature. One study examined four practices, including visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on drug utilization. An additional study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

379.     Marketing Defendants spent millions of dollars to market their drugs to prescribers and patients, and meticulously tracked their return on that investment. In one recent survey published by the AMA, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic non-cancer pain.[191] These results are directly due to the Marketing Defendants' fraudulent marketing campaign focused on several misrepresentations.

380.     Thus, both independent studies and Defendants' own tracking confirm that Defendants' marketing scheme dramatically increased their sales.

2.     **The Marketing Defendants' Deception in Expanding Their Market Created and Fueled the Opioid Epidemic**

381.     Independent research demonstrates a close link between opioid prescriptions and opioid abuse. For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[192] It has been

---

[191] CS Hwang et al., *Prescription Drug Abuse: A National Survey of Primary Care Physicians*, 175 JAMA Intern. Med. 302 (2014), doi: 10.1001/jamainternmed.2014.6520, https://www.ncbi.nlm.nih.gov/pubmed/25485657.
[192] Theodore J. Cicero et al., *Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States*, 16 Pharmacoepidemiology and Drug Safety, 827-40 (2007), doi: 10.1002/pds.1452, https://www.cdhs.udel.edu/content-sub-site/Documents/Publications/Relationship%20Between%20Therapeutic%20Use%20and%20Abuse%20of%20Opioid%20Analgesics.pdf.

estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

382.   There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes." The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[193]

383.   In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

### E.   Each of the Marketing Defendants Made Materially Deceptive Statements and Concealed Material Facts

384.   As alleged herein, the Marketing Defendants made and/or disseminated deceptive statements regarding material facts and further concealed material facts in the course of manufacturing, marketing, and selling prescription opioids. The Marketing Defendants' actions were intentional and/or unlawful. Such statements include, but are not limited to, those set out below and alleged throughout this Complaint.

385.   As a part of their deceptive marketing scheme, the Marketing Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the United States. For example, the Marketing Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs but were less likely

---

[193] See Califf et al., supra n. 32.

to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept the Marketing Defendants' misrepresentations.

### 1.    **Endo**

386.    Defendant Endo made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.    Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.    Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.    Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high-risk patients;

d.    Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.    Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.    Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.    Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.    Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.      Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.      Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.      Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.      Directly distributing and assisting in the dissemination of literature written by pro- opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.     Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.      Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

## 2.   **Janssen**

387.   Defendant Janssen made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.      Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.      Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c.      Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

113

d.    Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e.    Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

f.    Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g.    Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including inpatient education materials, concerning the use of opioids to treat chronic non-cancer pain;

h.    Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

i.    Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

j.    Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.    Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

l.    Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

m.    Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

> n.    Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

**3.**    **Assertio**

388.    Defendant Assertio has, since at least October 2011, made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive with respect to Lazanda and (with the acquisition from Janssen in January 2015) of Nucynta and Nucynta ER, including, but not limited to:

> a.    Promoting the usage of Lazanda with patients not suffering from cancer;
>
> b.    Endorsing, supporting, and pressuring its sales representative to target pain management physicians, particularly those who historically wrote large numbers of Lazanda-like drugs;
>
> c.    Discouragement of sales representatives from targeting physicians treating cancer patients in contradiction to the FDA approved warning indicating that Lazanda is only indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain;"
>
> d.    Training of sales representatives on how to deal with pushback from physicians;
>
> e.    Promotion of Nucynta and Nucynta ER for all manner of pain management while downplaying the drug's addictive nature;
>
> f.    Promoting its drugs as a safer alternative than other opioids;
>
> g.    Telling investors that Lazanda is safe. August Moretti, Assertio's Senior Vice President and Chief Financial Officer, stated that "[a]lthough not in the label, there's a very low abuse profile and side effect rate."

**4.**    **Cephalon**

389.    Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

> a.    Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.   Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

c.   Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

d.   Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

e.   Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

f.   Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g.   Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

h.   Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

i.   Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

j,   Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

**5.  <u>Actavis</u>**

390.   Defendant Actavis made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.   Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

b.   Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

116

c.     Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

d.     Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

391.   A Kadian prescriber guide deceptively represents that Kadian is more difficult to abuse and less addictive than other opioids. Kadian's prescriber guide is full of disclaimers that Actavis has not done any studies on the topic and that the guide is "only intended to assist you in forming your own conclusion." However, the guide includes the following statements: 1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and 2) "KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action," "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine," "Long duration of action," and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state." The guide is copyrighted by Actavis in 2007 before Actavis officially purchased Kadian from Alpharma.

## VI.   DEFENDANTS THROUGHOUT THE SUPPLY PROCESS DELIBERATELY DISREGARDED THEIR DUTIES TO MAINTAIN EFFECTIVE CONTROLS AND TO IDENTIFY, REPORT, AND TAKE STEPS TO HALT SUSPICIOUS ORDERS

392.   The Marketing Defendants created a vastly and dangerously larger market for opioids. All of the Defendants compounded this harm by facilitating the supply of far more opioids than could have been justified to serve that market. The failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to not fill prescriptions that they knew or should have known were suspicious breached both their statutory and common law duties.

393.    Marketing Defendants' scheme was resoundingly successful. Chronic opioid therapy – the prescribing of opioids long-term to treat chronic pain – has become commonplace and often first-line treatment. Marketing Defendants' deceptive marketing caused prescribing not only of their opioids but also of opioids as a class, to skyrocket. According to the CDC, opioid prescriptions, as measured by the number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. While previously a small minority of opioid sales, today between 80% and 90% of opioids (measured by weight) used are for chronic pain. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids.

394.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[194] Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[195]

A.    **All Defendants Have, and Breached Duties to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders**

395.    Multiple sources impose duties on Defendants with respect to the supply of opioids, including the common law duty to exercise reasonable care.

396.    Each Defendant was also required to register with the Alabama Board of Pharmacy and certify compliance with Alabama law. The "Alabama Uniform Controlled Substances Act," Ala. Code 1975 §§ 20-2-1 *et seq*. provides, *inter alia*, that anyone who "manufactures, distributes,

---

[194] 2000-2014 Increases in Drug and Opioid Overdose Deaths, *supra* n. 46.
[195] *Id.*

or dispenses" any controlled substance in Alabama must obtain a registration annually. issued by the certifying boards. § 20-2-51(a). Such registrants must abide by the terms of their issued registration and act "in conformity with the other provisions of this article." § 20-2-51(b). Ala. Code 1975 §§ 20-2-56 requires registrants to maintain records in conformity "with any additional rules issued by the State Board of Medical Examiners, the State Board of Health, or the State Board of Pharmacy." Ala. Code 1975 §§ 20-2-210 through 220 created the "Controlled Substances Prescription Database" and imposes mandatory reporting requirements on registrants.

397.     The Defendants also had legal duties under Alabama common law, statutes and regulations to maintain adequate records, prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids. This includes the common law of fraud, statutes designed to generally prohibit unfair and deceptive acts in commerce, as well as statutes specifically prohibiting deceptive practice relating to drugs. Ala. Admin. Code r.680-X-2-.23 requires distributors (a term defined quite broadly) "to establish and maintain inventories and records of all transactions regarding the receipt and distribution or other disposition of drugs," § 2(e), to forward to the Board of Pharmacy "[c]opies of records and reports required by the [DEA] concerning increases in purchases or high or unusual volumes purchased by pharmacies," § 2(e)5, and to comply with "applicable federal, state and municipal laws and regulations." § 2(k)3. Ala. Admin. Code r. 680-X-3-.05 requires "[a]ny manufacturer, wholesaler or distributor of controlled substances doing business in the State of Alabama" to "submit to the Alabama State Board of Pharmacy legible copies of records and reports required by the Drug Enforcement Administration concerning increases in purchases or high or unusual volumes purchased by pharmacies within 30 days."

398.    These prescription drugs are regulated for the purpose of providing a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[196]

399.    "Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities."[197]

400.    The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and the subsequent plague of opioid addiction, with costs and damages necessarily inflicted on and incurred by Plaintiff and others.

401.    The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality, along with the costs imposed upon Plaintiff and others associated with the treatment of these conditions and related health consequences caused by opioid abuse.

402.    Finding it impossible to legally achieve their ever-increasing sales ambitions, Defendants engaged in the common purpose of increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and distribution of their prescription opioids.

---

[196] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

[197] Brief for Healthcare Distribution Mgmt. Association and National Ass'n of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 (hereinafter "Brief for HDMA and NACDS"). The Healthcare Distribution Mgmt. Ass'n (HDMA or HMA) – now known as the Healthcare Distribution Alliance (HDA) – is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others: AmerisourceBergen Drug Corporation and Cardinal Health, Inc. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about. The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others: Walgreen Company, CVS Health, Rite Aid Corporation and Walmart. *See generally* NACDS, *Mission*, https://www.nacds.org/%20about/mission/.

403.    The Marketing Defendants engaged in the practice of paying rebates and/or chargebacks to entities for sales of prescription opioids as a way to help them boost sales and better target their marketing efforts. The Washington Post has described the practice as industry-wide, and the Healthcare Distribution Alliance ("HDA") includes a "Contracts and Chargebacks Working Group," suggesting a standard practice. The transaction information contains data relating to the direct customer sales of controlled substances to "downstream registrants", meaning pharmacies or other dispensaries, such as hospitals. Marketing Defendants buy data from pharmacies as well. This exchange of information, upon information and belief, would have opened channels providing for the exchange of information revealing suspicious orders as well.

404.    A dramatic example of the use of prescription information provided by IMS Health was described in Congressional testimony:

> Mr. Greenwood: Well, why do you want that [IMS Health] information then?
>
> Mr. Friedman: Well, we use that information to understand what is happening in terms of the development of use of our product in any area.
>
> Mr. Greenwood: And so the use of it–and I assume that part of it–a large part of it you want is to see how successful your marketing techniques are so that you can expend money in a particular region or among a particular group of physicians– you look to see if your marketing practices are increased in sales. And, if not, you go back to the drawing board with your marketers and say, how come we spent "X" number of dollars, according to these physicians, and sales haven't responded. You do that kind of thing. Right?
>
> Mr. Friedman: Sure.[198]

405.    The contractual relationships among the Defendants also include vault security programs. Defendants are required to maintain certain security protocols and storage facilities for

---

[198] *Oxycontin: Its Use and Abuse: Hearing Before the H. Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce,* 107th Cong. 1 (Aug. 28, 2001) (statement of Michael Friedman, Executive Vice President, Chief Operating Officer, Purdue Pharma, L.P.), https://www.gpo.gov/fdsys/pkg/CHRG-I07hhrg75754/html/CHRG-107hh.rg75754.htm.

the manufacture and distribution of their opiates. The Defendants negotiated agreements whereby the Marketing Defendants installed security vaults for distributors of their product in exchange for agreements to maintain minimum sales performance thresholds. These agreements were used by the Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

### 1. <u>Defendants' Use of Trade and Other Organizations</u>

406.    In addition, Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and the Healthcare Distribution Alliance ("HDA").

### a. **Pain Care Forum**

407.    PCF has been described as a coalition of drugmakers, trade groups, and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

408.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drugmakers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[199] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[200]

---

[199] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (Sept. 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic. (emphasis added).
[200] *Id.*

409.    The Defendants who stood to profit from expanded prescription opioid use are members of and/or participants in the PCF.[201] In 2012, membership and participating organizations included Endo, Actavis, and Cephalon. Each of the Marketing Defendants worked together through the PCF.

### b.    Healthcare Distribution Alliance

410.    Additionally, the HDA led to the formation of interpersonal relationships and an organization among the Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Marketing Defendants, including Actavis, Endo, and Cephalon, were members of the HDA.[202] Additionally, the HDA eagerly sought the active membership and participation of the Marketing Defendants by advocating for the many benefits of members, including "strengthening . . . alliances."[203]

411.    Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[204] The HDA used membership in the HDA as an opportunity to create interpersonal and ongoing organizational relationships and "alliances."

412.    The application for manufacturer membership in the HDA further indicates the level of connection among the Defendants and the level of insight that they had into each other's

---

[201]   *PAIN   CARE   FORUM   2012   Meetings   Schedule*,   (last   updated   Dec.   2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf.
[202] *Manufacturer Membership*, Healthcare Distribution Alliance,
https://www.healthcaredistribution.org/about/membership/manufacturer.
[203] *Id.*
[204] *Id.*

businesses.[205] For example, the manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company.

413.    The HDA application also requests that the manufacturer identify its current distribution information, including the facility name and contact information. Manufacturer members were also asked to identify their "most recent year-end net sales" through wholesale distributors.

414.    The closed meetings of the HDA's councils, committees, task forces and working groups provided the Marketing Defendants and distributors of their products with the opportunity to work closely together, confidentially, to develop and further the common purpose and interests of the enterprise.

415.    The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA advertises these conferences to the Marketing Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[206] The conferences also gave the Marketing Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[207] The HDA and its conferences were significant opportunities for the Marketing Defendants to interact at a high-level of leadership. The Marketing Defendants embraced this opportunity by attending and sponsoring these events.[208]

---

[205] *Id.*

[206] *Business and Leadership Conference – Information for Manufacturers*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-business-and- leadership-conference/blc-for-manufacturers (last visited Aug. 1, 2018, and no longer available).

[207] *Id.*

[208] *2015 Distribution Management Conference and Expo*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

416.   After becoming members of the HDA, Defendants were eligible to participate on councils, committees, task forces and working groups, including:

a.   Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

b.   Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes marketing members.

c.   Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes marketing members.

d.   Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.

e.   Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation in this group includes marketing members.

417.   The Marketing Defendants also participated, through the HDA, in Webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including purchase orders, acknowledgments, ship notices, and invoices.[209] For example, on April 27, 2011, the HDA offered a Webinar to "accurately and effectively exchange business transactions

---

[209] *Webinars*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

between distributors and manufacturers…" The Marketing Defendants used this information to gather high-level data regarding overall distribution and to direct distributors on how to most effectively sell prescription opioids.

418.    The HDA and the Pain Care Forum are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of the Defendants were in communication and cooperation.

419.    Publications and guidelines issued by the HDA confirm that the Defendants utilized their membership in the HDA to form agreements. Specifically, in the fall of 2008, the HDA published the *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (the "Industry Compliance Guidelines") regarding diversion. As the HDA explained in an amicus brief, the Industry Compliance Guidelines were the result of "[a] committee of HDMA members contribut[ing] to the development of this publication" beginning in late 2007.

420.    This statement by the HDA and the Industry Compliance Guidelines support the allegation that Defendants utilized the HDA to form agreements about their approach to their duties under the law. As John M. Gray, President/CEO of the HDA stated to the Energy and Commerce Subcommittee on Health in April 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications." Here, it is apparent that all of the Defendants found the same balance – an overwhelming pattern and practice of failing to identify, report or halt suspicious orders, and failure to prevent diversion.

421.    The Defendants' scheme had a decision-making structure driven by the Marketing Defendants. The Marketing Defendants worked together to control the government's responses to

the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

422.    The Defendants worked together to control the flow of information and to influence governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution. The Marketing Defendants did this through their participation in the PCF and HDA.

423.    The Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas, and Procurement Quotas allowed by the DEA remained artificially high. In so doing, they ensured that suspicious orders were not reported to the DEA, and, further, in so doing, they ensured that the DEA had no basis for either refusing to increase production quotas or decreasing production quotas due to diversion.

424.    The Defendants also had reciprocal obligations to report suspicious orders of other parties if they became aware of them. Defendants were thus collectively responsible for each other's compliance with reporting obligations.

425.    Defendants thus knew that their own conduct could be reported by other distributors or manufacturers and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting of suspicious orders to ensure consistency in their dealings with DEA.

426.    The desired consistency was achieved. As described below, none of the Defendants reported suspicious orders and the flow of opioids continued unimpeded.

   **2.    Defendants Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers**

427. The data that reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's Confidential Automation of Reports and Consolidated Orders System (ARCOS) database. The data necessary to identify with specificity the transactions that were suspicious is in possession of the Defendants but has not been disclosed to the public.

428. Publicly available information confirms that the Marketing Defendants and National Retail Pharmacies Defendants funneled far more opioids into the Tribe and its communities than could have been expected to serve legitimate medical use and ignored other red flags of suspicious orders. This information, along with the information known only to Marketing Defendants, would have alerted them to potentially suspicious orders of opioids.

429. This information includes the following facts:

   a. manufacturers have access to detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

   b. manufacturers make use of that data to target their marketing and, for that purpose, regularly monitor the activity of doctors and pharmacies;

   c. manufacturers regularly visit pharmacies and doctors to promote and provide their products and services, which allows them to observe red flags of diversion; and

   d. Marketing Defendants purchased chargeback data (in return for discounts to distributors) that allowed them to monitor the combined flow of opioids into a pharmacy or geographic area.

430. The conclusion that Defendants were on notice of the problems of abuse and diversion follows inescapably from the fact that they flooded communities with opioids in quantities that they knew or should have known exceeded any legitimate market for opioids-even the wider market for chronic pain.

431.    At all relevant times, the Defendants were in possession of national, regional, state, and local prescriber-and patient-level data that allowed them to track prescribing patterns over time. They obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

432.    Defendants purchased nationwide, regional, state, and local prescriber- and patient-level data from the Data Vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc. The Data Vendors' information purchased by the Defendants allowed them to view, analyze, compute, and track their competitors' sales, and to compare and analyze market share information.[210]

433.    IMS Health, for example, provided Defendants with reports detailing prescriber behavior and the number of prescriptions written between competing products.[211]

434.    Similarly, Wolters Kluwer, an entity that eventually owned data mining companies that were created by Cardinal (ArcLight), provided the Defendants with charts analyzing the weekly prescribing patterns of multiple physicians, organized by territory, regarding competing drugs and analyzed the market share of those drugs.[212]

435.    This information allowed the Defendants to track and identify instances of overprescribing. In fact, one of the Data Vendors' experts testified that the Data Vendors'

---

[210] A Verispan representative testified that the National Retail Pharmacies Defendants use the prescribing information to "drive market share." *Sorrell v. IMS Health Inc.*, 2011 WL 661712, \*9-10 (Feb. 22, 2011).

[211] Paul Kallukaran & Jerry Kagan, *Data Mining at IMS HEALTH: How we Turned a Mountain of Data into a Few Information-rich Molehills*,
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.198.349&rep=rep1&type=pdf, Figure 2 at p. 3.

[212] *Sorrell v. IMS Health Inc.*, 2011 WL 705207, at \*467-471 (Feb. 22, 2011).

information could be used to track, identify, report and halt suspicious orders of controlled substances.[213] Defendants were, therefore, collectively aware of the suspicious orders that flowed from their facilities.

436.    Sales representatives were also aware that the prescription opioids they were promoting were being diverted, often with lethal consequences. As a sales representative wrote on a public forum:

> Actions have consequences - so some patient gets Rx'd the 80mg OxyContin when they probably could have done okay on the 20mg (but their doctor got "sold" on the 80mg) and their teen son/daughter/child's teen friend finds the pill bottle and takes out a few 80's . . . next they're at a pill party with other teens and some kid picks out a green pill from the bowl . . . they go to sleep and don't wake up (because they don't understand respiratory depression). Stupid decision for a teen to make . . . yes . . . but do they really deserve to die?

437.    Defendants' obligation to report suspicious prescribing ran head-on into their marketing strategy. Defendants did identify doctors who were their most prolific prescribers. However, this was done not to report them, but to market to them. It would make little sense to focus on marketing to doctors who may be engaged in improper prescribing only to report them to law enforcement.

438.    Defendants purchased data from IMS Health (now IQVIA) or other proprietary sources to identify doctors to target for marketing and to monitor their own and competitors' sales. Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high frequency detailing visits. This focus on marketing to the highest prescribers demonstrates that manufacturers were keenly aware of the

---

[213] In *Sorrell*, expert Eugene "Mick" Kolassa testified, on behalf of the Data Vender, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." *Id*; *see also* Joint Appendix in *Sorrell v. IMS Health*, 2011 WL 687134, at *204 (Feb. 22, 2011).

doctors who were writing large quantities of opioids. But instead of investigating or reporting those doctors, Defendants were singularly focused on maintaining, capturing, or increasing their sales.

439.     Whenever examples of opioid diversion and abuse have drawn media attention, Marketing Defendants have consistently blamed "bad actors." But given the closeness with which they monitored prescribing patterns through IMS Health data, the Defendants either knew or chose not to know of the obvious drug diversions.

440.     As discussed below, Endo knew that Opana ER was widely abused. Yet, the New York Attorney General revealed, based on information obtained in an investigation into Endo, that Endo sales representatives were not aware that they had a duty to report suspicious activity and were not trained on the company's policies or duties to report suspicious activity, and Endo paid bonuses to sales representatives for detailing prescribers who were subsequently arrested for illegal prescribing.

441.     Sales representatives making in-person visits to such clinics were likewise not fooled. But as pill mills were lucrative for the manufacturers and individual sales representatives alike, Marketing Defendants and their employees turned a collective blind eye, allowing certain clinics to dispense staggering quantities of potent opioids and feigning surprise when the most egregious examples eventually made the nightly news.

**3.     <u>Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement</u>**

442.     When a manufacturer does not report or stop suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse. This, in turn, fuels and expands the illegal market and results in opioid-related overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action – or may not know to take action at all.

443.   After being caught failing to comply with particular obligations at particular facilities, Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens.

444.   Other Marketing Defendants also misrepresented their compliance with their legal duties and their cooperation with law enforcement.

445.   Public statements by the Defendants and their associates created the false and misleading impression to regulators, prescribers, and the public that the Defendants rigorously carried out their legal duties, including their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

**B.   The Marketing Defendants' Unlawful Failure to Prevent Diversion and Monitor, Report, and Prevent Suspicious Orders**

446.   The legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids are legally required of the Marketing Defendants under Alabama law. The Marketing Defendants were required to register with the Alabama Board of Pharmacy and the DEA to manufacture and distribute Schedule II controlled substances, like prescription opioids. A requirement of such registration is to comply with laws requiring them to maintain effective controls against the diversion of controlled substances or precursor chemicals to unauthorized persons or entities. Defendants failed to maintain effective controls as required, and to comply with the other requirements imposed by Alabama law.

447.   The Marketing Defendants breached these duties.

448.   The Marketing Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The

Marketing Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Marketing Defendants knew – just as the Distributors knew – the volume, frequency, and pattern of opioid orders being placed and filled. The Marketing Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

449.   The Marketing Defendants utilized industry-wide "charge backs" and receipt and review of data from opioid distributors regarding orders of opioids.

450.   Through, *inter alia*, the charge back data, the Marketing Defendants could monitor suspicious orders of opioids.

451.   The Marketing Defendants failed to monitor, report, and halt suspicious orders of opioids as required by law.

452.   The Marketing Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

453.   The Marketing Defendants have misrepresented their compliance with the laws regulating controlled substances.

454.   The wrongful actions and omissions of the Marketing Defendants that caused the diversion of opioids and which were a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's allegations of Defendants' unlawful acts below.

455.    The Marketing Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids throughout the United States.

## C.   The National Retail Pharmacies Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids

456.    National retail pharmacy chains earned enormous profits by flooding the country with prescription opioids.[214] They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Yet, instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it.

457.    Each of the National Retail Pharmacies does substantial business throughout the United States, including areas surrounding the Tribe. This business includes the distribution and dispensing of prescription opioids.

458.    Data shows that the National Retail Pharmacies distributed and dispensed substantial quantities of prescription opioids, including fentanyl, hydrocodone, and oxycodone in Alabama, including areas surrounding the Tribe. In addition, they distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Alabama. The National Retail Pharmacies failed to take meaningful action to stop this diversion despite their knowledge of it and contributed substantially to the diversion problem.

459.    The National Retail Pharmacies developed and maintained extensive data on opioids they distributed and dispensed. Through this data, National Retail Pharmacies had direct

---

[214] Plaintiff's allegations of wrongdoing are pointing to the National Retail Pharmacies, not the pharmacy industry who in general serve a vital healthcare function in the U.S.

knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country, and in Alabama in particular. They used the data to evaluate their own sales activities and workforce. On information and belief, the National Retail Pharmacies also provided Defendants with data regarding, inter alia, individual doctors in exchange for rebates or other forms of consideration. The National Retail Pharmacies' data is a valuable resource that they could have used to help stop diversion but failed to do so.

### 1.   The National Retail Pharmacies Have a Duty to Prevent Diversion

460.    Each participant in the supply chain of opioid distribution, including the National Retail Pharmacies, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

461.    The National Retail Pharmacies, like manufacturers, are registrants under the Alabama Uniform Controlled Substances Act ("AUCSA"). AL. Code §20-2-1 *et seq.* (1975). Because pharmacies themselves are registrants under the AUCSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

462.    The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies on how to identify suspicious orders and other evidence of diversion.

463.    Suspicious pharmacy orders include orders unusually large in size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others.

464.    Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled

substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwriting. Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies.

465.    Suspicious pharmacy orders are red flags for, if not direct, evidence of diversion.

466.    Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the National Retail Pharmacies themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

467.    According to industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

468.    Despite their legal obligations as registrants under state law, the National Retail Pharmacies allowed widespread diversion to occur – and they did so knowingly. They knew they made money by filling prescriptions, not by not filling descriptions. They knew they made money by making it easy for doctors to refer patients with drug prescriptions to them to fill, not by making it difficult for doctors to refer patients to them to fill prescriptions.

469.    Performance metrics and prescription quotas adopted by the National Retail Pharmacies for their retail stores contributed to their failure. For instance, under CVS's Metrics System, pharmacists are directed to meet high goals that make it difficult, if not impossible, to

comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. The result is both deeply troubling and entirely predictable: opioids flowed out of National Retail Pharmacies and into communities throughout the country. The policies remained in place even as the epidemic raged.

470.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that this problem was compounded by the National Retail Pharmacies' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present, including when prescriptions are procured and pills supplied for the purpose of illegal diversion and drug trafficking.

471.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that the National Retail Pharmacies also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

472.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that the National Retail Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's

community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

473.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that the National Retail Pharmacies also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

474.    In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that the National Retail Pharmacies also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

475.    The National Retail Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

## 2.    Multiple Enforcement Actions Against the National Retail Pharmacies Confirm their Compliance Failures

476.    The National Retail Pharmacies have long been on notice of their failure to abide by the law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the National Retail Pharmacies have been repeatedly penalized for their illegal prescription opioid practices. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that based upon the widespread nature of these violations, these

enforcement actions are the product of, and confirm, national policies and practices of the National Retail Pharmacies.

### a.   CVS

477.   CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations. CVS could be a force for good in connection with the opioid crisis, but like other Defendants, CVS sought profits over people.

478.   CVS is a repeat offender; the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the DOJ. It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the law.

479.   In July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.[215]

480.   In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.[216]

---

[215] Press Release, U.S. Attorney's Office E. Dist. of Cal., *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. Dep't of Just. (July 11, 2017), https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violationscontrolled-substance-act.
[216] Press Release, U.S. Attorney's Office Dist. of Md., *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. Dep't of Just. (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-millionsettlement-agreement-cvs-unlawful-distribution-controlled.

481.    In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.[217]

482.    In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.[218]

483.    In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances – mostly addictive painkillers – more than 500 times between 2011 and 2014.[219]

484.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.[220]

---

[217] Press Release, U.S. Attorney's Office Dist. of Conn., *CVS Pharmacy Pays $600,000 to Settle Controlled Substances Act Allegations*, U.S. Dep't of Just. (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-actallegations.
[218] Dialynn Dwyer, *CVS will pay $795,000, strengthen policies around dispensing opioids in agreement with state*, Boston.com (Sept. 1, 2016), https://www.boston.com/news/localnews/2016/09/01/cvs-will-pay-795000-strengthen-policies-around-dispensing-opioids-inagreement-with-state.
[219] Press Release, U.S. Attorney's Office Dist. of Mass., *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacists Filled Fake Prescriptions*, U.S. Dep't of Just. (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filledfake-prescriptions.
[220] Press Release, U.S. Attorney's Office Dist. of R.I., Drug Diversion Claims Against CVS Health Corp. Resolved With $450,000 Civil Settlement, U.S. Dep't of Just. (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved- 450000-civil-settlement.

485.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."[221]

486.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.[222]

487.    In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.[223]

488.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[224]

### b.    Walgreens

489.    Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates

---

[221] Press Release, U.S. Attorney's Office M. Dist. of Fla., United States Reaches $22 Million Settlement Agreement with CVS For Unlawful Distribution of Controlled Substances, U.S. Dep't of Just. (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22- million-settlement-agreement-cvs-unlawful-distribution.

[222] Patrick Danner, H-E-B, CVS Fined Over Prescriptions, San Antonio Express-News (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-BCVSfined-over-prescriptions-5736554.php.

[223] Andrew Knittle, *Oklahoma pharmacy board stays busy, hands out massive fines at times*, NewsOK (May 3, 2015), http://newsok.com/article/5415840.

[224] Press Release, U.S. Attorney's Office W. Dist. of Okla., CVS to Pay $11 Million To Settle Civil Penalty Claims Involving Violations of Controlled Substances Act, U.S. Dep't of Just. (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penaltyclaims-involving-violations-controlled.

more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

490.    Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history – $80 million – to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black-market sales.[225]

491.    As part of the settlement, Walgreens admitted that it failed to uphold its obligations as a DEA registrant regarding the above-described conduct.[226]

492.    The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

493.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011 – more than ten times the average amount.[227]

494.    They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens' corporate officers not only turned a blind eye but provided pharmacists with incentives through a bonus program that compensated them based

---

[225] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees to Pay a Record Settlement pf $80 Million for Civil Penalties Under the Controlled Substances Act*, U.S. Dep't of Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-recordsettlement-80-million-civil-penalties-under-controlled.
[226] *Id.*
[227] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreens Co.* (Drug Enf't Admin. Sept. 13, 2012).

on the number of prescriptions filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the law or the health of communities.[228]

495.    Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on the number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by the number of oxycodone prescriptions dispensed in June of that year and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.[229]

496.    The six retail pharmacies in Florida that received the suspicious drug shipments from the Jupiter Distribution Center, in turn, filled customer prescriptions that they knew or should have known were not for legitimate medical use.[230]

497.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).[231]

---

[228] *Id.*
[229] *Id.*
[230] *Id.*
[231] *Walgreens to pay $200,000 settlement for lapses with opioids*, APhA (Jan. 25, 2017), https://www.pharmacist.com/article/walgreens-pay-200000-settlement-lapses-opioids.

498.     The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

499.     In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.[232]

### c.     Rite Aid

500.     With approximately 4,600 stores in 31 states and the District of Columbia, Rite Aid is the largest drugstore chain on the East Coast and the third-largest in the United States, with annual revenue of more than $21 billion.

501.     In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.[233]

502.     Numerous state and federal drug diversion prosecutions have occurred in which prescription opioid pills were procured from National Retail Pharmacies. The allegations in this Complaint do not attempt to identify all these prosecutions, and the information above is merely by way of example.

---

[232] *Id.*

[233] Press Release, Dep't of Just., *Rite Aid Corporation and Subsidiaries Agree to Pay $5 Million in Civil Penalties to Resolve Violations in Eight States of the Controlled Substances Act*, U.S. Dep't of Just. (Jan. 12, 2009), https://www.justice.gov/opa/pr/rite-aid-corporation-andsubsidiaries-agree-pay-5-million-civil-penalties-resolve-violations.

503.    The litany of state and federal actions against the National Retail Pharmacies demonstrate that they routinely, and as a matter of standard operating procedure, violated their legal obligations under the CSA and other laws and regulations that govern the distribution and dispensing of prescription opioids.

504.    Throughout the country and in the Tribe, in particular, the National Retail Pharmacies were or should have been aware of numerous red flags of potentially suspicious activity and diversion.

505.    On information and belief, from the catbird seat of their retail pharmacy operations, the National Retail Pharmacies knew or reasonably should have known about the disproportionate flow of opioids into Alabama, including the Tribe, and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for if not direct evidence of illicit supply and diversion. Additional information was provided by news reports, and state and federal regulatory actions, including prosecutions of pill mills in the area.

506.    On information and belief, the National Retail Pharmacies knew or reasonably should have known about the devastating consequences of the oversupply and diversion of prescription opioids, including spiking opioid overdose rates in the Tribal community.

507.    On information and belief, because of (among others sources of information) regulatory and other actions taken against the National Retail Pharmacies directly, actions taken against others pertaining to prescription opioids obtained from their retail stores, complaints and information from employees and other agents, and the massive volume of opioid prescription drug sale data that they developed and monitored, the National Retail Pharmacies were well aware that their distribution and dispensing activities fell far short of legal requirements.

508.    The National Retail Pharmacies' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids.

## VII.    DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM AND SUBSTANTIAL DAMAGE ALLEGED HEREIN

509.    As the Marketing Defendants' efforts to expand the market for opioids increased, so have the rates of prescription and sale of their products – and the rates of opioid-related substance abuse, hospitalization, and death among the people of the United States, including the Tribe's citizens.

There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[234]

510.    Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[235]

511.    The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[236]

512.    The increased abuse of prescription painkillers, along with growing sales, has contributed to a large number of overdoses and deaths.[237]

513.    For example, one doctor in Ohio was convicted of illegally distributing some 30,000 tablets of oxycodone, OxyContin, and Opana. In connection with sentencing, the U.S.

---

[234] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241-248 (2015), DOI: 10.1056/NEJMsa1406143, http://www.nejm.org/doi/full/10.1056/NEJMsa1406143.
[235] *See* Volkow & McLellan, *supra* n. 70.
[236] *See* Califf et al., *supra* n. 32.
[237] *See* Prescription Painkiller Overdoses at Epidemic Levels, *supra* n. 27.

Attorney explained that its enforcement efforts reflected that "[o]ur region is awash in opioids that have brought heartbreak and suffering to countless families." Henry Schein delivered opioids directly to the office of this doctor, whom the Northern District of Ohio court has described as "selling 30,000 doses of poison into the community."[238] In a separate civil suit, the same prescriber reached a consent judgment alleging that he was purchasing hydrocodone/APAP tablets (hydrocodone and acetaminophen), from Henry Schein on as many as fourteen separate dates within a one-year period, and, subsequently dispensed 11,500 hydrocodone tablets without maintaining purchase and dispensing records as required by the CSA

514.   As shown above, the opioid epidemic has escalated with devastating effects: substantial opiate-related substance abuse, hospitalization, and death that goes hand in hand with Defendants' increased distribution of opioids.

515.   Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, like heroin, the massive distribution of opioids by Defendants has caused the opioid epidemic to include heroin addiction, abuse, and death.

516.   Defendants repeatedly and purposefully breached their duties under Alabama law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes and the foreseeable, inevitable financial burdens imposed on and incurred by hospitals and other health care providers.

## VIII.   CONSPIRACY ALLEGATIONS

517.   The Defendants conspired to engage in the wrongful conduct complained of herein and intended to benefit both independently and jointly from their wrongful conduct.

---

[238] Eric Heisig, *Former Akron-Area Doctor Sentenced to 63 Months in Prison for Doling Out Painkillers*, Cleveland.com (Mar. 16, 2015), https://www.cleveland.com/court-justice/index.ssf/2015/03/former_akron-area_doctor_sente.html.

## A. **Conspiracy Among the Marketing Defendants**

518.    The Marketing Defendants agreed among themselves to set up, develop, and fund an unbranded promotion and marketing network to promote the use of opioids for the management of pain in order to mislead the Tribe and its citizens through misrepresentations and omissions regarding the appropriate uses, risks, and safety of opioids in order to increase sales, revenue, and profit from their opioid products.

519.    This interconnected and interrelated network relied on the Marketing Defendants' collective use of unbranded marketing materials, such as KOLs, scientific literature, CMEs, patient education materials, and Front Groups developed and funded collectively by the Marketing Defendants and intended to mislead consumers, such as the Tribe's citizens, of the appropriate uses, risks, and safety of opioids.

520.    The Marketing Defendants' collective marketing scheme to increase opioid prescriptions, sales, revenues and profits centered around the development, dissemination, and reinforcement of nine false propositions: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition dubbed "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

521.    The Marketing Defendants knew that none of these propositions are true.

522.   Each Marketing Defendant worked individually and collectively to develop and actively promulgate these false propositions in order to mislead the Tribe and its citizens regarding the appropriate uses, risks, and safety of opioids.

523.   What is particularly remarkable about the Marketing Defendants' effort is the seamless method in which the Marketing Defendants joined forces to achieve their collective goal: to persuade consumers and medical providers of the safety of opioids, and to hide their actual risks and dangers. In doing so, the Marketing Defendants effectively built a new – and extremely lucrative – opioid marketplace for their select group of industry players.

524.   The Marketing Defendants' unbranded promotion and marketing network was a wildly successful marketing tool that achieved marketing goals that would have been impossible to have been met by a single or even a handful of the network's distinct corporate members.

525.   For example, the network members pooled their vast marketing funds and dedicated them to expansive and normally cost-prohibitive marketing ventures, such as the creation of Front Groups. These collaborative networking tactics allowed each Marketing Defendant to diversify its marketing efforts, all the while sharing any risk and exposure, financial and/or legal, with other Marketing Defendants.

526.   The most unnerving tactic utilized by the Marketing Defendants' network was their unabashed mimicry of the scientific method of citing "references" in their materials. In the scientific community, cited materials and references are rigorously vetted by objective unbiased and disinterested experts in the field, and an unfounded theory or proposition would, or should, never gain traction.

527.   Marketing Defendants put their own twist on the scientific method: they worked together to manufacture wide support for their unfounded theories and propositions involving

opioids. Due to their sheer numbers and resources, the Marketing Defendants were able to create a false consensus through their materials and references.

528.    An illustrative example of the Marketing Defendants' utilization of this tactic is the wide promulgation of the Porter & Jick Letter, which declared the incidence of addiction "rare" for patients treated with opioids. The authors had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. These patients were not given long-term opioid prescriptions or provided opioids to administer to themselves at home, nor was it known how frequently or infrequently and in what doses the patients were given their narcotics. Rather, it appears the patients were treated with opioids for short periods of time under in-hospital doctor supervision.

529.    Nonetheless, Marketing Defendants widely and repeatedly cited this letter as proof of the low addiction risk in connection with taking opioids despite the letter's obvious shortcomings. Marketing Defendants' egregious misrepresentations based on this letter included claims that less than one percent of opioid users became addicted.

530.    Marketing Defendants' collective misuse of the Porter & Jick Letter helped the opioid manufacturers convince patients and healthcare providers that opioids were not a concern. The enormous impact of Marketing Defendants' misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and, in some cases, "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the Journal in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crises by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy . . .

By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, the Marketing Defendants committed overt acts in furtherance of their conspiracy.

**B.**   **Conspiracy Among the Marketing Defendants and the National Retail Pharmacies Defendants**

531.   In addition, and on an even broader level, all the Marketing Defendants and National Retail Pharmacies Defendants took advantage of the industry structure, including end-running its internal checks and balance, to their collective advantage. The Marketing Defendants and National Retail Pharmacies Defendants agreed among themselves to increase the supply of opioids and fraudulently increase the quotas that governed the manufacture and supply of prescription opioids. The Marketing Defendants and National Retail Pharmacies Defendants did so to increase sales, revenue, and profit from their opioid products.

532.   The interaction and length of the relationships between and among the Marketing Defendants and National Retail Pharmacies Defendants reflect a deep level of interaction and cooperation between the Marketing Defendants and National Retail Pharmacies Defendants in a tightly knit industry. The Marketing and National Retail Pharmacies Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The Marketing Defendants and National Retail Pharmacies Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

533.   The Marketing Defendants and National Retail Pharmacies Defendants collaborated to expand the opioid market in an interconnected and interrelated network in the following ways, as set forth more fully below including, for example, membership in the Healthcare Distribution Alliance.

534.     The Marketing Defendants and National Retail Pharmacies Defendants, in unison with distributors, utilized their membership in the HDA and other forms of collaboration to form agreements about their approach to their duties under AUCSA and other laws to report suspicious orders. The Marketing Defendants and National Retail Pharmacies Defendants, in unison with distributors, overwhelmingly agreed on the same approach – to fail to identify, report, or halt suspicious opioid orders, and fail to prevent diversion. The Marketing Defendants and National Retail Pharmacies Defendants' agreement to restrict reporting provided an added layer of insulation from DEA scrutiny for the entire industry as the Marketing Defendants and National Retail Pharmacies Defendants were thus collectively responsible for each other's compliance with their reporting obligations. The Marketing Defendants and National Retail Pharmacies Defendants were aware, both individually and collectively, of the suspicious orders that flowed directly from the Marketing Defendants and National Retail Pharmacies Defendants' facilities.

535.     The desired consistency and collective end goal was achieved. The Marketing Defendants and National Retail Pharmacies Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

## IX.     ADDITIONAL FACTS PERTAINING TO PUNITIVE DAMAGES

536.     As set forth above, Defendants acted deliberately to increase sales of, and profits from, opioid drugs. The Marketing Defendants knew there was no support for their claims that addiction was rare, that addiction risk could be effectively managed, that signs of addiction were merely "pseudoaddiction," that withdrawal is easily managed, that higher doses pose no significant additional risks, that long-term use of opioids improves function, or that time-release or abuse-deterrent formulations would prevent addiction or abuse. Nonetheless, they knowingly promoted these falsehoods in order to increase the market for their addictive drugs.

537.    All of the Defendants, moreover, knew that large and suspicious quantities of opioids were being poured into communities throughout the United States, including the Tribe's. Despite this knowledge, Defendants took no steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion. Indeed, as described above, Defendants acted in concert together to maintain high levels of quotas for their products and to ensure that suspicious orders would not be reported to regulators.

538.    Defendants' conduct was so willful and deliberate that it continued in the face of numerous enforcement actions, fines, and other warnings from state and local governments and regulatory agencies. Defendants paid their fines, made promises to do better, and continued on with their marketing and supply schemes. This ongoing course of conduct knowingly, deliberately, and repeatedly threatened and accomplished harm and risk of harm to public health and safety, and large-scale economic loss to the Tribal citizens, families, communities, and governments

539.    As all of the governmental actions against the Marketing Defendants and against all the Defendants show, Defendants knew that their actions were unlawful, and yet deliberately refused to change their practices because compliance with their legal obligations would have decreased their sales and their profits.

### A.    The Marketing Defendants Persisted in Their Fraudulent Scheme Despite Repeated Admonitions, Warnings, and Even Prosecutions

540.    So determined were the Marketing Defendants to sell more opioids that they simply ignored multiple admonitions, warnings, and prosecutions, as described more fully below.

### 1.    FDA Warnings to Janssen Failed to Deter Janssen's Misleading Promotion of Duragesic

541.    February 15, 2000, the FDA sent Janssen a letter concerning the dissemination of "homemade" promotional pieces that promoted the Janssen drug Duragesic in violation of the

Federal Food, Drug, and Cosmetic Act. In a subsequent letter, dated March 30, 2000, the FDA explained that the "homemade" promotional pieces were "false or misleading because they contain misrepresentations of safety information, broaden Duragesic's indication, contain unsubstantiated claims, and lack fair balance." The March 30, 2000 letter detailed numerous ways in which Janssen's marketing was misleading.

542.    The letter did not stop Janssen. On September 2, 2004, the U.S. Department of Health and Human Services ("HHS") sent Janssen a warning letter concerning Duragesic due to "false or misleading claims about the abuse potential and other risks of the drug, and . . . unsubstantiated effectiveness claims for Duragesic," including, specifically, "suggesting that Duragesic has a lower potential for abuse compared to other opioid products." The September 2, 2004 letter detailed a series of unsubstantiated, false or misleading claims.

543.    One year later, Janssen was still at it.  On July 15, 2005, the FDA issued a public health advisory warning to doctors of deaths resulting from the use of Duragesic and its generic competitor, manufactured by Mylan N.V.  The advisory noted that the FDA had been  "examining the circumstances of product use to determine if the reported adverse events may be  related to inappropriate use of the patch" and noted the possibility "that patients and physicians  might be unaware of the risks" of using the fentanyl transdermal patch, which is a potent opioid  analgesic approved only for chronic pain in opioid-tolerant patients that could not be treated by  other drugs.

## 2.    Governmental Action, Including Large Monetary Fines, Failed to Stop Cephalon From Falsely Marketing Actiq For Off-label Uses

544.    On September 29, 2008, Cephalon finalized and entered into a corporate integrity agreement with the Office of the Inspector General of HHS and agreed to pay $425 million in civil and criminal penalties for its off-label marketing of Actiq and two other drugs (Gabitril and Provigil).  According to a DOJ press release, Cephalon had trained sales representatives to

disregard restrictions of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of the three drugs and funded CMEs to promote off-label uses.

545.   Notwithstanding letters, an FDA safety alert, DOJ and state investigations, and the massive settlement, Cephalon has continued its deceptive marketing strategy.

### 3.   FDA Warnings Did Not Prevent Cephalon from Continuing False and Off-Label Marketing of Fentora

546.   On September 27, 2007, the FDA issued a public health advisory to address numerous reports that patients who did not have cancer or were not opioid-tolerant had been prescribed Fentora, and death or life-threatening side effects had resulted. The FDA warned: "Fentora should not be used to treat any type of short-term pain." Indeed, the FDA specifically denied Cephalon's application in 2008 to broaden the indication of Fentora to include treatment of non-cancer breakthrough pain and use in patients who were not already opioid-tolerant.

547.   Flagrantly disregarding the FDA's refusal to broaden the indication for Fentora, Cephalon nonetheless marketed Fentora beyond its approved indications. On March 26, 2009, the FDA warned Cephalon against its misleading advertising of Fentora ("Warning Letter"). The Warning Letter described a Fentora Internet advertisement as misleading because it purported to broaden "the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora . . . when this is not the case." It further criticized Cephalon's other direct Fentora advertisements because they did not disclose the risks associated with the drug.

548.   Despite this warning, Cephalon continued to use the same sales tactics to push Fentora as it did with Actiq. For example, on January 13, 2012, Cephalon published an insert in Pharmacy Times titled "An Integrated Risk Evaluation and Mitigation Strategy (REMS) for

FENTORA (Fentanyl Buccal Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)." Despite the repeated warnings of the dangers associated with the use of the drugs beyond their limited indication, as detailed above, the first sentence of the insert states: "It is well recognized that the judicious use of opioids can facilitate effective and safe management of chronic pain."

    **4.**     **Endo Continued to Aggressively Promote Opana After Becoming Aware of Its Widespread Abuse**

549.    The New York Attorney General found that Endo knew, as early as 2011, that Opana ER was being abused in New York, but certain sales representatives who detailed New York health care providers testified that they did not know about any policy or duty to report problematic conduct. The New York Attorney General further determined that Endo detailed health care providers who were subsequently arrested or convicted for illegal prescribing of opioids a total of 326 times, and these prescribers collectively wrote 1,370 prescriptions for Opana ER (although the subsequent criminal charges at issue did not involve Opana ER).

550.    Even after the Indiana Department of Public Health determined that an HIV outbreak in Southeastern Indiana was linked to injection of the prescription painkiller Opana and requested removal from the market, in 2015, "based on its concern that the benefits of the drug may no longer outweigh its risks," Endo continued to market the drug until 2017.

## X.    JOINT ENTERPRISE ALLEGATIONS

551.    Defendants entered into an agreement with respect to opioids and/or distribution of opioids in Alabama and the Tribe's communities.

552.    The agreement had a common purpose: to promote the sale and distribution of opioids through the marketing of opioids and/or distribution of opioids into Alabama and the Tribe's communities, in violation of the statutory, common law (of fraud and nuisance) and regulations of Alabama.

553.   The Defendants had a community of pecuniary interest in that common purpose, as all of the Defendants profited from sales of opioids in Alabama.

554.   The Defendants had an equal right to a voice in the direction of the enterprise.

## XI.   TOLLING AND FRAUDULENT CONCEALMENT

555.   Defendants, individually and acting through their employees and agents, knowingly and intentionally concealed material facts and knowledge from Plaintiff and others to induce them to purchase and administer opioids as set forth in detail above.

556.   The Defendants invented the term "pseudoaddiction" and promoted it to the medical community, including Plaintiff. Defendants provided the medical community, including Plaintiff, with false and misleading information about ineffectual medical strategies to avoid or control the opioid addiction. Marketing Defendants recommended to the medical community that dosages be increased, without disclosing the risks. Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.

557.   In overstating the benefits of and evidence for the use of opioids for chronic pain and understating their very serious risks, including the risk of addiction and death; in falsely promoting abuse-deterrent formulations as reducing abuse; in falsely portraying their efforts or commitment to rein in the supply and diversion of opioids; and doing all of this while knowing full well that their statements were misrepresentations of material facts, Defendants have engaged in intentional, fraudulent misrepresentations and concealment of the material facts, as detailed herein.

558.   Defendants intended that Plaintiff would rely on their misrepresentations, omissions, and concealment, knew that Plaintiff would rely on their misrepresentations, and that

such reliance would cause harm to Plaintiff. The general community, including Plaintiff, was duped by the Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing to the Tribe.

559.   Plaintiff reasonably relied on Defendants' misrepresentations and omissions in writing and filling prescriptions for Defendants' opioids. The use of Defendants' opioid medicines became widespread and continuous as a result.

560.   The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed, nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants have not ceased. The nuisance created by Defendants remains unabated.

561.   Plaintiff's claims are equitably tolled because Defendants knowingly and fraudulently concealed the facts and their wrongful acts, and the material information pertinent to their discovery, which Defendants concealed from the Plaintiff. Plaintiff did not know or could not have known through the exercise of reasonable diligence, of their claims, as a result of Defendants' conduct.

562.   Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on their part.

563.   Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from the negligence of Defendants. They do not seek damages that may have been

suffered by individual citizens for wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by the actions of Defendants.

564.    Plaintiff suffered actual pecuniary damages proximately caused by Defendants concealment of material fact, which include but are not limited to, expending funds on treatment, counseling, additional training, additional security, and other services Plaintiff would not have incurred.

565.    Plaintiff has incurred expenditures for special programs over and above their ordinary services.

566.    Defendants' misconduct alleged, in this case, does not concern a discrete event or discrete emergency of the sort a Tribe would reasonably expect to occur and is not part of the normal and expected costs of a Tribe's existence. Plaintiff alleges wrongful acts which were neither discrete nor of the sort a Tribe can reasonably expect.

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE
### (Against All Defendants)

567.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

568.    This claim is brought under the Alabama common law of negligence.

### 1.    Defendants Owed a Duty of Care

569.    Each Defendant had a duty to exercise reasonable care in the manufacturing, marketing, selling, prescribing, and distributing highly dangerous opioid drugs. Defendants knew or should have known that opioids were unreasonably dangerous and were likely to cause

addiction. Each Defendant owed its aforesaid duties to Plaintiff because the injuries alleged herein were foreseeable by the Defendants.

570.    A reasonable person could foresee the probability of occurrence of injury to Plaintiff. Reasonably prudent wholesale drug manufacturers, marketers and distributors of opioids would have anticipated the scourge of opioid addiction, especially when being warned and prosecuted by law enforcement repeatedly. Defendants are required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of highly dangerous opioid drugs during manufacture and distribution.

### 2.    Defendants Breached Their Duty of Care

#### a.    Defendants' Conduct, in Violation of Applicable Statutes, Constitutes Negligence *Per Se*

571.    Defendants violated State law in failing to report suspicious orders of opioid pain medications in Alabama. Defendants violated state law, including Ala. Admin. Code r.680-X-2-.23, in failing to maintain effective controls against the diversion of opioids into other than legitimate medical channels. Defendants also violated state law, including Ala. Code 1975 § 20-2-56, and Ala. Code 1975 § 20-2-213, in failing to operate a system to stop orders which were flagged or should have been flagged as suspicious.

572.    A manufacturer or wholesaler/distributor of prescription drugs must obtain a license from Alabama Board of Pharmacy and must forward "[c]opies of records and reports required by the [DEA] concerning increases in purchases or high or unusual volumes purchased by pharmacies," Ala. Admin. Code r.680-X-2-.23 § 2(e)5, and to comply with "applicable federal, state and municipal laws and regulations," Ala. Admin. Code r.680-X-2-.23 § 2(k)3, among other requirements. A license shall be denied by the Board if "the granting of such a license would not

be in the public interest." Ala. Admin. Code r.680-X-2-.23 § 2(i). Defendants have a duty to comply with the law and regulations.

573.     Each Defendant's actions were in violation of Chapter 2 of the Alabama Uniform Controlled Substances Act ("AUCSA"), as set out above, including but not limited to Ala. Code 1975 § 20-2-54, which forbids excessively dispensed controlled substances, and of Ala. Code 1975 § 20-2-55, which allows suspension of any registration "without an order to show cause" by the certifying board if "there is an imminent danger to the public health or safety which warrants this action."

574.     Defendants' failure to comply with Alabama law constitutes negligence *per se*.

575.     Alabama law and the CSA require that the Defendants know their customers, which includes an awareness of the customer base, knowledge of the average prescriptions filled each day, the percentage of controlled substances compared to overall purchases, a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and identification of physicians and bogus centers for the alleged treatment of pain that are the dispenser's most frequent prescribers.

576.     Defendants have failed to diligently respond to suspicious orders in contravention of Alabama law.

577.     Defendants have failed to provide effective controls and procedures to guard against the diversion of controlled substances in contravention of Alabama law.

578.     Defendants have, by their acts and omissions, proximately caused and substantially contributed to damages to Plaintiff by violating Alabama law, by creating conditions which contribute to violations of Alabama laws by others, and by their negligent and/or reckless disregard of the customs, standards, and practices within their own industry.

579.   Plaintiff has suffered and will continue to suffer enormous damages as the proximate result of the failure by Defendants to comply with Alabama law.

580.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties. Plaintiff is within the class of persons the AUCSA and the CSA was intended to protect.

581.   The harm that has occurred is the type of harm that the AUCSA and the CSA were intended to guard against.

Defendants' violations constitute negligence *per se*.

### 3.   Defendants Breached Their Duty of Reasonable Care

582.   Alternatively, to the extent that Defendants' statutory violations do not obviate the need to show breaches of the duty of care, each Defendant breached its aforesaid duties of care.

### a.   Negligent Marketing

583.   Defendants marketed opioids in a negligent and improper manner by:

  a.   Overstating the benefits of chronic opioid therapy, promising improvement in patients' function and quality of life, and failing to disclose the lack of evidence supporting long-term use;

  b.   Trivializing or obscuring opioids' serious risks and adverse outcomes, including the risk of addiction, overdose and death;

  c.   Overstating opioids' superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives;

  d.   Mischaracterizing the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms;

  e.   Marketing opioids for indications and benefits that were outside of the opioids' labels and not supported by substantial evidence.

584.   It was Defendants' marketing – and not any medical breakthrough – that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse. The result has been catastrophic.

585.    Defendants disseminated many of their false, misleading, imbalanced, and unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing materials. These KOLs and Front Groups were important elements of Defendants' marketing plans, which specifically contemplated their use because they seemed independent and, therefore, outside FDA oversight. Through unbranded materials, Defendants, with their own knowledge of the risks, benefits and advantages of opioids, presented information and instructions concerning opioids generally that was contrary to, or at best, inconsistent with information and instructions listed on Defendants' branded marketing materials and drug labels. Defendants did so knowing that unbranded materials typically are not submitted to or reviewed by the FDA.

586.    Defendants also negligently marketed opioids through the following vehicles: (a) KOLs, who could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body of biased and unsupported scientific literature; (c) treatment guidelines; (d) CMEs; (e) unbranded patient education materials; and (f) Front Group patient-advocacy and professional organizations, which exercised their influence both directly and through Defendant-controlled KOLs who served in leadership roles in those organizations.

### b.    Negligent Distribution

587.     The Marketing and National Retail Pharmacies Defendants distributed opioids in an improper manner by:

a.    Selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

b.    Selling opioids without maintaining effective controls against diversion;

c.    Choosing not to or failing to report suspicious orders;

d.    Choosing not to or failing to stop or suspend shipments of suspicious orders; and

e.   Selling opioids prescribed by "pill mills" when Marketing and National Retail Pharmacies Defendants knew or should have known the opioids were being prescribed by "pill mills."

### 4.   **The Marketing and National Retail Pharmacies Defendants' Breaches of Care Were Intentional, Willful, Wanton and/or Reckless**

588.   Marketing and National Retail Pharmacies Defendants' breaches of care were intentional, willful, wanton and/or reckless. Marketing and National Retail Pharmacies Defendants purposely overstated the benefits of chronic opioid therapy and opioids' superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives; actively and continuously promoted the use of opioids for improvement in patients' function and quality of life but failed to disclose the lack of evidence supporting the long-term use, as well as mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms; intentionally trivialized or obscured opioids' serious risks and adverse outcomes, including the risk of addiction, overdose, and death; continuously marketed opioids for indications and benefits that were outside of the opioids' labels and not supported by substantial evidence.

589.   Marketing and National Retail Pharmacies Defendants have willfully turned a blind eye towards the actual facts by regularly distributing large quantities of controlled substances to retailers and dispensers who are serving a customer base substantially comprised of individuals who are abusing and/or diverting prescription medications, many of whom are addicted and all of whom can reasonably be expected to become addicted.  Marketing and National Retail Pharmacies Defendants conducted themselves with reckless indifference to the consequences of their acts and omissions, in that they were conscious of their conduct and were aware, from their knowledge of existing circumstances and conditions, that their conduct would inevitably or probably result in injury to others, specifically tribes such as Plaintiff.

### 5.   **Causation and Damages**

590.    As a proximate result of Defendants' conduct, Defendants have caused Plaintiff's injury related to the diagnosis and treatment of opioid-related conditions. Plaintiff has incurred massive costs by providing uncompensated care as a result of opioid-related conditions.

591.    The injuries to Plaintiff would not have happened in the ordinary course of events had Defendants exercised the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business in the manufacture, marketing, sale and distribution of opioids.

592.    Plaintiff is entitled to recover compensatory damages as a result of Marketing and National Retail Pharmacies Defendants' negligence, in an amount to be determined at trial.

593.    As a result of Defendants' intentional, willful, wanton and/or reckless conduct described herein, Plaintiff is entitled to treble, punitive, exemplary and/or otherwise enhanced damages to the full extent available under state law, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### NUISANCE
### (Against All Defendants)

594.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

595.    This claim is brought under the Alabama common law of nuisance.

596.    The nuisance created by Defendants is the over-saturation of opioids in the patient population of the geographic area surrounding the Tribe for illegitimate purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use.

597.    Defendants, individually and acting through their employees and agents, through fraudulent and deceptive marketing and other fraudulent schemes as described herein, created and

maintained the opioid epidemic in Plaintiff's communities, which is harmful and disruptive to and substantially and unreasonable annoys, injuriously affects, endangers, and interferes with the safety, health, morals, comfort, and general welfare of the public.

598.    Defendants' nuisance-causing activities include selling or facilitating the sale of prescription opioids to the Tribe's citizens, as well as to unintended users, including children, people at risk of overdose or suicide, and criminals.

599.    Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

600.    Defendants' activities unreasonably interfere with Plaintiff's economic rights and the reasonable use of Plaintiff's property. Plaintiff's resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources that could be used to benefit the community within the geographic area served by Plaintiff.

601.    The Defendants' interference with these rights of Plaintiff is unreasonable because it:

a.    Has harmed and will continue to harm the public health services of and public peace of Plaintiff;

b.    Has harmed and will continue to harm the Tribe's communities;

c.    Is proscribed by statutes and regulation, including the AUCSA;

d.    Is of a continuing nature and it has produced long-lasting effects;

e.    Was the result of conduct that the Defendants knew, or had reason to know, would inflict a significant effect upon Plaintiff; and

f.    Has inflicted substantial costs on Plaintiff.

602.     The nuisance undermines public health, quality of life, and safety. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within families and entire communities. It has created a public health crisis.

603.     Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in facilitating widespread opioid addiction and failing to identify, halt, and report suspicious opioid transactions.

604.     Defendants knew of the public health hazard their conduct would create. It was foreseeable to Defendants that their conduct would unreasonably interfere with the ordinary comfort, use, and enjoyment of the Tribal residents in the Tribe's communities.

605.     Defendants' conduct is unreasonable, intentional, unlawful, reckless, and/or negligent.

606.     At all times, all Defendants possessed the right and ability to control the nuisance causing an outflow of opioids from pharmacy locations or other points of sale. National Retail Pharmacies Defendants had the power to shut off the supply of illicit opioids to Plaintiff and in the geographic areas surrounding the Plaintiff.

607.     As a direct and proximate result of the nuisance, Plaintiff has sustained economic harm by spending a substantial amount of money trying to remedy the harms caused by Defendants' nuisance-causing activity. In short, the Defendants created a mess, leaving the Plaintiff the costs of cleaning it up. This is a classic nuisance.

608.     The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

609.    Defendants should be required to pay the expenses Plaintiff has incurred or will incur in the future to fully abate the nuisance.

610.    The acts forming the basis of the nuisance claim against the Defendants were wanton, malicious and/or attended with circumstances of aggravation.

611.    Therefore, Plaintiff demands judgment in its favor against the Defendants for injunctive relief, abatement of the public nuisance, and for damages in an amount to be determined by a jury, together with all cost of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against All Defendants)

612.    The Tribe re-alleges and incorporates by reference the foregoing paragraphs.

613.    The Tribe has expended substantial amounts of money to fix or mitigate the societal harms caused by Defendants' conduct.

614.    The expenditures by the Tribe in providing healthcare services to people who use opioids have added to Defendants' wealth. The expenditures by the Plaintiff has helped sustain Defendants' businesses.

615.    The Tribe has conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities—the costs of the harm caused by Defendants' negligent distribution and sales practices.

616.    Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

617.     Defendants made substantial profits while fueling the prescription drug epidemic in the Plaintiff's community.

618.     Defendants continue to receive considerable profits from the distribution of controlled substances in the Plaintiff's Indian Lands.

619.     Defendants have been unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

620.     It would be inequitable to allow Defendants to retain benefits or financial advantage.

621.     The Tribe demands judgment against each Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

## FOURTH CLAIM FOR RELIEF
### FRAUD AND DECEIT
### (Against All Defendants)

622.     Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

623.     This claim is brought under the Alabama common law of fraud and deceit.

624.     As alleged herein, Defendants violated their duty not to actively deceive by intentionally and unlawfully making knowingly false statements, and by intentionally and unlawfully omitting and/or concealing information.

625.     Defendants made misrepresentations and failed to disclose material facts to physicians and consumers throughout Alabama and the United States, including the Tribe, to induce the physicians to prescribe and administer, and consumers to purchase and consume, opioids as set forth herein.

626.     Specifically, the Marketing Defendants' knowing deceptions during the relevant period, which were intended to induce reliance, include but are not limited to:

a.     Marketing Defendants' misrepresentations overstating the benefits of, and evidence for, the use of opioids in chronic pain;

b.     Marketing Defendants' misrepresentations that the risks of long-term opioid use, especially the risk of addiction, were overblown;

c.     Marketing Defendants' misrepresentations that opioid doses can be safely and effectively increased until pain relief is achieved;

d.     Marketing Defendants' misrepresentations that signs of addiction were "pseudoaddiction" and thus reflected undertreated pain, which should be responded to with more opioids;

e.     Marketing Defendants' misrepresentations that screening tools effectively prevent addiction;

f.     Marketing Defendants' misrepresentations concerning the comparative risks of NSAIDs and opioids;

g.     Marketing Defendants' misrepresentations that opioids differ from NSAIDs in that opioids have no ceiling dose;

h.     Marketing Defendants' misrepresentations that evidence supports the long-term use of opioids for chronic pain;

i.     Marketing Defendants' misrepresentations that chronic opioid therapy would improve patients' function and quality of life;

j.     Marketing Defendants' false portrayal of their efforts and/or commitment to rein in the diversion and abuse of opioids;

k.     Marketing Defendants' misrepresentations that withdrawal is easily managed;

l.     Endo's misrepresentations that alleged abuse-deterrent opioids reduce tampering and abuse;

m.     Teva's misrepresentations that Actiq and Fentora were appropriate for treatment of non-cancer pain and its failure to disclose that Actiq and Fentora were not approved for such use;

n.     Cephalon's unsubstantiated claims that Actiq and Fentora were appropriate for treatment of non-cancer pain;

o.    Marketing Defendants' use of front groups to misrepresent that the deceptive statements from the sources described in this Complaint came from objective, independent sources;

p.    Marketing Defendants' creation of a body of deceptive, misleading and unsupported medical and popular literature, advertisements, training materials, and speaker presentations about opioids that (1i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors; and

q.    Such other misrepresentations and deceptions outlined above.

627.    By engaging in the acts and practices alleged herein, Marketing Defendants, in the relevant time period and with the intent that others rely on their omissions or suppression of information, omitted material facts that Marketing Defendants had a duty to disclose by virtue of these Defendants' other representations, including but not limited to:

a.    Opioids are highly addictive and may result in overdose or death;

b.    No credible scientific evidence supports the use of screening tools as a strategy for reducing abuse or diversion;

c.    High dose opioids subject the user to greater risks of addiction, other injury, and/or death;

d.    Opioids present the risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, dizziness, increased falls and fractures in the elderly, NAS, and potentially fatal interactions with alcohol or benzodiazepines; these omissions were made while Defendants exaggerated the risks of competing products such as NSAIDs;

e.    Claims regarding the benefits of chronic opioid therapy lacked scientific support or were contrary to the scientific evidence;

f.    Endo's abuse-deterrent formulations are not designed to address, and have no effect on, the common route of abuse (oral), can be defeated with relative ease, and may increase overall abuse;

g.    Marketing Defendants' failure to report suspicious prescribers and/or orders;

h.    Cephalon's failure to disclose that Actiq and Fentora were not approved for non-cancer pain;

i.   Marketing Defendants' failure to disclose their financial ties to and role in connection with KOLs, front groups, and deceptive literature and materials, as more fully described above; and

j.   Such other omissions and concealments as described above in this Complaint.

628.   In each of the circumstances described *inter alia* the foregoing paragraph, Marketing Defendants knew that their failure to disclose rendered their prior representations untrue or misleading.

629.   In addition, and independently, Marketing Defendants had a duty not to deceive Plaintiff because Defendants had in their possession unique material knowledge that was unknown, and not knowable, to the Tribe, its citizens, and its communities.

630.   Marketing Defendants intended and had reason to expect under the operative circumstances that Plaintiff, their agents, their communities, physicians, and persons on whom Plaintiff and their agents relied would be deceived by Defendants' statements, concealments, and conduct as alleged herein and that Plaintiff would act or fail to act in reasonable reliance thereon.

631.   Marketing Defendants intended that Plaintiff, their agents, their communities, physicians, and persons on whom Plaintiff and their agents relied would rely on these Defendants' misrepresentations and omissions; Defendants intended and knew that this reasonable and rightful reliance would be induced by these Defendants' misrepresentations and omissions; and, Defendants intended and knew that such reliance would cause Plaintiff to suffer loss.

632.   By engaging in the acts and practices alleged herein, National Retail Pharmacies Defendants, in the relevant time period and with the intent that others rely on their omissions or suppression of information, omitted material facts that National Retail Pharmacies Defendants had a duty to disclose by virtue of these Defendants' other representations, including but not limited to:

a.   There is no legitimate medical purpose for the copious amounts of opioids shipped into and around Plaintiff's communities;

b.   That they failed to report to the DEA suspicious orders;

c.   That they failed to maintain effective controls against diversion of controlled substances into other than legitimate medical scientific and industrial channels by sales to certain customers;

d.   That they failed to prevent against diversion from legitimate to non-legitimate channels;

e.   That they failed to conduct meaningful due diligence to ensure that controlled substances were not diverted into other than legitimate channels;

f.   That they failed to keep and maintain accurate records of Schedule II – V controlled substances; and

g.   Such other omissions or concealments as alleged above in this Complaint.

633.   National Retail Pharmacies Defendants intended and had reason to expect under the operative circumstances that Plaintiff, their agents, their communities, physicians, and persons on whom Plaintiff relied would be deceived by Defendants' statements, concealments, and conduct as alleged herein and that Plaintiff would act or fail to act in reasonable reliance thereon.

634.   National Retail Pharmacies Defendants intended that Plaintiff, their agents, their communities, physicians, and persons on whom Plaintiff and their agents relied would rely on these Defendants' misrepresentations and omissions; Defendants intended and knew that this reasonable and rightful reliance would be induced by these Defendants' misrepresentations and omissions; and, Defendants intended and knew that such reliance would cause Plaintiff to suffer loss.

635.   The Tribe and tribal members rightfully, reasonably, and justifiably relied on Marketing Defendants' representations and/or concealments, both directly and indirectly. As the Marketing Defendants knew or should have known Plaintiff were directly and proximately injured as a result of this reliance, Plaintiff's injuries were directly and proximately caused by this reliance.

636.    As a result of these representations and/or omissions, Plaintiff proceeded under the misapprehension that the opioid crisis was simply a result of conduct by persons other than Defendants. Consequently, these Defendants prevented Plaintiff from a timelier and more effective response to the opioid epidemic.

637.    Defendants' false representations and omissions were material and were made and omitted intentionally and recklessly.

638.    Defendants' misconduct alleged, in this case, is ongoing and persistent.

639.    Defendants' misconduct alleged, in this case, does not concern a discrete event or discrete emergency of the sort Plaintiff would reasonably expect to occur and is not part of the normal and expected costs of a Tribe. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a Tribe can reasonably expect.

640.    Plaintiff has incurred expenditures related to the opioid epidemic.

641.    These Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

642.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

643.    Plaintiff has suffered monetary damages as aforesaid. As such Plaintiff seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, as well as attorney fees, and costs, and pre- and post-judgment interest.

**FIFTH CLAIM FOR RELIEF**
**WANTONNESS**
**(Against All Defendants)**

644.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

645.    This cause of action is brought under Alabama common law relating to wantonness.

646.    The actions and failure to act of the Defendants enumerated in this complaint were made consciously and with reckless disregard of the rights and safety of others and Defendants were aware that harm would likely or probably result from their actions or failure to act.

647.    As a direct and proximate result of Defendants' wantonness, Plaintiff has suffered and continues to suffer injury-in-fact and actual damages.

648.    As a proximate result of Defendants' wantonness, Defendants have caused Plaintiff's injury related to the diagnosis and treatment of opioid-related conditions. Plaintiff has incurred massive costs by providing uncompensated care as a result of opioid-related conditions.

649.    As a result of the Defendants' wantonness, Plaintiff is entitled to compensatory and punitive damages, in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (Against the Marketing Defendants and National Retail Pharmacy Defendants)

650.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

651.    Plaintiff brings this claim under Alabama common law providing for the civil liability of persons who conspire to commit one or more unlawful acts.

652.    Defendants engaged in a common design between two or more persons to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, an overt act in furtherance of the conspiracy, and resulting injury to Plaintiff.

653.    Defendants engaged in a combination and an agreement to act in concert in their tortious and/or otherwise unlawful marketing of opioids and/or distribution of opioids in Plaintiff's communities.

654.    Defendants engaged in one or more unlawful activities to further the conspiracy. The objects of the conspiracy were nuisance, negligence, fraud, misrepresentation, violation of AUCSA, and other unlawful conduct as described above in this Complaint. Defendants knew that these objects were unlawful and would be accomplished by unlawful means such as fraud, misrepresentations, and omissions.

655.    Defendants each conspired with various KOLs and Front Groups to commit unlawful or lawful acts in an unlawful manner. Defendants and the various KOLs and Front Groups with which each of them were allied, knowingly and voluntarily agreed to engage in unfair and deceptive practices to promote and distribute opioids for the treatment of chronic pain by making and disseminating false, unsubstantiated, and misleading statements and misrepresentations to prescribers and consumers. Defendants enlisted various KOLs and Front Groups to make and disseminate these statements in furtherance of their common strategy to increase the sale and distribution of opioids, and Defendants – along with the KOLs and Front Groups with whom each of them conspired – knew that the statements they made and disseminated served this purpose.

656.    By engaging in the conduct described in this Complaint, Defendant Cephalon agreed with Front Groups FSMB and APF that they would deceptively promote the risks, benefits and superiority of opioid therapy. As part of its agreements with FSMB and APF, Cephalon provided support for FSMB's and APF's deceptive statements promoting opioids and FSMB and APF used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Cephalon's drugs. *Responsible Opioid Prescribing* (Cephalon and FSMB) and

*Treatment Options: A Guide for People Living with Pain* (Cephalon and APF) are publications that contained a number of deceptive statements about opioids as outlined *supra.* They are products of these conspiracies, and the collaboration between Cephalon and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

657.    By engaging in the conduct described in this Complaint, Defendant Endo agreed with Front Groups APF, NICP, AGS and FSMB that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with APF, NIPC, AGS and FSMB, Endo provided support for APF, NICP, AGS and FSMB's deceptive statements promoting opioids and APF, NICP, AGS and FSMB used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Endo's drugs. *Persistent Pain in the Older Adult* (Endo, APF, and NIPC), *Persistent Pain in the Older Patient* (Endo, APF, and NIPC), *Painknowledge.com* (Endo, APF, and NIPC), *Exit Wounds* (Endo and APF), *Pharmacological Management of Persistent Pain in Older Persons* (Endo and AGS), and *Responsible Opioid Prescribing* (Endo and FSMB) are publications, CMEs, and websites that contained a number of deceptive statements about opioids as outlined *supra.* They are products of these conspiracies, and the collaboration between Endo and each of these entities in creating and disseminating these publication, CMEs, and websites is further evidence of each conspiracy's existence.

658.    By engaging in the conduct described in this Complaint, Defendant Janssen agreed with Front Groups AAPM, AGS and APF that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with AAPM, AGS, and APF, Janssen provided support for AAPM, AGS, and APF's deceptive statements promoting opioids and Conrad & Associates LLC, Medical Writer X, AAPM, AGS, and APF used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Janssen's drugs.

*Finding Relief: Pain Management for Older Adults* (Janssen, AAPM, and AGS), a CME promoting the *Pharmacological Management of Persistent Pain in Older Persons* (Janssen and APF), the *Let's Talk Pain* website (Janssen and APF), and *Exit Wounds* (Janssen and APF) are publications, CMEs, and websites that contained a number of deceptive statements about opioids as outlined *supra*. They are products of these conspiracies and the collaboration between Janssen and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

659.   Each of the participants to the conspiracies outlined above was aware of the misleading nature of the statements they planned to issue and of the role they played in each scheme to deceptively promote opioids as appropriate for the treatment of chronic pain. These Defendants and third parties nevertheless agreed to misrepresent the risks, benefits, and superiority of using opioids to Plaintiff in return for increased pharmaceutical sales, financial contributions, reputational enhancements, and other benefits.

660.   Each of the participants to the conspiracies outlined above was aware of the nuisance resulting from their conduct and agreed to continue the practices described above that resulted in the maintenance of that nuisance.

661.   Defendants knew that their own conduct could be reported by other Defendants and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting or suspicious orders to ensure consistency in their dealings with DEA.

662.   The Defendants also worked together to ensure that the opioid quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the

DEA in order to ensure that the DEA had no basis for refusing to increase or decrease production quotas due to diversion.

663.    The Defendants further worked together in their unlawful failure to act to prevent diversion and failure to monitor for, report, and prevent suspicious order of opioids.

664.    The desired consistency, and collective end goal was achieved. Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

665.    By reason of Defendants' unlawful acts, Plaintiff has been damaged and continues to be damaged by paying the costs of Defendants' externalities and has suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain.

666.    Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

667.    Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

668.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

669.    As outlined above, Defendants played an active role in determining the substance of the misleading messages issued by KOLs and Front Groups, including by providing content themselves, editing and approving content developed by their co-conspirators, and providing slide decks for speaking engagements. Defendants further ensured that these misstatements were widely disseminated by both distributing the misstatements themselves and providing their co-

conspirators with funding and other assistance with distribution. The result was an unrelenting stream of misleading information about compliance with state and federal legislation as related to opioid distribution, and the risks, benefits, and superiority of using opioids to treat chronic pain from sources Defendants knew were trusted by prescribers and consumers. Defendants exercised direct editorial control over most of these statements. However, even if Defendants did not directly disseminate or control the content of these misleading statements, they are liable for conspiring with the third parties who did.

670.    Defendants had a meeting of the minds on the object of or course of action for this conspiracy. Defendants knew and agreed upon the unlawful object or course of action for this conspiracy. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiff.

671.    Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

672.    Defendants' misconduct alleged, in this case, is ongoing and persistent.

673.    Defendants' misconduct alleged, in this case, does not concern a discrete event or discrete emergent of the sort the Tribe would reasonably expect to occur and is not part of the normal and expected costs of the Tribe. Plaintiff alleges wrongful acts which are neither discrete nor of the sort the Tribe can reasonably expect.

674.    Plaintiff has incurred expenditures for special programs.

675.    Because of Defendants' dissemination of false information and misleading information of opioid risks, benefits, and sustainability for chronic pain, and false and misleading statements regarding compliance with Alabama law concerning the distribution of opioids, Defendants are responsible for the costs incurred by Plaintiff.

676.    Defendants conspired to create a public nuisance and to commit tortious conduct and are therefore jointly and severally liable for the damages flowing from the conspiracy.

677.    Plaintiff, therefore, request this Court to enter an order awarding judgment in its favor against Defendants, compelling Defendants to pay the direct and consequential damages, and awarding Plaintiff such other, further, and different relief as this Court may deem just and proper.

## SEVENTH CLAIM FOR RELIEF
## ALABAMA DECEPTIVE TRADE PRACTICES ACT

678.    Plaintiff realleges and incorporates by reference all paragraphs above.

679.    Defendants violated the Alabama Deceptive Trade Practices Act, Ala. Code § 18-19-1, et seq. ("ADTPA") by engaging in unfair and deceptive acts or practices and/or unconscionable consumer sales acts and practices in this state.

680.    This Cause of Action is brought in the public interest under the ADTPA and seeks a declaratory judgment that Defendants have violated the ADTPA, an injunction enjoining Defendants' misrepresentations and other misconduct described in this Complaint, restitution to Plaintiff who on behalf of its citizens paid for opioid prescriptions for chronic pain and therefore have been damaged by Defendants' conduct, and civil penalties, and restitution to Plaintiff who suffered financial losses to their annual budgets from increased associated costs in addressing the opioid epidemic caused by the Defendants. The ADTPA prohibits, in connection with consumer transactions, unfair, deceptive or unconscionable consumer sales practices that mislead consumers about the nature of the product they are receiving. The ADTPA prohibits sellers from representing that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have.

681.    The following acts are deemed to be deceptive under Alabama law:

i.      Making any express or implied statement in connection with the marketing or advertisement of any product that is false, or has the capacity, tendency or effect of deceiving or misleading consumers; or omitting any material information such that the express or implied statement deceives or tends to deceive consumers.

ii.     Making any representation, in connection with the marketing or advertising of a product, about research that has been performed, including but not limited to, any representation that a product has been clinically tested unless at the time the claim is made, competent and reliable scientific evidence exists substantiating such claim.

iii.    Making in connection with the marketing or advertising of a product any . . . statements or representations concerning a product that materially contradict or conflict with any other statements or representations the Defendants made about such Product and rend such statements or representations misleading and/or deceptive.

iv.     Making, or causing to be made, any written or oral claim that is false, misleading or deceptive.

v.      Representing that any product has any sponsorship, approval, characteristics, ingredients, uses, benefits, quantities, or qualities that it does not have.

vi.     Representing that any product has any sponsorship, characteristics, ingredients, uses, benefits, quantities, or qualities that it does not have.

vii.    Making in a promotional context an express or implied representation, not approved or permitted for use in the labeling or under the FDCA, that a product is better, more effective, useful in a broader range of conditions or patients, safer, has fewer, or less incidence of, or less serious side effects or contraindications than has been demonstrated by competent and reliable scientific evidence, whether or not such express or implied representation is made by comparison with another drug or treatment, and whether or not such a representation or suggestion is made directly or through use of published or unpublished literature, a quotation, or other references.

682.    As alleged herein, each Defendant, at all times relevant to this Complaint, violated the ADTPA by making deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

683.    Plaintiff has suffered monetary damages as aforesaid. As such, Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, as well as attorneys' fees, costs, and pre-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks that the Court:

A.    Enter judgment against Defendants, jointly and severally, and in favor of Plaintiff;

B.    Award compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages; punitive damages; pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate; and such equitable relief against Defendants as the Court should find appropriate, including disgorgement of illicit proceeds, injunctive relief, abatement and other orders;

C.    Award Plaintiff their costs of suit; including reasonable attorneys' fees as provided by law;

D.    Award such further and additional relief as the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 3, 2020

Respectfully Submitted,

*/s/ T. Roe Frazer II*
T. Roe Frazer II (6624-R42T)
Patrick D. McMurtray (3387-M37P)
FRAZER PLC

30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
roe@frazer.law
patrick@frazer.law

*To be Admitted Pro Hac Vice:*

Thomas Roe Frazer III
W. Matthew Pettit
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
trey@frazer.law
mpettit@frazer.law

Archie Lamb
THE LAW FIRM OF LEVIN PAPANTONIO
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
alamb@levinlaw.com

J. Nixon Daniel, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
jnd@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
2013 1st Avenue North, Ste 450
Birmingham, Alabama  35203
(205) 252-6127
ftk@thekuykendallgroup.com

Revised 1-1-04; 4-1-99; 11-1-99

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | | |
|---|---|---|
| _____ | * | |
| _____ | * | |
| Plaintiff(s) | * | |
| vs. | * | CIVIL ACTION NO. _____ |
| _____ | * | DATE COMPLAINT FILED _____ |
| _____ | * | |
| Defendant(s) | * | |

## ASSIGNMENT TO EXPEDITED CASE MANAGEMENT SYSTEM AND GENERAL PRE-TRIAL ORDER

This case has been placed on the Expedited Case Management System which is designed to dispose of a case within 12 months after filing.

## OBJECTION TO INCLUSION IN SYSTEM

If a party to this cause believes that the cause is extremely complex or will involve unique problems and will be impossible to prepare for trial within the time frame of the system, he may, within 40 days after the date of this order, or if the party has not been served at the date of this order, within 40 days after service, file a motion requesting that the cause not be included in the system and that the parties be allowed additional time to prepare the cause for trial. A motion filed later than the aforesaid 40 days will not be considered by the Court. Oral argument may be requested on an exclusion motion. If a cause is excluded from the system by the Court, a discovery schedule will be set by the Court after conference with the parties. If a case is so excluded the general pre-trial portion of this order will remain in effect unless specifically altered by the Court.

## DISCOVERY

Unless the Court sets a shorter time, all pre-trial discovery shall be completed within 270 days after filing of the complaint unless party filing the Motion to Set and Certificate of Readiness requests an additional period of time, not to exceed 60 days, and certifies that all discovery will be concluded within that time. Notwithstanding the foregoing, for good cause shown, the Court may permit, or the parties may agree, that additional discovery procedures be undertaken anytime prior to trial, so long as such discovery can be completed so as not to require a continuance of the trial setting.

## MOTION TO SET AND CERTIFICATE OF READINESS

Counsel for the plaintiff shall, and counsel for any other party may, file a Motion to Set and Certificate of Readiness, which shall be filed not later than 270 days after the filing of the complaint. If such a motion is not filed by the 280th day, the Court will place the case marked "To Be Dismissed" on a disposition docket as near as possible to the 300th day and send notice of such to all parties. If a Motion to Set and Certificate of Readiness is not received by the Court prior to the disposition date, the case will be dismissed.

The Motion to Set and Certificate of Readiness will be in a form similar to that available of in the clerk's office and will contain the following information:

(1)     The date the complaint was filed;

(2) That the issues in the case have been defined and joined;

(3) That all discovery has been completed or will be completed within 60 days after the filing of the Certificate of Readiness;

(4) That a jury trial has or has not been demanded;

(5) The expected length of the trial expressed in hours and/or days;

(6) A brief description of the plaintiff's claim;

(7) The names, addresses and telephone numbers of the parties or their attorneys responsible for their litigation;

(8) That the movant certifies that all expert witnesses expected to testify at trial have been disclosed to all parties, together with a summary of their opinions;

(9) That the movant acknowledges his/her responsibility to make all documents, exhibits, and physical evidence, or copies thereof, expected to be used in the case in chief available to the other parties, not less than 21 days prior to trial, for inspection and copying;

(10) That the movant certifies that he/she has read the pre-trial order, that he/she has complied with it to date and will comply with its requirements in the future.

The filing by the plaintiff of a Motion to Set and Certificate of Readiness constitutes the voluntary dismissal of all fictitious parties whose true names have not been substituted.

## CONTROVERTING CERTIFICATE

Within 14 days after a Motion to Set and Certificate of Readiness has been filed, counsel for any other party may file a Controverting Certificate specifying the particular statements contained in the Certificate of Readiness to which objection is made, and the reasons therefore. Oral argument may be requested. The Court shall thereupon enter an order placing the case on the Active Calendar either immediately or, where good cause is shown, at a specified later date.

## ACTIVE CALENDAR

Fourteen days after a Motion to Set and Certificate of Readiness is filed, if a Controverting Certificate has not been filed, the case shall be placed on the Active Calendar, unless otherwise ordered by the Court.

## SETTING FOR TRIAL

Unless specifically set by the Court, cases on the Active Calendar shall be set for trial generally in the same order as they came on the Active Calendar and as soon as possible. Preference shall be given to cases which by statute, rule or order of the Court are entitled to priority. Counsel shall be given at least sixty days notice of the trial date.

## DELAY

When a case has been set for trial, no postponement of the trial will be considered by the Court except on a written motion substantially in the form previously approved by the Court. (Obtain from the Court a Request for Delay form.)

NOTIFICATION OF SETTLEMENT

In order to provide other litigants with prompt trial settings all attorneys shall notify the Court of settlement, regardless of to status or state of the case (discovery stage, active calendar or trial calendar).

### GENERAL PRE-TRIAL ORDER

To expedite pre-trial and trial procedure, it is ORDERED by the Court that the following will apply:

1.    EXHIBITS, DOCUMENTS, AND PHYSICAL EVIDENCE, GENERALLY

a.     Each party shall identify in writing to all other parties and shall make all documents, exhibits and physical evidence, or copies thereof, expected to be used in the case in chief available to the other parties, not less than 21 says prior to trial, for inspection and copying. The same shall then be authenticated and admitted into evidence without further proof, unless written objections to any such documents or exhibits be made to the Court not less than 14 days prior to trial specifying the grounds of objection to the genuineness and relevancy of the proposed document, exhibit, or physical evidence. The requirement does not apply to documents, exhibits and physical evidence used solely as impeachment evidence.

b.     Documents, exhibits or physical evidence not timely exhibited to or made available to other parties prior to trial under this Order will not be admitted into evidence at the trial unless solely for impeachment purposes or unless the ends of justice so require.

c.     Documents, exhibits or physical evidence so admitted hereunder shall be presented to the court reporter for marking in evidence prior to trial.

2.    DOCTOR, HOSPITAL AND MEDICAL RECORDS

a.     If applicable, all doctor, medical and hospital bills shall be sent to or made available to all parties not less than 21 days before trial and shall be admitted in evidence as reasonable without further proof, unless written objection to any such bills be made to the Court no less than 14 days before trial specifying the grounds for objection.

b.     Any such bills not timely exhibited to the other parties will not be admitted in evidence at trial unless the ends of justice so require.

c.     The bills so admitted shall be presented to the court reporter for marking in evidence prior to trial.

3.    DAMAGES

a.     All parties seeking special damages shall furnish the other parties with a list thereof not less than 21 days before trial. Written objections thereto may be made not less than 14 days before trial specifying the grounds of objections.

b.     Evidence of special damages claimed, but not timely exhibited to other parties, will not be admitted into evidence unless the ends of justice so require.

4.    AGENCY-TIME AND PLACE-DUTY

a.     Agency and the time and place of the incident involved, if alleged in the complaint, and, if a negligence case, the existence of a duty, are admitted and the parties are deemed correctly named and designated unless specifically denied by answer or unless written objection is made not less than 14 days before trial. The objections shall include the correct name and entity and/or the grounds relied on.

5.   EXPERTS

a.   Unless previously obtained by discovery, each party will furnish to all other parties the names, addresses and qualifications of all expert witnesses expected to testify, together with a brief summary of their opinions. Such disclosure of experts shall be made by the party filing the Motion to Set and Certificate of Readiness not later than the time of filing such motion. Disclosure by all parties shall be made not later than 14 days after the filing of the Motion to Set and Certificate of Readiness.

b.   Disclosure of experts in cases not included in the Fasttrack system shall be made by all parties not less than 60 days before trial.

c.   Unless written objection to the qualifications of an expert is made not later than 30 days before trial, stating grounds, the qualification of such experts will be admitted.

d.   Upon calling an expert to testify at trial, the attorney may state to the Court and jury the name, address and summary of the qualifications of the expert.

6.   JURY INSTRUCTIONS

If the case is to be tried by a jury, requested written charges shall be submitted to the Court not later than the close of the plaintiff's case, subject to supplementation during the course of the trial on matters which could not be reasonably anticipated. Each requested charge will be typed on letter sized paper and identified by the party's last name and shall be numbered.

7.   JURY SELECTION

Before the commencement of trial, the parties will furnish or advise the court, outside the presence of the jury, the names of all insurance companies involved and any special voir dire questions for the purpose of qualifying the jury.

8.   DUTY TO SUPPLEMENT DISCOVERY

All parties are under duty to supplement responses to discovery as provided by Rule 26(e)(3) ARCP which should be done not less than 30 days before trial.

9.   MOTIONS GENERALLY

If motion to strike or motion to dismiss a pleading is filed, the Court will not consider such unless a copy of the pleading sought to be struck or dismissed is attached thereto.

10.   CONFLICTS

In the event of scheduling conflict affected counsel shall comply with the Attorney Calendar Conflict Resolution Order of the Alabama Supreme Court.

It is further ORDERED by the Court that the Court will reconsider any portion of the General Pre-Trial Order upon timely application by any party.

Done this the _____ day of _____

_____
Presiding Judge, John R. Luckett

ELECTRONICALLY FILED
4/29/2020 11:34 AM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

# STATE OF ALABAMA

**Unified Judicial System**

02-MOBILE

☐ District Court   ☑ Circuit Court

Revised 3/5/08

Cas...   CV2...

## CIVIL MOTION COVER SHEET

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL

*Name of Filing Party:* D025 - CVS HEALTH CORPORATION
D026 - CVS PHARMACY, INC.
D027 - CVS INDIANA, L.L.C.

*Name, Address, and Telephone No. of Attorney or Party. If Not Represented.*

CASON M KIRBY

505 20th Street North, Suite 1600

Birmingham, AL 35203

*Attorney Bar No.:* KIR044

☐ Oral Arguments Requested

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative Summary Judgment ($50.00) | ☐ Continue |
| | ☐ Deposition |
| ☐ Renewed Dispositive Motion (Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Designate a Mediator |
| | ☐ Judgment as a Matter of Law (during Trial) |
| ☐ Summary Judgment pursuant to Rule 56 ($50.00) | ☐ Disburse Funds |
| ☐ Motion to Intervene ($297.00) | ☑ Extension of Time |
| ☐ Other _____ | ☐ In Limine |
| pursuant to Rule _____ ($50.00) | ☐ Joinder |
| | ☐ More Definite Statement |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| | ☐ New Trial |
| ☐ Local Court Costs $ 0 | ☐ Objection of Exemptions Claimed |
| | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| | ☐ Other _____ |
| | pursuant to Rule _____ (Subject to Filing Fee) |

Check here if you have filed or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) ☐

Date:
4/29/2020 11:31:45 AM

Signature of Attorney or Party
/s/ CASON M KIRBY

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

ELECTRONICALLY FILED
4/29/2020 11:34 AM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| **POARCH BAND OF CREEK INDIANS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No.: CV-2020-900755** |
| **AMNEAL PHARMACEUTICALS,** ) | |
| **LLC,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## JOINT STIPULATION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT

Plaintiff Poarch Band of Creek Indians and Defendants CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, L.L.C., (collectively "CVS"), Walgreen Eastern Co., Inc., Walgreen Co.[1] (collectively "Walgreens"), Walmart Inc.,[2] Wal-Mart Stores East, LP (collectively "Walmart"), Rite Aid of Alabama, Inc., Rite Aid of Maryland, Inc. (collectively "Rite Aid"), The Kroger Co., and Kroger Limited Partnership II (collectively "Kroger") stipulate to an extension of time through and including June 19, 2020 for CVS, Walgreens, Walmart, Rite Aid, and Kroger —with reservation of all rights and defenses including lack of personal jurisdiction—to answer, move to dismiss, or otherwise respond to the Complaint, and jointly request that the Court enter the proposed Order attached hereto as Exhibit A.

Dated: April 29, 2020

*/s/ Cason M. Kirby*
Andrew P. Campbell

---

[1] Plaintiff incorrectly identifies this entity as "Walgreen Co., Inc." in its Complaint.

[2] Plaintiff named Wal-Mart Inc. as a defendant to this action; as of February 1, 2018, Wal-Mart Stores, Inc. became known as Walmart Inc., not Wal-Mart Inc.

Cason M. Kirby
CAMPBELL PARTNERS, LLC
505 20th Street North, Suite 1600
Birmingham, Alabama 35203
Telephone:  (205) 224-0752
Facsimile:  (205) 383-2672
andy@campbellpartnerslaw.com
cason@campbellpartnerslaw.com

Conor B. O'Croinin*
J. Michael Pardoe*
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland  21202-1031
Telephone:  (410) 949-1160
Facsimile:  (410) 659-0436
cocroinin@zuckerman.com
mpardoe@zukerman.com

*Counsel for CVS Health Corporation, CVS
Pharmacy, Inc., and CVS Indiana, LLC*


*/s/ Anne Stone Sumblin (with permission)*
Anne Stone Sumblin
STONE SUMBLIN LAW LLC
600 Highway 52
P. O. Box 345
Kinston, AL 36453
Tel: 334.565.3380
Fax: 334.565.3076
anne@stonesumblinlaw.com

Lester C. Houtz*
Alex J. Harris*
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
les.houtz@bartlitbeck.com
alex.harris@bartlitbeck.com

*Counsel for Walgreen Co.
and Walgreen Eastern Co., Inc.*

*/s/ Alan T. Hargrove, Jr. (with permission)*
Alan T. Hargrove, Jr.
Dennis R. Bailey
RUSHTON, STAKELY, JOHNSTON &
GARRETT, P.A.
Post Office Box 270
Montgomery, Alabama 36101-0270
(334) 206-3100
(334) 481-0812 fax
ath@rushtonstakely.com
drb@rushtonstakely.com

*Counsel for Walmart Inc. and Wal-Mart Stores East, LP*

*/s/ George R. Irvine, III (with permission)*
George R. Irvine, III
STONE CROSBY, P.C.
8820 Highway 90
Daphne, Alabama 36526
Telephone: 251-626-6696
Facsimile: 251-626-2617
girvine@stonecrosby.com

Kelly A. Moore*
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10078-6612
Tel: (212) 309-6612
Fax: (212) 309-6001
kelly.moore@morganlewis.com

Coleen M. Meehan*
Elisa P. McEnroe*
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-5892/5917
Fax: (215) 963 5001
coleen.meehan@morganlewis.com
elisa.mcenroe@morganlewis.com

*Counsel for Rite Aid of Maryland, Inc. and Rite Aid of Alabama, Inc.*

*/s/ Sela S. Blanton (with permission)*
Sela S. Blanton
Elizabeth L. Nicholson
BAINBRIDGE, MIMS, ROGERS & SMITH, LLP
600 Luckie Drive, Suite 415
P.O. Box 530886
Birmingham, AL 35253
Main: (205) 879-1100
Fax: (205) 879-4300
sblanton@bainbridgemims.com
bnicholson@bainbridgemims.com

Christopher N. Nahley*
Ronda L. Harvey*
BOWLES RICE LLP
Fifth Floor, United Square, 501 Avery Street
P.O. Box 49
Parkersburg, West Virginia 26102-0049
Tel.: (304) 420-5518
cnahley@bowlesrice.com
rharvey@bowlesrice.com

*Counsel for The Kroger Co.,*
*Kroger Limited Partnership II*

*\* denotes national counsel appearing pro hac vice*

*/s/ T. Roe Frazer II (with permission)*
T. Roe Frazer II
FRAZER PLC
30 Burton Hills Blvd. Suite 450
Nashville, TN 37215
Tel.: (615) 647-6464
roe@frazer.law

*Counsel for Poarch Band of Creek Indians*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 29th day of April, 2020, I filed the foregoing with the clerk of the Court using the AlaFile system, which will electronically serve all counsel of record.

/s/ Cason M. Kirby
Of Counsel

ELECTRONICALLY FILED
4/29/2020 11:54 AM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

# EXHIBIT  A

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| **POARCH BAND OF CREEK INDIANS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No.: CV-2020-900755** |
| **AMNEAL PHARMACEUTICALS,** ) | |
| **LLC,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## ORDER GRANTING EXTENSION OF TIME TO RESPOND TO COMPLAINT

This cause having come before the Court on Plaintiff's and Defendants CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, L.L.C., (collectively "CVS"), Walgreen Eastern Co., Inc., Walgreen Co. (collectively "Walgreens"), Walmart Inc.,[1] Wal-Mart Stores East, LP (collectively "Walmart"), Rite Aid of Alabama, Inc., Rite Aid of Maryland, Inc. (collectively "Rite Aid"), The Kroger Co., and Kroger Limited Partnership II's (collectively "Kroger") April 29, 2020 Joint Stipulation for Extension of Time to Respond to Complaint, and the Court having reviewed the stipulation, finds that it is well taken and shall be granted.

The Court hereby ORDERS and ADJUDGES that Defendants CVS, Walgreens, Walmart, Rite Aid, and Kroger shall have through and including June 19, 2020 to respond to the Complaint.

**DONE AND ORDERED** this ___ day of _____, 2020.

_____
Hon. Jay A. York
Circuit Judge

---

[1] Plaintiff named Wal-Mart Inc. as a defendant to this action; as of February 1, 2018, Wal-Mart Stores, Inc. became known as Walmart Inc., not Wal-Mart Inc.



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CASON M KIRBY
cason@campbellpartnerslaw.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   AMNEAL PHARMACEUTICALS, INC. (PRO SE)
251 LITTLE FALLS DRIVE
WILMINGTON, DE, 19808-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  AMNEAL PHARMACEUTICALS, LLC (PRO SE)
2 NORTH JACKSON ST., STE
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  TEVA PHARMACEUTICALS USA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   CEPHALON, INC. (PRO SE)
3411 SILVERSIDE ROAD, STE
TATNALL BUIDLING
WILMINGTON, DE, 19810-0000

---

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  JOHNSON & JOHNSON (PRO SE)
ONE JOHNSON & JOHNSON PLA
NEW BRUNSWICK, NJ, 08933-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION

D026 CVS PHARMACY, INC.

D027 CVS INDIANA, L.L.C.

MOTION FOR EXTENSION OF TIME

[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   JANSSEN PHARMACEUTICALS, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  NORAMCO, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES (PRO SE)
60 COMMERCE STREET
MONTGOMERY, AL, 36103-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION

D026 CVS PHARMACY, INC.

D027 CVS INDIANA, L.L.C.

MOTION FOR EXTENSION OF TIME

[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ASSERTIO THERAPEUTICS, INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ENDO HEALTH SOLUTIONS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION

D026 CVS PHARMACY, INC.

D027 CVS INDIANA, L.L.C.

MOTION FOR EXTENSION OF TIME

[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: ENDO PHARMACEUTICALS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PAR PHARMACEUTICAL, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PAR PHARMACEUTICALS COMPANIES, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   ALLERGAN FINANCE, LLC (PRO SE)
      1209 ORANGE STREET
      WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN SALES, LLC (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN USA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION

D026 CVS PHARMACY, INC.

D027 CVS INDIANA, L.L.C.

MOTION FOR EXTENSION OF TIME

[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WATSON PHARMACEUTICALS, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ACTAVIS LLC (PRO SE)
3411 SILVERSIDE ROAD, STE
TATNALL BUILDING
WILMINGTON, DE, 19810-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: ACTAVIS PHARMA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: RITE AID OF ALABAMA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: RITE AID OF MARYLAND, IND. (PRO SE)
2405 YORK ROAD, STE 201
LUTHERVILLE TI, MD, 21093-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  THE KROGER CO (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:       4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  KROGER LIMITED PARTNERSHIP II (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:    4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CVS HEALTH CORPORATION (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CVS PHARMACY, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CVS INDIANA, L.L.C. (PRO SE)
150 WEST MARKET STREET, S
INDIANAPOLIS, IN, 46204-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   WAL-MART INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   WAL-MART STORES EAST, LP (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WALGREEN EASTERN CO., INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:        4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WALGREEN CO., INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  COUCH JOHN PATRICK (PRO SE)
1400 DALE BUMPERS ROAD
FORREST CITY, AZ, 72335-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  RUAN XIULU (PRO SE)
1507 EAST WHATLEY ROAD
OAKDALE, LA, 71463-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C. (PRO SE)
2001 SPRING HILL AVE
MOBILE, AL, 36607-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PALMER THOMAS JUSTIN (PRO SE)
305 NORTH JACKSON STREET
MOBILE, AL, 36603-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PARKER BRIDGETTE (PRO SE)
3461 DEER TRACK DRIVE
SEMMES, AL, 36575-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  EASTERN SHORE NEUROLOGY CLINIC, INC. (PRO SE)
28080 US HWY 98
STE D
DAPHNE, AL, 36526-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION

D026 CVS PHARMACY, INC.

D027 CVS INDIANA, L.L.C.

MOTION FOR EXTENSION OF TIME

[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   TARABEIN RASSAN M (PRO SE)
      27535 US-98
      DALPHNE, AL, 36526-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:     4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:34:22 AM

D025 CVS HEALTH CORPORATION
D026 CVS PHARMACY, INC.
D027 CVS INDIANA, L.L.C.
MOTION FOR EXTENSION OF TIME
[Filer: KIRBY CASON MICHAEL]

Notice Date:      4/29/2020 11:34:22 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| POARCH BAND OF CREEK INDIANS,<br>Plaintiff, | )<br>)<br>) |
| V. | ) Case No.:      CV-2020-900755.00 |
| | ) |
| AMNEAL PHARMACEUTICALS, INC.,<br>AMNEAL PHARMACEUTICALS, LLC,<br>TEVA PHARMACEUTICALS USA, INC.,<br>CEPHALON, INC. ET AL,<br>Defendants. | )<br>)<br>)<br>)<br>) |

### ORDER GRANTING EXTENSION OF TIME TO RESPOND TO COMPLAINT

This cause having come before the Court on Plaintiff's and Defendants CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, L.L.C., (collectively "CVS"), Walgreen Eastern Co., Inc., Walgreen Co. (collectively "Walgreens"), Walmart Inc., Wal-Mart Stores East, LP (collectively "Walmart"), Rite Aid of Alabama, Inc., Rite Aid of Maryland, Inc. (collectively "Rite Aid"), The Kroger Co., and Kroger Limited Partnership II's (collectively "Kroger") April 29, 2020 Joint Stipulation for Extension of Time to Respond to Complaint, and the Court having reviewed the stipulation, finds that it is well taken and shall be granted.

The Court hereby ORDERS and ADJUDGES that Defendants CVS, Walgreens, Walmart, Rite Aid, and Kroger shall have through and including June 19, 2020 to respond to the Complaint.

DONE this[To be filled by the Judge].

/s/[To be filled by the Judge]

_____
**CIRCUIT JUDGE**

PROPOSED ORDER



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CASON M KIRBY
cason@campbellpartnerslaw.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   AMNEAL PHARMACEUTICALS, INC. (PRO SE)
251 LITTLE FALLS DRIVE
WILMINGTON, DE, 19808-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   AMNEAL PHARMACEUTICALS, LLC (PRO SE)
2 NORTH JACKSON ST., STE
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   TEVA PHARMACEUTICALS USA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CEPHALON, INC. (PRO SE)
3411 SILVERSIDE ROAD, STE
TATNALL BUIDLING
WILMINGTON, DE, 19810-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   JOHNSON & JOHNSON (PRO SE)
      ONE JOHNSON & JOHNSON PLA
      NEW BRUNSWICK, NJ, 08933-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  JANSSEN PHARMACEUTICALS, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  NORAMCO, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES (PRO SE)
60 COMMERCE STREET
MONTGOMERY, AL, 36103-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   ASSERTIO THERAPEUTICS, INC. (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: ENDO HEALTH SOLUTIONS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ENDO PHARMACEUTICALS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: PAR PHARMACEUTICAL, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   PAR PHARMACEUTICALS COMPANIES, INC. (PRO SE)
      1209 ORANGE STREET
      WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   ALLERGAN FINANCE, LLC (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN SALES, LLC (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN USA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WATSON PHARMACEUTICALS, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   ACTAVIS LLC (PRO SE)
      3411 SILVERSIDE ROAD, STE
      TATNALL BUILDING
      WILMINGTON, DE, 19810-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ACTAVIS PHARMA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   RITE AID OF ALABAMA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  RITE AID OF MARYLAND, IND. (PRO SE)
2405 YORK ROAD, STE 201
LUTHERVILLE TI, MD, 21093-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  THE KROGER CO (PRO SE)
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   KROGER LIMITED PARTNERSHIP II (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   CVS HEALTH CORPORATION (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   CVS PHARMACY, INC. (PRO SE)
      2 NORTH JACKSON STREET, S
      MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CVS INDIANA, L.L.C. (PRO SE)
150 WEST MARKET STREET, S
INDIANAPOLIS, IN, 46204-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WAL-MART INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WAL-MART STORES EAST, LP (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   WALGREEN EASTERN CO., INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WALGREEN CO., INC. (PRO SE)
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   COUCH JOHN PATRICK (PRO SE)
1400 DALE BUMPERS ROAD
FORREST CITY, AZ, 72335-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  RUAN XIULU (PRO SE)
     1507 EAST WHATLEY ROAD
     OAKDALE, LA, 71463-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C. (PRO SE)
2001 SPRING HILL AVE
MOBILE, AL, 36607-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   PALMER THOMAS JUSTIN (PRO SE)
305 NORTH JACKSON STREET
MOBILE, AL, 36603-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PARKER BRIDGETTE (PRO SE)
3461 DEER TRACK DRIVE
SEMMES, AL, 36575-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:      4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   EASTERN SHORE NEUROLOGY CLINIC, INC. (PRO SE)
28080 US HWY 98
STE D
DAPHNE, AL, 36526-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   TARABEIN RASSAN M (PRO SE)
      27535 US-98
      DALPHNE, AL, 36526-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:   4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/29/2020 11:37:10 AM

[Filer: ]

Notice Date:     4/29/2020 11:37:10 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



ELECTRONICALLY FILED
4/30/2020 8:27 AM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

|                                           |     |            |                  |
|-------------------------------------------|-----|------------|------------------|
| POARCH BAND OF CREEK INDIANS,             | )   |            |                  |
| Plaintiff,                                | )   |            |                  |
|                                           | )   |            |                  |
| V.                                        | )   | Case No.:  | CV-2020-900755.00|
|                                           | )   |            |                  |
| AMNEAL PHARMACEUTICALS, INC.,             | )   |            |                  |
| AMNEAL PHARMACEUTICALS, LLC,              | )   |            |                  |
| TEVA PHARMACEUTICALS USA, INC.,           | )   |            |                  |
| CEPHALON, INC. ET AL,                     | )   |            |                  |
| Defendants.                               | )   |            |                  |

## ORDER

This cause having come before the Court on Plaintiff's and Defendants CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, L.L.C., (collectively "CVS"), Walgreen Eastern Co., Inc., Walgreen Co. (collectively "Walgreens"), Walmart Inc., Wal-Mart Stores East, LP (collectively "Walmart"), Rite Aid of Alabama, Inc., Rite Aid of Maryland, Inc. (collectively "Rite Aid"), The Kroger Co., and Kroger Limited Partnership II's (collectively "Kroger") April 29, 2020 Joint Stipulation for Extension of Time to Respond to Complaint, and the Court having reviewed the stipulation, finds that it is well taken and shall be granted.

The Court hereby ORDERS and ADJUDGES that Defendants CVS, Walgreens, Walmart, Rite Aid, and Kroger shall have through and including June 19, 2020 to respond to the Complaint.

**DONE this 30th day of April, 2020.**

**/s/ JAY A YORK** _____
**CIRCUIT JUDGE**



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   KIRBY CASON MICHAEL
cason@campbellpartnerslaw.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   AMNEAL PHARMACEUTICALS, INC. (PRO SE)
251 LITTLE FALLS DRIVE
WILMINGTON, DE, 19808-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:       4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  AMNEAL PHARMACEUTICALS, LLC (PRO SE)
2 NORTH JACKSON ST., STE
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  TEVA PHARMACEUTICALS USA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CEPHALON, INC. (PRO SE)
3411 SILVERSIDE ROAD, STE
TATNALL BUIDLING
WILMINGTON, DE, 19810-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:        4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   JOHNSON & JOHNSON (PRO SE)
ONE JOHNSON & JOHNSON PLA
NEW BRUNSWICK, NJ, 08933-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: JANSSEN PHARMACEUTICALS, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  NORAMCO, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES (PRO SE)
60 COMMERCE STREET
MONTGOMERY, AL, 36103-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ASSERTIO THERAPEUTICS, INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ENDO HEALTH SOLUTIONS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ENDO PHARMACEUTICALS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: PAR PHARMACEUTICAL, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PAR PHARMACEUTICALS COMPANIES, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN FINANCE, LLC (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN SALES, LLC (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:    4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN USA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WATSON PHARMACEUTICALS, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   ACTAVIS LLC (PRO SE)
      3411 SILVERSIDE ROAD, STE
      TATNALL BUILDING
      WILMINGTON, DE, 19810-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ACTAVIS PHARMA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   RITE AID OF ALABAMA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   RITE AID OF MARYLAND, IND. (PRO SE)
2405 YORK ROAD, STE 201
LUTHERVILLE TI, MD, 21093-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   THE KROGER CO (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   KROGER LIMITED PARTNERSHIP II (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WAL-MART INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WAL-MART STORES EAST, LP (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:    4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   WALGREEN EASTERN CO., INC. (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:       4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   WALGREEN CO., INC. (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:       4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  COUCH JOHN PATRICK (PRO SE)
1400 DALE BUMPERS ROAD
FORREST CITY, AZ, 72335-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   RUAN XIULU (PRO SE)
1507 EAST WHATLEY ROAD
OAKDALE, LA, 71463-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C. (PRO SE)
2001 SPRING HILL AVE
MOBILE, AL, 36607-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PALMER THOMAS JUSTIN (PRO SE)
305 NORTH JACKSON STREET
MOBILE, AL, 36603-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: PARKER BRIDGETTE (PRO SE)
3461 DEER TRACK DRIVE
SEMMES, AL, 36575-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:     4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   EASTERN SHORE NEUROLOGY CLINIC, INC. (PRO SE)
28080 US HWY 98
STE D
DAPHNE, AL, 36526-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   TARABEIN RASSAN M (PRO SE)
      27535 US-98
      DALPHNE, AL, 36526-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 4/30/2020 8:27:45 AM

Notice Date:      4/30/2020 8:27:45 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

CVS PHARMACY, INC.

2 North Jackson Street

Suite #605

Montgomery, AL 36104

9590 9402 5670 9308 3695 70

7019 2280 0001 1109 6423

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Jennifer Lockwood*   ☐ Agent
                         ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

APR 2 0 2020

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D026 CVS PHARMACY, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

PAR PHARMACEUTICAL, INC.

2 North Jackson Street

Suite #605

Montgomery, AL 36104

9590 9402 5670 9308 3696 24

7019 2280 0001 1117 8891

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)  APR 2020 Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Registered Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D013 PAR PHARMACEUTICAL, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PAR PHARMACEUTICAL, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D013 PAR PHARMACEUTICAL, INC.

Corresponding To

CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

ASSERTIO THERAPEUTICS, INC.
641 South Lawrence Street
Montgomery, AL 36104

9590 9402 5670 9308 3697 92

Article Number (Transfer from service label)

7019 2280 0001 1109 9914

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D010 ASSERTIO THERAPEUTICS, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

Complete items 1, 2, and 3.

Print your name and address on the reverse so that we can return the card to you.

Attach this card to the back of the mailpiece, or on the front if space permits.

WALGREEN EASTERN CO., INC.

641 South Lawrence Street

Montgomery, AL 36104

9590 9402 5670 9308 3699 52

7019 2280 0001 1109 6577

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____

☑ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

4-20-20

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D030 WALGREEN EASTERN CO., INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

ALLERGAN USA, INC.
2 North Jackson Street
Suite #605
Montgomery, AL 36104

9590 9402 5670 9308 3699 07

7019 2280 0001 1109 6515

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _signed_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

APR 2 0 2020

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ Insured Mail
- ☐ Insured Mail Restricted Delivery (over $500)
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D017 ALLERGAN USA, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

WALGREEN CO., INC.
641 South Lawrence Street
Montgomery, AL 36104

9590 9402 5670 9308 3695 94

7019 2280 0001 1109 6409

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☒ Agent
                                     ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D031 WALGREEN CO., INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

PAR PHARMACEUTICALS
COMPANIES, INC.
1209 Orange Street
Wilmington, DE 19801

9590 9402 5670 9308 3696 55

2. Article Number (Transfer from service label)

7019 2280 0001 1109 5013

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____    ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D014 PAR PHARMACEUTICALS COMPANIES, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

WAL-MART STORES EAST, LP

2 North Jackson Street

Suite #605

Montgomery, AL 36104

9590 9402 5670 9308 3699 45

7019 2280 0001 1109 6560

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

APR 2 0 2020

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature                      ☐ Priority Mail Express®
☐ Adult Signature Restricted Delivery  ☐ Registered Mail™
☐ Certified Mail®                      ☐ Registered Mail Restricted
☐ Certified Mail Restricted Delivery      Delivery
☐ Collect on Delivery                  ☐ Return Receipt for
☐ Collect on Delivery Restricted Delivery   Merchandise
☐ Insured Mail                         ☐ Signature Confirmation™
☐ Insured Mail Restricted Delivery     ☐ Signature Confirmation
  (over $500)                             Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D029 WAL-MART STORES EAST, LP
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

THE KROGER CO.
641 South Lawrence Street
Montgomery, AL 36104

9590 9402 5670 9308 3699 69

2. Article Number (Transfer from service label)

7019 2280 0001 1109 6584

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery   4-20-20

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053            Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00
Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D023 THE KROGER CO
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

KROGER LIMITED PARTNERSHIP II

641 South Lawrence Street

Montgomery, AL 36104

9590 9402 5670 9308 3696 31

7019 2280 0001 1109 5020

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
  ☐ Addressee

B. Received by (Printed Name)       C. Date of Delivery
                                     4-20-20

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D024 KROGER LIMITED PARTNERSHIP II
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

ABBOTT LABORATORIES, INC.
2 North Jackson Street
Suite #605
Montgomery, AL 36104

9590 9402 5670 9308 3699 76

7019 2280 0001 1109 6485

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____   ☐ Agent
                     ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

APR · 0 2020

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ Insured Mail
- ☐ Insured Mail Restricted Delivery

- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D009 ABBOTT LABORATORIES, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

CVS INDIANA, LLC
150 West Market Street
Suite #800
Indianapolis, IN 46204

9590 9402 5670 9308 3698 91

7014 2280 0001 1109 6522

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*          C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D027 CVS INDIANA, L.L.C.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

## SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

RITE AID OF ALABAMA, INC.
2 North Jackson Street
Suite #605
Montgomery, AL 36104

9590 9402 5670 9308 3625 57

7019 2280 0001 1109 6379

## COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____   ☐ Agent
                             ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
                                  APR 20 2020

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D021 RITE AID OF ALABAMA, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

AMNEAL PHARMACEUTICALS, INC.

251 Little Falls Drive

Wilmington, DE 19808

9590 9402 5670 9308 3699 38

7019 2280 0001 1109 6553

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                            ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ Insured Mail
- ☐ Insured Mail Restricted Delivery
  (over $500)
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery



**AlaFile E-Notice**

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D001 AMNEAL PHARMACEUTICALS, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.

■ Print your name and address on the reverse
   so that we can return the card to you.

■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

1. Article Addressed to:

NORAMCO, INC.
2 North Jackson Street
Suite #605
Montgomery, AL 36104

9590 9402 5670 9308 3695 18

2. Article Number *(Transfer from service label)*

7019 2280 0001 1117 8914

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  *[signature]*  ☐ Agent
                  ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

APR 20 2020

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature                        ☐ Priority Mail Express®
☐ Adult Signature Restricted Delivery    ☐ Registered Mail™
☐ Certified Mail®                        ☐ Registered Mail Restricted
☐ Certified Mail Restricted Delivery        Delivery
☐ Collect on Delivery                    ☐ Return Receipt for
☐ Collect on Delivery Restricted Delivery   Merchandise
☐ Insured Mail                           ☐ Signature Confirmation™
☐ Insured Mail Restricted Delivery       ☐ Signature Confirmation
                                            Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D007 NORAMCO, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

XIULU RUAN
1507 East Whatley Road
Oakdale, LA 71463

9590 9402 5670 9308 3698 46

7019 2280 0001 1117 9027

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D033 RUAN XIULU

Corresponding To

CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1.

THOMAS JUSTIN PALMER
305 North Jackson Street

Mobile, AL 36603

9590 9402 5670 9308 3698 60

7019 2280 0001 1117 9003

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Sin 316 Cla_          ☐ Agent
                          ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

_Thomas palmer_   _4/21/20_

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/21/2020

D035 PALMER THOMAS JUSTIN

Corresponding To

CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

## SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

AMNEAL PHARMACEUTICALS, LLC

2 North Jackson Street

Suite #605

Montgomery, AL 36104

9590 9402 5670 9308 3695 63

7019 2280 0001 1109 6430

PS Form 3811, July 2015 PSN 7530-02-000-9053

## COMPLETE THIS SECTION ON DELIVERY

A. Signature

X _Jennifer Lockwood_   ☐ Agent
                        ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

Jennifer Lockwood   APR 2 0 2020

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D002 AMNEAL PHARMACEUTICALS, LLC
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

RITE AID OF MARYLAND, INC,

2405 York Road

Suite #201

Lutherville Timonium, MD 21093

9590 9402 5670 9308 3696 00

7019 2280 0001 1109 6393

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)          C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt



**AlaFile E-Notice**

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/21/2020

D022 RITE AID OF MARYLAND, IND.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.

■ Print your name and address on the reverse so that we can return the card to you.

■ Attach this card to the back of the mailpiece, or on the front if space permits.

WAL-MART INC.
2 North Jackson Street
Suite #605
Montgomery, AL 36104

9590 9402 5670 9308 3698 53

7019 2280 0001 1117 9010

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Gerald Blackwood_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

APR 2 0 2020

D. Is delivery address different from Item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D028 WAL-MART INC.

Corresponding To

CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.

■ Print your name and address on the reverse so that we can return the card to you.

■ Attach this card to the back of the mailpiece, or on the front if space permits.

1.

ALLERGAN SALES, LLC

2 North Jackson Street

Suite #605

Montgomery, AL 36104

9590 9402 5670 9308 3695 25

7019 2280 0001 1109 6478

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Jennifer Lockwood_   ☐ Agent
                         ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

APR 2 0 2020

D. Is delivery address different from Item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D016 ALLERGAN SALES, LLC
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.

■ Print your name and address on the reverse so that we can return the card to you.

■ Attach this card to the back of the mailpiece, or on the front if space permits.

CEPHALON, INC.

3411 Silverside Road, Suite 104

Tatnall Building

Wilmington, DE 19810

9590 9402 5670 9308 3695 56

7015 2280 0001 1109 6447

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes

If YES, enter delivery address below:   ☐ No

3. Service Type

☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D004 CEPHALON, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

# SENDER: *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

Article Addressed to:

JOHN PATRICK COUCH
1400 Dale Bumpers Road
Forrest City, AZ 72335

9590 9402 5670 9308 3625 64

Article Number *(Transfer from service label)*

7019 2280 0001 1109 6366

PS Form 3811 July 2015 PSN 7530-02-000-9053

# *COMPLETE THIS SECTION ON DELIVERY*

**A. Signature**

X _____ ☑ Agent   ☐ Addressee

**B. Received by *(Printed Name)*** | **C. Date of Delivery**

**D.** Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

**3. Service Type**
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D032 COUCH JOHN PATRICK

Corresponding To

CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

WATSON PHARMACEUTICALS, INC.

6 Office Park Circle #100

Mountain Brook, AL 35223

9590 9402 5670 9308 3695 87

7019 2280 0001 1109 6416

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3.  Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/8/2020

D018 WATSON PHARMACEUTICALS, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

JANSSEN PHARMACEUTICALS, INC.

2 North Jackson Street

Suite #605

Montgomery, AL 36104

9590 9402 5670 9308 3699 14

7019 2280 0001 1109 6539

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

APR 2 0 2020

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   FRAZER THOMAS ROE II
      ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/20/2020

D006 JANSSEN PHARMACEUTICALS, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

TEVA PHARMACEUTICALS USA, INC.

6 Office Park Circle #100

Mountain Brook, AL 35223

9590 9402 5670 9308 3695 49

7019 2280 0001 1109 6454

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)          C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D003 TEVA PHARMACEUTICALS USA, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

BRIDGETTE PARKER

3461 Deer Track Drive

Semmes, AL 36575

9590 9402 5670 9308 3695 32

7019 2280 0001 1109 6461

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                            ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D036 PARKER BRIDGETTE
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

ACTAVIS PHARMA, INC.
6 Office Park Circle #100
Mountain Brook, AL 35223

9590 9402 5670 9308 3698 77

7019 2280 0001 1109 6492

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D020 ACTAVIS PHARMA, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

ENDO HEALTH SOLUTIONS, INC.
1209 Orange Street
Wilmington, DE 19801

9590 9402 5670 9308 3699 21

7019 2280 0001 1109 6546

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                        ☐ Agent
                                         ☐ Addressee

B. Received by (Printed Name)          C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D011 ENDO HEALTH SOLUTIONS, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

Complete items 1, 2, and 3.

Print your name and address on the reverse so that we can return the card to you.

Attach this card to the back of the mailpiece, or on the front if space permits.

ENDO PHARMACEUTICALS, INC.

1209 Orange Street

Wilmington, DE 19801

9590 9402 5670 9308 3698 22

7019 2280 0001 1109 6645

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)       C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 5/7/2020

D012 ENDO PHARMACEUTICALS, INC.
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

9590 9402 5670 9308 3698 15

7019 2280 0001 1109 6638

PS Form 3811, July 2015 PSN 7530-02-000-9053

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)          C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

KIL
USPS
APR 21 2020

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/21/2020

D005 JOHNSON & JOHNSON
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X                              ☐ Agent<br>                                ☐ Addressee |
| | B. Received by *(Printed Name)*   C. Date of Delivery |
| **ALLERGAN FINANCE, LLC**<br>**1209 Orange Street**<br>**Wilmington, DE 19801** | D. Is delivery address different from Item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No<br><br>RECEIVED<br><br>APR 2 9 2020<br><br>CT CORPORATION |

9590 9402 5670 9308 3698 84

| 3. Service Type | |
|---|---|
| ☐ Adult Signature | ☐ Priority Mail Express® |
| ☐ Adult Signature Restricted Delivery | ☐ Registered Mail™ |
| ☐ Certified Mail® | ☐ Registered Mail Restricted Delivery |
| ☐ Certified Mail Restricted Delivery | ☐ Return Receipt for Merchandise |
| ☐ Collect on Delivery | ☐ Signature Confirmation™ |
| ☐ Collect on Delivery Restricted Delivery | ☐ Signature Confirmation Restricted Delivery |
| ☐ Mail<br>☐ Mail Restricted Delivery (over $500) | |

7019 2280 0001 1109 6508

PS Form **3811**, July 2015 PSN 7530-02-000-9053                    Domestic Return Receipt



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was served on 4/29/2020

D015 ALLERGAN FINANCE, LLC
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

ELECTRONICALLY FILED
5/13/2020 3:50 PM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

# IN THE CIRCUIT COURT OF
# MOBILE COUNTY, ALABAMA

**POARCH BAND OF CREEK INDIANS,**

    **Plaintiff,**

v.                       **Case No.:** <u>02-CV-2020-900755.00</u>

**AMNEAL PHARMACEUTICALS, LLC, et al.,**

    **Defendants.**

### <u>Notice of Partial Voluntary Dismissal Without Prejudice As to Certain Defendants</u>

Plaintiff, through its undersigned counsel, hereby voluntarily dismisses without prejudice only Abbott Laboratories and Abbott Laboratories, Inc., and all claims against those two defendants, from this action. The voluntary dismissal without prejudice of claims in this action as to Abbott Laboratories and Abbott Laboratories, Inc. does not affect any and all other claims against any and all other Defendants named in this action. The claims against those remaining Defendants are unaffected by this limited Dismissal without prejudice.

Dated this 13th day of May 2020.

Respectfully submitted,

*/s/ T. Roe Frazer II*

T. Roe Frazer II (FRA031)
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
615-647-6464
roe@frazer.law



AlaFile E-Notice

02-CV-2020-900755.00

To:  THOMAS ROE FRAZER II
     ROE@FRAZER.LAW

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  AMNEAL PHARMACEUTICALS, INC. (PRO SE)
251 LITTLE FALLS DRIVE
WILMINGTON, DE, 19808-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:    5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  AMNEAL PHARMACEUTICALS, LLC (PRO SE)
     2 NORTH JACKSON ST., STE
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  TEVA PHARMACEUTICALS USA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  CEPHALON, INC. (PRO SE)
     3411 SILVERSIDE ROAD, STE
     TATNALL BUIDLING
     WILMINGTON, DE, 19810-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  JOHNSON & JOHNSON (PRO SE)
ONE JOHNSON & JOHNSON PLA
NEW BRUNSWICK, NJ, 08933-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  JANSSEN PHARMACEUTICALS, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  NORAMCO, INC. (PRO SE)
     2 NORTH JACKSON STREET, S
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ABBOTT LABORATORIES (PRO SE)
60 COMMERCE STREET
MONTGOMERY, AL, 36103-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ABBOTT LABORATORIES, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To: ASSERTIO THERAPEUTICS, INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To: ENDO HEALTH SOLUTIONS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ENDO PHARMACEUTICALS, INC. (PRO SE)
     1209 ORANGE STREET
     WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To: PAR PHARMACEUTICAL, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  PAR PHARMACEUTICALS COMPANIES, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ALLERGAN FINANCE, LLC (PRO SE)
     1209 ORANGE STREET
     WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ALLERGAN SALES, LLC (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ALLERGAN USA, INC. (PRO SE)
     2 NORTH JACKSON STREET, S
     MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  WATSON PHARMACEUTICALS, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   ACTAVIS LLC (PRO SE)
      3411 SILVERSIDE ROAD, STE
      TATNALL BUILDING
      WILMINGTON, DE, 19810-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ACTAVIS PHARMA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  RITE AID OF ALABAMA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   RITE AID OF MARYLAND, IND. (PRO SE)
2405 YORK ROAD, STE 201
LUTHERVILLE TI, MD, 21093-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   THE KROGER CO (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  KROGER LIMITED PARTNERSHIP II (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  WAL-MART INC. (PRO SE)
     2 NORTH JACKSON STREET, S
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  WAL-MART STORES EAST, LP (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   WALGREEN EASTERN CO., INC. (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  WALGREEN CO., INC. (PRO SE)
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  COUCH JOHN PATRICK (PRO SE)
1400 DALE BUMPERS ROAD
FORREST CITY, AZ, 72335-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   RUAN XIULU (PRO SE)
      1507 EAST WHATLEY ROAD
      OAKDALE, LA, 71463-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C. (PRO SE)
2001 SPRING HILL AVE
MOBILE, AL, 36607-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To: PALMER THOMAS JUSTIN (PRO SE)
305 NORTH JACKSON STREET
MOBILE, AL, 36603-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  PARKER BRIDGETTE (PRO SE)
3461 DEER TRACK DRIVE
SEMMES, AL, 36575-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   EASTERN SHORE NEUROLOGY CLINIC, INC. (PRO SE)
28080 US HWY 98
STE D
DAPHNE, AL, 36526-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  TARABEIN RASSAN M (PRO SE)
     27535 US-98
     DALPHNE, AL, 36526-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:      5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  KIRBY CASON MICHAEL
     cason@campbellpartnerslaw.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following CASE STATUS REPORT was FILED on 5/13/2020 3:50:54 PM

Notice Date:     5/13/2020 3:50:54 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

Case 1:20-cv-00279-WS-B   Document 1-1   Filed 05/18/20   Page 649 of 777   PageID #: 676

# STATE OF ALABAMA
**Unified Judicial System**

Revised 3/5/08

02-MOBILE

☐ District Court   ☑ Circuit Court

CV2...

ELECTRONICALLY FILED
5/13/2020 4:16 PM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## CIVIL MOTION COVER SHEET

POARCH BAND OF CREEK INDIANS V. AMNEAL
PHARMACEUTICALS, INC. ET AL

*Name of Filing Party:* D021 - RITE AID OF ALABAMA, INC.
D022 - RITE AID OF MARYLAND, IND.

*Name, Address, and Telephone No. of Attorney or Party. If Not Represented.*

GEORGE R IRVINE MR.

8820 HIGHWAY 90

DAPHNE, AL 36526

*Attorney Bar No.:* IRV001

☐ Oral Arguments Requested

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e.Summary Judgment, Judgment on the Pleadings, orother Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative SummaryJudgment($50.00) | ☐ Continue |
| | ☐ Deposition |
| ☐ Renewed Dispositive Motion(Summary Judgment,Judgment on the Pleadings, or other DispositiveMotion not pursuant to Rule 12(b)) ($50.00) | ☐ Designate a Mediator |
| | ☐ Judgment as a Matter of Law (during Trial) |
| ☐ Summary Judgment pursuant to Rule 56($50.00) | ☐ Disburse Funds |
| ☐ Motion to Intervene ($297.00) | ☐ Extension of Time |
| ☐ Other _____ | ☐ In Limine |
| pursuant to Rule _____ ($50.00) | ☐ Joinder |
| | ☐ More Definite Statement |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| ☐ Local Court Costs $ 0 | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| | ☑ Other   Motion for Exclusion from the Expedited Case Management System |
| | pursuant to Rule ___   (Subject to Filing Fee) |

Check here if you have filed or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees)

Date:
5/13/2020 4:16:05 PM

Signature of Attorney or Party
/s/ GEORGE R IRVINE MR.

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**May also be filed in CM/ECF by attorney for plaintiff pursuant to LCivR 5(b)(1) and are in fact considered by the Court subject to filing fee



ELECTRONICALLY FILED
5/13/2020 4:19 PM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| POARCH BAND OF CREEK INDIANS, | * |
| | * |
| | * |
| | * |
| | * |
| *Plaintiff*, | * |
| | * |
| v. | * |
| | * |
| AMNEAL PHARMACEUTICALS, INC. | * |
| AMNEAL PHARMACEUTICALS, LLC. | * |
| TEVA PHARMACEUTICALS USA, INC., | * |
| CEPHALON, INC. ET AL, | * |
| | * |
| *Defendants.* | * |

CASE NO.: 02-CV-2020-900755

---

## MOTION FOR EXCLUSION
## FROM THE EXPEDITED CASE MANAGEMENT SYSTEM

---

NOW COME Defendants, Rite Aid of Alabama, Inc., Rite Aid of Maryland, Inc. (collectively "Rite Aid"), CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, L.L.C. (collectively "CVS"), Walgreen Eastern Co., Inc., Walgreen Co. (collectively "Walgreens"), Walmart Inc.,[1] Wal-Mart Stores East, LP (collectively "Walmart"), The Kroger Co., and Kroger Limited Partnership II (collectively "Kroger") and respectfully move the Court to remove the above styled matter from the Expedited Case Management System. In support of this motion, Rite Aid, CVS, Walgreens, Walmart, and Kroger state as follows:

1.      On April 3, 2020, the Poarch Band of Creek Indians ("Plaintiff") filed this action against dozens of Defendants—including drug manufacturers, distributors, retail pharmacies, and

---

[1] Plaintiff named Wal-Mart Inc. as a defendant to this action; as of February 1, 2018, Wal-Mart Stores, Inc. became known as Walmart Inc., not Wal-Mart Inc.

other differently situated individuals and entities—based on their alleged participation in the supply chain for prescription opioids in Alabama.

2.      Plaintiff contends that certain Marketing Defendants deceptively marketed prescription opioids and that other Defendants conspired with the Marketing Defendants to expand the opioid market and oversupply it, allegedly resulting in increased opioid use and abuse.  Plaintiff therefore seeks to hold the Defendants liable for the costs Plaintiff has incurred to abate the opioid epidemic by providing medical services and opioid-related treatments and to "procure the additional financial resources required to adequately combat and abate opioid addiction, opioid-related injuries, and other problems caused by the opioid crisis." (*See, e.g.,* Compl., Doc. # 2, ¶ 57).

3.      In its 683-paragraph Complaint, Plaintiff asserts seven causes of action: (a) negligence (against all defendants); (b) nuisance (against all defendants); (c) unjust enrichment (against all defendants); (d) fraud and deceit (against all defendants); (e) wantonness (against all defendants); (f) civil conspiracy (against the marketing defendants and national retail pharmacy defendants); and (g) violations of the Alabama Deceptive Trade Practices Act, Ala. Code § 18-19-1, *et seq.* (Compl., Doc. # 2, ¶¶ 567-683).

4.      On April 9, 2020, this Court entered an Order that, among other things, placed this case in the Expedited Case Management System, "which is designed to dispose of a case within 12 months after filing."  (04/09/20 Pre-Trial Order, Doc. # 5 ("Order"), at 1).  The 40-day deadline for parties to move to exclude the case from that system is May 19, 2020.  (*See id.*)

5.      It is the position of Rite Aid, CVS, Walgreens, Walmart, and Kroger that the Complaint fails to state a claim against which relief can be granted.  While Rite Aid, CVS,

2

Walgreens, Walmart, and Kroger intend to file motions to dismiss at the appropriate time, such motions will not be resolved before the May 19, 2020 deadline to remove the case from the Expedited Case Management System.  (*See* 04/30/20 Order, Doc. # 12 (setting 06/19/20 deadline for Rite Aid, CVS, Walgreens, Walmart, and Kroger to move to dismiss or otherwise respond to Complaint)).  Rite Aid, CVS, Walgreens, Walmart, and Kroger therefore file this Motion in an abundance of caution without waiver of any claims or defenses.

6.     The Expedited Case Management System is not designed for opioid mass tort actions.  This case is one of thousands of opioids lawsuits filed around the country on behalf of hospitals, state and local governments and political subdivisions, and others against manufacturers, distributors, retail pharmacies, and others in the prescription opioid supply chain for damages arising out of individuals' use and abuse of opioids.  These cases raise complex factual and legal issues and can be difficult to manage (to the extent they can survive a motion to dismiss).

7.     In this case, there are thirty-eight (38) named Defendants. The Complaint allegations are extensive and raise complex issues that will involve unique problems in discovery and pre-trial preparation.  It will be impossible to prepare for trial on the seven claims against the thirty-eight (38) Defendants within the timeframes of the Expedited Case Management System.

For the foregoing reasons, Rite Aid, CVS, Walgreens, Walmart, and Kroger request that this case be removed from the Expedited Case Management System.

Respectfully submitted this the __ day of May, 2020.

*/s/ George R. Irvine, III*
GEORGE R. IRVINE, III  (IRV001)
FINLEY B. REEVES  (REE079)
STONE CROSBY, P.C.
Attorneys at Law

3

8820 U.S. Highway 90
Daphne, Alabama 36526
(P) 251-626-6696
(F) 251-626-2617
E-Mail: girvine@stonecrosby.com
***Counsel for Defendants, Rite Aid of Alabama, Inc.
and Rite Aid of Maryland, Inc.***

*/s/ Cason M. Kirby (with permission)*
CAMPBELL PARTNERS, LLC
505 20th Street North, Suite 1600
Birmingham, Alabama 35203
Telephone:  (205) 224-0752
Facsimile:  (205) 383-2672
andy@campbellpartnerslaw.com
cason@campbellpartnerslaw.com

Conor B. O'Croinin*
J. Michael Pardoe*
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland  21202-1031
Telephone:  (410) 949-1160
Facsimile:  (410) 659-0436
cocroinin@zuckerman.com
mpardoe@zukerman.com
***Counsel for CVS Health Corporation, CVS
Pharmacy, Inc., and CVS Indiana, LLC***

*/s/ Anne Stone Sumblin (with permission)*
Stone Sumblin Law LLC
600 Highway 52
P.O. Box 345
Kinston, Alabama 36453
Phone: 334.565.3380
Fax: 334.565.3076
anne@stonesumblinlaw.com

***Counsel for Walgreen Co. and Walgreen Eastern
Co., Inc.***

4

*/s/ Alan T. Hargrove, Jr. (with permission)*
Alan T. Hargrove, Jr.
Dennis R. Bailey
RUSHTON, STAKELY, JOHNSTON &
GARRETT, P.A.
Post Office Box 270
Montgomery, Alabama 36101-0270
(334) 206-3100
(334) 481-0812 fax
ath@rushtonstakely.com
drb@rushtonstakely.com
**Counsel for Walmart Inc. and Wal-Mart Stores East, LP**

*/s/ Sela S. Blanton (with permission)*
Sela S. Blanton
Elizabeth L. Nicholson
BAINBRIDGE, MIMS, ROGERS & SMITH, LLP
600 Luckie Drive, Suite 415
P.O. Box 530886
Birmingham, AL 35253
Main: (205) 879-1100
Fax: (205) 879-4300
sblanton@bainbridgemims.com
bnicholson@bainbridgemims.com

Christopher N. Nahley*
Ronda L. Harvey*
BOWLES RICE LLP
Fifth Floor, United Square, 501 Avery Street
P.O. Box 49
Parkersburg, West Virginia 26102-0049
Tel.: (304) 420-5518
cnahley@bowlesrice.com
rharvey@bowlesrice.com
**Counsel for The Kroger Co.,
Kroger Limited Partnership II**

*denotes national counsel
 appearing pro hac vice

5

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of May, 2020, I filed the foregoing with the clerk of the Court using the AlaFile system, which will electronically serve all counsel of record and all other parties by U.S. Mail, First Class, postage prepaid.

*s/ George R. Irvine III*
*Of Counsel*

T. Roe Frazer II
Patrick D. McMurtray
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
trey@frazer.law
mpettit@frazer.law

Archie Lamb
THE LAW FIRM OF LEVIN PAPANTONIO
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
alamb@levinlaw.com

J. Nixon Daniel, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
jnd@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
2013 1st Avenue North, Ste 450
Birmingham, Alabama 35203
(205) 252-6127
ftk@thekuykendallgroup.com

*Attorneys for the Plaintiff, Poarch Band of Creek Indians*

6

Amneal Pharmaceuticals, Inc.
251 Little Falls Drive
Wilmington, DE 19808
*Defendant, Pro Se*

Amneal Pharmaceuticals, LLC
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Teva Pharmaceuticals USA, Inc.
6 Office Park Circle #100
Mountain Brook, AL 35223
*Defendant, Pro Se*

Cephalon, Inc.
3411 Silverside Road, Ste 104
Tatnall Building
Wilmington, DE 19810
*Defendant, Pro Se*

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
*Defendant, Pro Se*

Janssen Pharmaceuticals, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Noramco, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Abbott Laboratories
60 Commerce Street
Montgomery AL 36103
*Defendant, Pro Se*

Abbott Laboratories, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Assertio Therapeutics, Inc.
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

Endo Health Solutions, Inc.
1209 Orange Street
Wilmington, DE 19801
*Defendant, Pro Se*

Endo Pharmaceuticals, Inc.
1209 Orange Street
Wilmington, DE 19801
*Defendant, Pro Se*

PAR Pharmaceuticals, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

PAR Pharmaceuticals Companies, Inc.
1209 Orange Street
Wilmington, DE 19801
*Defendant, Pro Se*

Allergan Finance, LLC
1209 Orange Street
Wilmington, DE 19801
*Defendant, Pro Se*

Allergan Sales, LLC
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Allergan USA, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Watson Pharmaceuticals, Inc.
6 Office Park Circle #100
Mountain Brook, AL 35223
*Defendant, Pro Se*

7

Actavis, LLC
3411 Silverside Road, Ste 104
Tatnall Building
Wilmington, DE 19810
*Defendant, Pro Se*

Actavis Pharma, Inc.
6 Office Park Circle #100
Mountain Brook, AL 35223
*Defendant, Pro Se*

The Kroger Co.
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

Kroger Limited Partnership II
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

Andrew P. Campbell
Cason M. Kirby
CAMPBELL PARTNERS, LLC 505 20th
Street North, Suite 1600 Birmingham,
Alabama 35203 Telephone:  (205) 224-0752
Facsimile:  (205) 383-2672
andy@campbellpartnerslaw.com
cason@campbellpartnerslaw.com
*Attorneys for CVS Health Corporation, CVS
Pharmacy, Inc., and CVS Indiana, LLC*

Wal-Mart Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Wal-Mart STO
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Walgreen Eastern Co., Inc.
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

Walgreen Co., Inc.
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

John Patrick Couch
1400 Dale Bumpers Road
Forrest City, AL 72335
*Defendant, Pro Se*

Ruan Xiulu
1507 East Whatley Road
Oakdale, LA 71463
*Defendant, Pro Se*

Physicians Pain Specialist of Alabama, P.C.
2001 Spring Hill Ave.
MOBILE, AL 36607
*Defendant, Pro Se*

Thomas Justin Palmer
305 North Jackson Street
Mobile, AL 36603
*Defendant, Pro Se*

Bridgette Parker
3461 Deer Track Drive
Semmes, AL 36575
*Defendant, Pro Se*

Eastern Shore Neurology Clinic, Inc.
28080 US Highway 98, Ste. D
Daphne, AL 36526
*Defendant, Pro Se*

Rassan M. Tarabein
27535 US-98
Daphne, AL 36526
*Defendant, Pro Se*

8

9



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  GEORGE R IRVINE MR.
     girvine@stonecrosby.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  AMNEAL PHARMACEUTICALS, INC. (PRO SE)
251 LITTLE FALLS DRIVE
WILMINGTON, DE, 19808-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: AMNEAL PHARMACEUTICALS, LLC (PRO SE)
2 NORTH JACKSON ST., STE
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  TEVA PHARMACEUTICALS USA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CEPHALON, INC. (PRO SE)
     3411 SILVERSIDE ROAD, STE
     TATNALL BUIDLING
     WILMINGTON, DE, 19810-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  JOHNSON & JOHNSON (PRO SE)
ONE JOHNSON & JOHNSON PLA
NEW BRUNSWICK, NJ, 08933-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   JANSSEN PHARMACEUTICALS, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:      5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  NORAMCO, INC. (PRO SE)
     2 NORTH JACKSON STREET, S
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES (PRO SE)
60 COMMERCE STREET
MONTGOMERY, AL, 36103-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ASSERTIO THERAPEUTICS, INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ENDO HEALTH SOLUTIONS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ENDO PHARMACEUTICALS, INC. (PRO SE)
     1209 ORANGE STREET
     WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PAR PHARMACEUTICAL, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]


Notice Date:     5/13/2020 4:19:28 PM


JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PAR PHARMACEUTICALS COMPANIES, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN FINANCE, LLC (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]


Notice Date:     5/13/2020 4:19:28 PM




JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN SALES, LLC (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:      5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN USA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WATSON PHARMACEUTICALS, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   ACTAVIS LLC (PRO SE)
      3411 SILVERSIDE ROAD, STE
      TATNALL BUILDING
      WILMINGTON, DE, 19810-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:      5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: ACTAVIS PHARMA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  RITE AID OF ALABAMA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  RITE AID OF MARYLAND, IND. (PRO SE)
2405 YORK ROAD, STE 201
LUTHERVILLE TI, MD, 21093-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:      5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  THE KROGER CO (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  KROGER LIMITED PARTNERSHIP II (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WAL-MART INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WAL-MART STORES EAST, LP (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: WALGREEN EASTERN CO., INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WALGREEN CO., INC. (PRO SE)
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   COUCH JOHN PATRICK (PRO SE)
      1400 DALE BUMPERS ROAD
      FORREST CITY, AZ, 72335-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   RUAN XIULU (PRO SE)
      1507 EAST WHATLEY ROAD
      OAKDALE, LA, 71463-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C. (PRO SE)
2001 SPRING HILL AVE
MOBILE, AL, 36607-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:      5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PALMER THOMAS JUSTIN (PRO SE)
305 NORTH JACKSON STREET
MOBILE, AL, 36603-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PARKER BRIDGETTE (PRO SE)
3461 DEER TRACK DRIVE
SEMMES, AL, 36575-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  EASTERN SHORE NEUROLOGY CLINIC, INC. (PRO SE)
28080 US HWY 98
STE D
DAPHNE, AL, 36526-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: TARABEIN RASSAN M (PRO SE)
27535 US-98
DALPHNE, AL, 36526-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:     5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:      5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  KIRBY CASON MICHAEL
     cason@campbellpartnerslaw.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POORCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following matter was FILED on 5/13/2020 4:19:28 PM

D021 RITE AID OF ALABAMA, INC.
D022 RITE AID OF MARYLAND, IND.
MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT SYSTEM
[Filer: IRVINE GEORGE RICHARDSON]

Notice Date:    5/13/2020 4:19:28 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



**JOJO SCHWARZAUR, CIRCUIT CLERK**
**MOBILE COUNTY - CIVIL DIVISION**
Mobile Government Plaza, Room C936
205 Government Street
Mobile, Alabama 36644-2936

MAY 1 3 2020

FILED _____

JOJO SCHWARZAUER, CLERK

To:  ABBOTT LABORATORIES (PRO SE)
     60 COMMERCE STREET
     MONTGOMERY, AL, 36103-0000

MIXIE    352   DE 1250    0005/10/20

RETURN TO SENDER
INSUFFICIENT ADDRESS
UNABLE TO FORWARD

BC: 36644293S    *2075-00935-10-27



ELECTRONICALLY FILED
5/13/2020 9:44 AM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK       *
INDIANS,       *
      *
      *
      *
      *Plaintiff,*       *     CASE NO.:  02-CV-2020-900755
      *
v.       *
      *
AMNEAL PHARMACEUTICALS, INC.       *
AMNEAL PHARMACEUTICALS, LLC.       *
TEVA PHARMACEUTICALS USA, INC.,       *
CEPHALON, INC. ET AL,       *
      *
      *Defendants.*       *

---

### NOTICE OF APPEARANCE

---

      NOW COMES Finley B. Reeves of the firm Stone Crosby, P.C., and files this Notice of Appearance as counsel of record for Defendants, Rite Aid of Alabama, Inc. and Rite Aid of Maryland, Inc., in the above-styled cause.

      Respectfully submitted,

      *s/ Finley B. Reeves*
      FINLEY B. REEVES (REE079)

OF COUNSEL:
STONE CROSBY, P.C.
8820 Highway 90
Daphne, Alabama 36526
T: 251-626-6966
F: 251-626-2617
freeves@stonecrosby.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of May, 2020, I filed the foregoing with the clerk of the Court using the AlaFile system, which will electronically serve all counsel of record and all other parties by U.S. Mail, First Class, postage prepaid.

<div align="right">

<u>s/ Finley B. Reeves</u>
*Of Counsel*

</div>

T. Roe Frazer II
Patrick D. McMurtray
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
trey@frazer.law
mpettit@frazer.law

Archie Lamb
THE LAW FIRM OF LEVIN PAPANTONIO
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
alamb@levinlaw.com

J. Nixon Daniel, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
jnd@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
2013 1st Avenue North, Ste 450
Birmingham, Alabama 35203
(205) 252-6127
ftk@thekuykendallgroup.com

*Attorneys for the Plaintiff, Poarch Band of Creek Indians*

Amneal Pharmaceuticals, Inc.
251 Little Falls Drive
Wilmington, DE 19808
*Defendant, Pro Se*

Amneal Pharmaceuticals, LLC
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Teva Pharmaceuticals USA, Inc.
6 Office Park Circle #100
Mountain Brook, AL 35223
*Defendant, Pro Se*

Cephalon, Inc.
3411 Silverside Road, Ste 104
Tatnall Building
Wilmington, DE 19810
*Defendant, Pro Se*

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
*Defendant, Pro Se*

Janssen Pharmaceuticals, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Noramco, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Abbott Laboratories
60 Commerce Street
Montgomery AL 36103
*Defendant, Pro Se*

Abbott Laboratories, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Assertio Therapeutics, Inc.
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

Endo Health Solutions, Inc.
1209 Orange Street
Wilmington, DE 19801
*Defendant, Pro Se*

Endo Pharmaceuticals, Inc.
1209 Orange Street
Wilmington, DE 19801
*Defendant, Pro Se*

PAR Pharmaceuticals, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

PAR Pharmaceuticals Companies, Inc.
1209 Orange Street
Wilmington, DE 19801
*Defendant, Pro Se*

Allergan Finance, LLC
1209 Orange Street
Wilmington, DE 19801
*Defendant, Pro Se*

Allergan Sales, LLC
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Allergan USA, Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Watson Pharmaceuticals, Inc.
6 Office Park Circle #100
Mountain Brook, AL 35223
*Defendant, Pro Se*

Actavis, LLC
3411 Silverside Road, Ste 104
Tatnall Building
Wilmington, DE 19810
*Defendant, Pro Se*

Actavis Pharma, Inc.
6 Office Park Circle #100
Mountain Brook, AL 35223
*Defendant, Pro Se*

The Kroger Co.
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

Kroger Limited Partnership II
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

Andrew P. Campbell
Cason M. Kirby
CAMPBELL PARTNERS, LLC 505 20th
Street North, Suite 1600 Birmingham,
Alabama 35203
Telephone:  (205) 224-0752
Facsimile:  (205) 383-2672
andy@campbellpartnerslaw.com
cason@campbellpartnerslaw.com
*Attorneys for CVS Health Corporation, CVS
Pharmacy, Inc., and CVS Indiana, LLC*

Wal-Mart Inc.
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Wal-Mart STO
2 North Jackson Street, Suite 605
Montgomery AL 36104
*Defendant, Pro Se*

Walgreen Eastern Co., Inc.
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

Walgreen Co., Inc.
641 South Lawrence Street
Montgomery AL 36104
*Defendant, Pro Se*

John Patrick Couch
1400 Dale Bumpers Road
Forrest City, AL 72335
*Defendant, Pro Se*

Ruan Xiulu
1507 East Whatley Road
Oakdale, LA 71463
*Defendant, Pro Se*

Physicians Pain Specialist of Alabama, P.C.
2001 Spring Hill Ave.
MOBILE, AL 36607
*Defendant, Pro Se*

Thomas Justin Palmer
305 North Jackson Street
Mobile, AL 36603
*Defendant, Pro Se*

Bridgette Parker
3461 Deer Track Drive
Semmes, AL 36575
*Defendant, Pro Se*

Eastern Shore Neurology Clinic, Inc.
28080 US Highway 98, Ste. D
Daphne, AL 36526
*Defendant, Pro Se*

Rassan M. Tarabein
27535 US-98
Daphne, AL 36526
*Defendant, Pro Se*



AlaFile E-Notice

02-CV-2020-900755.00

To:   FINLEY B. REEVES
freeves@stonecrosby.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   AMNEAL PHARMACEUTICALS, INC. (PRO SE)
      251 LITTLE FALLS DRIVE
      WILMINGTON, DE, 19808-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  AMNEAL PHARMACEUTICALS, LLC (PRO SE)
2 NORTH JACKSON ST., STE
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   TEVA PHARMACEUTICALS USA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  CEPHALON, INC. (PRO SE)
     3411 SILVERSIDE ROAD, STE
     TATNALL BUIDLING
     WILMINGTON, DE, 19810-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  JOHNSON & JOHNSON (PRO SE)
ONE JOHNSON & JOHNSON PLA
NEW BRUNSWICK, NJ, 08933-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  JANSSEN PHARMACEUTICALS, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  NORAMCO, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ABBOTT LABORATORIES (PRO SE)
*** RETURNED ADDRESS ***
MONTGOMERY, AL, 36103-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ABBOTT LABORATORIES, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ASSERTIO THERAPEUTICS, INC. (PRO SE)
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   ENDO HEALTH SOLUTIONS, INC. (PRO SE)
      1209 ORANGE STREET
      WILMINGTON, DE, 19801-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ENDO PHARMACEUTICALS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  PAR PHARMACEUTICAL, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  PAR PHARMACEUTICALS COMPANIES, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   ALLERGAN FINANCE, LLC (PRO SE)
      1209 ORANGE STREET
      WILMINGTON, DE, 19801-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To: ALLERGAN SALES, LLC (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ALLERGAN USA, INC. (PRO SE)
     2 NORTH JACKSON STREET, S
     MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  WATSON PHARMACEUTICALS, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ACTAVIS LLC (PRO SE)
     3411 SILVERSIDE ROAD, STE
     TATNALL BUILDING
     WILMINGTON, DE, 19810-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  ACTAVIS PHARMA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   THE KROGER CO (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   KROGER LIMITED PARTNERSHIP II (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   WAL-MART INC. (PRO SE)
      2 NORTH JACKSON STREET, S
      MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   WAL-MART STORES EAST, LP (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   WALGREEN EASTERN CO., INC. (PRO SE)
      641 SOUTH LAWRENCE STREET
      MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  WALGREEN CO., INC. (PRO SE)
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   COUCH JOHN PATRICK (PRO SE)
      1400 DALE BUMPERS ROAD
      FORREST CITY, AZ, 72335-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   RUAN XIULU (PRO SE)
      1507 EAST WHATLEY ROAD
      OAKDALE, LA, 71463-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To: PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C. (PRO SE)
2001 SPRING HILL AVE
MOBILE, AL, 36607-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  PALMER THOMAS JUSTIN (PRO SE)
     305 NORTH JACKSON STREET
     MOBILE, AL, 36603-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  PARKER BRIDGETTE (PRO SE)
3461 DEER TRACK DRIVE
SEMMES, AL, 36575-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  EASTERN SHORE NEUROLOGY CLINIC, INC. (PRO SE)
28080 US HWY 98
STE D
DAPHNE, AL, 36526-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   TARABEIN RASSAN M (PRO SE)
      27535 US-98
      DALPHNE, AL, 36526-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:     5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To: FRAZER THOMAS ROE II
ROE@FRAZER.LAW

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:    5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:   IRVINE GEORGE RICHARDSON
girvine@stonecrosby.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

To:  KIRBY CASON MICHAEL
     cason@campbellpartnerslaw.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

The following NOTICE OF APPEARANCE was FILED on 5/14/2020 9:44:32 AM

Notice Date:      5/14/2020 9:44:32 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



ELECTRONICALLY FILED
5/14/2020 2:52 PM
02-CV-2020-900755.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS,  )
Plaintiff,                      )
                                )
V.                              )   Case No.:    CV-2020-900755.00
                                )
AMNEAL PHARMACEUTICALS, INC.,   )
AMNEAL PHARMACEUTICALS, LLC,    )
TEVA PHARMACEUTICALS USA, INC., )
CEPHALON, INC. ET AL,           )
Defendants.                     )

## ORDER

MOTION FOR EXCLUSION FROM THE EXPEDITED CASE MANAGEMENT

SYSTEM filed by RITE AID OF ALABAMA, INC. and RITE AID OF MARYLAND, IND. is

hereby **GRANTED**.

**DONE this 14th day of May, 2020.**

**/s/ JAY A YORK**
**CIRCUIT JUDGE**



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  IRVINE GEORGE RICHARDSON
girvine@stonecrosby.com

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  REEVES FINLEY B
freeves@stonecrosby.com

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  KIRBY CASON MICHAEL
     cason@campbellpartnerslaw.com

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   AMNEAL PHARMACEUTICALS, INC. (PRO SE)
251 LITTLE FALLS DRIVE
WILMINGTON, DE, 19808-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:   GRANTED
Judge:         JAY

Notice Date:   5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  AMNEAL PHARMACEUTICALS, LLC (PRO SE)
2 NORTH JACKSON ST., STE
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:    GRANTED
Judge:          JAY

Notice Date:    5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  TEVA PHARMACEUTICALS USA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



**AlaFile E-Notice**

02-CV-2020-900755.00

Judge: JAY A YORK

To:  CEPHALON, INC. (PRO SE)
     3411 SILVERSIDE ROAD, STE
     TATNALL BUIDLING
     WILMINGTON, DE, 19810-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



**AlaFile E-Notice**

02-CV-2020-900755.00

Judge: JAY A YORK

To:  JOHNSON & JOHNSON (PRO SE)
ONE JOHNSON & JOHNSON PLA
NEW BRUNSWICK, NJ, 08933-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   JANSSEN PHARMACEUTICALS, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:   GRANTED
Judge:         JAY

Notice Date:   5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



**AlaFile E-Notice**

02-CV-2020-900755.00

Judge: JAY A YORK

To:  NORAMCO, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ABBOTT LABORATORIES (PRO SE)
*** RETURNED ADDRESS ***
MONTGOMERY, AL, 36103-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:   GRANTED
Judge:         JAY

Notice Date:   5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: ABBOTT LABORATORIES, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ASSERTIO THERAPEUTICS, INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ENDO HEALTH SOLUTIONS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:      GRANTED
Judge:            JAY

Notice Date:      5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ENDO PHARMACEUTICALS, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PAR PHARMACEUTICAL, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:            JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PAR PHARMACEUTICALS COMPANIES, INC. (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN FINANCE, LLC (PRO SE)
1209 ORANGE STREET
WILMINGTON, DE, 19801-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ALLERGAN SALES, LLC (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:    GRANTED
Judge:          JAY

Notice Date:    5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   ALLERGAN USA, INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:   GRANTED
Judge:   JAY

Notice Date:   5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WATSON PHARMACEUTICALS, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:      GRANTED
Judge:            JAY

Notice Date:      5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ACTAVIS LLC (PRO SE)
3411 SILVERSIDE ROAD, STE
TATNALL BUILDING
WILMINGTON, DE, 19810-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  ACTAVIS PHARMA, INC. (PRO SE)
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL, 35223-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:      GRANTED
Judge:            JAY

Notice Date:      5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  THE KROGER CO (PRO SE)
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: KROGER LIMITED PARTNERSHIP II (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:      GRANTED
Judge:            JAY

Notice Date:      5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   WAL-MART INC. (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:      GRANTED
Judge:            JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WAL-MART STORES EAST, LP (PRO SE)
2 NORTH JACKSON STREET, S
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  WALGREEN EASTERN CO., INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To: WALGREEN CO., INC. (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:      GRANTED
Judge:            JAY

Notice Date:      5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  COUCH JOHN PATRICK (PRO SE)
1400 DALE BUMPERS ROAD
FORREST CITY, AZ, 72335-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



**AlaFile E-Notice**

02-CV-2020-900755.00

Judge: JAY A YORK

To:   RUAN XIULU (PRO SE)
      1507 EAST WHATLEY ROAD
      OAKDALE, LA, 71463-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:   GRANTED
Judge:         JAY

Notice Date:   5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C. (PRO SE)
2001 SPRING HILL AVE
MOBILE, AL, 36607-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PALMER THOMAS JUSTIN (PRO SE)
305 NORTH JACKSON STREET
MOBILE, AL, 36603-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:     GRANTED
Judge:           JAY

Notice Date:     5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:  PARKER BRIDGETTE (PRO SE)
3461 DEER TRACK DRIVE
SEMMES, AL, 36575-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:    GRANTED
Judge:          JAY

Notice Date:    5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   EASTERN SHORE NEUROLOGY CLINIC, INC. (PRO SE)
28080 US HWY 98
STE D
DAPHNE, AL, 36526-0000

# NOTICE OF COURT ACTION

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:   GRANTED
Judge:        JAY

Notice Date:   5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-900755.00

Judge: JAY A YORK

To:   TARABEIN RASSAN M (PRO SE)
      27535 US-98
      DALPHNE, AL, 36526-0000

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. AMNEAL PHARMACEUTICALS, INC. ET AL
02-CV-2020-900755.00

A court action was entered in the above case on 5/14/2020 2:52:05 PM

ORDER

[Filer: ]

Disposition:   GRANTED
Judge:         JAY

Notice Date:   5/14/2020 2:52:05 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov